# Exhibit 14

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

```
                              )
PARTSRIVER, INC.,             )
    Plaintiff,,               )
                              )
v.                            )
                              ) CASE NO. 2-07-CV-440 DF
SHOPZILLA, INC., YAHOO!       )
INC.; PRICEGRABBER.COM,       )
INC.; EBAY, INC.; and         )
MICROSOFT CORPORATION,        )
    Defendants.               )
```

**********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

KRIS W. KIMBROUGH

JANUARY 22, 2009

**********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF KRIS W.

KIMBROUGH, produced as a witness at the instance of the

DEFENDANTS, and duly sworn, was taken in the

above-styled and numbered cause on the 22nd day of

January, 2009, from 8:33 a.m. to 3:14 p.m., before Julie

C. Brandt, RMR, CRR, and CSR in and for the State of

Texas, reported by machine shorthand, at the offices of

Fulbright & Jaworski, 2200 Ross Avenue, Suite 2800,

Dallas, Texas, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH      January 22, 2009

Page 6

1                          KRIS W. KIMBROUGH,

2       having been first duly sworn, testified as follows:

3                          EXAMINATION

4       BY MR. CEDEROTH:

5            Q.    Good morning.

6            A.    Good morning.

7            Q.    State your full name for the record, please.

8            A.    Sure.  It's Kris Walter Kimbrough.

9            Q.    And would you spell your last name, please?

10           A.    K-I-M-B-R-O-U-G-H.

11           Q.    And Kris is with a "K"?

12           A.    It's with a "K."

13           Q.    Where do you live, sir?

14           A.    Sunnyvale, California.

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH         January 22, 2009

Page 83

8        Q.   If we could, I would like to bounce back a few

9    years in time then to, you know, the early 1990's,

10   specifically.  And when -- when's the first time you

11   used an internet browser?

12       A.   I can't place the time, but '94, '95 time

13   frame.

14       Q.   When's the first time you used any software in

15   association with the internet?

16       A.   Around the same time period.

17       Q.   Okay.  Do you recall the events?  Was it

18   something specific you were doing, something specific

19   you were attending or --

20       A.   I recall in the early '90s that e-mail was

21   just starting for us, and we had to -- at that time the

22   only option was -- at least that most people were

23   comfortable with was UNIX.  We got a Sun SPARC server to

24   run our e-mail on.  We bought third-party products to

25   add functionality to our IBM PC's at the time to add

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH        January 22, 2009

Page 84

1    TCIP capabilities and things like that.

2        Q.   At this point in time, you were working for

3    Danish International?

4        A.   Yes.

5        Q.   And just to help pin the time down a little

6    bit, in Exhibit 1000, the '821 patent, in -- what's

7    column 18?

8        A.   What column?

9        Q.   Yeah.  Column 18, roughly line 10.  There's

10   reference to an internet environment.

11       A.   Yes.

12       Q.   So the -- the original application that you

13   and Mr. Danish filed was filed on October 14, 1994.

14       A.   Okay.

15       Q.   And I believe that statement was included in

16   the application as filed.  Does that help you pin down

17   when you first did any work in relation to the internet?

18       A.   Well, it certainly rules out the '95 and moves

19   it into earlier '94, but common sense, it doesn't really

20   help in any recollections specifically about the date.

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH        January 22, 2009

Page 86

4        Q.   Can you -- in thinking back, can you place

5    the -- the internet related work, you know, working back

6    from October 1994?  Was there a month?  Two months?  Was

7    it the summer of 1994?  Can you place it at all with

8    respect to the -- the calendar of 1994?

9        A.   I can't very specifically.  I know that this

10   was all brand new to me and to our company, and there

11   were very few people that knew how to get these

12   environments up and running, so there was definitely a

13   lot of trial and error in terms of just getting the

14   basic environments up and working.

15       Q.   How did you -- how did you come up with the

16   idea of applying this on the internet?

17       A.   It was Sherif's idea.  Based on what I've

18   heard recently, it was some discussion with a client of

19   AMP.

20       Q.   Who was that?

21       A.   I don't know.

22       Q.   Who told you that?

23       A.   Sherif.

Merrill Legal Solutions
(800) 869-9132

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH        January 22, 2009

Page 99

6        Q.   Okay.  I read somewhere that, you know, one

7    way that folks referred to web servers at the time and

8    even today is that they're basically stateless.  Is that

9    an expression you're familiar with?

10        A.   Sure.

11        Q.   And what's your understanding about it?

12        A.   It's not so much true today, but in those

13    days, the -- the web server itself does not provide

14    services to track a user's request from click to click

15    or page to page.

16        Q.   Was that -- was that a concept you learned at

17    the time, or was that described in any of the materials

18    you think you might have reviewed?

19        A.   I am familiar with the term, but I've done web

20    development for many years, so I can't really say when I

21    first came to be aware of it.  But anyone building a

22    website for the first time would learn of that directly

23    or indirectly.

24        Q.   And you've been doing web development

25    basically without pause since 1994.  Right?

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH        January 22, 2009

Page 100

1          A.   Mostly, yes.

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH        January 22, 2009

Page 102

15       Q.   And how did you -- how did you have to modify

16   that software to get it to run in an internet

17   environment where the actual catalog and searching was

18   done on a web server?

19       A.   The '92 software?

20       Q.   Sure.  It's the only software that -- that's

21   around that we have, it seems.

22       A.   I mean, prior to the internet version, we

23   built at least the majority of a CD-ROM based software.

24   So there was a large evolution between the '92 version

25   and the CD-ROM version that happened, I don't know, I

KRIS W. KIMBROUGH        January 22, 2009

Page 103

1    would guess somewhere in the '93 or '94 time frame.

2         Q.   Actually, I want to come back to the -- to the

3    timeline.  But let's talk about the CD-ROM software.

4    Again, that -- you plugged the CD into a computer, and

5    everything was local --

6         A.   Yes.

7         Q.   -- if you will.  How did you have to modify

8    that software to -- to get it to work with the web

9    server where the web server had the catalog and did the

10   searching operations?

11        A.   Well, at the time HTML was very primitive, so,

12   you know, the CD-ROM version was very -- for those days

13   was very attractive in terms of colors and 3-D buttons

14   and pictorial indexes and nice radio buttons and

15   drop-down list boxes.  That the internet version didn't

16   have those capabilities when we first started.  It was a

17   hyperlink or nothing pretty much.  So it went from

18   attractive to very ugly.

19        Q.   And that -- that was a function of the HTML

20   capabilities --

21        A.   The state-of-the-art at that point was HTML

22   and browsers and their capabilities, yes.

23        Q.   Putting aside the attractiveness --

24        A.   Yes.

25        Q.   -- of the user interface, you know, how did --

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH          January 22, 2009

Page 104

1   how did the -- well, let me ask a foundation question.

2   Did you create the database searching capabilities,

3   database searching software that was used with the

4   CD-ROM?

5         A.   Yes.

6         Q.   Did you use anything as a model for the

7   programming for that?

8         A.   The programming of the database only?

9         Q.   The database searching, yes.

10        A.   I don't recall specifically.  It was usually a

11  Microsoft Access database in those days.  I -- I don't

12  know where I would have gotten the documentation for

13  querying that database.

14        Q.   But -- but you had basically modified an

15  existing database product, Access, or whatever it was?

16        A.   So the data was stored in Access in the CD-ROM

17  version.  In the '92 prototype, it was a DB 4, dBase 4.

18  I think a single table using a third-party API.  So it

19  was very different in terms of database access from a

20  programming perspective.

21        Q.   Okay.  How did it then -- how did you change

22  that to have it access a database on a web server as

23  opposed to a database that was either on the local

24  computer or on the CD of the local computer?

25        A.   The CD-ROM was very early in its development,

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH     January 22, 2009

Page 105

1   so the database structure was something that came about,

2   an evolvement from the '92 version.  We knew that Access

3   wouldn't work on our UNIX environment, so we had to look

4   for expertise.  And Oracle, I think, was the database

5   that AMP used as in-house.  So we switched from Access

6   to Oracle.

7        Q.   Did you create then an Oracle database on

8   the -- on the Danish web server?

9        A.   We did.  I don't know at what time period, but

10  we did.

11       Q.   And how did then the -- and the client was

12  a -- was a browser.  Right?

13       A.   Right.

14       Q.   How did the client communicate -- well, let me

15  make sure I've got this clear, too.  The searching was

16  done on the web server.  Is that right?

17       A.   Yes.

18       Q.   You didn't download the database to the

19  local -- each local client?

20       A.   No, we did not.

21       Q.   Okay.  How did the client communicate to the

22  web server the -- you know, the part request, the search

23  request?

24       A.   So the initial versions were just every option

25  was a hyperlink.  So every hyperlink communicated to the

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH       January 22, 2009

Page 106

1   web server which family of products you wanted to search

2   and which features you had selected.

3        Q.   So the -- all right.  So the -- so when you

4   clicked on the hyperlink on the client, say it was a

5   part size or shape or whatever it was, that -- that

6   hyperlink was put then into the URL that was sent to

7   the -- the CGI interface on your -- on the Danish web

8   server?

9        A.   Yes.

10       Q.   Did the CGI system allow you to -- or did your

11  interface allow you to click multiple options?

12       A.   The first version we created did not.  I don't

13  know what point in time the multiple select came into

14  capability in terms of the -- the browser support.

15       Q.   So how did it work then if you wanted to

16  narrow your search, if you did one search and you wanted

17  to narrow it?

18       A.   Okay.

19       Q.   How did that work with the web server?

20       A.   So you would get a feature screen to appear

21  from your initial get request of saying which family of

22  products you wanted.  You clicked an option that said, I

23  want whatever speed -- fast.

24       Q.   Okay.

25       A.   And that request would go to the web server.

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH      January 22, 2009

Page 107

1    The web server would create a database, construct a new

2    HTML page that represented that selection as being made,

3    in bold or whatever terminology we did to make it appear

4    different, and then construct hyperlinks for all the

5    other options that remained, and send back to the

6    client.

7         Q.    Okay.  So the client would get a new web page?

8         A.    A new web page.

9         Q.    And if the option selected the first time was

10   fast, that would be somehow indicated on the web page?

11        A.    That would be indicated on each hyperlink that

12   they might click on subsequently.

13        Q.    Okay.  So it was -- if one of the other

14   options on the page was red, and I clicked that, are you

15   saying that the request which would go back to the --

16   the CGI software on the web server would include both

17   fast and red?

18        A.    Yes, it would.

19        Q.    Okay.  So it -- you used the phrase

20   "concatenated searching."

21        A.    Yes.

22        Q.    Is that a term you use?

23        A.    It's a term I'm familiar with, yes.

24        Q.    Is it a term you used in this context ever?

25        A.    In those days?

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH       January 22, 2009

Page 108

1       Q.   Yeah, in those days, frankly.  Yeah.

2       A.   I don't know what we termed it in those days,

3    to be honest with you.

4       Q.   But in any event, you understand

5    "concatenated"?

6       A.   Sure.

7       Q.   So what went back with the second search to

8    the web server was the concatenated URL that

9    corresponded to the first selection and the URL that

10   corresponded to the second selection?

11      A.   Yes.

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH        January 22, 2009

Page 117

21      Q.   In -- I want to talk some about the evolution

22  of your product.  When in -- you know, working backwards

23  from October 1994, did you first contemplate the idea of

24  using concatenated searching?

25      A.   I don't know.

Merrill Legal Solutions
(800) 869-9132

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH      January 22, 2009

Page 118

1      Q.   Had you thought of that when you created the

2  CD-ROM version?

3      A.   No.

4      Q.   Had you --

5      A.   Well, let me rephrase that.  Did we do

6  concatenated search on the CD-ROM version?

7      Q.   Uh-huh.

8      A.   Is that the question, to paraphrase?

9      Q.   That's a good question.  What's the answer --

10     A.   Yes, we did.

11     Q.   -- to that question?

12     A.   Yes, we did.

13     Q.   And when did you do that?

14     A.   I think every version we built always did

15  concatenated search.

16     Q.   You think.  Did the -- did the 1992

17  demonstration -- the software you found, did that do

18  concatenated search?

19     A.   I believe it did.  I didn't review the -- the

20  source code.

21     Q.   So you think all your work always did

22  concatenated searching?

23     A.   I believe so.

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH        January 22, 2009

Page 146

7        Q.   Okay.  So if you take a look at Exhibit 1015,

8    that's the Plaintiff's Responses to Defendants' First

9    Set of Joint Interrogatories to PartsRiver, Inc.

10        A.   Okay.  Okay.

11        Q.   So if we look at interrogatory 1, at the

12    bottom it says, In 1990 to 1991, Sherif Danish became

13    aware of problems AMP customers were facing,

14    including -- and then it proceeds to the next page.

15    In -- so in that 1990 to 1991 period, were you aware of

16    these problems that AMP customers were facing?

17        A.   I may have been.  I mean, while I was working

18    on the project, Sherif was frequently in town and

19    frequently meeting with people at AMP to, I'm sure, look

20    for future business.

21        Q.   And then if we go to the paragraph on the next

22    page which begins with, Sherif Danish knew.  Do you see

23    that paragraph?

24        A.   Yes.

25        Q.   And then the last sentence of that paragraph

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH          January 22, 2009

Page 147

1    states, Between February and April 1992, the methods

2    described in claims 1 and 2 of the '821 patent were

3    implemented as a demonstration program.  Do you see that

4    sentence?

5         A.   I do.

6         Q.   And do you recall the demonstration program

7    that's referred to there?

8         A.   I do.

9         Q.   And what is that?

10         A.   That's the CPC, circular plastic connectors

11    demonstration that we provided the floppy disk of the

12    source code for.

13         Q.   Okay.  And when -- is it correct then that you

14    wrote that software?

15         A.   I did.

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH        January 22, 2009

Page 148

9        Q.   If we could take a look at what's previously

10   been marked as Exhibit 1020.  Do you have that one?  It

11   says, Fax cover sheet, on the top.  That's it.

12        A.   Okay.  I do now.

13        Q.   Okay.  Have you seen this document before --

14   or these documents, to be more accurate?

15        A.   I've seen them in the last few days preparing

16   for this.  And I can assume I would have seen it back at

17   this time period, but I don't recall specifically seeing

18   it then.

19        Q.   Okay.  Do you recall whether you authored any

20   of this document, any of these documents that are

21   comprising Exhibit 1020?

22        A.   Obviously, the source code at the end, I -- I

23   developed, so that part's mine.

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH        January 22, 2009

Page 206

11                    (Exhibit 1051 marked.)

12          Q.    Mr. Kimbrough, I'm going to hand to you

13    Exhibit No. 1051, which includes a copy of some

14    electronic files that were produced to the defendants in

15    this case by PartsRiver.

16          A.    Okay.

17          Q.    During the break, did you have an opportunity

18    to review the files that were on that CD?

19          A.    Briefly, yes.

20          Q.    Could you please take a look at Exhibit 1020.

21          A.    Okay.

22          Q.    And please turn to page TWC 001573.

23          A.    Okay.

24          Q.    Were you able to confirm that one of the files

25    on Exhibit 1051 is the file that's shown on page TWC

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH      January 22, 2009

Page 207

1    1573?

2         A.   Yes.

3         Q.   And if you could turn to the next page, which

4    is TWC 001574 --

5         A.   Yes.

6         Q.   -- were you able to confirm that the files

7    that are listed on this page were also present on the CD

8    that's marked as Exhibit 1051?

9         A.   Yes.

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

KRIS W. KIMBROUGH      January 22, 2009

Page 208

1     Q.   And the files on Exhibit 1051 included the

2   electronic files that you referenced earlier that you

3   provided to Mr. Danish on a floppy disk.  Is that

4   correct?

5     A.   Correct.

9e2a72a8-9a30-4ab7-9960-81b795adcd4b

```
1                     UNITED STATES DISTRICT COURT

                    EASTERN DISTRICT OF TEXAS

2                        MARSHALL DIVISION

3                                       )

     PARTSRIVER, INC.,                  )

4          Plaintiff,,                  )

                                        )

5    v.                                 )

                                        ) CASE NO. 2-07-CV-440 DF

6    SHOPZILLA, INC., YAHOO!            )

     INC.; PRICEGRABBER.COM,            )

7    INC.; EBAY, INC.; and              )

     MICROSOFT CORPORATION,             )

8          Defendants.                  )

9

10

11               REPORTER'S CERTIFICATION

12          DEPOSITION OF KRIS W. KIMBROUGH

13                 JANUARY 22, 2009

14

15       I, Julie C. Brandt, Certified Shorthand Reporter in

16   and for the State of Texas, hereby certify to the

17   following:

18       That the witness, KRIS W. KIMBROUGH, was duly sworn

19   by the officer and that the transcript of the oral

20   deposition is a true record of the testimony given by

21   the witness;

22       That the deposition transcript was submitted on

23   _____ to the witness or to the attorney

24   for the witness for examination, signature and return to

25   Merrill Legal Solutions by _____;
```

211

KRIS W. KIMBROUGH      January 22, 2009

```
 1         That the amount of time used by each party at the
 2    deposition is as follows:
 3    MR. ZEMBEK.....00 HOUR(S):22 MINUTE(S)
 4    MR. CEDEROTH.....02 HOUR(S):58 MINUTE(S)
 5    MR. TOMASULO.....01 HOUR(S):29 MINUTE(S)
 6    MS. DeRIEUX.....00 HOUR(S):00 MINUTE(S)
 7    MR. COYKENDALL.....00 HOUR(S):00 MINUTE(S)
 8         That pursuant to information given to the
 9    deposition officer at the time said testimony was taken,
10    the following includes counsel for all parties of
11    record:
12    FOR THE PLAINTIFF:
13         Robert W. Coykendall
           MORRIS LAING
14         300 N. Mead
           Suite 200
15         Wichita, Kansas  67202-2722
           316.262.2671
16         316.262.6226 (fax)
           rcoykendall@morrislaing.com
17
           Jack Baldwin
18         BALDWIN & BALDWIN, LLP
           400 West Houston Street
19         Marshall, Texas  75670
           903.935.4131
20         903.935.1397 (fax)
           jbb@baldwinlaw.com
21
22    FOR THE DEFENDANTS MICROSOFT and eBAY:
23         Richard A. Cederoth
           SIDLEY AUSTIN, LLP
24         One South Dearborn
           Chicago, Illinois  60603
25         312.853.7026
```

212

KRIS W. KIMBROUGH        January 22, 2009

```
 1          312.853.7036 (fax)
            rcederoth@sidley.com
 2
            Theodore W. Chandler
 3          SIDLEY AUSTIN, LLP
            555 West Fifth Street
 4          Suite 4000
            Los Angeles, California  90013
 5          213.896.5830
            213.896.6600 (fax)
 6          tchandler@sidley.com
 7
       FOR THE DEFENDANT PRICEGRABBER.COM:
 8
            Michael A. Tomasulo
 9          JONES DAY
            555 South Flower Street
10          Fiftieth Floor
            Los Angeles, California  90071
11          213.243.2619
            213.243.2539 (fax)
12          matomasulo@jonesday.com
13
       FOR THE DEFENDANT SHOPZILLA, INC.:
14
            Elizabeth L. DeRieux
15          CAPSHAW DeRIEUX, LLP
            1127 Judson Road
16          Suite 220
            Longview, Texas  75601
17          903.236.9800
            903.236.8787 (fax)
18          ederieux@capshawlaw.com
19
       FOR THE DEFENDANT YAHOO! INC.:
20
            Richard Zembek
21          FULBRIGHT & JAWORSKI
            1301 McKinney
22          Suite 5100
            Houston, Texas  77010-3095
23          713.651.5203
            713.651.5246 (fax)
24          rzembek@fulbright.com
25
```

213

1    Dan D. Davison

2    FULBRIGHT & JAWORSKI

     2200 Ross Avenue

     Suite 2800

3    Dallas, Texas  75201-2784

     214.855.8049

4    214.855.8200 (fax)

     ddavison@fulbright.com

5

6        That $_____ is the deposition officer's

7    charges to the Defendants eBay, Inc. and Microsoft

8    Corporation for preparing the original deposition

9    transcript and any copies of exhibits;

10       I further certify that I am neither counsel for,

11   related to, nor employed by any of the parties or

12   attorneys in the action in which this proceeding was

13   taken, and further that I am not financially or

14   otherwise interested in the outcome of the action.

15       Certified to by me _January 29_____, 2009.

16

17

18

19       _Julie C. Brandt_____

         Julie C. Brandt, CSR, RMR, CRR

20       Texas CSR No. 4018

         Expiration Date:  12/31/10

21

         Merrill Legal Solutions

22       Reg. No. 191

         4144 North Central Expressway

23       Suite 850

         Dallas, Texas 75204

24       800-966-4567

25

# Exhibit 15

1   MANATT, PHELPS & PHILLIPS, LLP
    ROBERT D. BECKER (Bar No. CA 160648)
2   E-mail: rbecker@manatt.com
    RONALD S. KATZ (Bar No. CA 085713)
3   E-mail: rkatz@manatt.com
    SHAWN G. HANSEN (Bar No. CA 197033)
4   E-mail: shansen@manatt.com
    1001 Page Mill Road, Building 2
5   Palo Alto, CA  94304-1006
    Telephone:  (650) 812-1300
6   Facsimile:  (650) 213-0260

7   Attorneys for Defendants and Counterclaim-Plaintiff
    PartsRiver, Inc. and Kelora Systems, LLC

8

9               IN THE UNITED STATES DISTRICT COURT

10             FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                        OAKLAND DIVISION

12

13  eBay Inc. and Microsoft Corporation,          No. 4:10-cv-4947-CW (filed Nov. 2, 2010)

14        *Plaintiffs and Counterclaim-Defendants,*   KELORA SYSTEMS LLC'S RESPONSE
                                                   TO EBAY'S FIRST SET OF
15        vs.                                      INTERROGATORIES

16  Kelora Systems, LLC,

17        *Defendant and Counterclaim-Plaintiff.*

18  PROPOUNDED BY: PLAINTIFF, EBAY, INC.

19  PROPOUNDED TO:  DEFENDANT, KELORA SYSTEMS, LLC

20  SET NO.:           ONE

21

22

23                   **PRELIMINARY STATEMENT**

24        Kelora Systems, LLC ("Kelora") has made an effort to respond to each interrogatory as

25  Kelora understands and interprets it.  The following responses are based upon facts which Kelora

26  has ascertained as of the date of these responses.  Discovery in this action is in the earliest stages

27  and is continuing, and Kelora has not yet completed its factual investigation.  It is anticipated that

28  further discovery, independent investigation, legal research, and analysis may provide additional

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

KELORA'S RESPONSE TO EBAY'S 1ST SET OF
INTERROGATORIES, CASE NO. 10-4947-CW

1   evidence responsive to these Interrogatories, which may lead to substantial additions to, and

2   variations from, the contents of the responses set forth herein. Accordingly, without assuming

3   any obligation to do so, and without waiving any objection, Kelora reserves the right to amend or

4   supplement these responses as additional facts are discovered or ascertained. This response is

5   given without prejudice to Kelora's right to introduce at trial any subsequently discovered

6   evidence or documents which Kelora may later obtain and/or locate as a result of its continuing

7   investigation, discovery, legal research and analysis.

8         This preliminary statement is incorporated into each of Kelora's responses set forth below.

9

10  **GENERAL OBJECTIONS**

11        Kelora's responses to eBay's First Set of Interrogatories are provided subject to and

12  without waiving each of the following objections whether or not specifically repeated in response

13  to each individual interrogatory:

14        1.     Kelora submits these responses subject to all objections ordinarily available if such

15  statements are offered in court. All such objections are hereby expressly reserved and may be

16  interposed at the time of trial or at any other time. No response or objection to any interrogatory

17  herein should be taken as an admission that Kelora admits the existence of any fact set forth in or

18  assumed by the interrogatory, or that such response or objection constitutes admissible evidence.

19  No response to any interrogatory is intended to be, and shall not be construed as, a waiver by

20  Kelora of all or any part of any objection to any interrogatory.

21        2.     Kelora objects to each and every interrogatory to the extent that it seeks

22  information protected by the attorney-client privilege and/or the attorney work-product doctrine.

23  Kelora incorporates this objection by reference into each one of its responses.

24        3.     Kelora objects to the extent that the interrogatories seek premature discovery of

25  expert testimony in violation of Federal Rule of Civil Procedure 26(a)(2).

26        4.     Kelora objects to the extent that the interrogatories seek premature discovery of

27  Kelora's claim construction positions in violation of Patent L.R. 2-5.

28        5.     Kelora objects to the interrogatories to the extent that the interrogatories seek to

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

2

KELORA'S RESPONSE TO EBAY'S FIRST SET OF
INTERROGATORIES, CASE NOS. 10-4947-CW

1    evade the limitation on the number of interrogatories available under Federal Rule of Civil

2    Procedure 33 because they include multiple discrete subparts.  Although the interrogatories were

3    originally numbered 1 by eBay, the interrogatories actually include 3 (three) discrete subparts.

4    Accordingly, Kelora's responses below are renumbered 1-3.  Kelora will provide the specified

5    information in the three conjoined interrogatories regarding: "conception date", "reduction to

6    practice date", and "any activities that you contend constitute diligence in reduction to practice

7    for each asserted claim of the '821 patent."

8         6.      Kelora objects to the interrogatories to the extent they seek to impose obligations

9    on Kelora that exceed the scope of the Federal Rules of Civil Procedure and/or the Rules and

10   Orders of this Court.

11        7.      Kelora objects generally and specifically to each interrogatory to the extent that

12   the information sought is a matter of public record or uniquely within the knowledge of eBay or

13   other parties or non-parties, or to the extent that the information sought is as readily determinable

14   by eBay as by Kelora.

15        8.      Kelora objects generally and specifically to each interrogatory to the extent it

16   seeks the disclosure of information protected by the attorney-client privilege or the attorney work

17   product doctrine or to the extent such interrogatories seek the impressions, conclusions, opinions,

18   legal research, or theories of Kelora's attorneys or their agents.  The inadvertent production of

19   any privileged document or information shall not constitute a waiver of any privilege.  For

20   purposes of responding to these interrogatories, Kelora will interpret such requests as excluding

21   information subject to the attorney-client privilege, attorney work product doctrine, and any other

22   applicable privilege or immunity.

23        9.      Kelora objects generally and specifically to each interrogatory to the extent that it

24   seeks to discover trade secrets and/or any other sensitive, confidential, proprietary and/or

25   commercial information, the disclosure of which could be damaging to the business or property of

26   Kelora or other related business entities.  To the extent that an interrogatory requests Kelora's

27   confidential, proprietary or trade secret information, Kelora objects to each interrogatory on this

28   basis.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

3

KELORA'S RESPONSE TO EBAY'S FIRST SET OF
INTERROGATORIES, CASE NOS. 10-4947-CW

10.     Kelora objects generally and specifically to each interrogatory to the extent that it is vague and ambiguous, especially when the manner in which the specific request is phrased creates confusion given the issues involved in this litigation. For example, Kelora objects to the interrogatory on the ground that it is vague, ambiguous, and overly broad with respect to the preamble command to "Describe in detail the facts and circumstances of the invention of each asserted claim of the '821 patent".

11.     Kelora objects to each and every interrogatory to the extent that it seeks unreasonably cumulative and duplicative discovery of documents that Kelora has produced and continues to produce and supplement.

12.     Kelora objects to each and every interrogatory to the extent that it seeks information of any current Kelora employee or agent or former Kelora employee or agent that is protected by such person's right to privacy set forth in federal and/or California laws.

13.     Kelora objects to each and every interrogatory to the extent that it is unlimited as to time and thus, calls for information not relevant to the subject matter of this action or not reasonably calculated to lead to the discovery of admissible evidence.

14.     Kelora objects to the interrogatories to the extent that they call for information that is not known by or available to Kelora at this time.

15.     Kelora objects to the interrogatories on the grounds that they are unduly burdensome and duplicative to the extent that they request information that Kelora is required to provide under the Court's Rules and Orders. To the extent that the interrogatories seek such information, Kelora will provide the information in accordance applicable Local Rules, Local Patent Rules, Court Rules, and orders.

## **RESPONSES TO INTERROGATORIES**

INTERROGATORY NO. 1: COMBINED INTERROGATORY LANGUAGE STRUCK OUT

Describe in detail the facts and circumstances of the invention of each asserted claim of the '821 patent, including but not limited to identifying the conception date, reduction to practice date, and any activities that you contend constitute diligence in reduction to practice for each

1    ~~asserted claim of the '821 patent~~, all documents and evidence supporting these dates and activities

2    and the identity of the people most knowledgeable about the foregoing.

3    RESPONSE TO INTERROGATORY NO. 1:

4            Kelora objects to this interrogatory on the grounds that "Describe in detail the facts and

5    circumstances of the invention of each asserted claim of the '821 patent" is vague and ambiguous.

6    Kelora will respond to the remaining portion of the interrogatory that attempts to clarify the

7    ambiguity.  Kelora objects on the grounds that the interrogatory is premature.  The interrogatory

8    seeks information that is at least partially dependent on the Court's claim constructions, eBay's

9    invalidity contentions and other defenses, and expert testimony, as well as evidence to be

10   obtained in the ordinary course of discovery in this case, none of which information is available

11   to Kelora at this time.  Kelora also objects on the ground that the interrogatory seeks premature

12   discovery of Kelora's claim construction positions in violation of Patent L.R. 2-5.  In addition,

13   Kelora objects to the interrogatory on the ground that it seeks to evade the limitation on the

14   number of interrogatories available under Federal Rule of Civil Procedure 33 because it includes

15   multiple discrete subparts.  Kelora further objects to the interrogatory on the ground that it seeks

16   the disclosure of information protected by the attorney-client privilege and/or the attorney work

17   product doctrine.  For purposes of this response, Kelora will interpret the interrogatory as

18   excluding information subject to the attorney-client privilege, attorney work product doctrine, and

19   any other applicable privilege or immunity.  Kelora reserves all rights to amend or supplement

20   this response as additional facts are discovered or ascertained.

21           Subject to and without waiving the foregoing general and specific objections, Kelora

22   answers the interrogatory as follows:

23           Claims 1, 2, 3, 4, and 9 of the '821 patent were conceived of during or before the second

24   quarter of 1994. On or before April of 1994, Sherif Danish joined a consortium called

25   CommerceNet that promotes commerce on the Internet.  From this group, Mr. Danish learned

26   about a class on web servers at Stanford University.  He and Kris Kimbrough attended the class,

27   which was about web servers in general but not about search.  After this class, Sherif and Kris

28   started to learn more about web servers and to think about an Internet implementation of the

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

5

KELORA'S RESPONSE TO EBAY'S FIRST SET OF
INTERROGATORIES, CASE NOS. 10-4947-CW

1   search technology.

2        Kris Kimbrough and Sherif Danish are witnesses to conception.

3        The conception happened at Danish International, which is a small company that has not

4   retained documents from that period of time.  Any potentially relevant computerized records for

5   Danish International were lost when a computer was stolen on or before September 26, 2000.

6

7   INTERROGATORY NO. 2: COMBINED INTERROGATORY LANGUAGE STRUCK OUT

8        Describe in detail the facts and circumstances of the invention of each asserted claim of

9   the '821 patent, including but not limited to identifying the ~~conception date,~~ reduction to practice

10  date~~, and any activities that you contend constitute diligence in reduction to practice for each~~

11  ~~asserted claim of the '821 patent~~, all documents and evidence supporting these dates and activities

12  and the identity of the people most knowledgeable about the foregoing.

13  RESPONSE TO INTERROGATORY NO. 2:

14       Kelora objects to this interrogatory on the grounds that "Describe in detail the facts and

15  circumstances of the invention of each asserted claim of the '821 patent" is vague and ambiguous.

16  Kelora will respond to the remaining portion of the interrogatory that attempts to clarify the

17  ambiguity.  Kelora objects on the grounds that the interrogatory is premature.  Kelora objects on

18  the grounds that the interrogatory is premature.  The interrogatory seeks information that is at

19  least partially dependent on the Court's claim constructions, eBay's invalidity contentions and

20  other defenses, and expert testimony, as well as evidence to be obtained in the ordinary course of

21  discovery in this case, none of which information is available to Kelora at this time.  Kelora also

22  objects on the ground that the interrogatory seeks premature discovery of Kelora's claim

23  construction positions in violation of Patent L.R. 2-5.  In addition, Kelora objects to the

24  interrogatory on the ground that it seeks to evade the limitation on the number of interrogatories

25  available under Federal Rule of Civil Procedure 33 because it includes multiple discrete subparts.

26  Kelora further objects to the interrogatory on the ground that it seeks the disclosure of

27  information protected by the attorney-client privilege and/or the attorney work product doctrine.

28  For purposes of this response, Kelora will interpret the interrogatory as excluding information

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

6

KELORA'S RESPONSE TO EBAY'S FIRST SET OF
INTERROGATORIES, CASE NOS. 10-4947-CW

1   subject to the attorney-client privilege, attorney work product doctrine, and any other applicable

2   privilege or immunity.  Kelora reserves all rights to amend or supplement this response as

3   additional facts are discovered or ascertained.

4        Subject to and without waiving the foregoing general and specific objections, Kelora

5   answers the interrogatory as follows:

6        Claims 1, 2, 3, 4, and 9 were reduced to practice during or before the second or third

7   quarter of 1994, with reduction to practice complete on or before October 14, 1994, when

8   application No. 08/323,186 was filed.

9        The reduction to practice happened at Danish International, which is a small company that

10  has not retained documents from that period of time.  Potentially relevant computerized records

11  for Danish International were lost when a computer was stolen on or before September 26, 2000.

12       Kris Kimbrough and Sherif Danish are witnesses to reduction to practice.

13

14  INTERROGATORY NO. 3: COMBINED INTERROGATORY LANGUAGE STRUCK OUT

15       Describe in detail the facts and circumstances of the invention of each asserted claim of

16  the '821 patent, including but not limited to identifying ~~the conception date, reduction to practice~~

17  ~~date, and~~ any activities that you contend constitute diligence in reduction to practice for each

18  asserted claim of the '821 patent, all documents and evidence supporting these dates and activities

19  and the identity of the people most knowledgeable about the foregoing.

20  RESPONSE TO INTERROGATORY NO. 3:

21       Kelora objects to this interrogatory on the grounds that "Describe in detail the facts and

22  circumstances of the invention of each asserted claim of the '821 patent" is vague and ambiguous.

23  Kelora will respond to the remaining portion of the interrogatory that attempts to clarify the

24  ambiguity.  Kelora objects on the grounds that the interrogatory is premature.  Kelora objects on

25  the grounds that the interrogatory is premature.  The interrogatory seeks information that is at

26  least partially dependent on the Court's claim constructions, eBay's invalidity contentions and

27  other defenses, and expert testimony, as well as evidence to be obtained in the ordinary course of

28  discovery in this case, none of which information is available to Kelora at this time.  Kelora also

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

7

KELORA'S RESPONSE TO EBAY'S FIRST SET OF
INTERROGATORIES, CASE NOS. 10-4947-CW

1    objects on the ground that the interrogatory seeks premature discovery of Kelora's claim

2    construction positions in violation of Patent L.R. 2-5.  In addition, Kelora objects to the

3    interrogatory on the ground that it seeks to evade the limitation on the number of interrogatories

4    available under Federal Rule of Civil Procedure 33 because it includes multiple discrete subparts.

5    Kelora further objects to the interrogatory on the ground that it seeks the disclosure of

6    information protected by the attorney-client privilege and/or the attorney work product doctrine.

7    For purposes of this response, Kelora will interpret the interrogatory as excluding information

8    subject to the attorney-client privilege, attorney work product doctrine, and any other applicable

9    privilege or immunity.  Kelora reserves all rights to amend or supplement this response as

10   additional facts are discovered or ascertained.

11           Subject to and without waiving the foregoing general and specific objections, Kelora

12   answers the interrogatory as follows:

13           Between the time of conception and reduction to practice, Sherif Danish and Kris

14   Kimbrough worked to structure a search process that achieved the goals of avoiding the

15   limitations of the existing process and functioning as desired in an Internet environment.

16   Beginning on or around June of 1994, in an iterative collaboration,  the structure of the method

17   emerged, and, the feature screens, the method of selecting alternatives, the way of communicating

18   between the client and the server, and features such as hiding certain groupings from view were

19   developed.  Bringing the search technology to the Internet involved revisiting many of the design

20   decisions made in non-Internet versions of the search technology and required solving significant

21   engineering problems.  It also called for new and different implementations of aspects of the

22   search technology.  On or around July or August of 1994 demonstration software which could be

23   used to illustrate the concept of an Internet version of the search technology was complete.  That

24   demonstration software may not have been capable of being used to perform all the limitations of

25   the asserted claims.  This was demonstrated to others, including representatives of AMP, Inc., in

26   or before August and September of 1994.

27           In or before August of 1994 a decision was made to pursue development of an Internet

28   version of the software.  From approximately August of 1994 until approximately October of

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

8

KELORA'S RESPONSE TO EBAY'S FIRST SET OF
INTERROGATORIES, CASE NOS. 10-4947-CW

1    1994, Sherif Danish and Kris Kimbrough continued to develop the design and the software, and it

2    was in this period that the software was capable of being used to perform at least some of the

3    asserted claims.  Some or all of these were also demonstrated.

4            Figures 26 through 35 of the '821 patent are representation of screen shots from these

5    demonstration programs.

6            Kris Kimbrough, Amy Kimbrough, Magda Danish, and Sherif Danish are witnesses to the

7    diligence with which reduction to practice was done.

8            Witnesses to demonstrations may have included Robert Orendorf and Jim Kessler, then

9    both at AMP.

10           The conception and reduction to practice happened at Danish International, which is a

11   small company that has not retained documents from that period of time.  Potentially relevant

12   computerized records for Danish International relevant to diligence were lost when a computer

13   was stolen on or before September 26, 2000.

14

15   Dated:     June 3, 2011              MANATT, PHELPS & PHILLIPS, LLP
                                         Robert D. Becker
16

17

18                                       By:  _____
                                              Robert D. Becker
19                                            *Attorneys for Defendant*
                                              KELORA SYSTEMS, LLC
20

21

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

9

KELORA'S RESPONSE TO EBAY'S FIRST SET OF
INTERROGATORIES, CASE NOS. 10-4947-CW

**PROOF OF SERVICE**

I, Faye Stephenson, declare as follows:

I am employed in San Francisco County, San Francisco, California.  I am over the age of eighteen years and not a party to this action.  My business address is MANATT, PHELPS & PHILLIPS, LLP, One Embarcadero Center, 30th Floor, San Francisco, California  94111.  On June 3, 2011, I served the within:

KELORA SYSTEMS LLC'S RESPONSE TO EBAY'S FIRST SET OF INTERROGATORIES

on the interested parties in this action addressed as follows:

| | |
|---|---|
| David T. Pritikin<br>Richard A. Cederoth<br>SIDLEY AUSTIN, LLP<br>One South Dearborn Street<br>Chicago, IL 60603 | Tel:  (312) 853-7000<br>Fax:  (312) 853-7036<br>Email:  dpritikin@sidley.com<br>Email:  rcederoth@sidley.com |
| Theodore W. Chandler<br>SIDLEY AUSTIN, LLP<br>555 West Fifth Street, Suite 4000<br>Los Angeles, California  90013 | Tel:  (213) 896-6000<br>Fax:  (213) 896-66001<br>Email:  tchandler@sidley.com |
| Marc R. Ascolese<br>SIDLEY AUSTIN, LLP<br>555 California St., Suite 2000<br>San Francisco, CA 94104 | Tel:  (415) 772-1200<br>Fax:  (415) 772-7400<br>Email:  mascolese@sidley.com |

***Attorneys for Plaintiff and Counterclaim Defendant***
**MICROSOFT CORPORATION AND EBAY INC.**

☒      **(BY ELECTRONIC MAIL)** By transmitting such document(s) electronically at [time] from my e-mail address, FStephenson@manatt.com at Manatt, Phelps & Phillips, LLP, San Francisco, California, to the person(s) at the electronic mail addresses listed above.  The transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on June 3, 2011, at San Francisco, California.

_____
Faye Stephenson

300261722.1

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

KELORA'S RESPONSE TO EBAY'S 1ST SET OF
INTERROGATORIES, CASE NO. 10-4947-CW

# Exhibit 16

# Ninth New Collegiate Dictionary

*A Merriam-Webster*®

MERRIAM-WEBSTER INC., *Publishers*
Springfield, Massachusetts, U.S.A.



### A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*A Merriam-Webster®* is the registered trademark you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 1991 by Merriam-Webster Inc.

Philippines Copyright 1991 by Merriam-Webster Inc.

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's ninth new collegiate dictionary.
     p.    cm.
  ISBN 0-87779-508-8. — ISBN 0-87779-509-6  (indexed). — ISBN
0-87779-510-X (deluxe)
  1.  English language—Dictionaries.  I. Merriam-Webster, Inc.
PE1628.W5638  1991
423—dc20                      90-47350
                                  CIP

Webster's Ninth New Collegiate Dictionary principal copyright 1983

COLLEGIATE trademark Reg. U.S. Pat. Off.

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

4142434445RMcN91

chords that may constitute part of a phrase, theme, or composition **syn** see FORM

²**figure** *vb* **fig·ured; fig·ur·ing** \'fig-yə-riŋ, 'fig(-ə)-\ *vt* (14c) **1** : to represent by or as if by a figure or outline : PORTRAY **2** : to decorate with a pattern; *also* : to write figures over or under (the bass) in order to indicate the accompanying chords **3** : to indicate or represent by numerals **4** a : CALCULATE **b** : CONCLUDE, DECIDE ⟨*figured* there was no use in further effort⟩ **c** : REGARD, CONSIDER ⟨*figured* him an upright man⟩ ~ *vi* **1** a : to be or appear important or conspicuous **b** : to be involved or implicated ⟨persons who *figured* in a robbery⟩ **2** : to perform a figure in dancing **3** : COMPUTE, CALCULATE **4** : to seem rational, normal, or expected ⟨that ~s⟩ — **figure-er** \-(y)ər-ər\ *n* — **figure on 1** : to take into consideration ⟨*figuring* on $50 a month extra income⟩ **2** : to rely on **3** : PLAN ⟨I *figure* on going into town⟩

**fig·ured** \-(y)ərd\ *adj* (1552) **1** : being represented : PORTRAYED : adorned with, formed into, or marked with a figure ⟨~ muslin⟩ ⟨~ wood⟩ **3** : indicated by figures

**figured bass** *n* (1880) : CONTINUO

**figure eight** *n* (1887) : something resembling the Arabic numeral eight in form or shape: as **a** : a small knot — see KNOT illustration **b** : an embroidery stitch **c** : a dance pattern **d** : a skater's figure

**fig·ure·head** \'fig-(y)ər-,hed\ *n* (1765) **1** : the figure on a ship's bow **2** : a head or chief in name only

**figure in** *vt* (ca. 1934) : to include esp. in a reckoning ⟨*figure* in occasional expenses⟩

**figure of speech** (1824) : a form of expression (as a simile or metaphor) used to convey meaning or heighten effect often by comparing or identifying one thing with another that has a meaning or connotation familiar to the reader or listener

**figure out** *vt* (1833) **1** : DISCOVER, DETERMINE ⟨try to *figure out* a way to do it⟩ **2** : SOLVE, FATHOM ⟨*figure out* a problem⟩

**figure skating** *n* (1869): skating in which the skater describes or outlines prescribed figures — **figure skater** *n*

**fig·u·rine** \,fig-(y)ə-'rēn\ *n* [F, fr. It *figurina*, dim. of *figura* figure, fr. L — more at FIGURE] (1854) : a small carved or molded figure : STATUETTE

figurehead 1

**fig wasp** *n* (1883) : a minute wasp (*Blastophaga psenes* of the family Agaontidae) that breeds in the caprifig and is the agent of caprification; *broadly* : a wasp of the same family

**fig·wort** \'fig-,wərt, -,wō(ə)rt\ *n* (1548): any of a genus (*Scrophularia* of the family Scrophulariaceae, the figwort family) of chiefly herbaceous plants with leaves having no stipules, an irregular bilabiate corolla, and a 2-celled ovary

**Fi·ji·an** \'fē-(,)jē-ən, fi-'\ *n* (1809) **1** : a member of a Melanesian people of the Fiji islands **2** : the Austronesian language of the Fijians — **Fijian** *adj*

**fila** *pl of* FILUM

**fil·a·ment** \'fil-ə-mənt\ *n* [MF, fr. ML *filamentum*, fr. LL *filare* to spin — more at FILE] (1594) : a single thread or a thin flexible threadlike object, process, or appendage: as **a** : a tenuous conductor (as of carbon or metal) made incandescent by the passage of an electric current; *specif* : a cathode in the form of a metal wire in an electron tube **b** (1) : a thin and fine elongated constituent part of a gill (2) : an elongated thin series of cells attached one to another or a very long thin cylindrical single cell (as of some algae, fungi, or bacteria) **c** : the anther-bearing stalk of a stamen — see FLOWER illustration — **fil·a·men·ta·ry** \,fil-ə-'ment-ə-rē, -'men-trē\ *adj* — **fil·a·men·tous** \-'ment-əs\ *adj*

**fi·lar** \'fī-lər\ *adj* [L *filum* thread] (1874) **1** : of or relating to a thread or line; *esp* : having threads across the field of view ⟨a ~ eyepiece⟩

**fi·lar·ia** \fə-'lar-ē-ə, -'ler-\ *n, pl* **-i·ae** \-ē-,ē, -ē-,ī\ [NL, fr. L *filum*] (1883) : any of numerous slender filamentous nematodes (of *Filaria* and related genera) that as adults are parasites in the blood or tissues of mammals and as larvae usu. develop in biting insects — **fi·lar·i·al** \-ē-əl\ *adj* or **fi·lar·i·id** \-ē-əd\ *adj or n*

**fil·a·ri·a·sis** \,fil-ə-'rī-ə-səs\ *n, pl* **-a·ses** \-,sēz\ (1879) : infestation with or disease caused by filariae

**fil·a·ture** \'fil-ə-,chủ(ə)r, -,chər, -,t(y)ủ(ə)r\ *n* [F, fr. LL *filatus*, pp. of *filare*] (1759) **1** : a place where silk is reeled **2** : the reeling of silk from cocoons **3** : a reel for drawing off silk from cocoons

**fil·bert** \'fil-bərt\ *n* [ME, fr. AF *philber*, fr. St. *Philbert* †684 Frankish abbot whose feast day falls in the nutting season] (15c) **1** : either of two European hazels (*Corylus avellana pontica* and *C. maxima*); *also* : the sweet thick-shelled nut of the filbert **2** : HAZELNUT

**filch** \'filch\ *vt* [ME *filchen*] (14c) : to appropriate furtively or casually ⟨~ a cookie⟩ *syn* see STEAL

¹**file** \'fī(ə)l\ *n* [ME, fr. OE *fēol*; akin to OHG *fīla* file] (bef. 12c) **1** : a tool usu. of hardened steel with cutting ridges for forming or smoothing surfaces esp. of metal **2** : a shrewd or crafty person

²**file** *vt* **filed; fil·ing** (13c) : to rub, smooth, or cut away with or as if with a file

³**file** *n* **filed; fil·ing** [ME *filen*, fr. OE *fȳlan*, fr. *fūl* foul] *chiefly dial* (bef. 12c) : DEFILE, CORRUPT

⁴**file** *vb* **filed; fil·ing** [ME *filen*, fr. MF *filer* to string documents on a string or wire, fr. *fil* thread, fr. OF, fr. L *filum*; akin to Am. *fil* sinew] *vt* (15c) **1** : to arrange in order for preservation and reference ⟨~ letters⟩ **2** a : to place among official records as prescribed by law ⟨~ a mortgage⟩ **b** : to send (copy) to a newspaper ⟨*filed* a good story⟩ **c** : to return to the office of the clerk of a court without action on the merits **3** : to perform the first act of (as a lawsuit) ⟨threatened to ~ charges against him⟩ ~ *vi* **1** : to register as a candidate for election **2** : to place items in a file

⁵**file** *n* (1525) **1** : a device (as a folder, case, or cabinet) by means of which papers are kept in order **2** a *archaic* : ROLL, LIST **b** : a collection of papers or publications usu. arranged or classified **c** : a collection of related data records (as for a computer) — **on file** : in or as if in a file for ready reference

⁶**file** *n* [MF, fr. *filer* to spin, fr. LL *filare*, fr. L *filum*] (1598) **1** : a row of persons, animals, or things arranged one behind the other **2** : any of the rows of squares that extend across a chessboard from white's side to black's side

⁷**file** *vi* **filed; fil·ing** (1616) : to march or proceed in file

**file** \'fē-(,)ā-\, 'fī-'lā, \'fē-'lä\ *n* [AmerF (Louisiana), fr. F, pp. of *filer* to twist, spin] (1806) : powdered young leaves of sassafras used to thicken soups or stews

**file clerk** *n* (1919) : a clerk who works on files

**file·fish** \'fī(ə)l-,fish\ *n* (1814) : any of various bony fishes (order Tetraodontiformes and esp. genera *Aluterus*, *Cantherhines*, and *Monacanthus* of the family Balistidae) with rough granular leathery skins

**fi·let** \fi-'lā, 'fil-(,)ā\ *n* [F, lit., net] (1881) : a lace with a square mesh and geometric designs

**filet mi·gnon** \,fil-(,)ā-mēn-'yōⁿ, fi-,lā-\ *n, pl* **filets mignons** \-(,)ā-mēn-'yōⁿz, -,lā-\ [F, lit., dainty fillet] (1906) : a thick slice of beef cut from the narrow end of a beef tenderloin

**fili- or filo- comb form** [L *filum*]: thread (*filiform*)

**fil·i·al** \'fil-ē-əl, 'fil-yəl\ *adj* [ME, fr. LL *filialis*, fr. L *filius* son — more at FEMININE] (14c) **1** : of, relating to, or befitting a son or daughter ⟨~ obedience⟩ **2** : having or assuming the relation of a child or offspring — **fil·i·al·ly** \-ē-ə-lē, -yə-lē\ *adv*

**filial generation** *n* (1909) : a generation in a breeding experiment that is successive to a parental generation

**fil·i·a·tion** \,fil-ē-'ā-shən\ *n* (15c) **1** a : filial relationship esp. of a son to his father **b** : the adjudication of paternity **2** a : descent or derivation esp. from a culture or language **b** : the act or process of determining such relationship

¹**fil·i·bus·ter** \'fil-ə-,bəs-tər\ *n* [Sp *filibustero*, lit., freebooter] (1587) **1** : an irregular military adventurer; *specif* : an American engaged in fomenting insurrections in Latin America in the mid-19th century **2** [²*filibuster*] **a** : the use of extreme dilatory tactics in an attempt to delay or prevent action esp. in a legislative assembly **b** : an instance of this practice

²**filibuster** *vb* **-tered; -ter·ing** \-t(ə-)riŋ\ *vi* (1853) **1** : to carry out insurrectionist activities in a foreign country **2** : to engage in a filibuster ~ *vt* **1** : to subject to a filibuster — **fil·i·bus·ter·er** \-tər-ər\ *n*

**fil·i·form** \'fil-ə-,form, 'fī-lə-\ *adj* (1757) : shaped like a filament

**fil·i·gree** \'fil-ə-,grē\ *n* [F *filigrane*, fr. It *filigrana*, fr. L *filum* + *granum* grain — more at CORN] (1693) **1** : ornamental work esp. of fine wire of gold, silver, or copper applied chiefly to gold and silver surfaces **2** a : ornamental openwork of delicate or intricate design **b** : a pattern or design resembling such openwork ⟨a ~ of frost⟩

**filigree** *or* **fil·i·greed; fil·i·gree·ing** (1831) : to adorn with or as if with filigree

**fil·ing** \'fī-liŋ\ *n* (14c) **1** : an act or instance of using a file **2** : a fragment rubbed off in filing ⟨iron ~s⟩

**fil·io·pi·e·tis·tic** \'fil-ē-ō-,pī-ə-'tis-tik\ *adj* [*filial* + *-o-* + *pietistic*] (1891) : of or relating to an often excessive veneration of ancestors or tradition

**Fil·i·pi·no** \,fil-ə-'pē-(,)nō\ *n, pl* **Filipinos** [Sp] (1898) : a native of the Philippine islands; *specif* : a member of a Christianized Philippine people **2** : a citizen of the Republic of the Philippines — **Filipino** *adj*

¹**fill** \'fil\ *vb* [ME *fillen*, fr. OE *fyllan*; akin to OE *full* full] *vt* (bef. 12c) **1** a : to put into as much as can be held or conveniently contained ⟨~ a cup with water⟩ **b** : to supply with a full complement ⟨the class is already ~ed⟩ **c** (1) : to cause to swell or billow ⟨wind ~ed the sails⟩ (2) : to trim (a sail) to catch the wind **d** : to raise the level of with fill ⟨~ed land⟩ **e** : to repair the cavities of (teeth) **f** : to stop up : OBSTRUCT, PLUG ⟨wreckage ~ed the channel⟩ **g** : to stop up the interstices, crevices, or pores of (as cloth, wood, or leather) with a foreign substance **2** a : FEED, SATIATE **b** : SATISFY, FULFILL ⟨~s all requirements⟩ **c** : MAKE OUT, COMPLETE — often used with *out* or in ⟨~ out a form⟩ ⟨~ in the blanks⟩ **3** a : to occupy the whole of ⟨smoke ~ed the room⟩ **b** : to spread through **c** : to make full ⟨a mind ~ed with fantasies⟩ **4** a : to supply and perform the duties of : HOLD ⟨~ an office⟩ **b** : to place a person in ⟨~ a vacancy⟩ **5** : to supply as directed ⟨~ a prescription⟩ **6** : to cover the surface of with a layer of precious metal ~ *vi* : to become full — **fill one's shoes** : to take over one's job, position, or responsibilities

²**fill** *n* (bef. 12c) **1** a : full supply; *esp* : a quantity that satisfies or satiates ⟨eat your ~⟩ **2** : material used to fill a receptacle, cavity, passage, or low place

**fill away** *vi* (1840) **1** : to trim a sail to catch the wind **2** : to proceed on the course esp. after being brought up in the wind

**filled milk** *n* (ca. 1924) : skim milk with fat content increased by the addition of vegetable oils

¹**fill·er** \'fil-ər\ *n* (15c) : one that fills: as **a** : a substance added to a product (as to increase bulk, weight, viscosity, opacity, or strength) **b** : a composition used to fill the pores and grain esp. of a wood surface before painting or varnishing **c** : a piece used to cover or fill in a space between two parts of a structure **d** : tobacco used to form the core of a cigar **e** : material used to fill extra space in a column or page of a newspaper or magazine **f** : pack of paper for a loose-leaf notebook

²**fil·ler** \'fil·,e(ə)r\ *n, pl* **fillers** *or* **filler** [Hung *fillér*] (1904) — see *forint* at MONEY table

¹**fil·let** \'fil-ət, *in sense 2b also* fi-'lā, 'fil-(,)ā\ *also* **fi·let** \fi-'lā, 'fil-(,)ā\ *n* [ME *filet*, fr. MF, dim. of *fil* thread — more at FILE] (14c) **1** a : a ribbon or narrow strip of material used esp. as a headband **2** a : thin narrow strip of material: as **a** : a band of anatomical fibers; *specif* : LEMNISCUS **b** : a piece or slice of boneless meat or fish; *esp* : the tenderloin of beef **3** a : a concave junction formed where two surfaces meet **b** : a curved strip forming such a junction **4** : a narrow flat architectural member: as **a** : a flat molding separating others **b** : the space between two flutings in a shaft

²**fillet** \'fil-ət, *in sense 2 also* fi-'lā, 'fil-(,)ā\ *vt* (1604) **1** : to bind, furnish, or adorn with or as if with a fillet **2** : to cut into fillets

**fill-in** \'fil-,in\ *n* (1907) : one who or something that fills in

**fill in** \(')fil-'in\ *vi* (1840) **1** : to give necessary or recently acquired information to ⟨I'll *fill you in*⟩ **2** : to enrich (as a design) with detail ~ *vi* : to fill a vacancy usu. temporarily

**fill·ing** \'fil-iŋ\ *n* (14c) **1** : an act or instance of filling **2** : something used to fill a cavity, container, or depression ⟨a ~ for a tooth⟩

# Exhibit 17

REF   QA   76.15   .M54   1994

Microsoft Press Computer
    Dictionary

MICROSOFT PRESS®

# COMPUTER
# DICTIONARY

### SECOND        EDITION

## THE COMPREHENSIVE

## STANDARD FOR

## BUSINESS, SCHOOL,

## LIBRARY, AND HOME



Wildman, Harrold, Allen & Dixon
#5 West Wacker Drive
Chicago, IL  60606  (312) 201-2000

JUN 1 6



PUBLISHED BY
Microsoft Press
A Division of Microsoft Corporation
One Microsoft Way
Redmond, Washington 98052-6399

Copyright © 1994 by Microsoft Press

All rights reserved. No part of the contents of this book may be reproduced or
transmitted in any form or by any means without the written permission of the publisher.

Library of Congress Cataloging-in-Publication Data

Microsoft Press computer dictionary : the comprehensive standard for
    business, school, library, and home / Microsoft Press. -- 2nd ed
        p.   cm.
    ISBN 1-55615-597-2
    1. Computers--Dictionaries.   2. Microcomputers--Dictionaries.
I. Microsoft Press.   II. Title: Computer dictionary.
    QA76.15.M54   1993
    004'.03--dc20                                                    93-29868
                                                                        CIP

Printed and bound in the United States of America.

    3 4 5 6 7 8 9   MLML   9 8 7 6 5 4

Distributed to the book trade in Canada by Macmillan of Canada, a division of Canada
Publishing Corporation.

Distributed to the book trade outside the United States and Canada by
Penguin Books Ltd.

Penguin Books Ltd., Harmondsworth, Middlesex, England
Penguin Books Australia Ltd., Ringwood, Victoria, Australia
Penguin Books N.Z. Ltd., 182-190 Wairau Road, Auckland 10, New Zealand

British Cataloging-in-Publication Data available.


**Project Editor:** Casey D. Doyle
**Manuscript Editor:** Alice Copp Smith
**Technical Editors:** Mary DeJong, Jeff Carey, Dail Magee, Jr., Jim Fuchs, Seth McEvoy

## CONTRIBUTORS

JoAnne Woodcock
*Senior Contributor*

| | |
|---|---|
| Peter Aitken | Charles Petzold |
| Andrew Himes | Phil Rose |
| Chris Kinata | David Rygmyr |
| William G. Madison | Michael Vose |
| Ross Nelson | Bruce Webster |
| Wallace Parker | |

## TECHNICAL REVIEWERS

| | |
|---|---|
| Robert Ackerman | James Johnson |
| Steve Bostwick | Chris Kinata |
| Keith Burgoyne | Cary Lu |
| Kaare Christian | M. David Stone |
| Ray Duncan | John Viescas |

# D

...sks via a channel or ... The database ma- ...owever, because it ...ent tasks to perform, can be highly opti- ...database server that ...ctions is sometimes ...chine. *See also* data-

**...n** Abbreviated DBMS. ...n the physical data- ...MS manages all re- ...for example, queries ... Thus, the user is ...eeping track of the ...ions and formats, in- ...In addition, a DBMS ...of security and data ...*lso* database engine. ...native term for data- ...Depending on con- ...so mean database ...abase administrator, ...m.

...ation) on a computer ...d to storing a shared ...atabase requests sent ...When the computer ...ally designed to per- ...ns, it is often called a

...nmunications, a group ...8 bits—used to repre- ...data for transmission. ...sed in a transmission ...e sending and receiv- ...lata bits in a transmis- ...it and followed by an ...as one or more stop ...s transmission, com-

...iory used for the tem- ...s moved from one lo-

ally at the time a transaction occurs, in a form that can be used by a computer system—for example, the recording of a sale or a withdrawal from an automated cash machine. The term also applies to saving on a storage medium—a hard or floppy disk—a record of the interchanges between the user and a remote information utility.

**data carrier** *See* carrier.

**Data Carrier Detected** *See* DCD.

**data chaining** The process of storing segments of data in discontinuous areas of a disk, a tape, or memory, while retaining the ability to reconnect the parts in proper order to re-create the whole— for example, continuing a file onto another tape or disk, or storing segments of one file on differ- ent parts of a disk.

**data channel** *See* channel.

**data collection** The process of acquiring source documents or data; also, the grouping of data ele- ments into a coherent whole through classifica- tion, sorting, ordering, and other organizational techniques.

**datacom** Abbreviation for data communications. *See* communications.

**data communications** *See* communications.

**data compaction** *See* data compression.

**data compression** Also called data compaction. A term applied to various means of compacting information for more efficient transmission or storage, used in such areas as data communica- tion, database management systems, facsimile transmission, and CD-ROM publishing. One com- mon compression technique, called key-word encoding, replaces each frequently occurring word—such as *the* or *here*—with a 2-byte token, thus saving one or more bytes of storage for ev- ery instance of that word in a text file.

**data control** The aspect of data management that involves tracking how and by whom data is used, accessed, altered, owned, and reported on.

**data corruption** *See* corruption.

**data declaration** A statement within a program that specifies the characteristics of a variable.

rations usually require a size specification in ad- dition to name and type, and record declarations must specify the elements of the record. Some languages require declarations for all variables; others require declarations only for certain types (often arrays and records); and still others have no declarations. *See also* array, data type, record, variable.

**data definition language** Abbreviated DDL. A language, usually a part of a database manage- ment system, that is used to define all attributes and properties of a database, especially record layouts, field definitions, key fields (and, some- times, keying methodology), file locations, and storage strategy.

**data description language** A language designed specifically for declaring data structures and files, often in a machine- or language-independent fashion. *See also* data definition language

**data dictionary** A database containing data about all the databases composing a database system. The content of the data dictionary can best be thought of as "data about the data"—that is, de- scriptions of all of the other objects (files, pro- grams, and so on) in the system. In particular, a data dictionary stores all the various schemas and file specifications and their locations. A complete data dictionary also includes information about which programs use which data and which users are interested in which reports. The data dictio- nary is frequently integrated into the system it describes.

**data directory** *See* catalog, data dictionary.

**data element** Also called a data item. An indi- vidual unit of data. A data element (such as a field) is defined for processing purposes and might have a specific size, type, and range. *See also* data field.

**data encryption** *See* encryption.

**Data Encryption Standard** Abbreviated DES. A commonly used, highly sophisticated algorithm developed by the U.S. National Bureau of Stan- dards for encrypting and decrypting data. *See*

**data field** A well-defined portion of a data record, such as a column in a database table; also, the physical representation of such a data unit.

**data field masking** The process of filtering or otherwise selecting a portion of a data field in or- der to control the manner in which it is returned and (possibly) displayed.

**data file** A file consisting of data—text, numbers, or graphics—as distinct from a program file of ex- ecutable instructions. *Compare* program file.

**data flow** The movement of data through a sys- tem, from its entry to its destination. Data flow can be as simple as input-process-print-store. It can also be a complex matter involving one or more programs or communication from one computer to another in a network, including in- termediate stations (nodes) along the way. Data flow is a concern of both system and network administrators and of people who analyze the movement of information through a system. In the form of computing known as parallel pro- cessing, *dataflow* (one word) refers to a type of design in which a calculation can be made either when all necessary information is available (known as data-driven processing) or when other processors request the results of the calculation (known as demand-driven processing). *See also* parallel processing.

**dataflow** *See* data flow.

**data fork** On the Macintosh, the part of a stored document file that typically contains user- supplied information. The data fork differs from the resource fork, which in program files typical- ly contains frequently used information such as blocks of executable program code, dialog boxes, font data, digitized sound, icons, and so on. A file on the Macintosh can have a header (summary information, such as filename and size), a resource fork, and a data fork, all used by the operating system in storing and managing the file. *See also* resource, resource fork.

**data format** The structure applied to data by an application program. The data format provides

# Exhibit 18



# McGraw-Hill
# Dictionary of
# Scientific and
# Technical
# Terms

## Fifth Edition

R 503  M1467  1994

**Sybil P. Parker**

Editor in Chief

CENTRAL LIBRARY
LOS ANGELES PUBLIC LIBRARY
DEPT. OF SCIENCE / TECHNOLOGY & PATENTS
630 W. FIFTH STREET
LOS ANGELES, CA 90071

**McGraw-Hill, Inc.**

New York    San Francisco    Washington, D.C.
Auckland    Bogotá    Caracas    Lisbon    London    Madrid    Mexico City    Milan
Montreal    New Delhi    San Juan    Singapore    Sydney    Tokyo    Toronto

JUN 1 1 1994

**interval** is equal to the change in storage; it is applied in hydrology to the routing of floods through a reservoir or a reach of a stream; the moisture-continuity equation applied to the atmosphere is a modification of this. { 'stȯr·ij ˌkwād·zhan }

**storage factor** *See* Q. { 'stȯr·ij ˌfak·tər }

**storage fill** [COMPUT SCI]   Storing a pattern of characters in areas of a computer storage that are not intended for use in a particular machine run; these characters cause the machine to stop if one of these areas is erroneously referred to. Also known as memory fill. { 'stȯr·ij ˌfil }

**storage hierachy** [COMPUT SCI]   The sequence of storage devices, characterized by speed, type of access, and size for the various functions of a computer; for example, core storage from programs and data, disks or drums for temporary storage of massive amounts of data, tapes and cards for back up storage. { stȯr·ij 'hī·ər,är·kē }

**storage integrator** [COMPUT SCI]   In an analog computer, an integrator used to store a voltage in the hold condition for future use while the rest of the computer assumes another computer control state. { 'stȯr·ij ,int·ə,grād·ər }

**storage key** [COMPUT SCI]   A special set of bits associated with every word or character in some block of storage, which allows tasks having a matching set of protection key bits to use that block of storage. { 'stȯr·ij ,kē }

**storage location** [COMPUT SCI]   A digital-computer storage position holding one machine word and usually having a specific address. { 'stȯr·ij lō,kā·shən }

**storage mark** [COMPUT SCI]   The name given to a point location which defines the character space immediately to the left of the most significant character in accumulator storage. { 'stȯr ,märk }

**storage medium** [COMPUT SCI]   Any device or recording medium into which data can be copied and held until some later time, and from which the entire original data can be obtained. { 'stȯr·ij ,mēd·ē·əm }

**storage oscilloscope** [ELECTR]   An oscilloscope that can retain an image for a period of time ranging from minutes to hours, or until deliberately erased to make room for a new image. { 'stȯr·ij ə,sil·ə,skōp }

**storage pool** [COMPUT SCI]   A collection of similar data storage devices. { 'stȯr·ij ,pül }

**storage print** [COMPUT SCI]   In computers, a utility program that records the requested core image, core memory, or drum locations in absolute or symbolic form either on the line-printer or on the delayed-printer tape. { 'stȯr·ij ,print }

**storage protection** [COMPUT SCI]   Any restriction on access to storage blocks, with respect to reading, writing, or both. Also known as memory protection. { 'stȯr·ij prə,tek·shən }

**storage register** [COMPUT SCI]   A register in the main internal memory of a digital computer storing one computer word. Also known as memory register. { 'stȯr·ij rej·ə·stər }

**storage reservoir** *See* impounding reservoir. { 'stȯr·ij ,rez·əv,wär }

**storage-retrieval machine** [CONT SYS]   A computer-controlled machine for an automated storage and retrieval system that operates on rails and moves material either vertically or horizontally between a storage compartment and a transfer station. { 'stȯr·ij ri'trēv·əl mə,shēn }

**storage rings** [NUCLEO]   Annular vacuum chambers in which charged particles can be stored, without acceleration, by a magnetic field of suitable focusing properties; they are used to stretch the duty cycle of a particle accelerator or to produce colliding beams of particles, resulting in a greater possible center of mass energy. { 'stȯr·ij ,riŋz }

**storage ripple** [COMPUT SCI]   A hardware function, used during maintenance periods, which reads or writes zeros or ones through available storage locations to detect a malfunctioning storage unit. { 'stȯr·ij ,rip·əl }

**storage routing** *See* flood routing. { 'stȯr·ij ,rüd·iŋ }

**storage surface** [COMPUT SCI]   In computers, the surface (screen), in an electrostatic storage tube, on which information is stored. { 'stȯr·ij ,sər·fəs }

**storage tank** *See* tank. { 'stȯr·ij ,taŋk }

**storage time** [ELECTR]   **1.** The time required for excess minority-carriers stored in a forward-biased *pn* junction to be removed after the junction is switched to reverse bias, and hence the time interval between the application of reverse bias and the cessation of forward current. **2.** The time required for excess charge carriers in the collector region of a saturated transistor

---

to be removed when the base signal is changed to cut-off level, and hence for the collector current to cease. [PHYS]   *See* decay time. { 'stȯr·ij ,tīm }

**storage-to-register instruction** [COMPUT SCI]   A machine-language instruction to move a word of data from a location in main storage to a register. { 'stȯr·ij tə 'rej·ə·stər in,strak·shən }

**storage-to-storage instruction** [COMPUT SCI]   A machine-language instruction to move a word of data from one location in main storage to another. { 'stȯr·ij tə 'stȯr·ij in,strak·shən }

**storage tube** [ELECTR]   An electron tube employing cathode-ray beam scanning and charge storage for the introduction, storage, and removal of information. Also known as electrostatic storage tube; memory tube (deprecated usage). { 'stȯr·ij ,tüb }

**storage-type camera tube** *See* iconoscope. { 'stȯr·ij 'tīp 'kam·rə ,tüb }

**store** [COMPUT SCI]   **1.** To record data into a (static) data storage device. **2.** To preserve data in a storage device. { stȯr }

**store and forward** [COMMUN]   A procedure in data communications in which data are stored at some point between the sender and the receiver and are later forwarded to the receiver. { 'stȯr ən 'fȯr·wərd }

**stored-energy welding** [MET]   Welding by means of energy accumulated electrostatically, electrochemically, or electromagnetically at a low rate. { 'stȯrd ˌen·ər,jē 'weld·iŋ }

**stored program** [COMPUT SCI]   A computer program that is held in a computer's main storage and carried out by a central processing unit that reads and acts on its instructions. { 'stȯrd 'prō,gram }

**stored-program computer** [COMPUT SCI]   A digital computer which executes instructions that are stored in main memory as patterns of data. { 'stȯrd 'prō,gram kəm'pyüd·ər }

**stored-program control** [COMMUN]   Electronic control of a telecommunications switching system by means of a program of instructions stored in bulk electronic memory. Abbreviated SPC. { 'stȯrd 'prō,gram kən'trōl }

**stored-program logic** [COMPUT SCI]   Program that is stored in a memory unit containing logical commands in order to perform the same processes on all problems. { 'stȯrd 'prō ,gram ,läj·ik }

**stored-program numerical control** *See* computer numerical control. { 'stȯrd 'prō,gram nü'mer·ə·kəl kən,trōl }

**stored response chain** [COMPUT SCI]   A fixed sequence of instructions that are stored in a file and acted on by an interactive computer program at a point where it would normally request instructions from the user, in order to save the user the trouble of repeatedly keying the same commands for a frequently used function. Abbreviated SRC. { 'stȯrd ri'späns ,chān }

**stored routine** [COMPUT SCI]   In computers, a series of instructions in storage to direct the step-by-step operation of the machine. { 'stȯrd rü'tēn }

**stored word** [COMPUT SCI]   The actual linear combination of letters (or their machine equivalents) to be placed in the machine memory; this may be physically quite different from a dictionary word. { 'stȯrd 'wərd }

**storethrough** [COMPUT SCI]   The process of updating data in main memory each time the central processing unit writes into a cache. { 'stȯr,thrü }

**store transmission bridge** [ELEC]   Transmission bridge, which consists of four identical impedance coils (the two windings of the back-bridge relay and live relay of a connector, respectively) separated by two capacitors, which couples the calling and called telephones together electrostatically for the transmission of voice-frequency (alternating) currents, but separates the two lines for the transmission of direct current for talking purposes (talking current). { 'stȯr tranz'mish·ən ,brij }

**storetrieval system** *See* storage and retrieval system. { 'stȯ ri,trē·vəl ,sis·təm }

**stork** [VERT ZOO]   Any of several species of long-legged wading birds in the family Ciconiidae. { stȯrk }

**storm** [METEOROL]   An atmospheric disturbance involving perturbations of the prevailing pressure and wind fields on scales ranging from tornadoes (0.6 mile or 1 kilometer across) to extratropical cyclones (1.2–1800 miles or 2–3000 kilometers across); also the associated weather (rain storm or blizzard) and the like. { stȯrm }

**storm beach** [GEOL]   A ridge composed of gravel or shingle built up by storm waves at the inner margin of a beach. { 'stȯrm ,bēch }



**STORM**

Key:
→ hurricanes
→ extratropical cyclones (W-winter only)
▲ subtropical high
■■ summer position of intertropical convergence
L semipermanent summer-heat lows
H winter continental anticyclones

Principal tracks of extratropical cyclones and hurricanes with significantly associated features in the Northern Hemisphere.

# Exhibit 19

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| PARTS RIVER, INC. | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. 2-07CV-440 DF |
| | ) | |
| SHOPZILLA, INC.; VALUECLICK, INC.; | ) | |
| PRICERUNNER, LTD.; YAHOO!, INC.; | ) | JURY |
| PRICEGRABBER.COM, INC.; EBAY, INC.; | ) | |
| and MICROSOFT CORPORATION | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO TRANSFER UNDER 1404(a) and 1406(a) OR, ALTERNATIVELY, TO DISMISS UNDER 12(b)(2) and (3)

# TABLE OF CONTENTS

I.  DEFENDANTS HAVE NOT ESTABLISHED §1404(A)TRANSFER IS
    PROPER ................................................................................................. 1

   A.  Private Interest Factors ............................................................... 1

   B.  Public Interest Factors ................................................................ 5

   C.  Plaintiff's Choice of Forum ......................................................... 6

II.  THE COURT HAS PERSONAL JURISDICTION OVER THE
     DEFENDANTS. .................................................................................... 6

   A.  THIS COURT HAS SPECIFIC JURISDICTION OVER DEFENDANTS
       VALUECLICK, PRICERUNNER AND PRICEGRABBER. ...................... 8

       1.  Defendants Have Purposefully Directed Their Activities at Residents of
           Texas. ...................................................................................... 8

       2.  Defendants' Infringement of the '821 Patent Directly Relates to Their
           Activities in Texas ................................................................. 9

       3.  Assertion of Personal Jurisdiction is Reasonable and fair. ...................... 13

   B.  DEFENDANTS' CONTINUOUS AND SYSTEMATIC CONTACTS WITH
       TEXAS SUPPORT A FINDING OF GENERAL JURISDICTION ......................... 14

   C.  IN THE ALTERNATIVE, PLAINTIFF REQUESTS THE OPPORTUNITY
       TO ENGAGE IN JURISDICTIONAL DISCOVERY. ................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*3d Systems, Inc. v. Aarotech Labs., Inc.,* 160 F.3d 1373, 1378 (Fed. Cir. 1998) ........................... 8

*Advanceme*, 450 F. Supp. 2d at 674 .................................................................................. 13

*Advanceme, Inc. v. Rapidpay LLC*, 450 F. Supp. 2d 669, 673 (E.D. Tex. 2006) ......................... 11

*Burger King v. Rudzewicz*, 471 U.S. 462, 476-77 (1985) .............................................................. 13

*Fix My PC, LLC v. N.F.N. Assocs., Inc.*, 48 F. Supp. 2d 640, 643 (N.D. Tex. 1999) ................. 12

*Fletcher v. Southern Pac. Trans. Co.*, 648 F. Supp. 1400, 1402 (E.D. Tex. 1986) ........................ 4

*Hanby v. Shell Oil Co.*, 144 F. Supp. 2d 673, 676 (E.D. Tex. 2001) ........................................... 1

*In re Triton Secs. Litig.*, 70 F. Supp. 2d 678 (E.D. Tex. 1999) ..................................................... 6

*In re Triton Secs. Litig.*, 70 F. Supp. 2d 678, 690 (E.D. Tex. 1999) ............................................. 3

*In re Volkswagen of Am. Inc.*, 2007 U.S. App. LEXIS 24931, 2007 WL 3088142, at *21, Docket No. 07-40058 (5th Cir. October 24, 2007) ....................................................................... 1

*In re Volkswagen of Am. Inc.*, 2007 U.S. App. LEXIS 24931, 2007 WL 3088142, at *7-8 . 1, 3, 5

*International Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945) ................................................. 7

*J-L Chieftan, Inc. v. Western Skyways*, 351 F. Supp. 2d 587, 592 (E.D. Tex. 2004) .................. 12

*LSI Indus. V. Hubbell Lighting, Inc.,* 232 F.3d 1369, 1375 (Fed. Cir. 2000) ................................ 7

*Millennium, L.P. v. Dakota Imaging, Inc*, 2003 U.S. Dist LEXIS 22373, *9 (S.D.N.Y. 2003) .. 15

*Network-1 Sec. Solutions, Inc. v. D-Link Corp.*, 433 F. Supp. 2d 795, 803 (E.D. Tex. 2006) ....... 3

*NTP, Inc. v. Research in Motion*, 418 F.3d 1282, 1319 (Fed. Cir. 2005) ..................................... 11

*Rock Bit Int'l, Inc., v. Smith Int'l., Inc.*, 957 F. Supp 843, 844 (E.D. Tex. 1997) ........................ 6

*Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1201 (Fed. Cir. 2003) ............................. 6

*T-NETIX, Inc. v. Global TEL*LINK Corp.*, 2007 U.S. Dist. LEXIS 71510, 2007 WL 2819742 at * 1, No. 2:06-CV-426 (TJW) (E.D. Tex. September 26, 2007) ................................................ 7

*Trintec Indus., Inc. v. Pedre Promotional Products, Inc.*, 395 F.3d 1275, 1279 (Fed. Cir. 2005) . 7

*Trintec Industries, Inc. v. Pedre Promotional Products, Inc.*, 395 F.3d 1275, 1283 (Fed. Cir. 2005) ............................................................................................................................ 15

*Viam Corp. v. Iowa Export-Import Trading Co.*, 84 F. 3d 424, 429 (Fed. Cir. 1996) ................ 14

*Z-TEL Communs.*, 331 F. Supp. 2d 567, 573 ............................................................................ 4, 5

*Z-TEL Communs.*, 331 F. Supp. 2d 567, 576 ............................................................................... 3

*Z-TEL Communs., Inc. v. SBC Communs., Inc.*, 331 F. Supp. 2d 567, 571 (E.D. Tex. 2004) ....... 1

*Z-TEL Communs., Inc. v. SBC Communs., Inc.*, 331 F. Supp. 2d 567, 574 (E.D. Tex. 2004) ....... 2

**Rules**

E.D. Tex. L.R. CV-26 ............................................................................................................ 4

E.D. Tex. P.R. 3-2 ................................................................................................................. 4

Fed. R. Civ. P. 26(a)(1) ......................................................................................................... 4

## ARGUMENT and AUTHORITY

I.   **DEFENDANTS HAVE NOT ESTABLISHED §1404(A)TRANSFER IS PROPER**

This Honorable Court is familiar with considering §1404(a) motions to transfer and the private and public interest factors that should be addressed in ruling.[1]  *Z-TEL Communs., Inc. v. SBC Communs., Inc.,* 331 F. Supp. 2d 567, 571 (E.D. Tex. 2004).  It is within the district court's discretion to decide whether to transfer venue, and the moving party bears the burden of showing why the court should.  *Hanby v. Shell Oil Co.*, 144 F. Supp. 2d 673, 676 (E.D. Tex. 2001).

The Fifth Circuit's recent *In re Volkswagen II* opinion establishes a defendant seeking transfer under §1404(a) "must show good cause" for the transfer.  *In re Volkswagen of Am.  Inc*., 2007 U.S. App. LEXIS 24931, 2007 WL 3088142, at *21, Docket No. 07-40058 (5th Cir. October 24, 2007). To establish "good cause"

> [T]he moving party must demonstrate that the proposed transfer is "[f]or the convenience of parties and witnesses, in the interest of justice." When the transferee forum is no more convenient than the chosen forum, the plaintiff's choice should not be disturbed. When the transferee forum is clearly more convenient a transfer should be ordered.

*Id*.

Defendants fail to demonstrate that California is "clearly" a more convenient forum.

### A.   Private Interest Factors

When considering transfer, a district court should consider private and public interest factors established by Fifth Circuit precedent.  *In re Volkswagen of Am.  Inc*., 2007 U.S. App. LEXIS 24931, 2007 WL 3088142, at *7-8.  Defendants fail to prove that <u>ANY</u> of these factors favor a transfer.

---

[1] In the interest of brevity and page limitation Plaintiff will not restate the private and public interest factors the court considers which have been stated in Defendants' Motion.  (Defs.' Mot. to Transfer 5)  Rather, each will be addressed in the order in which they were addressed by Defendants.

The first private interest factor is "ease of access to sources of proof." *In re Volkswagen of Am. Inc.*, 2007 U.S. App. LEXIS 24931, 2007 WL 3088142, at *7. Defendants make the conclusory statement "key documentary evidence is expected to be located…in California." (Defs.' Mot. to Transfer at 10) Conclusory statements do not suffice. *See, Z-TEL Communs., Inc. v. SBC Communs., Inc.*, 331 F. Supp. 2d 567, 574 (E.D. Tex. 2004)(Wherein this Court rejected declaration which alleged "a number" of witnesses as not clearly identifying how many lived closer to the Eastern District of Texas than the Western District of Texas.). Defendants attempt to support the statement with declarations, but they do not.[2] What is revealed is that Defendants have staff, offices and documents directly related to the Plaintiff's allegations as far away as Israel[3], Sweden[4], Colorado[5], New York[6], Pennsylvania[7], and the state of Washington[8].

For instance, eBay maintains engineering staff relative to its express.ebay.com site in California and Colorado.[9] Presumably documents reside there also. Approximately half of eBay's engineering staff relative to shopping.com and epinions.com is located in Netanya, Israel.[10] Sources of proof are hence located there. Microsoft does not contend that documents, or it servers, are located in California.[11] In fact, Microsoft is currently a plaintiff in this district.[12] Documents relative to Yahoo! HotJobs are located in New York and California.[13] The ValueClick defendants' servers enabling online commerce are located in California,

---

[2] Several of the declarations are defective and should not be considered. *See* Decl. of Behruz Nassre-Esfahani, Ex. 3 to Defs'. Mot. to Transfer (Various facts stated "upon information and belief" *See* ¶¶ 9, 13), Decl. of Alison Howard, Ex. 4 to Defs'. Mot. to Transfer, ¶ 1 (aware of facts "upon information and belief" and "inquiry") .The declaration of Sean Kane (PriceGrabber.com) is unsigned. (Ex. 2 to Defs'. Mot. to Transfer)
[3] Decl. of Behruz Nassre-Esfahani, Ex. 3 to Defs'. Mot. to Transfer, at ¶ 8.
[4] Decl. of Samuel J. Paisley, Ex. 1 to Defs'. Mot. to Transfer, at ¶ 19 and ¶ 25.
[5] Decl. of Behruz Nassre-Esfahani, Ex. 3 to Defs'. Mot. to Transfer, at ¶ 9.
[6] Decl. of Chris Motes, Ex. 9 to Defs'. Mot. to Transfer, at ¶ 6.
[7] Decl. of Samuel J. Paisley, Ex. 1 to Defs'. Mot. to Transfer, at ¶ 19.
[8] Decl. of Alison Howard, Ex. 4 to Defs'. Mot. to Transfer, at ¶¶ 5-7.
[9] Decl. of Behruz Nassre-Esfahani, Ex. 3 to Defs'. Mot. to Transfer, at ¶ 9.
[10] Decl. of Behruz Nassre-Esfahani, Ex. 3 to Defs'. Mot. to Transfer, at ¶ 8.
[11] Decl. of Alison Howard, Ex. 4 to Defs'. Mot. to Transfer, at ¶ 5-7.
[12] Microsoft Corporation v. Charles E. Hill & Associates, Inc. Case No. 2:07-cv-478 (DF).
[13] Decl. of Chris Motes, Ex. 9 to Defs'. Mot. to Transfer, at ¶ 6.

Sweden, Pennsylvania and England, and PriceRunner's documents and staff are located, at least in part, in Sweden.[14]  It is no more convenient for the documents located in Israel or Colorado, for instance, to be produced in California than in Texas.  Additionally, Defendants have not provided evidence to support a showing the documents are so "voluminous that they would be difficult to transport".  *In re Triton Secs. Litig.*, 70 F. Supp. 2d 678, 690 (E.D. Tex. 1999).

The location of documents is of little consequence whether they be in Sweden, California, Colorado, Washington, or otherwise.  The parties are duty-bound under the federal, local rules and local patent rules to make available copies, commonly electronically transferred, of all data and documents producible according to those rules.  See Fed. R. Civ. P. 26(a)(1); E.D. Tex. P.R. 3-2; Tex. L.R. CV-26.  Therefore, a key source of proof will be made accessible to all parties regardless of where the case is tried. The location of documentary evidence should be considered in a 1404(a) analysis.  However, it should be given little weight and does not support transfer in this case. S*ee*, *Z-TEL Communs.,* 331 F. Supp. 2d 567, 576.

The convenience of the witnesses is also a factor that should be considered.  The Honorable Leonard Davis has addressed the likely disbursement of witnesses in patent cases in *Network-1 Sec. Solutions, Inc.,* concluding similarly, if not predicting, the witness situation which exists in this case.  "Witnesses in patent cases are typically more dispersed *** Typically, witnesses in patent cases are scattered throughout the country, if not the world."  *Network-1 Sec. Solutions, Inc. v. D-Link Corp.*, 433 F. Supp. 2d 795, 803 (E.D. Tex. 2006).

"When the transferee forum is no more convenient that the chosen forum, the plaintiff's choice should not be disturbed." *In re Volkswagen of Am.  Inc.*, 2007 U.S. App. LEXIS 24931, 2007 WL 3088142, at *7-8.

---

[14] Decl. of Samuel J. Paisley, Ex. 1 to Defs'. Mot. to Transfer, at ¶¶ 19, 25.

Defendants vaguely aver "key witnesses…are likely to include…officers, developers, and engineers who reside in California." (Defs.' Mot. to Transfer Page at 10) Upon review of the declarations supporting their motion it became clear as why they are being vague. The party-witnesses are scattered! Defendants' evidence in support of transfer, actually defeats transfer. According to Defendants, relevant party-witnesses are located in Israel, Sweden, England, Colorado, New York, California, Washington and Pennsylvania. All are party-witnesses. None has been identified with particularity and not one person has been identified as someone who will testify at trial. The evidence is defective. *See*, *Fletcher v. Southern Pac. Trans. Co.*, 648 F. Supp. 1400, 1402 (E.D. Tex. 1986). When "'the key witnesses are . . . employees of the party seeking transfer, their convenience is entitled to less weight because that party will be able to compel their testimony at trial.'" *Z-TEL Communs.*, 331 F. Supp. 2d 567, 573 (quoting *Continental Airlines, Inc. v. American Airlines, Inc.*, 805 F. Supp. 1392, 1397 (S.D. Tex. 1992)).

Defendants next turn to non-party witnesses stating "the inventors and prosecuting attorneys [are] believed to be located in…California." (Defs.' Mot. to Transfer at 10) However, the co-inventors, Sherif Danish and Kris Kimbrough, have provided declarations indicating their willingness to travel to Marshall, Texas, for trial upon "the request of **any** party."[15] Likewise, one of the prosecuting attorneys for the '821 patent, A. James Isbester, is willing to attend trial in Marshall, Texas, if asked to do so by any party.[16] Likewise, he does not maintain nor has he kept documents relative to the '821 patent. Another, of the '821 prosecuting attorneys, Stanley Gradisar, believed by Defendants to be in California actually lives in Denver, Colorado.[17] In contrast, Defendants have not identified any non-party witness who says it would be an inconvenience or cost prohibitive to attend trial in Marshall, Texas. The convenience of non-

---

[15] Decl. of Sherif Danish ¶ 10, attached as Ex. "1".; Decl. of Kris Kimbrough ¶ 10, attached as Ex. 22.

[16] Decl. of A. James Isbester ¶ , attached as Ex. "2".

[17] Aff. of Michael Runyan ¶ 7, attached as Ex. "3"

party witnesses weighs more heavily than the convenience of party witnesses. *See, Z-TEL Communs.*, 331 F. Supp. 2d 567, 573. The fact that the non-party witnesses within the subpoena range of the Northern District of California have agreed to appear voluntarily upon the request of any party negates Defendants' argument that the court's subpoena powers favors transfer. Furthermore, whether a party is within subpoena power is not a factor to consider because they are presumed to be willing to attend trial in any district. *Z-TEL Communs., Inc.,* 331 F. Supp. 2d 567, 573. This factor does not favor transfer.

Defendants do not present any evidence or address "all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen of Am.  Inc*., 2007 U.S. App. LEXIS 24931, 2007 WL 3088142, at *8.

### B.      Public Interest Factors

The only public interest factor discussed by Defendants is "the local interest in having localized interests decided at home."  (Defs.' Mot. to Transfer  PP 6-7)  Defendants' activities intertwined with Plaintiff's allegations making this a case of interest and localized are discussed as part of the jurisdictional analysis below.[18]  (*See*, *infra.* at p. 9)  This district has an interest in enforcing United States patent laws in its jurisdiction, and acts of infringement occurring here affect the economy of the Eastern District of Texas.

Defendants rely on median time to <u>disposition</u> in their analysis of relative congestion. Plaintiff submits that the difference in time to trial in the two forums is significant and the more important factor.[19]  Furthermore, Defendants contacts with this forum are substantial.  Plaintiff

---

[18] Defendants have chosen to focus only on Plaintiff's direct infringement allegations in this jurisdiction and venue analysis.

[19] Median time to trial in E.D. of Texas is 17.7 months and in N.D. of Cal is 25 months.  Attached as Ex. "4" and "5".  Avail. for download at http://www.uscourts.gov/cgi-bin/cmsd2006.pl (follow link to E.D. Tex. and N.D. Cal.).

has numerous ongoing business relationships in Texas, including a number in the Eastern District.[20]

### C.    Plaintiff's Choice of Forum

Defendants suggest that the value of Plaintiff's choice of forum is diminished because it is not from this district.  (Defs.' Mot. to Transfer pp. 7-8)  Plaintiff chose to litigate in this forum based on a number of factors, one being the Eastern District's efficiently handled docket.  (Decl. of H. Wolcot).  A plaintiff's reason for choosing a forum is ordinarily not considered.  *See*, *In re Triton Secs. Litig.*, 70 F. Supp. 2d 678 (E.D. Tex. 1999). Defendants base their position on the fact that Plaintiff is not from this district, relying on *Rock Bit Int'l, Inc., v. Smith Int'l., Inc.*, 957 F. Supp 843, 844 (E.D. Tex. 1997).   However, Defendants ignore that Plaintiff's cause of action "arises out of" and "relates to" each Defendants' activities in Texas.  (*See, Infra*. at p. 9)  To say there is no connection between the Plaintiff's direct and indirect claims of infringement, these defendants and this forum is incorrect.   Therefore, Plaintiff's choice of forum is accorded deference.[21]

## II.    THE COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANTS.[22]

When determining personal jurisdiction in patent infringement cases, the law of the Federal Circuit governs.  *Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1201 (Fed. Cir. 2003).  As the parties have not conducted jurisdictional discovery, a plaintiff is only required to make a *prima facie* showing that the defendants are subject to personal jurisdiction, and the

---

[20] *See*, Decl. of Horation Wolcott, Attached as Ex. "6", ¶  .
[21] It is questionable whether the Federal Circuit will follow *In re Volkswagen II*, given it derives from a car wreck personal injury case.  The factual situation in *In re Volkswagen II* is opposite the facts in this patent action.  A transfer of venue for the convenience of the parties normally requires that the court give great weight to the plaintiff's choice of forum and then weigh the convenience of both parties.  *Hollyanne Corp., v. TFT, Inc.,* 199 F.3d. 1304 (Fed. Cir. 1999).
[22] Because personal jurisdiction exists, the request for change of venue under 28 U.S.C. §1406 should be denied.

pleadings and affidavits are to be construed in the light most favorable to the plaintiff.[23]  *Id.*  To exercise personal jurisdiction over an out-of-state defendant, service of process must be proper under the forum state's long-arm statute, and jurisdiction must comport with due process under the Federal Constitution.  *T-NETIX, Inc. v. Global TEL*LINK Corp*., 2007 U.S. Dist. LEXIS 71510, 2007 WL 2819742 at * 1, No. 2:06-CV-426 (TJW) (E.D. Tex. September 26, 2007).  Texas' long-arm statute extends to the limits of due process, so the only issue is whether the exercise of personal jurisdiction satisfies the requirements of due process.  *Id.*

Due process is present when (1) the defendant has established "minimum contacts" with the forum state and (2) the exercise of jurisdiction does not "offend traditional notions of fair play and substantial justice."  *International Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945).  Depending on the type of contacts with the forum state, a court may find either specific jurisdiction or general jurisdiction.  *Trintec Indus., Inc. v. Pedre Promotional Products, Inc.,* 395 F.3d 1275, 1279 (Fed. Cir. 2005).  If the cause of action either "arises out of" or "relates to" the defendant's in-state activity, specific jurisdiction is established.  *LSI Indus. V. Hubbell Lighting, Inc.,* 232 F.3d 1369, 1375 (Fed. Cir. 2000)(quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472-73 (1985)).  When a defendant maintains "continuous and systematic" contacts with the forum state, even when the cause of action does not arise out of or relate to the contacts, general jurisdiction is established.  *Id.*  Defendants' contacts with Texas support both specific and general jurisdiction.

---

[23] Because of this factor, the unsigned declaration submitted on behalf of PriceGrabber should be disregarded in its entirety, since it has no evidentiary value.

### A. THIS COURT HAS SPECIFIC JURISDICTION OVER DEFENDANTS VALUECLICK, PRICERUNNER AND PRICEGRABBER.

Defendants' contacts with Texas show that (1) Defendants purposefully directed their activities at residents of Texas, (2) Defendants' infringement of the '821 patent directly relates to their activities, and (3) assertion of personal jurisdiction is reasonable and fair. *See, 3d Systems, Inc. v. Aarotech Labs., Inc.,* 160 F.3d 1373, 1378 (Fed. Cir. 1998).

#### 1. Defendants Have Purposefully Directed Their Activities at Residents of Texas.

Through their websites, Defendants solicit business from residents of Texas. PriceRunner responds to email requests for information from both businesses and consumers in Texas, sends a weekly newsletter to members (some of whom live in Texas) and allow businesses interested in entering a merchant listing agreement with PriceRunner to fill out an online form. This online form contains a drop down menu to choose the state where the business is located, and Texas is an option.[24] ValueClick employees have made sales calls to Texas.[25]

PriceGrabber also responds to email requests for information from both businesses and consumers in Texas, sends out price alerts to members (some of whom live in Texas) and provides an email address for businesses interested in advertising on PriceGrabber.com.[26] Additionally, businesses with PriceGrabber.com merchant contracts can log in though the website.[27]

The sheer number of contacts Defendants have with individuals and businesses in Texas shows that they are purposefully directing their activities to Texas residents. According to their website, PriceGrabber reaches 24 million different consumers per month.[28] Assuming that those

---

[24] *See*, http://www.pricerunner.com/merchantsignup/signup.html (last visited Dec. 5, 2007) Attached as Ex. "7".
[25] Decl. of Samuel J. Paisley, Ex. 1 to Defs'. Mot. to Transfer, at ¶ 14.
[26] *See*, http://www.pricegrabber.com/about.php/about=contact (last visited Dec. 5, 2007) Attached as Ex. "8".
[27] *See*, https://partner.pricegrabber.com/mss_main.php (last visited Dec. 5, 2007) Attached as Ex. "9".
[28] http://www.pricegrabber.com/about.php/about=mediakit (last visited Dec. 5, 2007) Attached as Ex. "10".

consumers are spread out consistent with the population, means that every month PriceGrabber is providing access to Plaintiff's patented method to 1.25 million Texans who visit PriceGrabber.com. PriceGrabber indicated in a January 30, 2007, press release: "Overall, the site referred more than $54 billion throughout 2006."[29] Assuming that its 24 million different consumers are distributed evenly throughout the United States, as are its per capita referrals, then PriceGrabber directed nearly 4 billion dollars in purchases for Texas consumers in 2006 alone. PriceRunner has "access to over 75 percent of the U.S. internet user every month".[30] This percentage would translate into millions of Texans each month.

### 2. Defendants' Infringement of the '821 Patent Directly Relates to Their Activities in Texas

The patent at issue involves a method for searching that is particularly well suited for online catalogues. The heart of the invention lies in the interactive exchange between a consumer on the internet and a central computer that is required in order to execute the method. The method allows consumers to identify individual products that possess features that a consumer is seeking in a product. To understand the interactive nature of the operation of the method, it is useful to look at an example involving the web servers of ValueClick/PriceRunner and/or PriceGrabber and a Texas consumer.

The method set forth in claim 1 of the '821 patent first requires that Defendants "provide" a data file of information about at least one "family of items" that identifies at least one "alternative" for each item. The method provides for reading the data file (done by the web server) and "displaying a feature screen indicating said alternatives represented in the family." Although this screen is "built" in the web server, it is "displayed" on the user's computer in

---

[29] http://www.pricegrabber.com/about.php/about=press/article=90 (last visited Dec. 5, 2007) Attached as Ex. "11".
[30] http://www.pricerunner.com/press11.html dated Sep, 27, 2006, (last visited Dec. 5, 2007) Attached as Ex. "12".

Texas.  For example, a "family" of items could be digital cameras, and the alternatives could be such things as 4x zoom, 5x zoom, 6 megapixels, 8 megapixels, 10 megapixals, etc.

In response to the displayed feature screen, the consumer selects an alternative, such as 4x zoom.  The method involves the web server "accepting" this selection, searching the data file, determining the alternatives associated with those identified items, and then revising the feature screen to indicate the available alternatives within this subfamily.  This revised feature screen is then again "displayed" to the consumer on his computer monitor.  For example the server could accept the consumer's choice of 4x zoom, search the database, determine that there are no cameras with both a 4x zoom and a 10 megapixel capacity, and revise the feature screen such that it would not display to the user 10 megapixels as an alternative.

The method then requires that a second alternative feature selected by the consumer (e.g., in Texas), be "accepted" by the server (e.g., in California), and the data file be searched again for items that satisfy both the first selected alternative and the second selected alternative, that the feature screen be revised to indicate the available alternatives within this second subfamily.  Thus, if the Texas consumer selected 6 megapixels as a second selection, the web server would search for all digital cameras that had both a 4x zoom, and 6 megapixel capacity.  The web server would then revise the feature screen and send it to the consumer in Texas to display alternatives associated with the identified cameras.

The patented method thus requires that the remote consumer interact repeatedly with the web server.  Not only must the remote consumer interact with a web server to cause the web server to search a data file for a "family of items" and the alternatives associated therewith, but then the remote consumer must twice select alternatives from the choices presented by the web server, which alternatives are caused to be displayed on the remote consumer's computer.

Claim 1 of the patent at issue in this case requires that one step take place where the remote user is located. The method requires that a feature screen be "displayed." That necessarily happens where the user's computer terminal is located. That is where the feature screen is displayed so that the user can make a selection to trigger the next step, which involves the web server "accepting" that selection and sending information back to the user, so that the process can be completed.

Under the Federal Circuit's decision in *NTP, Inc. v. Research in Motion*, 418 F.3d 1282, 1319 (Fed. Cir. 2005), the presence of some step taking place in a location other than California, such as on a remote user's screen in Texas, precludes the Court from finding that infringement happens only within California. Given the interaction with remote users, such as those in Texas, which interaction is necessary for infringement to occur, it is wrong to assert, such as Defendants have, that only courts in California have any interest in pursuing this case.

Not only does a step of the method occur in Texas, but it occurs through the use of interactive websites operated by Defendants. "A website whose owners engage in repeated online contacts with forum residents through the site will likely satisfy the minimum contacts requirement." *Advanceme, Inc. v. Rapidpay LLC*, 450 F. Supp. 2d 669, 673 (E.D. Tex. 2006). At the very least, Defendants' websites reach the middle level of interactivity described in *Advanceme*. The websites provide the protected search method to consumers, who communicate their preferences to the servers; the website is "interactive" and allows for "bilateral information exchange." The interactive nature of PriceGrabber's business has been recognized by it being placed in the "Interactive" division by Experian, its corporate owner.[31] The information exchanged is commercial in nature, a factor this court has recognized as supporting personal

---

[31] *See* Experian, 2007 Annual Report p. 10, available at http://www.experianannualreport.ie/pdf/whole.pdf Attached as Ex. "13".

jurisdiction based in part on an interactive website.  *See, J-L Chieftan, Inc. v. Western Skyways*, 351 F. Supp. 2d 587, 592 (E.D. Tex. 2004) (*adopting Mink v. AAAA Development LLC,* 190 F.3d 333 (5th Cir. 1999)).

In asserting personal jurisdiction based on an "interactive" website, some courts have required "something more" than only having an interactive website to indicate that the defendant purposefully availed itself to the forum.  *Fix My PC, LLC v. N.F.N. Assocs., Inc.*, 48 F. Supp. 2d 640, 643 (N.D. Tex. 1999).  Defendants have taken actions that were purposely directed toward residents of Texas.  For example, PriceRunner and PriceGrabber both offer consumers the ability to fill out an online form to become members of the site.  PriceRunner sends out a "free e-weekly newsletter, containing the best deals, PriceRunner news and member only competitions. You will be the first to know about our new categories and special features."[32]  To become a PriceRunner member, you must sign up, and indicate, among other things, the geographic location.[33]  PriceRunner should thus know the exact number of Texas members that receive its weekly newsletter.  Similarly, PriceGrabber members are entitled to services such as e-mail alerts, and price alerts.[34]  Because these members can register an address, and PriceGrabber does not exclude people with Texas addresses, it is clear that PriceGrabber is knowingly, affirmatively, soliciting Texas members to use the services they offer.

PriceRunner affirmatively searches merchants' websites, including those of merchants located in Texas, to identify products and information about those products that they offer.  As it states: "Our sophisticated agent software gathers millions of prices from thousands of online stores which will in turn be displayed in one convenient location on the PriceRunner website."[35]

---

[32] http://www.pricerunner.com/faq.html#faqmembers3 (last visited Dec. 5, 2007) Attached as Ex. "14".

[33] http://www.pricerunner.com/MemberApply.jsp (last visited Dec. 5, 2007) Attached as Ex. "15".

[34] *See*, http://www.pricegrabber.com/info_memtermsofuse.php (last visited Dec. 5, 2007) Attached as Ex. "16".

[35] *See*, www.pricerunner.com (last visited Dec. 5, 2007) Attached as Ex. "17".

Through its agent software, it scours this state's computers looking for information that it can make available to users.

    3.    **Assertion of Personal Jurisdiction is Reasonable and fair.**

Defendants have failed to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable" under the Supreme Court's test in *Burger King v. Rudzewicz*, 471 U.S. 462, 476-77 (1985). The five factors to consider are: "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of the controversies," and the "shared interest of the several States in furthering substantive social policies." *Id.* at 477.

Defendants allege that because its offices are in California, litigating this case in Texas would be burdensome. Defendants are all large companies, with the resources to litigate this case in any United States forum. Additionally, very few of their employees are likely to be necessary witnesses to the case.

Texas has a strong interest in this litigation. The infringing method is offered to consumers in Texas, a step of the method occurs on consumers' screens in Texas, and businesses in Texas pay Defendants to have their products listed on the infringing website.

> Texas has a strong interest in discouraging injuries, including patent infringement, occurring within its borders. * * * Texas has an interest in upholding the patent laws of the United States. Texas, particularly given its technology sector, has an interest in promoting commerce and scientific development, which is promoted by the patent system and the policies it embodies.

*Advanceme*, 450 F. Supp. 2d at 674.

Plaintiff's choice of this forum was not arbitrary; from the Plaintiff's perspective, it was the most convenient and effective location. PartsRiver's CEO, Horatio Wolcott, affirms that he

chose the forum because of its reputation of competency in patent litigation and its markedly shorter litigation time. *See*, Wolcott Declaration, ¶¶ 9-12.

Defendants acknowledge that they make significant revenue from their Texas directed activities, without showing the total to the Court and the plaintiff.[36] It is not unreasonable for them to defend their actions in a state from which they derive significant revenues.

The balance of factors show this is not "the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." *Viam Corp. v. Iowa Export-Import Trading Co.,* 84 F. 3d 424, 429 (Fed. Cir. 1996).

## B. DEFENDANTS' CONTINUOUS AND SYSTEMATIC CONTACTS WITH TEXAS SUPPORT A FINDING OF GENERAL JURISDICTION

Defendants solicit on-going relationships with businesses in Texas, which pay advertising fees in exchange for their products being cataloged in Defendants' infringing online search catalog. For example, JCPenney, a major retailer headquartered in the Eastern District of Texas[37] sponsors links on PriceGrabber. Also, PriceRunner has JCPenney as a "strategic shopping partner".[38] JCPenney has more than 18,000 "prices" which are believed to be associated with as many products listed with PriceRunner.[39] Moreover, one of the Top 20 Retailers of PriceRunner, "TechOnWeb.com", has its corporate headquarters in Dallas, Texas.[40]

---

[36] Plaintiffs have no clear idea what PriceGrabber means when it speaks of "[r]evenue sourced from Texas…". (Decl. of Sean Kane, Ex. 2 to Defs'. Mot. to Transfer, at ¶ 7) Should this factor be considered key in the Court's finding, as expressed below, Plaintiff would request an opportunity to discover how PriceGrabber "sourced" the revenue from Texas.

[37] Record from Lexis from files of Texas Comptroller of Public Accounts available at Lexis attached as Ex. "18".

[38] http://www.pricerunner.com/press11.html dated Sep, 27, 2006, (last visited Dec. 5, 2007) Attached as Ex. "12".

[39] www.pricerunner.com/retailer/19822/products (last visited Dec. 5, 2007) Attached as Ex. "19".

[40] *See* www.pricerunner.com/top50retailers.html and www.pricerunner.com/retailer/14405/ (last visited Dec. 5, 2007) Attached as Ex. "20" and "21" respectively.

Representatives of Defendants have entered Texas for advertising events. ValueClick has sponsored local events in Texas.[41] PriceGrabber has representatives travel to Texas to attend trade shows.[42] Trade show participation has been held as sufficient, to support personal jurisdiction. *See, e.g. Millennium, L.P. v. Dakota Imaging, Inc*., 2003 U.S. Dist LEXIS 22373, *9 (S.D.N.Y. 2003)(attendance at two trade shows over three years supported a finding of specific jurisdiction).

### C.   IN THE ALTERNATIVE, PLAINTIFF REQUESTS THE OPPORTUNITY TO ENGAGE IN JURISDICTIONAL DISCOVERY.

Plaintiff believes that the facts it has gathered from publicly available sources show sufficient nexus between Defendants and this forum to justify their being required to litigate this matter here. Given the extent of the contacts gleaned from the public information, Plaintiff believes that additional information about additional contacts could be obtained if it were permitted to engage in jurisdictional discovery. For this reason, should the Court believe that Plaintiff has not made a *prima facie* case based upon this limited source of information, Plaintiff requests that it be given 60 days to engage in jurisdictional discovery from the moving defendants. *See*, *Trintec Industries, Inc. v. Pedre Promotional Products, Inc.*, 395 F.3d 1275, 1283 (Fed. Cir. 2005).

### CONCLUSION

For the reasons stated herein, Defendants' Motion to Dismiss should be denied and Defendants' Motion to Transfer should also be denied.

---

[41] Decl. of Samuel J. Paisley, Ex. 1 to Defs'. Mot. to Transfer, at ¶ 14.
[42] Decl. of Samuel J. Paisley, Ex. 1 to Defs'. Mot. to Transfer, at ¶ 24.

BALDWIN & BALDWIN, L.L.P.


_____/s/ Jack Baldwin_____
(Lead Counsel)
Jack Baldwin, Texas State Bar No. 01625330
jbb@baldwinlaw.com

Michael T. Runyan, Texas State Bar No. 24033143
michael@baldwinlaw.com
400 West Houston Street
Marshall, Texas 75670
Phone: (903) 935-4131
Facsimile: (903) 935-1397


and


Ken M. Peterson, Kansas State Bar No. 07499
kpeterson@morrislaing.com
Robert W. Coykendall, Kansas State Bar No. 10137
rcoykendall@morrislaing.com
Will B. Wohlford, Kansas State Bar No. 21773
wwohlford@morrislaing.com
MORRIS, LAING, EVANS, BROCK
 & KENNEDY, CHARTERED
300 N. Mead, Suite 200
Wichita, Kansas 67202
Phone: (316) 262-2671
Facsimile: (316) 262-5991

*ATTORNEYS FOR PLAINTIFF*


## CERTIFICATE OF SERVICE

This certifies that a true and correct copy of this document has been filed with the Clerk, and served on all counsel through the Court's CM/ECF electronic system.

_____/s/ Jack Baldwin_____
Jack Baldwin

# Exhibit 20

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF TEXAS

 3                    MARSHALL DIVISION

 4   PARTSRIVER, INC.              .  DOCKET NO. 2:07CV440

 5   V.                           .  TEXARKANA, TEXAS

 6   SHOPZILLA, INC., ET AL       .  APRIL 10, 2008

 7                                .  9:55 A.M.

 8            DEFENDANT'S MOTION TO TRANSFER

 9         BEFORE THE HONORABLE DAVID FOLSOM,

10           UNITED STATES DISTRICT JUDGE.

11   APPEARANCES:

12   FOR PLAINTIFF
     PARTSRIVER, INC.:              MR. JACK BALDWIN
13                                  BALDWIN & BALDWIN
                                    P.O. DRAWER 1349
14                                  400 W. HOUSTON STREET
                                    MARSHALL, TX. 75671-1349
15
     FOR DEFENDANT
16   SHOPZILLA, INC.:              MR. SIDNEY CALVIN CAPSHAW,
                                    III
17                                  CAPSHAW DERIEUX, LLP.
                                    1127 JUDSON ROAD
18                                  SUITE 220
                                    LONGVIEW, TX. 75601-5157
19
     VALUECLICK, INC.:            MR. MICHAEL CHARLES SMITH
20                                  SIEBMAN REYNOLDS BURG
                                    PHILLIPS & SMITH, LLP. -
21                                  MARSHALL
                                    713 SOUTH WASHINGTON
22                                  MARSHALL, TX. 75670

23   YAHOO!, INC. AND
     EBAY, INC:                   MR. ERIC HUGH FINDLAY
24                                  MR. BRIAN CRAFT
                                    RAMEY & FLOCK
25                                  100 EAST FERGUSON
```

```
 1                                        SUITE 500
                                          TYLER, TX. 75702
 2
    PRICEGRABBER.COM, INC.:               MR. THOMAS RAY JACKSON
 3                                        JONES DAY – DALLAS
                                          2727 NORTH HARWOOD STREET
 4                                        DALLAS, TX. 75201

 5                                        MR. LANCE LEE
                                          YOUNG PICKETT & LEE
 6                                        4122 TEXAS BLVD.
                                          P.O. BOX 1897
 7                                        TEXARKANA, TX. 75504-1897

 8  MICROSOFT CORPORATION:                MR. G. WILLIAM LAVENDER
                                          LAVENDER LAW
 9                                        210 N. STATE LINE AVE.
                                          SUITE 503
10                                        P.O. BOX 1938
                                          TEXARKANA, AR. 75504-1938
11
    COURT REPORTER:                       MS. LIBBY CRAWFORD, CSR
12                                        OFFICIAL COURT REPORTER
                                          500 STATE LINE AVENUE
13                                        TEXARKANA, TX. 75501
                                          903/794-4067
14

15

16

17

18

19

20

21

22

23

24  PROCEEDINGS RECORDED BY STENOMASK VERBATIM REPORTING,

25  TRANSCRIPT PRODUCED BY CAT SYSTEM.
```

1                                INDEX

2    THE COURT.............................................   4

3    DEFENDANT'S MOTION BY MR. LEE.............................   4

4    PLAINTIFF'S RESPONSE BY MR. BALDWIN.......................   9

5    DEFENDANT'S REPLY BY MR. LEE.............................  16

6    PLAINTIFF'S REPLY BY MR. BALDWIN..........................  18

7    DEFENDANT'S REPLY BY MR. LEE.............................  20

8    THE COURT.............................................  20

9    REPORTER'S CERTIFICATION.................................  21

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2                **TEXARKANA, TEXAS**

3                **APRIL 10, 2008**

4          (OPEN COURT)

5          THE COURT: PLEASE BE SEATED, LADIES AND GENTLEMEN.

6    GOOD MORNING.  WE ARE HERE ON DEFENDANTS' MOTION TO TRANSFER.

7    I BELIEVE I HAVE GIVEN EACH SIDE FIFTEEN MINUTES.  ARE THE

8    PARTIES READY TO GO FORWARD?

9          MR. LEE: MORNING, YOUR HONOR.  LANCE LEE ON BEHALF

10   OF DEFENDANT PRICEGRABBER.  I WILL BE ADDRESSING THE ISSUES ON

11   BEHALF OF ALL THE DEFENDANTS.

12         THE COURT: VERY WELL.

13         MR. LEE: JUDGE, WITH RESPECT TO THE ISSUES THAT YOU

14   HAVE BEFORE YOU, I WOULD LIKE TO START OFF FOCUSING ON

15   PERSONAL JURISDICTION BECAUSE I THINK THAT WITH RESPECT TO ALL

16   THREE FORMS OF RELIEF THAT WE ARE REQUESTING, THE 1404

17   TRANSFER, THE 1406 TRANSFER, AND THE DISMISSAL PERSONAL

18   JURISDICTION RUNS THROUGH THAT.  HAVING SAID THAT, THIS COURT

19   RECOGNIZED IN THE *OAKLEY* CASE AND IN THE *J. L. CHIEFTAIN* CASE

20   THAT FROM A 1404 STANDPOINT, THE FACTOR OF WHETHER PERSONAL

21   JURISDICTION EXISTS OVER A DEFENDANT IS RELEVANT TO THE

22   ANALYSIS AND SHOULD BE CONSIDERED.  ALSO IN THE RECENT

23   DECISION THAT WE SUBMITTED TO THE COURT, THE *MICRON* CASE, THE

24   FEDERAL CIRCUIT RECOGNIZED THAT FACT AS WELL.

25         ONE THING THAT I WANT TO SAY AT THE OUTSET, JUDGE, IS WE

1   HAVE SOME CONFUSION WITH RESPECT TO WHAT THE PLAINTIFF'S

2   ACTUAL INFRINGEMENT POSITION IS AND IT'S IMPORTANT FROM THE

3   STANDPOINT OF SPECIFIC JURISDICTION.  THE CLAIM THAT'S BEING

4   ASSERTED, THE PATENT THAT'S BEING ASSERTED AGAINST THE

5   DEFENDANTS IS A METHOD PATENT.  AND AS THE COURT IS WELL AWARE

6   THAT FOR PURPOSES OF THE PATENT STATUTE, TO FIND DIRECT

7   INFRINGEMENT YOU HAVE TO DETERMINE THAT USE IS TAKING PLACE BY

8   THE DEFENDANTS.  AND WHEN YOU ARE DEALING WITH WEBSITES, THAT

9   USE TAKES PLACE AT A WEB SERVER.  AND IN THE *EPICREALM* CASE

10   THIS COURT RECOGNIZED THAT OPERATION OF THE WEB SERVER IS THE

11   ACTUAL USE THAT'S INVOLVED.

12      I'D LIKE TO HAND SOMETHING UP, JUDGE, I HOPE WILL

13   ILLUSTRATE THE PROBLEM THAT WE ARE HAVING AT THIS POINT.  THIS

14   IS SIMPLY A PART THAT HAS THE PATENT CLAIM THAT'S BEING

15   ASSERTED, THE POSITION THAT THE PLAINTIFF IS TAKING IN

16   RESPONSE TO THE JURISDICTIONAL ARGUMENTS, AND THEN WHAT

17   THEY'VE SAID IN THEIR INFRINGEMENT CONTENTIONS.  AND HERE IS

18   THE RUB.  WHEN THIS SUIT WAS FILED, IN THE COMPLAINT THE

19   PLAINTIFF SAID THAT THE DEFENDANTS ARE INFRINGING THIS METHOD

20   PATENT BY OPERATION OF THESE WEBSITES, I.E., THE WEB SERVERS

21   ARE UTILIZING THE PROCESS AT ISSUE.  WE FILE OUR MOTION

22   SPECIFICALLY WITH RESPECT TO VALUECLICK, PRICERUNNER, AND

23   PRICEGRABBER SAYING, WELL, WE DON'T HAVE ANY WEB SERVERS IN

24   TEXAS, THEREFORE THERE IS NO INFRINGEMENT THAT'S TAKING PLACE

25   IN TEXAS AND YOU CAN'T HAVE PERSONAL JURISDICTION.

1    IN RESPONSE TO THAT, THE PLAINTIFF SAYS IN THEIR PAPERS

2    THAT, WELL, THERE'S ONE ELEMENT OF THE CLAIM THAT'S BEING

3    COMPLETED IN THE STATE OF TEXAS AND THAT'S DISPLAYING, AND

4    THAT'S DONE BY THE END USER AT THEIR COMPUTER.  WELL, THAT'S

5    CONTRARY TO WHAT THEY'VE SAID IN THEIR COMPLAINT.  A MONTH OR

6    SO GOES BY AND WE GET THEIR INFRINGEMENT CONTENTIONS.  AND

7    I'VE INCLUDED AN EXAMPLE HERE IN THIS CHART AS TO WHAT THEY

8    SAY WITH RESPECT TO THEIR INFRINGEMENT CONTENTIONS.  AND THAT

9    IS PRICEGRABBER.COM DISPLAYS A FEATURE SCREEN IN THIS EXAMPLE

10   FOR A DIGITAL CAMERA FAMILY.  IN THE INFRINGEMENT CONTENTIONS

11   THEY SAY THAT WE DO THE DISPLAYING STEP.  SO THEY'VE TAKEN A

12   CONTRADICTORY POSITION, AND THEY CAN'T HAVE IT BOTH WAYS.

13   FOR PURPOSES OF JURISDICTION, THEY CAN'T SAY THAT, WELL,

14   SOMEBODY ELSE DOES A STEP THAT'S IN THIS PROCESS AND THEREFORE

15   YOU HAVE JURISDICTION, BUT THEN WITH RESPECT TO THEIR

16   INFRINGEMENT CASE, THEY SAY THAT WE DO IT.  SO THE FUNDAMENTAL

17   CONFUSION THERE OR CONTRADICTORY POSITION IS VERY IMPORTANT

18   FROM THE STANDPOINT OF THIS MOTION BECAUSE WE NEED TO KNOW.

19   WE NEED TO KNOW WHICH IT IS.  AND ONE POTENTIAL WAY TO RESOLVE

20   THIS ISSUE IS IF THE PLAINTIFF WILL SAY, IF THEY WILL

21   STIPULATE THAT DISPLAYING TAKES PLACE WITH THE END USER, AND

22   THEY WILL AMEND THEIR INFRINGEMENT CONTENTIONS AND THEY WILL

23   AMEND THEIR COMPLAINT, THEN, QUITE FRANKLY, I BELIEVE THAT THE

24   PERSONAL JURISDICTION ASPECT OF THIS MOTION HAS TO GO AWAY.

25   IN OTHER WORDS, WE WOULD BE WILLING TO WITHDRAW THAT ASPECT OF

1    OUR MOTION.  BUT IF THEY ARE NOT WILLING TO DO THAT, THEN I

2    THINK THE RECORD IS CLEAR AND THE CASE LAW IS CLEAR THAT THERE

3    IS NO SPECIFIC JURISDICTION WITH RESPECT TO VALUECLICK,

4    PRICERUNNER, AND PRICEGRABBER.  THAT'S ESSENTIALLY THE

5    SPECIFIC JURISDICTION ISSUE THAT WE HAVE.

6        WITH RESPECT TO GENERAL JURISDICTION, YOUR HONOR KNOWS

7    THE TEST.  IT'S CONTINUOUS AND SYSTEMATIC CONTACTS WITH THE

8    FORUM.  THE PLAINTIFF HAS KIND OF MIXED AND MATCHED A LITTLE

9    BIT, WHICH IS INAPPROPRIATE.  BUT THE BOTTOM LINE IS, IF YOU

10   LOOK AT THE DECLARATIONS THAT HAVE BEEN SUBMITTED, THE

11   EVIDENCE IS CLEAR THAT WE DON'T HAVE THE TYPE OF CONTINUOUS

12   AND SYSTEMATIC CONTACTS WITH THE STATE OF TEXAS THAT WOULD

13   JUSTIFY AN EXERCISE OF GENERAL JURISDICTION OVER THESE

14   DEFENDANTS.

15       THE COURT IS WELL AWARE AND FAMILIAR WITH THE ISSUES

16   RELATING TO WEBSITES.  THE COURT IN *J. L. CHIEFTAIN* AND THE

17   *OAKLEY* CASE ANALYZED THE SLIDING SCALE, RECOGNIZED THAT THE

18   FIFTH CIRCUIT HAS SAID THAT IN THE CONTEXT OF GENERAL

19   JURISDICTION THAT SLIDING SCALE IS NOT VERY WELL ADAPTED TO

20   THE ANALYSIS.  AT THE VERY BEST IN THIS CASE, THESE WEBSITES

21   WOULD FALL IN THE MIDDLE OF THAT SCALE AND THAT ALONE IS NOT

22   SUFFICIENT TO ESTABLISH GENERAL JURISDICTION.  IN FACT, IT'S

23   LESS THAN WHAT YOU HAD IN *OAKLEY*.  IN *OAKLEY* THE CONSUMERS

24   COULD ACTUALLY PURCHASE THINGS ON THE WEBSITE DIRECTLY FROM

25   THE DEFENDANT THAT WAS SUED IN THAT CASE.  SO I DON'T BELIEVE

1   THAT THIS FACTOR, THE TYPE OF WEBSITE THAT WE HAVE, IS

2   SUFFICIENT.

3       SO NEXT YOU GO TO WHAT THE TRADITIONAL CONTACTS ARE.  THE

4   DECLARATIONS ALSO ESTABLISH THAT WE DON'T HAVE ANY OF THOSE

5   TRADITIONAL CONTACTS.  YOU DON'T HAVE A PROPERTY OWNERSHIP.

6   YOU DON'T HAVE THESE DEFENDANTS BEING REGISTERED TO DO

7   BUSINESS IN THE STATE OF TEXAS.  YOU DON'T HAVE EMPLOYEES IN

8   THE STATE OF TEXAS, SALES REPRESENTATIVES, AND THE LIKE.  SO

9   THERE IS A COMPLETE ABSENCE OF THE TRADITIONAL CONTACTS THAT

10  ARE UTILIZED TO ESTABLISH CONTINUOUS AND SYSTEMATIC THAT

11  SATISFY THAT TEST.

12      LAST THING IS THE SALES, REVENUES THAT ARE GENERATED FROM

13  THE STATE OF TEXAS.  AND WHILE IT'S A FACTOR TO BE CONSIDERED,

14  I THINK THAT YOU ARE WELL AWARE THAT YOU SHOULDN'T LOOK AT THE

15  ACTUAL DOLLAR NUMBERS, YOU LOOK AT THE PERCENTAGES.  AND THE

16  DECLARATIONS ESTABLISH THAT WITH RESPECT TO PRICEGRABBER, IT'S

17  APPROXIMATELY TWO PERCENT.  WITH RESPECT TO VALUECLICK AND

18  PRICERUNNER, IT'S LESS THAN SIX PERCENT.  THAT'S WELL BELOW

19  THE SEVEN POINT THREE PERCENT THAT WAS ANALYZED IN THE *J. L.*

20  *CHIEFTAIN* CASE.  SO AGAIN THIS FACTOR DOES NOT WEIGH IN FAVOR

21  OF A FINDING OF GENERAL JURISDICTION. THE TOTAL ANALYSIS, YOUR

22  HONOR, IS VERY MUCH LIKE WHAT YOU DID IN *J. L. CHIEFTAIN*.  AND

23  I WOULD RESPECTFULLY SUBMIT THAT THE FINDING SHOULD BE THE

24  SAME.

25      ON 1404 I JUST WANT TO RAISE A COUPLE OF POINTS.  I'VE

1    ALREADY TALKED ABOUT THE FACTOR OF PERSONAL JURISDICTION BEING

2    CONSIDERED IN THE ANALYSIS, BUT THIS CASE TRULY IS A CASE THAT

3    HAS NO CONNECTION WITH THE STATE OF TEXAS.  THE ONLY

4    CONNECTION THAT'S THERE IS PLAINTIFF CHOSE TO SUE HERE.  AND I

5    UNDERSTAND THAT THAT'S A FACTOR TO BE CONSIDERED, BUT WHEN YOU

6    LOOK AT ALL OF THE OTHER FACTORS THAT ONE SHOULD NOT CARRY THE

7    DAY.  SO I GUESS THE RELIEF THAT WE WOULD REQUEST IS IN THE

8    EVENT THE PLAINTIFF IS WILLING TO STIPULATE ON THE DISPLAYING

9    ISSUE THAT THAT TAKES PLACE AT THE END USER'S TERMINAL OR

10   COMPUTER, THEN THE ONLY DECISION FOR YOU TO MAKE IS A 1404

11   DECISION WHICH I THINK MERITS TRANSFER TO THE NORTHERN

12   DISTRICT OF CALIFORNIA.  IF THE PLAINTIFF IS NOT WILLING TO DO

13   THAT, YOUR HONOR, THEN WE SUBMIT THAT JURISDICTION OVER

14   VALUECLICK, PRICERUNNER, AND PRICEGRABBER IS NOT PRESENT AND

15   THE COURT SHOULD TRANSFER THE CASE PURSUANT TO 1406 FOR

16   IMPROPER VENUE SO THAT YOU DON'T HAVE POTENTIALLY TWO CASES

17   GOING ON AT THE SAME TIME.

18        FINALLY, IN THE ALTERNATIVE, WE WOULD REQUEST THAT AT THE

19   VERY LEAST VALUECLICK, PRICERUNNER, AND PRICEGRABBER BE

20   DISMISSED FOR WANT OF JURISDICTION.  IF YOU HAVE NO QUESTIONS,

21   THANK YOU.

22        THE COURT: RESPONSE.

23        MR. BALDWIN: THANK YOU, YOUR HONOR.  MAY I PROCEED?

24        THE COURT: YES.

25        MR. BALDWIN:  I SUPPOSE THE BEST WAY TO I THINK,

1    UNLESS THE COURT WOULD LIKE ME TO DO OTHERWISE, WOULD BE, JUST

2    BE TO RESPOND TO MR. LEE'S COMMENTS IN THE ORDER IN WHICH HE

3    MADE THEM, THE FIRST BEING AS TO THE JURISDICTIONAL ISSUE IN

4    THIS CASE AS TO VALUECLICK, PRICERUNNER, AND PRICEGRABBER.

5    AND THAT IS THIS, THAT WITH REGARD TO THOSE THREE DEFENDANTS,

6    OBVIOUSLY THE OTHER DEFENDANTS IN THE CASE ARE NOT CONTESTING

7    JURISDICTION.  WE BELIEVE THAT WE HAVE MADE OUT A PRIMA FACIE

8    CASE OF SPECIFIC JURISDICTION.

9         THE COURT: WHAT ABOUT THIS ISSUE OF DISPLAYING, THIS

10   STIPULATION THAT'S REQUESTED?  WHAT IS YOUR POSITION IN THAT

11   REGARD?

12        MR. BALDWIN: MY POSITION -- FIRST OF ALL, TO ANSWER

13   YOUR QUESTION ABOUT HIS STIPULATION, IS THE FIRST I'VE HEARD

14   OF IT IS TODAY, AND I'M NOT PREPARED TO STIPULATE TO THAT

15   WITHOUT SOME THOUGHT RIGHT NOW.  BUT I CAN TELL YOU, YOUR

16   HONOR, OUR POSITION WITH REGARD TO DISPLAY AS IT PERTAINS TO

17   JURISDICTION AND AS IT PERTAINS TO SPECIFIC JURISDICTION IS

18   THAT, YES, THE DISPLAY ORIGINATES AT THE SERVER THERE'S NO

19   DOUBT.  THE RESULT OF THAT ORIGINATION ENDS AT THE DISPLAY AT

20   THE COMPUTER TERMINAL OF A USER.  AND WE -- WE SAY THAT THAT

21   DISPLAY IS AT THE VERY LEAST IN PART AN INFRINGEMENT, A STEP

22   IN THE METHOD THAT WE CLAIM --

23        THE COURT: THE DISPLAY BY THE USER?

24        MR. BALDWIN:  -- IN THIS CASE.

25        THE COURT: IS THAT RIGHT?

1       MR. BALDWIN: AT THE END -- YES, SIR, AT THE END OF

2   THE -- AT THE USER TERMINAL.  IT SPECIFICALLY IS TO SPECIFIC

3   JURISDICTION, THAT FACT COUPLED WITH THE ACTIVITY, THE

4   INTERACTIVE NATURE OF THE WEBSITES THAT WE HAVE THAT THE

5   DEFENDANTS IN THEIR PAPERWORK AT THE VERY LEAST HAVE CALLED

6   PASSIVE, COUPLED WITH THE PURPOSEFUL AND DIRECT CONTACT THAT

7   THESE THREE DEFENDANTS HAVE WITH THE STATE OF TEXAS, AS MR.

8   LEE PUT IT, THEY GENERATE REVENUE FROM THE STATE OF TEXAS IN

9   CONNECTION WITH THESE WEBSITES.  THEY MAKE DIRECT CONTACT WITH

10  TEXAS' RESIDENTS THROUGH EMAIL, THROUGH E-ALERTS, THROUGH

11  PRICE ALERTS IN THE STATE OF TEXAS.  THEY HAVE SENT THEIR

12  PERSONNEL TO TRADE SHOWS IN THE STATE OF TEXAS, FOR INSTANCE.

13  TO SAY THAT THEY DON'T HAVE CONTACT OR ACTIVITIES IN THE STATE

14  OF TEXAS WHICH RELATE TO THE CAUSE OF ACTION THAT WE HAVE

15  ASSERTED IN THIS CASE, I TAKE ODDS WITH.

16      WHEN YOU LOOK AT ANY OF THESE FACTORS BY THEMSELVES, FOR

17  INSTANCE, IS THE OPERATION OF INTERACTIVE WEBSITES IN THE

18  STATE OF TEXAS, THAT ALONE THE COURTS HAVE HELD IS NOT

19  SUFFICIENT FOR YOU TO ESTABLISH JURISDICTION.  BUT WHEN YOU

20  COMBINE THE TOTALITY OF THE ACTIVITIES THAT THESE DEFENDANTS

21  HAVE IN THIS STATE, THE PURPOSEFUL DIRECTED ACTIVITIES AT THE

22  RESIDENCE OF THE STATE OF TEXAS, ONE BEING THAT A PART OF OUR

23  INFRINGEMENT ALLEGATIONS, THE RESULT OCCURS HERE IN TEXAS.

24  THE OTHERS BEING THE DIRECT CONTACT THAT THEY HAVE WITH

25  RESIDENTS OF THE STATE OF TEXAS BY WAY OF AGAIN PRICE ALERTS,

1    EMAIL ALERTS, MEMBERSHIP TO THEIR WEBSITE.  THE TOTALITY OF

2    THE CONTACT THAT THEY HAVE WITH THE STATE SATISFIES THE

3    CRITERIA SET FORTH IN THE *AKRO* CASE THAT THE DEFENDANT

4    PURPOSEFULLY CONDUCT DIRECTED ACTIVITIES IN THIS FORUM, THAT

5    THEY RELATE TO THE CAUSE OF ACTION.  THEY DON'T HAVE TO FORM

6    THE BASIS OF THE CAUSE OF ACTION AS THE *HOLLY ANN* COURT

7    STATED.  THEY HAVE TO FORM A BASIS OF THE CAUSE OF ACTION, AND

8    THEN AFTER THAT THEY HAVE TO SHOW A COMPELLING REASON AS TO

9    WHY IT WOULD BE CONSTITUTIONALLY UNREASONABLE TO ASSERT

10   JURISDICTION OVER THEM.

11       SO SIMPLY STATED, THAT'S OUR POSITION WITH REGARD TO

12   SPECIFIC JURISDICTION.  AND MR. LEE IS RIGHT, THERE IS SOME

13   OVERLAPPING IN THE ALLEGATIONS OF THE GENERAL JURISDICTION AND

14   SPECIFIC JURISDICTION.  IT'S DIFFICULT NOT TO.  WE HAVE ASKED

15   THE COURT TO GIVE US, SPEAKING OF RELIEF, TO GIVE US SOME

16   JURISDICTIONAL DISCOVERY.

17           THE COURT: WHAT'S BEEN DONE IN THIS CASE TO DATE BY

18   -- WHAT'S BEEN DONE BY WAY OF DISCOVERY TO DATE?

19           MR. BALDWIN: TO DATE, THE PARTIES HAVE EXCHANGED

20   THEIR DISCLOSURES.  THE DEFENDANTS ARE FILING OR HAVE FILED

21   THEIR INVALIDITY CONTENTIONS YESTERDAY.  WE HAVE FILED OUR

22   INFRINGEMENT CONTENTIONS AND DEPOSITIONS ARE BEING SCHEDULED.

23   WE HAVE NOT CONDUCTED, TO ANSWER YOUR QUESTION DIRECTLY, YOUR

24   HONOR, ANY JURISDICTIONAL DISCOVERY.  PAPER DISCOVERY HAS BEEN

25   EXCHANGED.  AGAIN, DIRECTLY NO JURISDICTIONAL DISCOVERY HAS

1    BEEN CONDUCTED.  WE ARE ENGAGED IN DISCOVERY, THOUGH, ON THE

2    MERITS OF THE CASE.  EXCUSE ME.

3        AND MR. LEE BROUGHT UP SEVERAL TIMES THE *OAKLEY* CASE, AND

4    ONE THING THAT I GOT OUT OF THAT CASE WAS THIS, AND THAT IS

5    THAT THE DEFENDANTS IN THAT CASE, THEY TOOK STEPS TO EXTRACT

6    THEMSELVES FROM THE JURISDICTION OF THIS COURT.  IN CONTRAST,

7    THESE THREE DEFENDANTS, THEY HAVE DONE NOTHING TO KEEP

8    THEMSELVES FROM THE JURISDICTION OF THIS COURT.  I MENTIONED

9    THE *HOLLY ANN* CASE. ONE OF THE ARGUMENTS THAT HAS BEEN MADE IS

10   THAT, WELL, IF YOU BELIEVE WHAT MR. BALDWIN SAYS YOU COULD

11   SUBJECT US TO JURISDICTION IN FIFTY STATES.  THE COURT IN THAT

12   CASE ADDRESSED THOSE VERY ISSUES.  AND ONE OF THE THINGS THAT

13   I GARNERED FROM THAT CASE WAS THAT IF RISK OF BEING SUBJECT TO

14   JURISDICTION IS TOO GREAT FOR PRICERUNNER, PRICEGRABBER, AND

15   VALUECLICK, TOO GREAT FOR THEM TO STAND, THEN WHY ARE THEY

16   STILL DOING BUSINESS HERE IN THE STATE OF TEXAS BECAUSE THEY

17   COULD NOT BE DOING BUSINESS HERE IF THAT'S WHAT THEY WANTED.

18   AND THEY HAVE TAKEN NO STEPS, YOUR HONOR, TO AVOID THE

19   JURISDICTION OF THIS COURT OTHER THAN TO SAY THAT, WELL, OUR

20   WEBSITES ARE MERELY PASSIVE AND THAT'S ALL WE DO.  I WAS

21   TELLING MR. RUNYAN ON THE WAY UP HERE THE BEST PART OF THE

22   ARGUMENT FROM A JURISDICTION VENUE STANDPOINT FOR THESE

23   DEFENDANTS IS THE FIRST THREE SENTENCES OF THEIR RESPONSE.

24   AND THAT IS, WELL, THIS IS A CASE INVOLVING A CALIFORNIA

25   PLAINTIFF AND A CALIFORNIA DEFENDANT AND NOTHING HAPPENED HERE

1    IN TEXAS.  BUT AFTER THAT, IN MY MIND, ONCE YOU READ AND STUDY

2    THE RESPONSE AND THE AFFIDAVITS THAT HAVE BEEN SUBMITTED, IT

3    FALLS APART.  AND I'LL USE THAT TO SEGUE INTO BRIEFLY THE

4    1404(A) ARGUMENT AND THEN I'LL QUIT.

5        QUICKLY, MR. LEE MENTIONED THE *MICRON* CASE, AND WHAT I

6    GLEANED FROM THAT CASE, THE *MICRON V. MOSAID*, IS THAT THE

7    COURT HAS BROAD DISCRETION IN RULING ON JURISDICTIONAL

8    MATTERS.  AND IT'S AN ABUSE OF DISCRETION STANDARDS BY WHICH

9    THESE TYPES OF RULINGS ARE REVIEWED UNDER.  AND ON THIS

10   RECORD, THE COURT IS WELL WITHIN HIS DISCRETION IN HOLDING

11   JURISDICTION OVER THESE THREE, VALUECLICK, PRICERUNNER, AND

12   PRICEGRABBER, IN HOLDING JURISDICTION.

13       AS TO THE 1404(A) ARGUMENT THAT MR. LEE MADE, THERE IS

14   OBVIOUSLY -- I WOULDN'T PRESUME TO STAND HERE AND TRY TO

15   EDUCATE THE COURT ON THOSE MATTERS.  SUFFICE IT TO SAY THAT

16   THIS COURT HAS RECOGNIZED, AS WELL AS THE FEDERAL CIRCUIT,

17   THAT IN A 1404(A) ANALYSIS, IT REQUIRES THE COURT TO GIVE

18   GREAT WEIGHT TO A PLAINTIFF'S CHOICE OF FORUM, AND, WITH THAT

19   IN MIND, IT CAN WEIGH THE CONVENIENCE FACTORS SET FORTH BY THE

20   FIFTH CIRCUIT IN THAT REGARD.  AND THAT IT'S A STANDARD AND A

21   HEAVY BURDEN BY WHICH THE DEFENDANTS OPERATE UNDER TO MAKE IT

22   CLEAR THAT THE CASE SHOULD BE TRANSFERRED.  AND WHEN YOU LOOK

23   AT THE EVIDENCE THAT HAS BEEN SUBMITTED, YOUR HONOR, IT JUST

24   DOESN'T GET THERE.

25       A FOR INSTANCE WOULD BE NONPARTY WITNESS, THE CONVENIENCE

1   OF NONPARTY WITNESSES IN THIS CASE, DOES IT WARRANT A TRANSFER

2   TO CALIFORNIA?  THESE ARE MULTINATIONAL, MULTIBILLION DOLLAR

3   CORPORATIONS, AND I'VE GOT TO MY LEFT OVER HERE A GROUP OF

4   LAWYERS THAT ARE SOME OF THE BEST IN THE COUNTRY, AND YET

5   THEY'VE NOT IDENTIFIED A SINGLE, NOT ONE NONPARTY WITNESS WHO

6   WOULD BE INCONVENIENCED BY A TRIAL HERE IN MARSHALL.  WE

7   HAVEN'T SEEN ONE YET.  THEY TALK ABOUT THE LOCATION OF THEIR

8   SERVERS.  THE IMPRESSION HAS BEEN LEFT THAT, WELL, EVERYTHING

9   HAPPENS IN CALIFORNIA.  AND THAT IS NOT THE CASE.  WE'VE GOT

10  THREE OF THE DEFENDANTS WHO WE DON'T KNOW WHERE THEIR SERVERS

11  ARE.  THEY HAVEN'T TOLD US.

12          THE COURT: AND WHICH THREE WOULD THAT BE?

13          MR. BALDWIN: FOR THE RECORD, AND I APOLOGIZE, YOUR

14  HONOR, SHOPZILLA, EBAY, AND MICROSOFT.  THEY HAVE NOT TOLD US

15  WHERE THEIR SERVERS ARE LOCATED.  IF THAT IS SUCH A PARAMOUNT

16  ISSUE IN THIS VENUE JURISDICTION BATTLE, ONE WOULD THINK THAT

17  WE WOULD -- THEY WOULD TELL US.  THEY HAVEN'T TOLD US.

18      YAHOO! HAS TOLD US THAT THEY ARE PRINCIPALLY LOCATED OR

19  PRIMARILY LOCATED IN CALIFORNIA.  VALUECLICK HAS SERVERS IN

20  SWEDEN.  THEY HAVE SERVERS IN CALIFORNIA, PENNSYLVANIA,

21  ENGLAND.  PRICEGRABBER IS THE ONLY DEFENDANT WHO HAS INDICATED

22  TO US THAT THEIR SERVERS ARE SOLELY IN CALIFORNIA.  THERE HAVE

23  BEEN NO ALLEGATIONS THAT A JURY IS GOING TO NEED TO GO AND

24  VIEW THESE SERVERS.  THAT'S NOT AN ISSUE IN THE CASE.  THE

25  EVIDENCE THAT THEY SUBMITTED WITH THEIR 1404(A) PART OF THEIR

1    MOTIONS IS IT JUST WHOLLY -- WHOLLY FAILS.

2        WE'VE SUBMITTED THE AFFIDAVITS TO YOUR HONOR FROM THE

3    INVENTORS OF THIS PATENT TO SAY THEY WILL NOT BE

4    INCONVENIENCED BY A TRIAL HERE.  WE'VE SUBMITTED AN AFFIDAVIT

5    OF A PROSECUTING PATENT ATTORNEY AND WHO DOES LIVE IN

6    CALIFORNIA, SAID HE WOULD NOT BE INCONVENIENCED BY A TRIAL

7    HERE IN MARSHALL.  THERE IS JUST -- THEY JUST HAVE NOT MET

8    THEIR BURDEN IN WARRANTING THAT IT IS CLEAR THAT A TRANSFER

9    SHOULD BE MADE TO CALIFORNIA.

10        AND WITH THAT, YOUR HONOR, THE REST OF IT, I COULD GO ON

11    BUT I THINK IT'S WELL DOCUMENTED IN OUR REPLY AND SUR-REPLY,

12    AND IF THERE AREN'T ANY QUESTIONS, I'LL CONCLUDE.

13            THE COURT: VERY WELL.

14            MR. BALDWIN: THANK YOU FOR YOUR --

15            THE COURT: REPLY TIME, HOW MUCH TIME?

16            THE CLERK: FOUR MINUTES.

17            THE COURT: EXCUSE ME?

18            THE CLERK: FOUR MINUTES.

19            THE COURT: YOU HAVE FOUR MINUTES OF REPLY TIME.

20            MR. LEE: YOUR HONOR, MR. BALDWIN MENTIONED THE *HOLLY*

21    *ANN* CASE, AND I'M GLAD THAT HE DID BECAUSE ONE THING THAT THE

22    *HOLLY ANN* CASE SAYS IS THAT YOU CAN'T IMPART THE CONDUCT OF

23    OTHERS TO ESTABLISH JURISDICTION OVER ANOTHER DEFENDANT.  AND

24    THAT'S BASICALLY IF THEY ARE NOT WILLING TO STIPULATE AS FAR

25    AS THE DISPLAYING ASPECT OF THIS CLAIM, THAT'S OUR POSITION.

1  YOU CAN'T TAKE THE CONDUCT OF A USER LOGGING ON AND DISPLAYING

2  THIS PARTICULAR SCREEN AND IMPART THAT TO US.  THE WEB SERVER

3  IS WHAT ACTUALLY OPERATES THE SYSTEM OR THE METHOD.  IT'S WHAT

4  PERFORMS THE METHOD.  SO WHAT MR. BALDWIN IS TRYING TO DO IS

5  IMPERMISSIBLE UNDER THE *HOLLY ANN* DECISION.

6       *OAKLEY*, IN *OAKLEY* ONE OF THE DEFENDANTS THERE EXTRACTED

7  THE ACTUAL PRODUCT FROM TEXAS.  THEY PREVENTED THE SPECIFIC

8  PRODUCT THAT WAS ACCUSED OF INFRINGEMENT FROM COMING INTO

9  TEXAS.  THOSE DEFENDANTS STILL MAINTAIN WEBSITES, AND AS I

10 INDICATED IN MY OPENING REMARKS, YOU COULD ACTUALLY PURCHASE

11 PRODUCTS, TEXAS' RESIDENTS COULD PURCHASE PRODUCTS FROM THOSE

12 WEBSITES.  YOU DON'T HAVE THAT HERE.  SO I THINK THAT THE

13 DISTINCTION BETWEEN SPECIFIC AND GENERAL IS EVEN FURTHER

14 ILLUSTRATED BY WHAT TOOK PLACE IN THE *OAKLEY* CASE.

15      LOCATION OF THE SERVERS, YOUR HONOR, LOCATION OF THE

16 SERVERS IS OF PARAMOUNT CONSIDERATION ON THE PERSONAL

17 JURISDICTION ISSUE.  WHERE MICROSOFT'S SERVERS ARE LOCATED,

18 WHERE YAHOO!'S SERVERS ARE LOCATED, THAT DOESN'T MATTER WITH

19 RESPECT TO WHETHER YOU HAVE JURISDICTION OVER VALUECLICK,

20 PRICERUNNER, AND PRICEGRABBER.  AND FROM THE BRIEFING ON THIS

21 IT'S CLEAR THAT THERE ARE NO SERVERS OF ANY OF THOSE THREE

22 DEFENDANTS THAT ARE FOUND IN THE STATE OF TEXAS.

23      JURISDICTIONAL DISCOVERY, JUDGE, WE TRIED TO WORK

24 SOMETHING OUT ON THIS.  FIRST OF ALL, THEY HAVEN'T SERVED ANY

25 AND THEY COULD HAVE DONE THAT.

1          THE COURT: HAVE NOT?

2          MR. LEE: THEY HAVE NOT SERVED ANY JURISDICTIONAL

3  DISCOVERY.  AND THEY COULD HAVE DONE THAT.  AND IN FACT I

4  THINK OUR ANSWERS TO INTERROGATORIES AND SOME DOCUMENT

5  REQUESTS ARE DUE EITHER TODAY OR TOMORROW, AND WE ARE IN THE

6  PROCESS OF PUTTING THOSE TOGETHER.  WE TRIED TO WORK THAT OUT.

7  AND WHAT WE SAID WAS TO AVOID THE EXPENSE AND POTENTIAL DELAY

8  OF THE RESOLUTION OF THIS MOTION, WE WOULD BE WILLING TO

9  ENGAGE IN JURISDICTIONAL DISCOVERY ON THE GENERAL JURISDICTION

10 SIDE.  OUR POSITION IS THAT SPECIFIC JURISDICTION DOESN'T

11 REQUIRE ANY DISCOVERY.  AND WHAT WE HAD HOPED TO DO WAS HAVE

12 YOUR HONOR DECIDE THIS SPECIFIC JURISDICTION ISSUE.  IF YOU

13 WERE TO FIND SPECIFIC JURISDICTION, THERE IS NO NEED TO ENGAGE

14 IN THE EXPENSE AND THE TIME TO DO THE GENERAL JURISDICTION

15 DISCOVERY.  THAT OFFER WAS REJECTED.  SO WE ARE NOT

16 STONEWALLING.  AND I DIDN'T WANT THE COURT TO BE LEFT WITH THE

17 IMPRESSION OF THAT.

18     BUT IF THE COURT HAS NO QUESTIONS AT THIS POINT --

19          THE COURT: NO.

20          MR. LEE:  -- I WOULD RESPECTFULLY REQUEST THAT THE

21 MOTION BE GRANTED.

22          THE COURT: VERY WELL.  MR. BALDWIN, DID YOU REJECT

23 THEIR OFFER OF JURISDICTIONAL DISCOVERY?  IF SO, WHY?  AND IF

24 YOU'VE REJECTED IT, WHY DO YOU NOW WANT IT?

25          MR. BALDWIN: I HEAR YOU, YOUR HONOR, AND LANCE AND I

1    HAD TALKED ABOUT THAT JUST THE OTHER DAY.  AND OUR POSITION ON

2    THAT WAS IS THAT WE DON'T AGREE WITH MR. LEE WHEN HE SAYS THAT

3    JURISDICTIONAL DISCOVERY ON THE SPECIFIC JURISDICTION ISSUE

4    WOULD NOT HELP THE COURT, AND WE DIDN'T WANT TO PRESUME TO

5    MAKE THAT DECISION FOR THE COURT.  NOR DID ME OR MR. LEE HAVE

6    ANY CONFIDENCE THAT IF WE DID REACH AN AGREEMENT ABOUT HOW

7    THIS MOTION WOULD BE ARGUED AND WHAT DISCOVERY WE MIGHT

8    CONDUCT, WE DIDN'T KNOW HOW -- WHAT THE COURT WOULD DO, OR

9    WOULD THE COURT RECEIVE THAT WELL OR NOT.  AND OUR POSITION ON

10   IT WAS IS THAT WE THINK THAT IF YOU DO NEED MORE INFORMATION

11   FOR THE COURT, THAT WE SHOULDN'T BE LIMITED -- SHOULDN'T LIMIT

12   IT TO GENERAL JURISDICTION ONLY IF THE COURT SHOULD DECIDE

13   THAT YOU DO NEED MORE INFORMATION.  WE WEREN'T REJECTING THE

14   OFFER OF DISCOVERY FOR --

15            THE COURT: WELL, I MEAN THIS IS YOUR RESPONSE.

16            MR. BALDWIN: YES, SIR.  AND MY UNDERSTANDING IS THAT

17   IF --

18            THE COURT: WELL --

19            MR. BALDWIN: WE WOULD LIKE MORE DISCOVERY THEN.  I

20   HEAR WHAT YOU'RE SAYING.  AND I WAS LOOKING AT IT FROM THE

21   STANDPOINT OF WHAT THE COURT'S PLEASURE WAS AND THAT'S ALL.

22   THAT'S WHAT I MEANT BY THAT, YOUR HONOR.  I REALIZE IT'S OUR

23   OBLIGATION AND OUR RESPONSE, AND IT WOULD BE OUR REQUEST AS

24   WELL.  AGAIN, AS MR. LEE PUT IT, WE DIDN'T JUST OUTRIGHT

25   REJECT JURISDICTIONAL DISCOVERY.  WE REJECTED THE WAY IT WAS

1   PROPOSED, THAT'S ALL.

2            THE COURT: MR. LEE, ANY ADDITIONAL COMMENTS?

3            MR. LEE: JUDGE, WE WOULD -- WE ARE STILL WILLING TO

4   OFFER GENERAL JURISDICTION DISCOVERY.  WE FIRMLY BELIEVE THAT

5   SPECIFIC JURISDICTION IS SET IN THE RECORD AND YOU CAN MAKE A

6   FINDING ON THAT.  AND WE WOULD REQUEST THAT YOU DO SO, SO WE

7   COULD POTENTIALLY AVOID --

8            THE COURT: WELL, HERE IS WHAT I AM GOING TO SUGGEST.

9   IT'S GOING TO BE MORE THAN A FEW DAYS BEFORE I COULD TAKE THIS

10  UP.  IF YOU GENTLEMEN WANT TO DISCUSS THIS MORE, AND MR.

11  BALDWIN, I'M GOING TO GIVE YOU AN OPPORTUNITY TO CONSIDER THIS

12  STIPULATION.

13            MR. BALDWIN: THANK YOU.

14            THE COURT: AND IF YOU DESIRE TO ENTER INTO THE

15  STIPULATION, PERHAPS THAT TAKES CARE OF THE JURISDICTIONAL

16  ISSUE.  BUT I WANT YOU TO MAKE KNOWN YOUR INTENTIONS.  I AM

17  GOING TO BE OUT OF THE OFFICE MOST OF NEXT WEEK ATTENDING A

18  MEETING OF CHIEF JUDGES AND CHIEF JUDGES TO BE.  SO I WANT YOU

19  TO ADVISE THE COURT BY FRIDAY OF NEXT WEEK WHETHER YOU'RE

20  WILLING TO ENTER INTO THE STIPULATION, AND THAT'S OBVIOUSLY UP

21  TO THE PLAINTIFF WHETHER YOU ARE OR ARE NOT.  BUT THEN IF THE

22  PARTIES WANT TO DISCUSS SOME TYPE OF JURISDICTIONAL DISCOVERY

23  AND THEN AMEND THE MOTION AND RESPONSES, I'LL CERTAINLY BE

24  OPEN TO ANY REASONABLE AGREEMENT IN THAT REGARD.  SO I WANT

25  THE PARTIES LIKEWISE TO ADVISE ME BY FRIDAY OF NEXT WEEK YOUR

1    INTENTIONS IN THAT REGARD, AND THEN I'LL SEE WHERE THAT LEAVES

2    THE PARTIES ON THESE MOTIONS AND GO FORWARD ACCORDINGLY.

3              MR. BALDWIN: YES, SIR.

4              THE COURT: VERY WELL.  WE WILL BE IN RECESS.

5         (ADJOURNED AT 10:28 A.M.)

6

7

8

9

10                   REPORTER'S CERTIFICATION

11        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

12   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

13

14   DATE: <u>APRIL 22, 2008</u>              <u>/S/LIBBY CRAWFORD</u>

15                                    LIBBY CRAWFORD, CSR

16                                    OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25

# Exhibit 21

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| PARTSRIVER, INC., | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | |
| | § | |
| SHOPZILLA, INC.; | § | **CASE NO. 2-07-CV-440 DF** |
| YAHOO! INC.; | § | |
| PRICEGRABBER.COM, INC.; | § | |
| EBAY, INC.; and | § | |
| MICROSOFT CORPORATION, | § | |
| | § | |
| **Defendants.** | § | |

## JOINT CLAIM CONSTRUCTION AND PREHEARING STATEMENT

Pursuant to the requirement of Rule 4-3, the parties jointly submit the following Joint Claim Construction and Prehearing Statement. The parties submit the attached Joint Claim Construction Chart, attached hereto as Exhibit "A", which contains the construction of the claim terms, phrases or clauses on which the parties agree, as well as the proposed constructions of the disputed claim terms, phrases and clauses and the required references as set forth in Rule 4-3(b).

The parties anticipate that the Claim Construction Hearing will take approximately four hours total.

To the extent necessary to establish their meaning, the Plaintiff may rely upon the testimony of A. James Isbester of, Townsend & Townsend & Crew L.L.P. at the Claim Construction Hearing. Defendants object to this potential testimony and contend that Plaintiff's identification of A. James Isbester as a testifying witness fails to comply with the requirements of P.R. 4-3(b) and (d).

This disclosure is preliminary, and may be modified as further and additional information is made available, and as review of previously produced information proceeds.

Defendants respectfully submit that the pending Motion to Transfer Under 1404(a) and 1406(a), or Alternatively, to Dismiss Under 12(B)(2) and (3) should be taken up before the Court invests time in addressing the parties' claim construction disputes and in advance of the Claim Construction Hearing.  Pursuant to P.R. 4-3(e), the parties will promptly submit proposed dates for a Pre-Hearing Conference on the pending motion in a supplemental pleading.

Dated: December 15, 2008

By: /s/ Will B. Wohlford
Robert W. Coykendall, (Kansas Bar No.21773)
rcoykendall@morrislaing.com
MORRIS, LAING, EVANS, BROCK
& KENNEDY, CHARTERED
300 N. Mead, Suite 200
Wichita, Kansas 67202
Tel: (316) 262-2671
Fax: (316) 262-5991

ON BEHALF OF PLAINTIFFS

Respectfully submitted,

By: /s/ Thomas N. Tarnay
Thomas N. Tarnay (Texas Bar No. 24003032)
ttarnay@sidley.com
SIDLEY AUSTIN LLP
717 N. Harwood, Suite 3400
Dallas, Texas 75201
Tel:  (214) 981-3300
Fax:  (214) 981-3400

ON BEHALF OF DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV5(a) on December 15, 2008.  As of this date, all counsel of record have consented to electronic service and are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV5(a)(3)(A).

                    _____/s/_ Thomas N. Tarnay_____
                    Thomas N. Tarnay

# EXHIBIT A

| Claim | No. | Claim Term, Phrase, or Clause | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Agreed Construction |
|-------|-----|-------------------------------|-----------------------------------|-----------------------------------|---------------------|
| 1. A method for assisting a user in identifying a subfamily of items within a family of items, comprising the steps of: | 1. | "A method for assisting a user in identifying a subfamily of items within a family of items" | A method for assisting a user in narrowing down a list of items to a smaller list based on criteria<br><br>*'821 Patent*: 2:9-50; 3:36-39<br><br>Plaintiff may rely upon other portions of the intrinsic record to respond to arguments and positions taken by the Defendants during the course of Claim Construction. Plaintiffs may also rely on any evidence identified by the Defendants in support of its proposed construction. | The preamble limits the claim, and user means a person using a computer.<br><br>'821 patent: Abstract; 3:43-45; 3:64 – 4:5; 5:31-34; 7:1-11; 7:12-37; 18:60 – 19:11; 19:19-35; claim 1 (e.g., limitations (a), (e), (d), (h))<br><br>Defendants may also rely upon other portions of the intrinsic record for the patent-in-suit including reexaminations and other patents in the same patent family, to respond to positions taken by PartsRiver. Defendants may also rely on any evidence identified by PartsRiver to support its proposed constructions. | No agreement. |
| (a) providing a computer readable data file of stored information representing at least one family of items, said data file identifying at least one alternative for each item, | 2. | "items / family of items / subfamily of items" | "items" could be any commercial product or service offering with a common set of features and alternatives associated therewith<br><br>*'821 Patent*: 5:31-49<br><br>Plaintiff may rely upon other portions of the intrinsic record to respond to arguments and positions taken by the Defendants during the course of Claim Construction. Plaintiffs may also rely on any evidence identified by the Defendants in | "items" means offerings.<br><br>'821 patent: 1:23-30; 2:9-27; 2:50-59; 5:31-49; 11:9-11; 11:19-21; 11:35-36<br><br>'821 patent file history including: Office Action dated 01/04/2000; Amendment of 07/05/2000<br><br>U.S. Patent No. 5,544,360 including: 6:16-33; 10:10-18 (specifically cited by the Examiner during prosecution)<br><br>Defendants may also rely upon other portions of the intrinsic | ==The parties agree on these constructions:==<br><br>=="family of items" - a collection of [items] with specific qualifiers and/or attributes, where one would want to identify [items] by specifying its qualifiers and/or attributes.==<br><br>=="subfamily of items" - a collection of [items] from the family with at least one matching qualifier and/or attribute.== |

# EXHIBIT A

| Claim | No. | Claim Term, Phrase, or Clause | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Agreed Construction |
|---|---|---|---|---|---|
| | | | support of its proposed construction. | record for the patent-in-suit including reexaminations and other patents in the same patent family, to respond to positions taken by PartsRiver. Defendants may also rely on any evidence identified by PartsRiver to support its proposed constructions. | |
| | 3. | "computer readable data file" | | | a collection of data—text, numbers, or graphics—that is stored in any medium and which can be read by a computer. |
| | 4. | "alternative for each item" | | | a qualifier and/or attribute |
| (b) reading said data file, | | | | | |
| (c) displaying a feature screen indicating said alternatives represented in the family, | 6. | "displaying [a feature screen / at least one grouping]" | | | showing on the display device of the user's computer [a feature screen/at least one grouping] |
| | 7. | "feature screen" | | | an image showing multiple alternatives within a family or subfamily |
| | 8. | "indicating said alternatives represented in the family" | feature screen shows alternatives represented in the family of items<br><br>'821 Patent: 7:12-17, 8:20-24, figures 7-9, 26-27<br><br>Plaintiff may rely upon other portions of the intrinsic record to respond to arguments and | showing to the user all the alternatives from the data file for the family of items<br><br>'821 patent:  Abstract; 3:43-45; 3:50-63; 7:12-37; 8:20-27; 8:51-58; 8:61 – 9:4; 16:39 – 17:18; 17:41 – 18:6; 18:50-66;  Figs. 7-9 and 25-29; claim 1 ("said alternatives" refers to limitation | No agreement. |

| Claim | No. | Claim Term, Phrase, or Clause | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Agreed Construction |
|---|---|---|---|---|---|
| | | | positions taken by the Defendants during the course of Claim Construction. Plaintiffs may also rely on any evidence identified by the Defendants in support of its proposed construction. | (a): ". . . data file identifying at least one alternative for each item"); claim 4<br><br>'444 patent file history including: Office Action of 02/16/1996 including pp. 3-4; Amendment of 05/16/1996 including pp. 11-12, 17-18; Affidavit of Kris Walter Kimbrough of 02/12/1997 including p. 1 and Ex. C; Affidavit of Mohamed Sherif Danish of 02/12/1997 including p. 3 and Ex. C.<br><br>The "demonstration program" described in PartsRiver's responses to Interrogatories Nos. 1 and 2 and produced at Bates number PA-NAT-000001, which allegedly existed in April 1992 and embodies claims 1 and 2 of the '821 patent-in-suit.<br><br>Defendants may also rely upon other portions of the intrinsic record for the patent-in-suit including reexaminations and other patents in the same patent family, to respond to positions taken by PartsRiver. Defendants may also rely on any evidence identified by PartsRiver to support its proposed constructions. | |
| (d) accepting a first selection criteria of at least one | 9. | "accepting a first selection criteria" | a computer recognizes that the user has made a selection of one | using a user input device to initiate a search using the | No agreement. |

# EXHIBIT A

| Claim | No. | Claim Term, Phrase, or Clause | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Agreed Construction |
|---|---|---|---|---|---|
| alternative, | | | or more selection criteria<br><br>'*821 Patent*: 7:43-49<br><br><br>Plaintiff may rely upon other portions of the intrinsic record to respond to arguments and positions taken by the Defendants during the course of Claim Construction. Plaintiffs may also rely on any evidence identified by the Defendants in support of its proposed construction. | alternative(s) selected from the feature screen<br><br>'821 patent: 3:50-63; 5:65-66; 6:19-26; 6:38-40; 6:59-61; 7:38-52; 7:53 – 8:19; 8:59-66; 15:64 – 16:3; 18:11-31; 18:64-19:12; Figs. 7-9 and 25-29<br><br>'821 patent file history including: Office Action dated 01/04/2000; Amendment of 07/05/2000<br><br>U.S. Patent No. 5,544,360 (cited during prosecution) including: 8:61 – 9:4; 10:40-57<br><br>'444 patent: claims 1, 14, 17, 29, and 30.<br><br>'444 patent file history including: Office Action of 02/16/1996 including pp. 3-4; Amendment of 05/16/1996 including pp. 11-12, 17-18; Affidavit of Kris Walter Kimbrough of 02/12/1997 including p. 1 and Ex. C; Affidavit of Mohamed Sherif Danish of 02/12/1997 including p. 3 and Ex. C.<br><br>'219 patent: claims 1, 2, 3, 9, 19, and 20<br><br>'588 patent: claims 1 and 6<br><br>The "demonstration program" described in PartsRiver's responses to Interrogatories Nos. 1 and 2 and produced at Bates number PA-NAT-000001, which | |

# EXHIBIT A

| Claim | No. | Claim Term, Phrase, or Clause | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Agreed Construction |
|---|---|---|---|---|---|
| | | | | allegedly existed in April 1992 and embodies claims 1 and 2 of the '821 patent-in-suit.<br><br>Defendants may also rely upon other portions of the intrinsic record for the patent-in-suit including reexaminations and other patents in the same patent family, to respond to positions taken by PartsRiver. Defendants may also rely on any evidence identified by PartsRiver to support its proposed constructions. | |
| | 9A. | "accepting a [ first /second] selection criteria" | a computer recognizes that the user has made a selection of one or more selection criteria<br><br>*'821 Patent*: 7:43-49<br><br><br>Plaintiff may rely upon other portions of the intrinsic record to respond to arguments and positions taken by the Defendants during the course of Claim Construction. Plaintiffs may also rely on any evidence identified by the Defendants in support of its proposed construction. | See #9 above and #14 below. | |

# EXHIBIT A

| Claim | No. | Claim Term, Phrase, or Clause | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Agreed Construction |
|---|---|---|---|---|---|
| | 10. | "selection criteria of at least one alternative" | The first selection criteria is comprised of one or more of the available alternatives displayed to the user<br><br>'*821 Patent*: 7:38-52<br><br>Plaintiff may rely upon other portions of the intrinsic record to respond to arguments and positions taken by the Defendants during the course of Claim Construction. Plaintiffs may also rely on any evidence identified by the Defendants in support of its proposed construction. | selected alternative(s)<br><br>'821 patent:  3:64-67; 7:38-52; 7:53 – 8:5; 8:6-19; 8:24-38; 8:51-57; 8:59-66; 15:64 – 16-3; 16:17-39; 18:41 – 19:12<br><br>'821 patent file history including: Amendment of 07/05/2000<br><br>'444 patent:  claims 1 and 9<br><br>'444 patent file history including: Amendment of 05/16/1996 including pp. 6-11<br><br>'588 patent:  claims 1 and 6<br><br>The "demonstration program" described in PartsRiver's responses to Interrogatories Nos. 1 and 2 and produced at Bates number PA-NAT-000001, which allegedly existed in April 1992 and embodies claims 1 and 2 of the '821 patent-in-suit.<br><br>Defendants may also rely upon other portions of the intrinsic record for the patent-in-suit including reexaminations and other patents in the same patent family, to respond to positions taken by PartsRiver. Defendants may also rely on any evidence identified by PartsRiver to support its proposed constructions. | No agreement. |

# EXHIBIT A

| Claim | No. | Claim Term, Phrase, or Clause | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Agreed Construction |
|---|---|---|---|---|---|
| (e)  determining a first subfamily of items wherein each said item in the first subfamily satisfies said first selection criteria,<br><br>(i)  determining a second subfamily of items of the family wherein each item in the second subfamily satisfies said second selection criteria, | 11. | "determining a [first / second] subfamily" | | | searching for items that match the selection criteria |
| (f)  determining available alternatives represented in the first subfamily,<br><br>(j)  determining available alternatives represented in the second subfamily, and | 12. | "determining available alternatives" | | | identifying those alternatives that remain available for further selection |
| (g)  revising said feature screen to indicate the available alternatives of the first subfamily,<br><br>(k)  revising said feature screen to indicate the available alternatives of the second subfamily. | 13. | "revising said feature screen to indicate the available alternatives of the [first/second] subfamily" | updating the feature screen to display at least the available alternatives in the [first/second] subfamily<br><br>'821 Patent: 5:12-15; 8:20-46, figures 7-9, 26-29<br><br>Plaintiff may rely upon other portions of the intrinsic record to respond to arguments and positions taken by the Defendants during the course of Claim Construction.  Plaintiffs may also rely on any evidence identified by the Defendants in support of its proposed | changing the feature screen on the display device of the user's computer to show all the available alternatives of the [first/second] subfamily<br><br>'821 patent:  Abstract; 3:43-45; 3:50-63; 3:64-4:2; 5:7-11; 7:12-37; 8:20-46; 8:51-58; 8:61 – 9:4; 16:39 – 17:18; 17:35-40; 17:41 – 18:6; 18:50 – 19:11; Figs. 7-9 and 25-29;  claim 1 ("the available alternatives" refers to limitation (f): ". . . available alternatives"); claim 4<br><br>'444 patent:  claims 1, 14, 29, and 30 | No agreement. |

# EXHIBIT A

| Claim | No. | Claim Term, Phrase, or Clause | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Agreed Construction |
|-------|-----|-------------------------------|-----------------------------------|-----------------------------------|---------------------|
| | | | construction. | '444 patent file history including: Office Action of 02/16/1996 including pp. 3-4; Amendment of 05/16/1996 including pp. 11-12, 17-18; Affidavit of Kris Walter Kimbrough of 02/12/1997 including p. 1 and Ex. C; Affidavit of Mohamed Sherif Danish of 02/12/1997 including p. 3 and Ex. C. <br><br> '219 patent:  claims 1, 2, 3, 19 and 20 <br><br> The "demonstration program" described in PartsRiver's responses to Interrogatories Nos. 1 and 2 and produced at Bates number PA-NAT-000001, which allegedly existed in April 1992 and embodies claims 1 and 2 of the '821 patent-in-suit. <br><br> Defendants may also rely upon other portions of the intrinsic record for the patent-in-suit including reexaminations and other patents in the same patent family, to respond to positions taken by PartsRiver. Defendants may also rely on any evidence identified by PartsRiver to support its proposed constructions. | |
| (h)  accepting a second selection criteria comprising the alternative or alternatives of | 14. | "accepting a second selection criteria comprising the alternative | A concatenated set of search criteria comprising the first search selection criteria plus the | using a user input device to initiate a search using the alternative(s) selected from the | No agreement. |

# EXHIBIT A

| Claim | No. | Claim Term, Phrase, or Clause | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Agreed Construction |
|---|---|---|---|---|---|
| the first selection criteria plus at least one alternative selected from the revised feature screen, | | or alternatives of the first selection criteria plus at least one alternative selected from the revised feature screen" | selection criteria added through a second selected alternative<br><br>*'821 Patent:*8:59-66<br><br>*'821 Patent File History*:<br>Response to Office Action of January 4, 2000 at p. 4-5<br><br><br><br>Plaintiff may rely upon other portions of the intrinsic record to respond to arguments and positions taken by the Defendants during the course of Claim Construction.  Plaintiffs may also rely on any evidence identified by the Defendants in support of its proposed construction. | feature screen, where the information transmitted to perform the search includes the alternative(s) previously selected for a prior search plus the alternative(s) most recently selected from the revised feature screen.<br><br>'821 patent:  3:50-63; 3:64-67; 5:65-66; 6:19-26; 6:38-40; 6:59-61; 7:38-52; 7:53 – 8:5; 8:6-19; 8:24-38; 8:51-57; 8:59-66; 15:64 – 16:3; 16:17-39; 18:7-10; 18:11-31; 18:41-19:12; Figs. 7-9 and 25-29<br><br>'821 patent file history including:  Office Action dated 01/04/2000; Amendment of 07/05/2000<br><br>U.S. Patent No. 5,544,360 (cited during prosecution) including:  8:61 – 9:4; 10:40-57<br><br>'444 patent:  claims 1, 14, 17, 29, and 30.<br><br>'444 patent file history including:  Office Action of 02/16/1996 including pp. 3-4; Amendment of 05/16/1996 including pp. 11-12 and 17-18; Affidavit of Kris Walter Kimbrough of 02/12/1997 including p. 1 and Ex. C; Affidavit of Mohamed Sherif Danish of 02/12/1997 including p. 3 and Ex. C.<br><br>'219 patent:  claims 1, 2, 3, 9, 19, | |

# EXHIBIT A

| Claim | No. | Claim Term, Phrase, or Clause | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Agreed Construction |
|-------|-----|-------------------------------|-----------------------------------|-----------------------------------|---------------------|
| | | | | and 20 | |
| | | | | <u>'588 patent</u>:  claims 1 and 6 | |
| | | | | The "demonstration program" described in PartsRiver's responses to Interrogatories Nos. 1 and 2 and produced at Bates number PA-NAT-000001, which allegedly existed in April 1992 and embodies claims 1 and 2 of the '821 patent-in-suit. | |
| | | | | "[The HTTP] protocol is stateless, in that no state is kept by the server on behalf of the client."  Tim Berners-Lee, *HyperText Transfer Protocol* (available on http://info.cern.ch website on Nov. 3, 1992) | |
| | | | | "Requests [using the HTTP protocol on the World Wide Web] are idempotent.  The server need not store any information about the request after disconnection."  Tim Berners-Lee, *Re: Is there a paper which describes the www protocol?* (posted to www-talk newsgroup on Jan. 9, 1992) | |
| | | | | "A gateway running on info.cern.ch provides access by any WWW browser to the world of information provided by 'WAIS' servers.  WAIS servers are full-text search servers using software from Thinking | |

## EXHIBIT A

| Claim | No. | Claim Term, Phrase, or Clause | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Agreed Construction |
|-------|-----|-------------------------------|-----------------------------------|-----------------------------------|---------------------|
| | | | | Machines Corporation." Tim Berners-Lee, *WWW-WAIS Gateway* (posted to www-interest newsgroup on Nov. 8, 1991).<br><br>"A WAIS server was designed to be 'stateless', meaning that search result sets were not stored by the server." *RFC 1625: WAIS over Z39.50 1988* (June 1994)<br><br>"[T]he Result-Set will always be deleted by DowQuest immediately after returning a Search-Response . . . . This enables DowQuest to be stateless." Franklin Davis et al., *WAIS Interface Protocol Prototype Functional Specification* § 3.1 (Apr. 23, 1990).<br><br>Defendants may also rely upon other portions of the intrinsic record for the patent-in-suit including reexaminations and other patents in the same patent family, to respond to positions taken by PartsRiver. Defendants may also rely on any evidence identified by PartsRiver to support its proposed constructions. | |
| | 14A. | "second selection criteria comprising the alternative or alternatives of the first | a concatenated set of search criteria comprising the first search selection criteria plus the | See #14 above. | |

# EXHIBIT A

| Claim | No. | Claim Term, Phrase, or Clause | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Agreed Construction |
|-------|-----|-------------------------------|-----------------------------------|-----------------------------------|---------------------|
| | | selection criteria plus at least one alternative selected from the revised feature screen" | selection criteria added through a second selected alternative<br><br>See # 14 above | | |
| 2. The method of claim 1 wherein each family has at least one feature associated therewith and further comprising the step of:<br><br>displaying at least one grouping wherein each said grouping comprises one of said features visually related to respective alternatives. | 15. | "grouping" | | | a combination of one of the features and a plurality of respective alternatives |
| | 16. | "features visually related to respective alternatives" | | | features shown together with alternatives on the display device of the user's computer |

# Exhibit 22

1   MANATT, PHELPS & PHILLIPS, LLP
    ROBERT D. BECKER (Bar No. CA 160648)
2   E-mail: rbecker@manatt.com
    RONALD S. KATZ (Bar No. CA 085713)
3   E-mail: rkatz@manatt.com
    SHAWN G. HANSEN (Bar No. CA 197033)
4   E-mail: shansen@manatt.com
    1001 Page Mill Road, Building 2
5   Palo Alto, CA  94304-1006
    Telephone:  (650) 812-1300
6   Facsimile:  (650) 213-0260

7   *Attorneys for*
    KELORA SYSTEMS, LLC
8

9              IN THE UNITED STATES DISTRICT COURT

10         FOR THE NORTHERN DISTRICT OF CALIFORNIA

11  | eBay Inc. and Microsoft Corporation, | Case No. 4:10-cv-04947-CW |
    |---|---|
12  | *Plaintiffs and Counter-defendants,* | **PATENT L.R. 4-3 JOINT CLAIM CONSTRUCTION AND PREHEARING STATEMENT** |
13  | vs. | |
14  | Kelora Systems, LLC, | |
15  | *Defendant and Counterclaimant.* | |
16  | | |
17  | Kelora Systems, LLC, | Case No. 4:11-cv-01548-CW |
18  | *Plaintiff and Counter-defendant,,* | (Related) |
19  | vs. | |
20  | Target Corporation, et al., | |
21  | *Defendants and Counterclaimants.* | |
22  | | |
23  | Cabela's, Inc., | Case No. 4:11-cv-01398-CW |
24  | *Plaintiff and Counter-defendant,* | (Related) |
25  | vs. | |
26  | Kelora Systems, LLC, | |
27  | *Defendant and Counterclaimant.* | |
28  | | |

1
2
3
4
5
6

Nebraska Furniture Mart, Inc.,

    *Plaintiff and Counter-defendant*,

        vs.

Kelora Systems, LLC,

    *Defendant and Counterclaimant.*

Case No. 4:11-cv-02284-CW

 (Related)

7
8
9
10

    Pursuant to Northern District of California Patent L.R. 4-3, the Parties to the above-captioned cases respectfully submit their Joint Claim Construction and Prehearing Statement pursuant to Patent L.R. 4-3.

11
12
13

    **A.**    **Construction of those terms on which the parties agree**

    The parties have met and conferred, and have agreed upon the construction of certain claim terms.  Appendix A identifies those claim terms and their agreed claim constructions, pursuant to Patent L.R. 3-4(a).

14
15
16
17

    **B.**    **Each party's proposed construction of each disputed term**

    Appendix B contains the claim constructions for those terms on which the parties do not agree and identifies intrinsic and extrinsic references and evidence known to the respective parties pursuant to Patent L.R. 4-3(b).

18
19
20
21
22

    **C.**    **Identification of Most Significant Constructions**

    Pursuant to Patent L.R. 4-3(c), the parties have met and conferred on the 10 most significant terms but have not reached agreement.  As such, the parties below identify the ones which they do agree are most significant and then they have evenly divided the remainder.

    The Parties agree that the following 5 terms are the terms whose construction will be the most significant to the resolution of these cases.

23
24
25
26
27
28

    1.   "displaying [a feature screen / at least one grouping]" as used in claims 1 and 9;

    2.   "revising said feature screen to indicate available alternatives of the [first/second] subfamily" as used in claim 1;

    3.   "revising said data for said feature screen to indicate the available alternatives of the

[first/second] subfamily" as used in claim 9;

    4.  "accepting a second selection criteria" as used in original claim 1; and

    5.  "accepting a second selection criteria" as used in amended claims 1 and 9.

At this time, Kelora does not identify any further terms as most significant to the resolution of the case.   Kelora objects to the Accused Infringers' below identification of additional, non-agreed terms as it exceeds the limit under Patent L.R. 4-3(c) on the number of additional, non-agreed terms that may be identified by a party as most significant to resolution of the case.

The Accused Infringers identify the following additional terms as most significant to the resolution of the case:

    6.  "computer readable data file of stored information" as used in claims 1 and 9;

    7.  "resubmission to the server" as used in claim 1;

    8.  "said alternatives represented in the family" as used in claims 1 and 9;

    9.  "determining a [first / second] subfamily" as used in claims 1 and 9; and

    10. "determining available alternatives" as used in claims 1 and 9.

Kelora identifies the following terms among the above-listed terms whose construction may be case or claim dispositive: 1 - 5.  The Accused Infringers believe that each of the terms above may be case or claim dispositive for all or some Accused Infringers.

**D.**    **<u>Anticipated Length of Time Necessary for the Claim Construction Hearing</u>**

The Court has already indicated the amount of time that will be provided for the hearing on claim construction and summary judgment:

> I've never had a claim construction last four hours, so I don't think this one will. I deal with them as if they were, basically, a motion for summary judgment. They'll be on a motion calendar on a Thursday afternoon, and we might have an hour or so for it. I don't take live testimony. If I found the need for live testimony, I'd put it over to some other date. There is a limit on the number of claims that can be construed, in the Local Rules.

Hearing in Case No. 10-cv-04947, at 34:20–35:2 (March 17, 2011).

> In terms of claim construction, there's a couple answers that I can give you. And that is that I don't take live testimony at Markman hearings. If I had the Markman hearing, which is basically held as if

it were an argument on a summary judgment motion. If at that hearing I found that there was some sort of factual dispute that did require live testimony, I would set it for live testimony in the future, but don't bring any witnesses or plan on any live testimony at the actual scheduled Markman hearing.

I usually put them on a summary judgment or law and motion calendar at 2:00 o'clock on a Thursday afternoon. I wouldn't set it -- I wouldn't hear it on a date when I had a of other matters on. If it turned out to be on a date where I had a lot of other matters, we might have to adjust the date. But most often I hear them on Thursdays at 2:00 o'clock, so that will be the default unless you look at my calendar and see that you're one of a number of big items, then you might try to pick a new date and send in a stipulation to have it specially set some other afternoon. But I certainly have not ever spent a day on a Markman hearing.

Hearing in Case Nos. 11-cv-01398, 11-cv-01548, and 11-cv-02284, at 15:14–16:8 (June 13, 2011).

The Parties agree to be bound by the Court's statements regarding the amount of time for the claim construction hearing.

### E.       Witnesses at the Claim Construction Hearing

**Kelora's Statement:**

Consistent with the Court's statements during the May 31, 2011, Case Management Conference (Tr. at 15-16), at this time Kelora does not anticipate calling any claim construction witnesses at the Markman hearing.  However, Kelora reserves the right to submit witness declarations in support of its briefing and to call witnesses at the hearing in view of the Accused Infringers' briefing and witness declarations, if any.

**Accused Infringers' Statement:**

Consistent with the Court's statements during the May 31, 2011, Case Management Conference (Tr. at 15-16), the Parties will not call any witnesses or submit any witness declarations for issues related to claim construction.  However, the Accused Infringers agree that declarations may be submitted for issues related to summary judgment.  The Accused Infringers object to Kelora's statement to the extent it suggests that Kelora may submit one or more declarations related to claim construction.  If Kelora wanted to provide testimony (whether live or by declaration) related to claim construction, then pursuant to Patent Local Rule 4-2(b), Kelora

was obligated to disclose on August 4, 2011 "a description of the substance of that witness'
proposed testimony that includes a listing of any opinions to be rendered in connection with claim
construction."  Kelora did not provide any such disclosure on August 4, and has not provided any
such disclosure since then.  According to the scheduling orders for all four actions, discovery
related to claim construction must be completed by this Friday, September 2, and thus it would be
highly prejudicial for Kelora to submit declaration(s) in support of its claim construction brief due
on October 6.

DATED: August 30, 2011

By: /s/ Robert D. Becker

Robert D. Becker (Bar No. 160648)
   <rbecker@manatt.com>
Ronald S. Katz (Bar No. 85713)
   <rkatz@manatt.com>
Shawn G. Hansen (Bar No. 197033)
   <shansen@manatt.com>
MANATT, PHELPS & PHILLIPS, LLP
1001 Page Mill Road, Building 2
Palo Alto, California  94304
Telephone:    (650) 812-1300
Facsimile:    (650) 213-0260

*Attorneys for Kelora Systems, LLC*

/s/ Richard A. Cederoth

David T. Pritikin (*pro hac vice*)
   <dpritikin@sidley.com>
Richard A. Cederoth (*pro hac vice*)
   <rcederoth@sidley.com>
SIDLEY AUSTIN LLP
One S. Dearborn Street
Chicago, Illinois  60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036

Theodore W. Chandler (Bar No. 219456)
   <tchandler@sidley.com>
Aaron M. Farber (Bar No. 270851)
   <afarber@sidley.com>
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California  90013
Telephone:    (213) 896-6000
Facsimile:    (213) 896-6600

<Kelora-Microsoft-eBay@sidley.com>

*Counsel for Plaintiff and Counterclaim-
Defendant eBay Inc.*

PATENT L.R. 4-3 JOINT STATEMENT

1    By:  /s/ Richard A. Cederoth

2         David T. Pritikin (*pro hac vice*)
             <dpritikin@sidley.com>
3         Richard A. Cederoth (*pro hac vice*)
             <rcederoth@sidley.com>
4         SIDLEY AUSTIN LLP
          One S. Dearborn Street
5         Chicago, Illinois  60603
          Telephone:    (312) 853-7000
6         Facsimile:    (312) 853-7036

7         Theodore W. Chandler (Bar No. 219456)
             <tchandler@sidley.com>
8         Aaron M. Farber (Bar No. 270851)
             <afarber@sidley.com>
9         SIDLEY AUSTIN LLP
          555 West Fifth Street, Suite 4000
10        Los Angeles, California  90013
          Telephone:    (213) 896-6000
11        Facsimile:    (213) 896-6600

12        <Kelora-Microsoft-eBay@sidley.com>

13

14        David E. Killough (Bar No. 110719)
             <davkill@microsoft.com>
15        MICROSOFT CORPORATION
          One Microsoft Way, 8/2076
16        Redmond, Washington  98052
          Telephone:    (425) 703-8865
17        Facsimile:    (425) 869-1327

18
          *Counsel for Plaintiff and Counterclaim-*
19        *Defendant Microsoft Corporation*

20

21

22

23

24

25

26

27

28

By:  /s/ Richard S. Zembek
_____

Dan D. Davison (*pro hac vice*)
   <ddavison@fulbright.com>
FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201
Telephone:    (214) 855-8000
Facsimile:    (214) 855-8200

Richard S. Zembek (*pro hac vice*)
   <rzembek@fulbright.com>
Daniel S. Leventhal (*pro hac vice*)
   <dleventhal@fulbright.com>
FULBRIGHT & JAWORSKI L.L.P.
Fulbright Tower
1301 McKinney, Suite 5100
Houston, Texas  77010
Telephone:    (713) 651-5151
Facsimile:    (713) 651-5246

Gilbert A. Greene (*pro hac vice*)
   <ggreene@fulbright.com>
FULBRIGHT & JAWORSKI L.L.P.
600 Congress Avenue, Suite 2400
Austin, Texas  78701
Telephone:    (512) 474-5201
Facsimile:    (512) 536-4598

John A. O'Malley (Bar No. 101181)
   <jomalley@fulbright.com>
Aaron D. Gopen (Bar No. 268451)
   <agopen@fulbright.com>
FULBRIGHT & JAWORSKI L.L.P.
555 South Flower Street, 41st Floor
Los Angeles, California  90071
Telephone:    (213) 892-9200
Facsimile:    (213) 892-9494

*Attorneys for Defendants and
Counterclaim-Plaintiffs Target
Corporation; Amazon.com, Inc.; Office
Depot, Inc.; Costco Wholesale
Corporation; Hewlett-Packard Company;
Audible, Inc.; and Zappos.com, Inc.*

1  By:  /s/ John S. Letchinger
   _____

2  John S. Letchinger (*pro hac vice*)
       <letchinger@wildman.com>
3  Douglas S. Rupert (*pro hac vice*)
       <rupert@wildman.com>
4  Edward Timothy Walker (*pro hac vice*)
       <walker@wildman.com>
5  WILDMAN, HARROLD, ALLEN & DIXON LLP
   225 West Wacker Drive, Suite 3000
6  Chicago, Illinois  60606
   Telephone:    (312) 201-2000
7  Facsimile:    (312) 201-2555

8  Clinton J. McCord (Bar No. 204749)
       <mccord@wildman.com>
9  WILDMAN, HARROLD, ALLEN & DIXON LLP
   9665 Wilshire Boulevard, Suite 200
10 Beverly Hills, California  90212
   Telephone:    (310) 860-8715
11 Facsimile:    (310) 860-3815

12
   *Attorneys for Defendant and Counterclaim-*
13 *Plaintiff OfficeMax Incorporated*

14

15 By:  /s/ Niall A. MacLeod
   _____

16 Niall A. MacLeod (*pro hac vice*)
       <niall.macleod@btlaw.com>
17 Aaron A. Myers (*pro hac vice*)
       <aaron.myers@btlaw.com>
18 BARNES & THORNBURG LLP
   225 South Sixth Street, Suite 2800
19 Minneapolis, Minnesota 55402
   Telephone:    (612) 333-2111
20 Facsimile:    (612) 333-6798

21 Stephen R. Mick (Bar No. 131569)
       <smick@btlaw.com>
22 BARNES & THORNBURG LLP
   2049 Century Park East
23 Los Angeles, California  90067
   Telephone:    (310) 284-3880
24 Facsimile:    (310) 284-3894

25
   *Attorneys for Defendant and Counterclaim-*
26 *Plaintiff Rockler Companies, Inc.*

27

28

PATENT L.R. 4-3 JOINT STATEMENT

By:  /s/ Catherine E. Hart

Vaibhav P. Kadaba (*pro hac vice*)
    <wkadaba@kilpatricktownsend.com>
Catherine E. Hart (*pro hac vice*)
    <chart@kilpatricktownsend.com>
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309
Telephone:    (404) 815-6500
Facsimile:    (404) 815-6555

David B. Perry (State Bar No. 255925)
    <dperry@kilpatricktownsend.com>
KILPATRICK TOWNSEND & STOCKTON LLP
Two Embarcadero Center, Eighth Floor
San Francisco, California  94111
Telephone:    (415) 576-0200
Facsimile:    (415) 576-0300

*Attorneys for Defendant and Counterclaim-Plaintiff 1-800-Flowers.com, Inc.*

PATENT L.R. 4-3 JOINT STATEMENT

By: /s/ David S. Bloch

Kimball R. Anderson (*pro hac vice*)
  <kanderson@winston.com>
Marlon E. Lutfiyya (*pro hac vice*)
  <mlutfiyya@winston.com>
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601
Telephone:     (312) 558-5600
Facsimile:     (312) 558-5700

Howard I. Shin (*pro hac vice*)
  <hshin@winston.com>
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York  10166
Telephone:     (212) 294-6700
Facsimile:     (212) 294-4700

David S. Bloch (State Bar No. 184530)
  <dbloch@winston.com>
WINSTON & STRAWN LLP
101 California Street
San Francisco, California  94111
Telephone:     (415) 591-1000
Facsimile:     (415) 591-1400

*Attorneys for Defendant and Counterclaim-
Plaintiff Dell, Inc.*

PATENT L.R. 4-3 JOINT STATEMENT

1

By: /s/ Kent E. Baldauf, Jr.

2

Kent E. Baldauf, Jr. (*pro hac vice*)
  <kbaldaufjr@webblaw.com>
Bryan P. Clark (*pro hac vice*)
  <bclark@webblaw.com>
THE WEBB LAW FIRM
One Gateway Center
420 Ft. Duquesne Blvd., Suite 1200
Pittsburgh, Pennsylvania 15222
Telephone:    (412) 471-8815
Facsimile:    (412) 471-4094

3

4

5

6

7

8

Phillip F. Shinn (State Bar No. 112051)
  <pshinn@foxrothschild.com>
FOX ROTHSCHILD LLP
235 Pine Street, Suite 1500
San Francisco, California  94104
Telephone:    (415) 364-5558
Facsimile:    (415) 391-4436

9

10

11

12

*Attorneys for Defendant and Counterclaim-Plaintiff Newegg Inc.*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PATENT L.R. 4-3 JOINT STATEMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:  /s/ Sarah E. Barrows
───────────────────────────

Sarah E. Barrows (Bar No. 253278)
    <barrowss@gtlaw.com>
GREENBERG TRAURIG, LLP
153 Townsend Street, 8th Floor
San Francisco, California  94107
Telephone:    (415) 655-1300
Facsimile:    (415) 707-2010

Michael A. Nicodema (*pro hac vice*)
    <nicodemam@gtlaw.com>
David M. Joyal (*pro hac vice*)
    <joyald@gtlaw.com>
Barry J. Schindler (*pro hac vice*)
    <schindlerb@gtlaw.com>
Douglas R. Weider (*pro hac vice*)
    <weider@gtlaw>
GREENBERG TRAURIG, LLP
200 Park Avenue, P.O. Box 677
Florham Park, New Jersey  07932
Telephone:    (973) 360-7900
Facsimile:    (973) 301-8410

Mary-Olga Lovett (*pro hac vice*)
    <lovettm@gtlaw.com>
GREENBERG TRAURIG, LLP
1000 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone:    (713) 374-3500
Facsimile:    (713) 374-3505

*Attorneys for Defendant and Counterclaim-Plaintiff CircuitCity.com Inc.*

12                    PATENT L.R. 4-3 JOINT STATEMENT

1

2      By:  /s/ Ted G. Dane
       _____

3      Ted G. Dane (Bar No. 143195)
           <Ted.Dane@mto.com>

4      Andrew W. Song (Bar No. 236588)
           <Andrew.Song@mto.com>
       MUNGER, TOLLES & OLSON LLP

5      355 South Grand Avenue, 35th Floor
       Los Angeles, California  90071

6      Telephone:    (213) 683-9100
       Facsimile:    (213) 687-3702

7

8      *Attorneys for Plaintiff and Counterclaim-
       Defendant Nebraska Furniture Mart, Inc.*

9

10     By:  /s/ Wendy K. Akbar
       _____

11     Gregory P. Sitrick (*pro hac vice*)
           <gregory.sitrick@quarles.com>

12     Wendy K. Akbar (*pro hac vice*)
           <wendy.akbar@quarles.com>

13     QUARLES & BRADY LLP
       One Renaissance Square

14     Two North Central Avenue
       Phoenix, Arizona  85004

15     Telephone:    (602) 229-5200
       Facsimile:    (602) 420-5198

16

17     Jeffrey L. Fillerup (Bar No. 120543)
           <jfillerup@luce.com>

18     LUCE, FORWARD, HAMILTON & SCRIPPS LLP
       Rincon Center II

19     121 Spear Street, Suite 200
       San Francisco, California  94105

20     Telephone:    (415) 356-4600
       Facsimile:    (415) 356-3881

21

22     Callie A. Bjurstrom (Bar No. 137816)
           <cbjurstrom@luce.com>

23     LUCE, FORWARD, HAMILTON & SCRIPPS LLP
       600 West Broadway, Suite 2600

24     San Diego, California  92101
       Telephone:    (619) 699-2586

25     Facsimile:    (619) 645-5323

26     *Attorneys for Plaintiff and Counterclaim-
       Defendant Cabela's Inc.*

27

28

1

**SIGNATURE ATTESTATION**

2          Pursuant to General Order No. 45(X)(B), I hereby certify that concurrence in the filing of

3    this document has been obtained from the other signatories shown above.

4                                                              /s/Robert D. Becker

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 30, 2011, all counsel of record who are deemed to have consented to electronic service are being served, via the Court's CM/ECF system pursuant to Civil L.R. 5-4 and General Order 45, with a copy of the foregoing PATENT L.R. 4-3 JOINT CLAIM CONSTRUCTION AND PREHEARING STATEMENT.

By: _/s/ Robert D. Becker_
Robert D. Becker

300699683.1

# APPENDIX A

# AGREED CLAIM CONSTRUCTIONS

# Appendix A: Agreed Claim Constructions

| Term/Phrase | Agreed Construction | Agreed Comment |
|---|---|---|
| Preamble<br><br>claims 1 and 9 | The preamble limits the claim. | The parties disagree on the meaning of preamble, as indicated in Appendix B. |

# APPENDIX B

# DISPUTED CLAIM CONSTRUCTIONS

# Appendix B: Disputed Claim Constructions

| Term/Phrase | Accused Infringers' Construction & Evidence | Kelora Systems LLC's Construction & Evidence |
|---|---|---|
| Preamble<br><br>claims 1 and 9 | The preamble limits the claim, and "user" means a person using a computer<br><br>'821 patent: 5:31-34, 18:11-19:35<br><br>'821 reexam: 6/24/10 NIRC, p. 3<br><br>'444 FH/P8, Danish Affidavit, p.2 | "Server connected to a client computer through a computer network" means "Server computer connected via the Internet to a client computer running a Mosaic compatible browser."<br><br>The ordinary and customary meaning of the remainder of the preambles of claims 1 and 9 are readily apparent, requiring no construction by the Court.<br><br>'821 Specification, Col. 18, Line 11 to Col. 19, Line 35, PR0000790-791.<br><br>Reexamination Appeal Brief, 18-Nov-2009, Section VII, Argument, KS0000522-532.<br><br>Reexamination, Reply to Office Action, 20-May-2010, KS0000448-455.<br><br>Reexamination, Reply to Office Action, 4-Aug-2009, KS0000631-650.<br><br>Reexamination, Reply to Office Action, 5-Jun-2009, KS0000700-714 |
| computer readable data file of stored information<br><br>claims 1 and 9 | "a collection of data—text, numbers, or graphics—in a non-volatile storage medium which can be read by a computer"<br><br>Joint Claim Construction and Prehearing Statement in *PartsRiver, Inc. v. Shopzilla,Inc.; Yahoo! Inc.; Pricegrabber.com, Inc.; eBay Inc.; and Microsoft* | The ordinary and customary meaning of this term is readily apparent, requiring no construction by the Court. |

2

| Term/Phrase | Accused Infringers' Construction & Evidence | Kelora Systems LLC's Construction & Evidence |
|---|---|---|
| | *Corporation*, No. 07-440 (E.D. Tex. Dec. 15, 2008) [Docket No. 141]<br><br>'821 patent: 1:23-30, 11:1-4, 18:11-17, 18:26-29, Fig. 12<br><br>'821 patent: 5:58-62, 6:61-64, 12:39-43, 18:11-17<br><br>McGraw-Hill Dictionary of Scientific and Technical Terms, Fifth Edition (1994): "store"<br><br>*Microsoft Press Computer Dictionary* (2d ed. 1994): "data file"<br><br>*Webster's Ninth New Collegiate Dictionary* (1991): "file" | |
| displaying [a feature screen / at least one grouping]<br><br>claims 1 and 9 | "showing on the display device of the user's computer [a feature screen/at least one grouping]"<br><br>Joint Claim Construction and Prehearing Statement in *PartsRiver, Inc. v. Shopzilla,Inc.; Yahoo! Inc.; Pricegrabber.com, Inc.; eBay Inc.; and Microsoft Corporation*, No. 07-440 (E.D. Tex. Dec. 15, 2008) [Docket No. 141]<br><br>'821 Claims 1, 3, 4, 7, 8, 9<br><br>'821 patent: 6:44-47, 8:23-27, 8:38-50, 9:66-10:4, 17:61-65, 18:9-32, 18:49–19:12<br><br>'444 Claims 1, 14, 29, 30<br><br>'821 reexam: 05/01/2009 Office Action at 4, 06/18/2009 Office Action at 3, 8/04/2009 After-Final Amendment, at | The term "displaying" means: "The action of sending a page to a display surface or device for viewing."<br><br>The ordinary and customary meaning of the remainder of this term is readily apparent, requiring no construction by the Court.<br><br>'821 Specification, Col. 18, Line 11 to Col. 19, Line 35, PR0000790-791.<br><br>Berners-Lee, November 1995, Hypertext Markup Language - 2.0, RFC 1866, KS0001875-1951.<br><br>Berners-Lee, May 1996, Hypertext Transfer Protocol -- HTTP/1.0, RFC 1945, KS0001952-2011.<br><br>Morgan, Eric Lease, World-Wide Web and Mosaic: An overview for librarians, originally published in The Public-Access Computer Systems Review 5, no. 6 |

3

| Term/Phrase | Accused Infringers' Construction & Evidence | Kelora Systems LLC's Construction & Evidence |
|---|---|---|
| | 3, 5, 5/20/10 Amendment, at 5, 7–8 | (1994): 5-26, (retrieved from http://infomotions.com/musings/www-and-libraries/, 4-Aug-2011), KS0002012-2020. |
| | '444 FH: 02/16/1996 Office Action, p. 3, 05/16/1996 Amendment, p. 11–12, 17–18, Kimbrough Affidavit, p. 1–2 and Ex. C, Danish Affidavit, p 2–3 and Ex. C. | |
| | U.S. Patent No. 4,905,094 to Pocock et al. 5:17–:24, Fig.2A, block 2 | |
| | Granacki, *A Component Library Management System and Browser*, § 1.3 & Fig.2 | |
| | Deposition of Sherif Danish at 111:11–112:13, 124:11–21, 129:23– 130:4 (Jan. 20, 2009) | |
| | PartsRiver's opposition to Defendants' motion to transfer the action from the Eastern District of Texas to this Court, p. 11 (Dec. 6, 2007) [Docket No. 45] | |
| | PartsRiver's oral argument in opposition to Defendants' motion to transfer, at 10:9–11:2 (Apr. 10, 2008) [Docket No. 201-7] | |
| | The "demonstration program" described in PartsRiver's responses to Interrogatories Nos. 1 and 2 and produced at Bates number PA-NAT-000001 | |
| | Order Granting Defendants' Motion for Summary Judgment, at 11:9–12:6 (Aug. 21, 2009) [Docket No. 234 in Case No. 09-811] | |
| | The declaration of Theodore W. Chandler and all cited | |

| Term/Phrase | Accused Infringers' Construction & Evidence | Kelora Systems LLC's Construction & Evidence |
|---|---|---|
| | and attached exhibits (May 28, 2009) | |
| feature screen<br><br>claims 1, 3, and 9 | "an image showing multiple alternatives within a family or subfamily"<br><br>Joint Claim Construction and Prehearing Statement in *PartsRiver, Inc. v. Shopzilla, Inc.; Yahoo! Inc.; Pricegrabber.com, Inc.; eBay Inc.; and Microsoft Corporation*, No. 07-440 (E.D. Tex. Dec. 15, 2008) [Docket No. 141]<br><br>'821 patent: 3:63-70, 4:24-36, 7:1-3, 7:11-21, 8:19-27, Figs. 7, 8, 9<br><br>'444 Patent: Claim 1, 17, 29, 31<br><br>'588 Patent: Claim 1, 6, 7<br><br>'821 Reexam: 03/29/2010 Examiner's Answer to Appeal Brief, p. 6, 8, 6/18/09 Final Office Action, p. 3<br><br>'444 FH: P2, P12, Examiner's Amendment<br><br>Deposition of Sherif Danish at 282-84, Ex. 1028 at pp. 13-17 (Jan. 20, 2009) | The ordinary and customary meaning of this term is readily apparent, requiring no construction by the Court.<br><br>'821 Specification, Col. 5, Line 31 to Col. 10, Line 33. |
| revising said feature screen to indicate the available alternatives of the [first/second] subfamily<br><br>claim 1 | "changing the feature screen on the display device of the user's computer to show all the available alternatives of the [first/second] subfamily"<br><br>821 patent: Claims 1, 4, 9<br><br>821 patent: Abstract, 3:43–45, 3:50–4:2, 4:24–35, 5:6–16, 7:12–37, 8:20–46, 8:51–9:9, 18:50–19:11, Figs. 7, 8, | The ordinary and customary meaning of this term is readily apparent, requiring no construction by the Court.<br><br>'821 Specification, Col. 5, Line 31 to Col. 10, Line 33.<br><br>The term may have different meanings in the original |

| Term/Phrase | Accused Infringers' Construction & Evidence | Kelora Systems LLC's Construction & Evidence |
|---|---|---|
| | 9, 26, 27, 28, 29<br><br>'444 claims: 1, 14, 29, and 30<br><br>'219 claims: 1, 2, 3, 19 and 20<br><br>'821 reexam: 05/01/2009 Office Action, p. 3–5; 06/18/2009 Final Rejection, p. 2–4, 3/29/10 Examiner's Brief to the BPAI, at 7–8<br><br>'444 FH: 02/16/1996 Office Action, p. 3-4, 05/16/1996 Amendment, p. 11–12, 17–18 Kimbrough Affidavit, p. 1–2 and Ex. C, Danish Affidavit, p 2–3 and Ex. C.<br><br>Granacki, *A Component Library Management System and Browser*, § 1.3<br><br>U.S. Patent No. 4,905,094 to Pocock et al. at 2:22–32, 5:28–39, Figs. 2A–2B<br><br>Deposition of Sherif Danish at 274:11–19, 278:23–279:4, 290:2–5, 294:17–23 (Jan. 21, 2009)<br><br>The "demonstration program" described in PartsRiver's responses to Interrogatories Nos. 1 and 2 and produced at Bates number PA-NAT-000001<br><br>Order Granting Defendants' Motion for Summary Judgment, at 11:9–12:6 (Aug. 21, 2009) [Docket No. 234 in Case No. 09-811]<br><br>The declaration of Theodore W. Chandler and all cited | and current claims given the narrower meaning of the current claims as compared to their corresponding original claims. |

6

| Term/Phrase | Accused Infringers' Construction & Evidence | Kelora Systems LLC's Construction & Evidence |
|---|---|---|
| | and attached exhibits (May 28, 2009) | |
| revising said data for said feature screen to indicate the available alternatives of the [first/second] subfamily<br><br>claim 9 | "changing the data used by the client computer to display the feature screen to provide all the available alternatives of the [first/second] subfamily"<br><br>'821 claims: 1, 9<br><br>'821 patent: 18:49–19:12, Fig. 25<br><br>'219 claims: 1, 2, 3<br><br>'821 reexam: 08/04/2009 After-Final Amendment, p. 3, 5–6, 5/20/10 Amendment, p. 5, 7–8 | The ordinary and customary meaning of this term is readily apparent, requiring no construction by the Court.<br><br>'821 Specification, Col. 5, Line 31 to Col. 10, Line 33. |
| selection criteria<br><br>claims 1 and 9 | "selected alternative(s)"<br><br>'821 patent: Claim 5<br><br>'821 patent: 7:46-53, 8:6-14, 8:21-38, 8:51-54, 8:59-66, 15:64-16:3, 16:17-39, 18:64-19:9, Fig. 8<br><br>'444 patent: claim 1<br><br>'821 FH: P5, Amendment, p. 5<br><br>'444 FH: P4, Amendment, p. 11 | "A signal including one or more alternatives to be used in search operations."<br><br>'821 patent – claim 1, elements (d), (e), (h), and (i).<br><br>Reexamination Appeal Brief, 18-Nov-2009, Section VII, Argument, KS0000522-532.<br><br>Reexamination, Reply to Office Action, 3-Nov-2009, KS0000542-555.<br><br>Reexamination, Reply to Office Action, 4-Aug-2009, KS0000631-650.<br><br>Reexamination, Reply to Office Action, 5-Jun-2009, KS0000700-714.<br><br>File History for App. No. 09/384,303, Reply to Office Action, 5-July-2000, KS0000238-243. |

7

| Term/Phrase | Accused Infringers' Construction & Evidence | Kelora Systems LLC's Construction & Evidence |
|---|---|---|
| accepting a second selection criteria<br><br>amended claims 1 and 9 | All accused infringers: an action performed by the server<br><br>Cabela's, Circuit City, and Nebraska Furniture Mart: "utilizing the alternative(s) selected from the feature screen to perform a search"<br><br>'821 reexam: 8/4/09 After-Final Amendment, p. 13–14, 18, 5/20/10 Amendment, p. 3–5, 7–8, 6/24/10 NIRC, p. 3<br><br>Transcript of hearing on eBay and Microsoft's motion for summary judgment, at 21:3–5 (May 10, 2011)<br><br>Kelora's opposition to summary judgment, at 19:8–10 (Apr. 14, 2011) | The term "accepting" means: "accepting selection criteria for processing". The ordinary and customary meaning of the remainder of this term is readily apparent, requiring no construction by the Court.<br><br>Berners-Lee, May 1996, Hypertext Transfer Protocol -- HTTP/1.0, RFC 1945, KS0001952-2011.<br><br>Reexamination Appeal Brief, 18-Nov-2009, Section VII, Argument, KS0000522-532.<br><br>Reexamination, Reply to Office Action, 3-Nov-2009, KS0000542-555.<br><br>Reexamination, Reply to Office Action, 4-Aug-2009, KS0000631-650.<br><br>Reexamination, Reply to Office Action, 5-Jun-2009, KS0000700-714. |
| accepting a second selection criteria<br><br>original claim 1 | "an action performed by the user on the client computer to initiate a search using the alternative(s) selected from the feature screen (e.g., when the user clicks on the "Search" button)"<br><br>'821 claims: 5<br><br>'821 patent: 7:38–49, 8:1–9, 8:51–61, 15:64–67, 18:64–19:2, Fig. 7<br><br>'444 claims: 1, 14, 29, and 30<br><br>'219 claims: 1, 2, 3, 19 and 20 | The term "accepting" means: "accepting selection criteria for processing". The ordinary and customary meaning of the remainder of this term is readily apparent, requiring no construction by the Court.<br><br>The term may have different meanings in the original and current claims given the narrower meaning of the current claims as compared to their corresponding original claims. |

| Term/Phrase | Accused Infringers' Construction & Evidence | Kelora Systems LLC's Construction & Evidence |
|---|---|---|
| | '821 FH: 1/4/00 Office Action, p. 3, 7/5/00 Amendment<br><br>'821 reexam: 05/01/2009 Office Action, p. 3–5, 06/18/2009 Final Rejection p. 2–4, 06/18/2009 Final Rejection, p. 9, 03/29/2010 Examiner Brief to the BPAI, p. 6–7<br><br>'444 FH: 02/16/1996 Office Action, p. 3-4, 05/16/1996 Amendment, p. 11–12, 17–18 Kimbrough Affidavit, p. 1–2 and Ex. C, Danish Affidavit, p 2–3 and Ex. C.<br><br>Granacki, *A Component Library Management System and Browser*, § 1.3<br><br>U.S. Patent No. 5,544,360 to Lewak at 8:61–9:4, 10:41–47<br><br>U.S. Patent No. 4,905,094 to Pocock et al. at 2:22–32, 5:25–39 & Fig. 2A block 11<br><br>Transcript of the hearing on Defendants' motion for summary judgment, at 4:4, 8:20–23<br><br>The "demonstration program" described in PartsRiver's responses to Interrogatories Nos. 1 and 2 and produced at Bates number PA-NAT-000001<br><br>Order Granting Defendants' Motion for Summary Judgment, at 11:9–12:6 (Aug. 21, 2009) [Docket No. 234 in Case No. 09-811]<br><br>The declaration of Theodore W. Chandler and all cited | |

| Term/Phrase | Accused Infringers' Construction & Evidence | Kelora Systems LLC's Construction & Evidence |
|---|---|---|
| | and attached exhibits (May 28, 2009) | |
| resubmission to the server<br><br>claim 1 | "resubmission by said client computer to the server"<br><br>821 claims: 1, 9<br><br>821 patent: 8:51-66, 18:63-19:12, Fig. 25<br><br>'821 Reexam: 5/20/10 Response to Final Rejection, p. 3, 6-24-10 NIRC, p. 3 | The ordinary and customary meaning of this term is readily apparent, requiring no construction by the Court.<br><br>Reexamination Appeal Brief, 18-Nov-2009, Section VII, Argument, KS0000522-532.<br><br>Reexamination, Reply to Office Action, 4-Aug-2009, KS0000631-650.<br><br>Reexamination, Reply to Office Action, 5-Jun-2009, KS0000700-714. |
| alternative for each item<br><br>claims 1 and 9 | "a qualifier and/or attribute"<br><br>Joint Claim Construction and Prehearing Statement in *PartsRiver, Inc. v. Shopzilla, Inc.; Yahoo! Inc.; Pricegrabber.com, Inc.; eBay Inc.; and Microsoft Corporation*, No. 07-440 (E.D. Tex. Dec. 15, 2008) [Docket No. 141]<br><br>'821 patent: 2:50-62, 5:31-47, 7:11-17, Fig. 7 | The ordinary and customary meaning of this term is readily apparent, requiring no construction by the Court.<br><br>'821 Specification, Col. 5, Line 31 to Col. 10, Line 33. |
| said alternatives represented in the family<br><br>claims 1 and 9 | "all the alternatives from the data file for the family of items"<br><br>'821 Claims: 1 and 9<br><br>'821 patent: 6:65-7:20, 8:5-27. Fig. 7, Fig. 8 | The ordinary and customary meaning of this term is readily apparent, requiring no construction by the Court.<br><br>'821 Specification, Col. 5, Line 31 to Col. 10, Line 33. |

10

| Term/Phrase | Accused Infringers' Construction & Evidence | Kelora Systems LLC's Construction & Evidence |
|---|---|---|
| | '444 FH: P4, pp. 17-18, P8, Danish Affidavit, Ex. C<br><br>The "demonstration program" described in PartsRiver's responses to Interrogatories Nos. 1 and 2<br><br>Order Granting Defendants' Motion for Summary Judgment, at 11:9–12:6 (Aug. 21, 2009) [Docket No. 234 in Case No. 09-811]<br><br>The declaration of Theodore W. Chandler and all cited and attached exhibits (May 28, 2009) | |
| determining available alternatives<br><br>claims 1 and 9 | "identifying those alternatives that remain available for further selection"<br><br>Joint Claim Construction and Prehearing Statement in *PartsRiver, Inc. v. Shopzilla, Inc.; Yahoo! Inc.; Pricegrabber.com, Inc.; eBay Inc.; and Microsoft Corporation*, No. 07-440 (E.D. Tex. Dec. 15, 2008) [Docket No. 141]<br><br>'821 patent: 3:43-45, 8:6-19, 16:17-16:49<br><br>'821 Reexam: 3/29/10 Examiner's Response Appeal Brief, p. 7, 6/18/09 Final Office Action, p. 4, 5/1/09 Non-Final Office Action, p. 4 | The ordinary and customary meaning of this term is readily apparent, requiring no construction by the Court.<br><br>'821 Specification, Col. 5, Line 31 to Col. 10, Line 33. |
| family of items<br><br>claims 1 and 9 | "a collection of [items] with specific qualifiers and/or attributes, where one would want to identify [items] by specifying its qualifiers and/or attributes"<br><br>Joint Claim Construction and Prehearing Statement in *PartsRiver, Inc. v. Shopzilla, Inc.; Yahoo! Inc.;* | The ordinary and customary meaning of this term is readily apparent, requiring no construction by the Court. |

| Term/Phrase | Accused Infringers' Construction & Evidence | Kelora Systems LLC's Construction & Evidence |
|---|---|---|
| | *Pricegrabber.com, Inc.; eBay Inc.; and Microsoft Corporation*, No. 07-440 (E.D. Tex. Dec. 15, 2008) [Docket No. 141]<br><br>'821 patent: 2:56-3:5, 5:31-49 | '821 Specification, Col. 5, Line 31 to Col. 10, Line 33. |
| subfamily of items<br><br>claims 1 and 9 | "A collection of [items] from the family with at least one common qualifier and/or attribute"<br><br>Joint Claim Construction and Prehearing Statement in *PartsRiver, Inc. v. Shopzilla, Inc.; Yahoo! Inc.; Pricegrabber.com, Inc.; eBay Inc.; and Microsoft Corporation*, No. 07-440 (E.D. Tex. Dec. 15, 2008) [Docket No. 141].<br><br>'821 patent: 3:35-40, 7:46-49, 8:6-19, 8:63-66<br><br>'444 FH/P4, p. 11 | The ordinary and customary meaning of this term is readily apparent, requiring no construction by the Court.<br><br>821 Specification, Col. 5, Line 31 to Col. 10, Line 33. |
| determining a [first/second] subfamily<br><br>claims 1 and 9 | "searching for items that match the selection criteria"<br><br>Joint Claim Construction and Prehearing Statement in *PartsRiver, Inc. v. Shopzilla, Inc.; Yahoo! Inc.; Pricegrabber.com, Inc.; eBay Inc.; and Microsoft Corporation*, No. 07-440 (E.D. Tex. Dec. 15, 2008) [Docket No. 141]<br><br>'821 patent: 3:36-39, 8:6-19, 8:59-67, 15:64-16:49, 17:19-22<br><br>'821 Reexam: 3/29/10 Examiner's response brief, p. 6, 6/18/09 Final Office Action, p. 5, 6/24/10 NIRC, p. 3<br><br>'219 claims: 19, 20 | The ordinary and customary meaning of this term is readily apparent, requiring no construction by the Court.<br><br>'821 Specification, Col. 5, Line 31 to Col. 10, Line 33. |

| Term/Phrase | Accused Infringers' Construction & Evidence | Kelora Systems LLC's Construction & Evidence |
|---|---|---|
| grouping<br><br>claims 2 and 4 | "a combination of one of the features and a plurality of respective alternatives"<br><br>Joint Claim Construction and Prehearing Statement in *PartsRiver, Inc. v. Shopzilla, Inc.; Yahoo! Inc.; Pricegrabber.com, Inc.; eBay Inc.; and Microsoft Corporation*, No. 07-440 (E.D. Tex. Dec. 15, 2008) [Docket No. 141]<br><br>'821 patent: Abstract, 3:40-42, 7:11-22, 7:47-59<br><br>'821 Reexam: 3/29/10 Examiner's Answer to Appeal Brief, p. 8-9, 6/18/09 Final Office Action, p. 5, 5/1/09 Non-Final Office Action, p. 6<br><br>'444 FH: P2, p. 4 | The ordinary and customary meaning of this term is readily apparent, requiring no construction by the Court.<br><br>'821 Claims 2 and 6. |
| features visually related to respective alternatives<br><br>claim 2 | "features shown together with alternatives on the display device of the user's computer"<br><br>Joint Claim Construction and Prehearing Statement in *PartsRiver, Inc. v. Shopzilla, Inc.; Yahoo! Inc.; Pricegrabber.com, Inc.; eBay Inc.; and Microsoft Corporation*, No. 07-440 (E.D. Tex. Dec. 15, 2008) [Docket No. 141]<br><br>'821 patent: 3:40-43, 7:11-20, 8:20-27, Fig. 7, Fig. 8 | The ordinary and customary meaning of this term is readily apparent, requiring no construction by the Court.<br><br>'821 Specification, Col. 18, Line 11 to Col. 19, Line 35, PR0000790-791. |

# Exhibit 23

David T. Pritikin, <dpritikin@sidley.com> (*pro hac vice*)
Richard A. Cederoth, <rcederoth@sidley.com> (*pro hac vice*)
SIDLEY AUSTIN LLP
One S. Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Theodore W. Chandler, <tchandler@sidley.com> (Bar No. 219456)
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

*Counsel for Defendant eBay Inc. and*
*Defendant and Counterclaim-Plaintiff Microsoft Corporation*

NOTE: Additional counsel and Defendants listed on signature page

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| PartsRiver, Inc., <br><br>       *Plaintiff*, <br><br>       vs. <br><br> Shopzilla, Inc.; Yahoo! Inc.; eBay Inc.; and Microsoft Corporation, <br><br>       *Defendants*. | No. 4:09-cv-00811-CW (filed Feb. 25, 2009) <br><br> **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT AND INVALIDITY DUE TO THE ON-SALE BAR** <br><br> Hr'g Date: Thursday, July 16, 2009 <br> Hr'g Time: 2:00 p.m. <br> Place: Courtroom 2, 4th Floor |
| Shopzilla, Inc.; Yahoo! Inc.; and Microsoft Corporation, <br><br>       *Counterclaim-Plaintiffs*, <br><br>       vs. <br><br> PartsRiver, Inc., <br><br>       *Counterclaim-Defendant*. | |

1

**NOTICE**

2      TO ALL PARTIES AND THEIR COUNSEL OF RECORD:  Please take notice that

3  Defendants Shopzilla, Inc.; Yahoo! Inc.; eBay Inc.; and Microsoft Corporation (collectively

4  "Defendants") hereby move for summary judgment that the asserted claims of the patent-in-suit

5  (claims 1 and 2 of U.S. Patent No. 6,275,821) are invalid and not infringed.  Judge Wilken is

6  presently scheduled to hear this motion at 2:00 p.m. on Thursday, July 16, 2009, in Courtroom 2 on

7  the 4th Floor of the U.S. District Court at 1301 Clay Street, Oakland, California 94612.  Pursuant to

8  the stipulation among the parties, Plaintiff's opposition brief is due on June 18, 2009, and

9  Defendants' reply brief is due on July 2, 2009.  *See* Docket No. 196 (May 22, 2009).

10      This motion is based on (i) the Memorandum of Points and Authorities below, (ii) the

11  attached Exhibits A to P, and (iii) the Declaration of Theodore W. Chandler with Exhibits Q to S, all

12  of which are being submitted today, May 28, 2009.

13

**RELIEF REQUESTED**

14      By this motion, Defendants seek a summary judgment that (i) they do not infringe the

15  asserted claims of the patent-in-suit (claims 1 and 2 of U.S. Patent No. 6,275,821) under the holdings

16  of *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373 (Fed. Cir. 2007), and *Muniauction, Inc.*

17  *v. Thomson Corp.*, 532 F.3d 1318, 1328–30 (Fed. Cir. 2008), *cert. denied*, 129 S. Ct. 1585 (2009),

18  and (ii) the asserted claims of the '821 patent-in-suit are invalid due to the on-sale bar, 35 U.S.C.

19  § 102(b).

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................ 1

II.    ISSUES TO BE DECIDED ........................................................................ 2

III.   UNDISPUTED FACTS ............................................................................... 3

     A.    The patent-in-suit:  U.S. Patent No. 6,275,821 to Danish et al.................................... 3

     B.    Screenshots from the first program to embody the '821 patent: the "AMP Navigator".......................................................................... 3

     C.    The "AMP Navigator" program was the subject of a commercial offer for sale over *two years* before the date of the application for the '821 patent.......................... 5

     D.    The first embodiment described in the '821 patent is a "local" embodiment, similar to the "AMP Navigator," where all steps are performed on a *stand-alone* computer.................................................................. 7

     E.    The second embodiment described in the '821 patent is an Internet embodiment with a "server" computer that performs some steps, and a "client" computer that performs other steps including the "displaying" step.............. 8

     F.    The asserted claims:  claims 1 and 2 of the '821 patent ............................................. 10

     G.    The parties and the accused products: websites for online comparison shopping, such as shopzilla.com, shopping.yahoo.com, shopping.com, and shopping.msn.com ............................................................. 11

     H.    The procedural history of the case ........................................................................ 12

IV.   ARGUMENT ........................................................................................... 12

     A.    Standard for summary judgment............................................................................ 12

     B.    Non-infringement........................................................................................ 13

           1.    The agreed-upon claim construction for "displaying" confirms that this step is performed by the user's computer, thus precluding a finding of direct infringement by Defendants............................................................. 13

                a.    The specification of the '821 patent confirms that the "displaying" step is performed by the user's computer.................... 14

                b.    The first-named inventor of the '821 patent has confirmed that the "displaying" step is performed by the user's computer ............... 14

                c.    PartsRiver itself has argued that the "displaying" step is performed by the user's computer ...................................................... 15

           2.    The Federal Circuit's decisions in *BMC* and *Muniauction* support a summary judgment of non-infringement in this case ..................................... 16

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT — No. 09-811-CW

3. The facts of this case are indistinguishable from those in *Global Patent*, where the district court *dismissed* a complaint in light of *BMC* and *Muniauction*, and the Federal Circuit summarily affirmed ...................... 18

4. Without direct infringement of claim 1, there cannot be infringement of dependent claim 2, or indirect infringement under 35 U.S.C. § 271(b) or (c) ................................................................................. 20

C. Invalidity ............................................................................................. 20

1. Standard for the on-sale bar, 35 U.S.C. § 102(b) ........................... 21

2. The asserted claims of the '821 patent were ready for patenting long before the critical date .............................................................. 21

3. The Navigator proposal in March 1992 was a commercial offer for sale of the claimed invention .......................................................... 22

V. CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
No. 06-11109, 2009 WL 1164570 (D. Mass. Apr. 24, 2009) (Zobel, J.) ................... 2, 17, 18

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ....................................................................................................... 12

*BMC Res., Inc. v. Paymentech, L.P.*,
498 F.3d 1373 (Fed. Cir. 2007) ............................................................................... passim

*Cardinal Chem. Co. v. Morton Int'l, Inc.*,
508 U.S. 83 (1993) ......................................................................................................... 20

*Dow Chem. Co. v. Mee Indus. Inc.*,
341 F.3d 1370 (Fed. Cir. 2003) ..................................................................................... 22

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
363 F.3d 1263 (Fed. Cir. 2004) ..................................................................................... 20

*Global Patent Holdings, LLC v. Panthers BRHC LLC*,
586 F. Supp. 2d 1331 (S.D. Fla. 2008), *aff'd*,
2009 WL 886300 (Fed. Cir. Apr. 1, 2009) (per curiam) ....................................... 2, 18, 19, 20

*Group One Ltd. v. Hallmark Cards, Inc.*,
254 F.3d 1041 (Fed. Cir. 2001) ................................................................................. 2, 22

*Keithley v. The Homestore.com, Inc.*,
No. 03-4447, 2008 WL 4962885 (N.D. Cal. Nov. 19, 2008) (Illston, J.) ................................ 2

*Minton v. Nat'l Ass'n of Sec. Dealers*,
336 F.3d 1373 (Fed. Cir. 2003) ..................................................................................... 22

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*,
No. 04-2000, 2007 WL 3231709 (N.D. Cal. Oct. 30, 2007) (Wilken, J.),
*aff'd*, 558 F.3d 1341 (Fed. Cir. 2009) ............................................................................. 23

*Muniauction, Inc. v. Thomson Corp.*,
532 F.3d 1318 (Fed. Cir. 2008), *cert. denied*, 129 S. Ct. 1585 (2009) ........................... passim

*NTP, Inc. v. Research in Motion, Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005) ..................................................................................... 15

*Pfaff v. Wells Elecs., Inc.*,
525 U.S. 55 (1998) ................................................................................................... 21, 22

*Robotic Vision Sys., Inc. v. View Eng'g, Inc.*,
249 F.3d 1307 (Fed. Cir. 2001) ..................................................................................... 22

*Scaltech, Inc. v. Retec/Tetra, LLC*,
269 F.3d 1321 (Fed. Cir. 2001) ............................................................................... 21, 22

*Space Systems/Loral, Inc. v. Lockheed Martin Corp.*,
No. 96-3418, 2006 WL 279331 (N.D. Cal. Feb. 6, 2006) (Illston, J.)............................23, 24

*Sparks v. Eastman Kodak Co.*,
230 F.3d 1344 (Fed. Cir. 2000)...........................................................................................19

## **Statutes**

28 U.S.C. § 1404(a) ...........................................................................................................12

35 U.S.C. § 102(b) ......................................................................................................passim

35 U.S.C. § 112, ¶ 4 ..........................................................................................................20

35 U.S.C. § 271(a) .......................................................................................................17, 20

35 U.S.C. § 271(b) .............................................................................................................20

35 U.S.C. § 271(c) .............................................................................................................20

## **Rules**

Civil L.R. 56-3 ...................................................................................................................13

Fed. Cir. R. 36 ...................................................................................................................19

Fed. R. Civ. P. 56(b) .........................................................................................................12

Fed. R. Civ. P. 56(c) .........................................................................................................12

Fed. R. Civ. P. 56(d)(1) .....................................................................................................13

## **Other Authorities**

*Restatement (Second) of Contracts* § 26 (1981) ..............................................................24

Richard A. Lord, *Williston on Contracts* § 4.10 (4th ed. 1990) ........................................24

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

This is a patent case that was recently transferred from the Eastern District of Texas.  This case should not be allowed to proceed any further because it is clear from the present record that Defendants are entitled to summary judgment of (i) non-infringement and (ii) invalidity due to the on-sale bar, 35 U.S.C. § 102(b).  These two grounds for summary judgment are independent from each other, and neither requires any claim construction.  This case is ripe for summary judgment.

*Non-infringement*:  The accused products are websites that consumers use to shop for products.  One of the accused websites, for example, is <www.shopping.com>.  Defendants are entitled to summary judgment of non-infringement because their websites do not perform each and every step of the asserted claims.  For example, none of Defendants' websites performs the step of "displaying" the webpage on the user's computer.  That step is performed by the user's computer, not Defendants' websites.  There are other steps of the asserted claims that Defendants' websites do not perform — such as "revising" the webpage and "accepting" selections made on the webpage — but the proper construction of those terms is disputed.  The proper construction of "displaying," however, is not disputed.  The parties have stipulated to its meaning, so all that remains is a question of law for this Court to decide.

The question of law is whether Defendants can be held liable for the "displaying" step performed by a third party.  The Federal Circuit has addressed this precise question of law in two recent cases:  *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373 (Fed. Cir. 2007) (affirming summary judgment of non-infringement), and *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328–30 (Fed. Cir. 2008) (overturning jury verdict of $77 million and finding non-infringement as a matter of law), *cert. denied*, 129 S. Ct. 1585 (2009).

In *BMC* and *Muniauction*, the Federal Circuit emphasized that direct infringement normally requires a *single* party to perform all the steps of the method claim.  "[W]here the actions of *multiple* parties combine to perform every step of a claimed method, the claim is directly infringed only if one party exercises 'control or direction' over the entire process such that every step is attributable to the controlling party, i.e., the 'mastermind.'"  *Muniauction*, 532 F.3d at 1329 (emphasis added).

Defendants do not perform all the steps of the asserted claims, nor do they "control or direct" consumers to perform the "displaying" step on their computers.  Accordingly, under the holdings of *BMC* and *Muniauction*, summary judgment of non-infringement should be granted.  *See Global Patent Holdings, LLC v. Panthers BRHC LLC*, 586 F. Supp. 2d 1331, 1335 (S.D. Fla. 2008) (dismissing complaint as a matter of law), *aff'd*, 2009 WL 886300 (Fed. Cir. Apr. 1, 2009) (per curiam); *Akamai Techs., Inc. v. Limelight Networks, Inc.*, No. 06-11109, 2009 WL 1164570, at *20– *26 (D. Mass. Apr. 24, 2009) (Zobel, J.) (overturning $45 million jury verdict and finding non-infringement as a matter of law); *Keithley v. The Homestore.com, Inc.*, No. 03-4447, 2008 WL 4962885, at *1–*7 (N.D. Cal. Nov. 19, 2008) (Illston, J.) (granting summary judgment of non-infringement).

**On-sale bar**:  Defendants are also entitled to summary judgment of invalidity because the asserted claims were both reduced to practice and the subject of a commercial offer for sale more than one year prior to the application for the patent-in-suit.  *See* 35 U.S.C. § 102(b).  It is undisputed that by April 1992 — over *two years* before the application for the patent was filed — the inventor had created a "demo" program that admittedly was a reduction to practice of the asserted claims, and he had faxed a proposal to a third party offering to sell software embodying the asserted claims.  With these facts undisputed, all that remains is a question of law for this Court to decide:  Was this proposal a "commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration)"?  *Group One Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001).  Both the language of the proposal and the circumstances of the proposal confirm that it was indeed a "commercial offer for sale," and thus the asserted claims are invalid as a matter of law.

## II.   ISSUES TO BE DECIDED

This motion presents the following issues for the Court to decide:

- In light of the agreed-upon construction for the term "displaying," are the asserted claims of the patent-in-suit (claims 1 and 2 of U.S. Patent No. 6,275,821) infringed by Defendants under the holdings of *BMC* and *Muniauction*?  (No.)

- In light of the proposal sent by the inventor to a third-party more than one year prior to the application for the '821 patent, are the asserted claims invalid due to the on-sale bar, 35 U.S.C. § 102(b)?  (Yes.)

# III.    UNDISPUTED FACTS

### A.    The patent-in-suit:  U.S. Patent No. 6,275,821 to Danish et al.

The patent-in-suit is U.S. Patent No. 6,275,821 (the "'821 patent"), which issued on August 14, 2001.  *See* Exs. A, I.  It is the third in a series of patents that all claim priority to an application filed on October 14, 1994.  *See* Exs. B, C.  Thus for purposes of the on-sale bar, 35 U.S.C. § 102(b), the "critical date" in this case is October 14, 1993.

The title of the '821 patent is "Method and System for Executing a Guided Parametric Search."  *See* Ex. A.  According to the '821 patent, the prior-art methods of searching had various deficiencies, such as failing "to guarantee a user that at least one item will be identified" by the search.  *Id.* at 3:31–:32.  The solution claimed by the '821 patent[1] is a "guided search," sometimes called a "parametric search" or a "faceted search."

### B.    Screenshots from the first program to embody the '821 patent: the "AMP Navigator"

Perhaps the easiest way to understand the concept of a "guided search" is to see it in action.  According to both the Plaintiff and the first-named inventor of the '821 patent, Sherif Danish, the program "AMP Navigator" was the first reduction to practice of the "guided search" method claimed by the '821 patent.  *See* Ex. F, Response to Interrogatory Nos. 1–2 (contending the "AMP Navigator" corroborates conception and reduction to practice of the '821 patent by April 1992); Chandler Decl. ¶¶ 3–6 & Exs. Q–R; Ex. E (annotated screenshots of Danish's "AMP Navigator").

The following screenshots from Danish's "AMP Navigator" program illustrate a "guided search."  In the first screenshot, a user looking for connectors with a "square flanged receptacle" clicks on the button for "Sq. Flanged Receptacle":

---

[1] Defendants dispute that there is anything novel about the solution claimed in the '821 patent, and for this reason they asked the Patent Office to reexamine the validity of the asserted claims of the '821 patent.  The Patent Office agrees with Defendants that the validity of the asserted claims is questionable, *see* Ex. O, and in fact the Patent Office recently issued a non-final rejection of the asserted claims, *see* Ex. P.  For purposes of this motion, however, Defendants are not contesting the validity of the asserted claims on the basis of the prior art presently before the Patent Office.

1

2

3

4

5

6

7

8

9

10

11

12

13



**4**

14    *See* Ex. E at 4.

15         In the second screenshot, the user clicks on the "Search" button:

16

17

18

19

20

21

22

23

24

25

26

27    **5**

28    *See* Ex. E at 5.

The third screenshot shows the results of the search:



6

*See* Ex. E at 6.

As shown above in the third screenshot, there are 65 part numbers that match the parameter "Sq. Flanged Receptacle."  The third screenshot also shows that Danish's program greys-out parameters that can no longer be selected, such as "Solid Feedthrough" and "with Tetraseal."  In this respect, Danish's program provides a "guided parametric search" to the user.  Danish's program does not use a keyword search, nor does it use a hierarchical search.  Instead, Danish's program allows a user to select parameters, in any order, in a step-by-step fashion to find the item that matches all of the user's criteria.

### C. The "AMP Navigator" program was the subject of a commercial offer for sale over *two years* before the date of the application for the '821 patent

The "AMP Navigator" program shown above figures prominently in the on-sale bar issue raised by this motion.

Both Danish and the Plaintiff have admitted that the "AMP Navigator" program was created "by April 1992" — long before the "critical date" of October 14, 1993.  *See* Ex. F, Response to

1    Interrogatory Nos. 1–2. They have also admitted that the "AMP Navigator" program was a

2    reduction to practice of the asserted claims. *See id.*

3    　　　　Furthermore, Danish has admitted that the "AMP Navigator" technology was the subject of a

4    proposal that he faxed to a company named AMP on March 5, 1992 — again, long before the

5    "critical date" for the on-sale bar. *See* Ex. D, ¶¶ 9–11; *id.* at PR 0000252–57; Chandler Decl. ¶ 7 &

6    Ex. S at TWC 1563–68.

7    　　　　The Navigator proposal was "[p]repared for AMP Incorporated by Danish International,

8    Inc." Chandler Decl. Ex. S at TWC 1564. Danish's company, Danish International, had made

9    proposals to AMP in the past that had been accepted. For example, in 1991, Danish International

10   developed a program for AMP called AMPFAX. *See* Ex. G at 21:19–22:1. Before beginning the

11   AMPFAX project, Danish International submitted a proposal describing the work to be done and the

12   price for the work. *See id.* at 22:22–23:24. AMP accepted that proposal. *See id.* at 23:23–:24.

13   　　　　The Navigator proposal described a project with five phases, with a specific price for each

14   phase. *See* Chandler Decl. Ex. S at TWC 1564–68. Of particular relevance to this motion is phase 3

15   of the proposal, in which Danish offered to sell a "Navigator" program that included the technology

16   covered by the asserted claims:

17   　　　　　　　　The objective of phase 3 is to allow the user to locate a part number.
18   　　　　　　　　The navigation system will contain all the functions of phase 2 in
     　　　　　　　　addition to the following:

19   　　　　　　　　•  The ability to locate a part number by selecting product
20   　　　　　　　　　 features in any order. Each time a feature is selected, the list of
     　　　　　　　　　 other selectable features is narrowed down to reflect only those
21   　　　　　　　　　 remaining selectable features. ***A demo of this approach is
     　　　　　　　　　 available at Danish International***.

22   *Id.* at TWC 1566 (emphasis added).

23   　　　　Danish has admitted that the "demo" described in phase 3 of the proposal is the "AMP

24   Navigator" program shown above that was a reduction to practice of the asserted claims. *See* Ex. G

25   at 143:9–144:2; *see also* Ex. F, Response to Interrogatory Nos. 1–2; Chandler Decl. ¶¶ 4–5, 8–9 &

26   Exs. Q–R. The second-named inventor of the '821 patent, Kris Kimbrough, was the person who

27   actually wrote the code for the "AMP Navigator" program. *See* Ex. H at 146:7–147:15. He

28

1   confirmed that the code for the "demo" described in phase 3 of the Navigator proposal existed as of

2   March 5, 1992. *See id.* at 149:19–150:6.

3          The Navigator proposal included prices for each of the five phases. *See* Chandler Decl. Ex. S

4   at TWC 1567–68. The price for phase 3 was $200,000. *See id.* at TWC 1568. When asked at his

5   deposition whether the prices quoted for each phase were "fair offers," Danish responded "Yes."

6   *See* Ex. G at 142:1–:13. Danish testified that he would have performed the work described in the

7   Navigator proposal at the quoted price. *Id.* at 89:3–:4. AMP did not accept the Navigator proposal,

8   *see id.* at 88:23–:24, but when asked whether he "wanted [AMP] to accept the proposal so that

9   Danish International could start this new project," Danish responded "Yes." *Id.* at 150:8–:9.

10         The evidence above about phase 3 of the Navigator proposal provides the basis for

11  Defendants' motion for summary judgment of invalidity due to the on-sale bar. The evidence shows

12  that the claimed invention was reduced to practice and offered for sale at a price of $200,000 long

13  before the "critical date" of October 14, 1993, thus rendering the asserted claims invalid as a matter

14  of law.

15         **D.      The first embodiment described in the '821 patent is a "local"
                    embodiment, similar to the "AMP Navigator," where all steps are
16                  performed on a *stand-alone* computer**

17         Over two years after Danish presented the Navigator proposal to AMP, he filed the patent

18  application from which the '821 patent claims priority. *See* Ex. C. The '821 patent describes two

19  embodiments. The first embodiment, called the "local" embodiment, runs on a ***stand-alone***

20  computer, as opposed to a computer connected to a network such as the Internet. *See* Ex. A at 7:4–

21  :11. The "local" embodiment described in the '821 patent is almost identical to Danish's "AMP

22  Navigator" program shown above. *Compare* Ex. A at 7:1–9:9 & figs. 7–9 (first embodiment of the

23  '821 patent), *with* Ex. E (screenshots from Danish's "AMP Navigator" program).

24         Figures 7 to 9 of the '821 patent show screenshots from the "local" embodiment described in

25  the patent. *See* Ex. A. Reprinted below is Figure 8 of the patent, annotated with some of the terms

26  used in the patent and the column and line number in the patent where each term is used:

27

28



The idea behind the "local" embodiment was that traditional paper catalogs could be replaced by electronic catalogs distributed on CD-ROM. *See* Ex. A at 1:42–:51. The CD-ROM would also contain a program, like that shown in Figure 8 above, that would allow a customer to search the CD-ROM on a ***stand-alone*** computer (not a computer connected to a network, such as the Internet). *See* Ex. D, ¶¶ 3–8; *see also* Ex. F, Response to Interrogatory No. 1 (similar).

    **E.**    **The second embodiment described in the '821 patent is an Internet embodiment with a "server" computer that performs some steps, and a "client" computer that performs other steps including the "displaying" step**

The second embodiment described in the '821 patent makes use of the Internet. *See* Ex. A at 18:10–19:35 & figs. 25–35. According to Danish, the Internet embodiment was reduced to practice

in 1994, two years after the "local" embodiment described above was reduced to practice. *See* Ex. D, ¶¶ 18–19.

In the local embodiment (created in 1992), *all* the steps described in the '821 patent are performed by the local computer; no other computer is involved. In the Internet embodiment, by way of contrast, some steps of the method are performed by the website (the "server" computer), while other steps are performed by the user's computer (the "client" computer).

The division of labor required by the Internet embodiment is at the heart of Defendants' motion for summary judgment of non-infringement. In particular, several steps in the Internet embodiment *must* be performed by the user's computer and *cannot* be performed by the server computer. One of the steps that *must* be performed by the user's computer is the step of "displaying" the feature screen to the user. Defendants' servers do not perform the "displaying" step, and thus Defendants do not infringe the asserted claims.

Below is how the specification describes the Internet embodiment, which confirms that the "displaying" step is performed by the user's computer, *not* the server computer:



Fig. 25

In an embodiment of the invention in an Internet environment, there is a ***server computer 125*** and a ***client computer 126***. ***All of the program files and data files described in the local embodiment reside on the server 125***. . . .

. . . .

The client 126 initiates a request to the server 125 for the electronic catalog searching application via the Internet. The server 125 detects the request. Receipt of the request executes the requested application on the server 125 that permits a user on the client 126 to select a family 1 or subfamily 2. Example of Main Menu,

Alphabetical search, Picture Search, and View Part Number screens are shown in FIGS. 31 through 35. When the family 1 or subfamily 2 is chosen, ***the server 125 sends a feature screen status 127 to the client 126***. The feature screen status 127 comprises a feature screen code, ScreenNum 102 in a preferred embodiment, all features 5 appropriate to the feature screen 9 specified in ScreenNum 102, all available alternatives 7, all unavailable alternatives 8, and the selection criteria 14. As the selection criteria 14 is always sent, it may comprise zero selected alternatives 37. It is apparent, therefore, that the server 125 sends all of the information necessary to define the current subfamily 2 to the client 126. The information, therefore, need not be retained in memory on the server 125. This particular feature renders it particularly appropriate for an Internet environment. ***The client 126 receives the feature screen status 127 and displays the feature screen 9 accordingly.*** An example of the feature screen 9 on the Internet is shown in FIGS. 26 through 29. ***The user on the client, makes selections from among the available alternatives 7 generating a selection criteria 14 different from that which was se[n]t to it.*** The client 126 initiates a search with the modified selection criteria 14. ***The client 126 sends to the server 125, the ScreenNum 102 value sent to it by the server, and the modified selection criteria 14.*** The server 125 receives the ScreenNum 102 and the selection criteria 14. ***The server 125 executes the search operation as disclosed hereinabove using the revised selection criteria 14 and generates the feature screen status 127.*** The server 125 sends the feature screen status 127 that has been updated based on the modified selection criteria 14 to the client 126. ***The client 126 receives the feature screen status 127 and displays the updated feature screen 9.*** This process may iterate similar to the local version to further narrow the subfamily as desired.

Ex. A at 18:10–19:12 (emphasis added).

## F.    The asserted claims:  claims 1 and 2 of the '821 patent

Claims 1 and 2 of the '821 patent have been asserted in this suit.  *See* Ex. I at 1.  Claim 2 depends from claim 1, and thus both include the step of "displaying" a feature screen to the user. (An example of a "feature screen" is Figure 8, shown above.  *See supra* p. 8.)

Reprinted below is the text of claims 1 and 2.  Steps (a) through (g) are illustrated by the screenshots from the "AMP Navigator" above.  *See supra* pp. 3–5; *see also* Ex. E.  Steps (h) through (k) simply repeat the process a second time:

1. A method for assisting a user in identifying a subfamily of items within a family of items, comprising the steps of:

(a) providing a computer readable data file of stored information representing at least one family of items, said data file identifying at least one alternative for each item,

(b) reading said data file,

(c) ***displaying*** a feature screen indicating said alternatives represented in the family,

(d) ***accepting*** a first selection criteria of at least one alternative,

(e) determining a first subfamily of items wherein each said item in the first subfamily satisfies said first selection criteria,

(f) determining available alternatives represented in the first subfamily,

(g) ***revising*** said feature screen to indicate the available alternatives of the first subfamily,

(h) ***accepting*** a second selection criteria comprising the alternative or alternatives of the first selection criteria plus at least one alternative selected from the revised feature screen,

(i) determining a second subfamily of items of the family wherein each item in the second subfamily satisfies said second selection criteria,

(j) determining available alternatives represented in the second subfamily, and

(k) ***revising*** said feature screen to indicate the available alternatives of the second subfamily.

2. The method of claim 1 wherein each family has at least one feature associated therewith and further comprising the step of

***displaying*** at least one grouping wherein each said grouping comprises one of said features visually related to respective alternatives.

**G.** **The parties and the accused products: websites for online comparison shopping, such as shopzilla.com, shopping.yahoo.com, shopping.com, and shopping.msn.com**

The plaintiff is PartsRiver, Inc. PartsRiver bought the '821 patent on April 26, 2006 — almost five years after the '821 patent issued. *See* Ex. F, Response to Interrogatory No. 4.

PartsRiver filed this suit on October 3, 2007 — over six years after the '821 patent issued. *See* Docket No. 1. PartsRiver has alleged that websites used for "online comparison shopping" infringe claims 1 and 2 of the '821 patent. *See* Ex. I. Listed below are the defendants still accused of infringement, along with their primary "online comparison shopping" site:

- Shopzilla, Inc. (shopzilla.com). *See* Ex. I at 1–2, 67–74.

- Yahoo! Inc. (shopping.yahoo.com). *See* Ex. I at 2–3, 101–05.

- eBay Inc. (shopping.com). *See* Ex. I at 5–6, 30–35.
- Microsoft Corporation (shopping.msn.com). *See* Ex. I at 6, 40–44.

**H.    The procedural history of the case**

This suit originally was filed in the Eastern District of Texas. On November 19, 2007, all the defendants moved to transfer the action to this Court pursuant to 28 U.S.C. § 1404(a), and some defendants moved to dismiss for lack of personal jurisdiction. *See* Docket No. 41. PartsRiver opposed the motion on December 6, 2007, *see* Ex. L, and a hearing was held on April 10, 2008, *see* Ex. M. After reviewing several intervening decisions by the courts of appeals, *see* Docket Nos. 70, 146, the court in Texas eventually granted Defendants' motion to transfer on January 30, 2009, without addressing the motion to dismiss for lack of personal jurisdiction, *see* Ex. N.

While the motion to transfer was pending in the Eastern District of Texas, the parties engaged in discovery and exchanged information required by the Patent Rules in that district. *See, e.g.*, Exs. F–K. (The Patent Rules in the Eastern District of Texas are similar to the Patent Local Rules here. *See* Ex. J.) Of particular relevance to this motion is that the parties filed a Joint Claim Construction Statement in which the parties stipulated to several claim constructions, including the construction for the term "displaying" in step (c) of claim 1 of the '821 patent. *See* Ex. K. Thus there is no need for this Court to construe any claim terms before deciding this motion.

**IV.    ARGUMENT**

**A.    Standard for summary judgment**

"A party against whom relief is sought may move at any time, with or without supporting affidavits, for summary judgment on all or part of the claim." Fed. R. Civ. P. 56(b). "The judgment sought should be rendered if . . . there is no *genuine* issue as to any *material* fact." Fed. R. Civ. P. 56(c) (emphasis added). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

This motion presents two independent grounds for summary judgment: non-infringement and invalidity. Thus even if one ground is rejected, the other should still be accepted. "If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine

what material facts are not genuinely at issue. . . . It should then issue an order specifying what facts — including items of damages or other relief — are not genuinely at issue. The facts so specified must be treated as established in the action." Fed. R. Civ. P. 56(d)(1); *see also* Civil L.R. 56-3.

**B.   Non-infringement**

**1.   The agreed-upon claim construction for "displaying" confirms that this step is performed by the user's computer, thus precluding a finding of direct infringement by Defendants**

Summary judgment of non-infringement is appropriate for the simple reason that Defendants do not perform all of the steps of claim 1 of the '821 patent: "Direct infringement requires a party to perform or use *each and every step* or element of a claimed method or product." *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007) (emphasis added).

In particular, Defendants do not perform the steps of "displaying" the feature screen, "accepting" selected alternatives, or "revising" the feature screen. (The language of the claim is reprinted above, *supra* p. 11.) The parties dispute the proper construction of "accepting" and "revising," however, so this motion is premised only on the "displaying" step, which has an agreed-upon meaning. *See* Ex. K.

The agreed-upon construction for "displaying" provides that this step is performed by the user's computer, not by Defendants' servers:

| Claim language | Agreed-upon construction |
| --- | --- |
| Claim 1: *displaying* a feature screen indicating said alternatives represented in the family<br><br>Claim 2: *displaying* at least one grouping wherein each said grouping comprises one of said features visually related to respective alternatives. | showing on the display device of *the user's computer* [a feature screen/at least one grouping]<br><br>*See* Ex. K. |

The agreed-upon construction for "displaying" — in which the "displaying" step is performed by the user's computer, not Defendants' servers — is confirmed by the specification of the '821 patent, the testimony of the inventor, and PartsRiver's own contentions, as discussed below.

**a.** **The specification of the '821 patent confirms that the "displaying" step is performed by the user's computer**

The specification of the '821 patent makes clear that the "displaying" step is performed by the client (i.e., the user's computer), not the server (i.e., Defendants' computers): "The server 125 sends the feature screen status 127 that has been updated based on the modified selection criteria 14 to the client 126. ***The client 126 receives the feature screen status 127 and displays the updated feature screen 9.***" Ex. A at 19:6–:10 (emphasis added). (The complete passage from the specification is reprinted above, *supra* pp. 9–10.)

**b.** **The first-named inventor of the '821 patent has confirmed that the "displaying" step is performed by the user's computer**

The first-named inventor of the '821 patent agrees that the "displaying" step is performed by the user's computer, not the server. He spoke candidly on this subject at his deposition:

> Q. . . . . [W]hat is a server?
>
> A. In the internet environment, that would be a web server, for example.
>
> Q. And what is a client?
>
> A. The client on the internet would be a web browser.
>
> Q. ***How do you accomplish displaying the feature screen*** indicating the alternatives in your patent?
>
> A. How do I —
>
> Q. How is that accomplished? How do you do it?
>
> A. You send to the browser — in the case of the internet —
>
> Q. Uh-huh.
>
> A. — you would send to the browser of the client the list of attributes and the values of each attribute for that particular product family, for example, like printers, like we were saying.
>
> Q. And how do you send it to the browser? What do you send to the browser?
>
> A. There is a protocol, I guess it was described here [in the '821 patent, *see* Ex. A at 18:21], an HTTP protocol where the browser requests information from the server, like show me the printer catalog,

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT — No. 09-811-CW

for example. And the server in response to the HTTP request will send the attributes and attribute values.

Q. *And what does the <u>browser</u> do once it gets the attributes and the attribute values?*

A. *It <u>displays</u> them.*

. . . .

Q. *Is there any teaching of <u>displaying</u> on the <u>server</u>* in column 18 or 19 [of the '821 patent, *see* Ex. A]?

A. Displaying on the server?

Q. Yes.

A. *The <u>display</u>, if I recall, is a display that happens on the user of the — on the browser of the <u>client</u>.*

Ex. G at 111:11–112:13, 129:23–130:4 (emphasis added).

### c. <u>PartsRiver itself has argued that the "displaying" step is performed by the user's computer</u>

Finally, PartsRiver itself has argued that the "displaying" step is performed by the user's computer, consistent with the claim construction to which it stipulated. To establish personal jurisdiction in Texas, PartsRiver needed to establish that at least part of the allegedly infringing activity took place in Texas. None of Defendants' allegedly infringing servers are located in Texas, however, so PartsRiver argued that the "displaying" step was performed by user's computers in Texas:

> Claim 1 of the patent at issue in this case requires that one step take place where the remote user is located. The method requires that a feature screen be *<u>"displayed."</u> That necessarily happens where the <u>user's computer</u> terminal is located*. That is where the feature screen is displayed so that the user can make a selection to trigger the next step, which involves the web server "accepting" that selection and sending information back to the user, so that the process can be completed.
>
> Under the Federal Circuit's decision in *NTP, Inc. v. Research in Motion*, 418 F.3d 1282, 1319 (Fed. Cir. 2005), the presence of some step taking place in a location other than California, such as on a remote user's screen in Texas, precludes the Court from finding that infringement happens only within California.

Ex. L at 11.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT — No. 09-811-CW

*       *       *       *       *

For all of these reasons, the agreed-upon construction for "displaying" requires this step to be performed by the user's computer, not Defendants' servers.

### 2. The Federal Circuit's decisions in *BMC* and *Muniauction* support a summary judgment of non-infringement in this case

At the hearing before the court in Texas, PartsRiver tried to have its cake and eat it, too. PartsRiver admitted that the "displaying" step was performed by the user's computer (in an effort to establish personal jurisdiction in Texas on account of the user's activity), but PartsRiver argued that Defendants' servers "originated" the information that was displayed (in an effort to establish infringement by Defendants' servers). The following colloquy took place:

> THE COURT: What about this issue of displaying . . . . ?
>
> MR. BALDWIN: . . . . [O]ur position with regard to display as it pertains to jurisdiction and as it pertains to specific jurisdiction is that, yes, ***the display originates at the server*** there's no doubt. The result of ***that origination ends at the display at the computer terminal of a user***. And we — we say that ***that display is at the very least in part an infringement, a step in the method that we claim*** —
>
> THE COURT: ***The display by the user?***
>
> MR. BALDWIN: — in this case.
>
> THE COURT: Is that right?
>
> MR. BALDWIN: At the end — ***yes, sir, at the end of the — at the user terminal***.

Ex. M at 10:9–11:2 (emphasis added).

The argument made by PartsRiver above — that Defendants' servers are somehow responsible for the "displaying" step performed by the user's computer — is the same argument that the Federal Circuit considered and rejected in *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373 (Fed. Cir. 2007) (affirming summary judgment of non-infringement) and *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328–30 (Fed. Cir. 2008) (overturning jury verdict of $77 million and finding non-infringement as a matter of law), *cert. denied*, 129 S. Ct. 1585 (2009). The holdings of *BMC* and *Muniauction* establish that summary judgment of non-infringement is appropriate in this case.

In *BMC*, the Federal Circuit affirmed a summary judgment of non-infringement. The claim in *BMC* — like the claim in this case — required different actors to perform different steps. *See* 498 F.3d at 1375–76. The plaintiff in *BMC* argued that the defendant was nonetheless liable for direct infringement because "[w]here the infringement is the result of the participation and combined action(s) of one or more persons or entities, they are joint infringers and are jointly liable for the infringement." *Id.* at 1379. The Federal Circuit flatly rejected this argument. *See id.* at 1380. "Infringement requires, as it always has, a showing that a defendant has practiced **each and every element** of the claimed invention." *Id.* (emphasis added) (citing 35 U.S.C. § 271(a)). The Federal Circuit cautioned, however, that "[a] party cannot avoid infringement . . . simply by contracting out steps of a patented process to another entity." *Id.* at 1381. "In those cases, the party in control would be liable for direct infringement." *Id.*

After *BMC*, there was some question as to the amount of "control or direction" that would be required to establish direct infringement in a case, like this one, where some of the steps of the patented process allegedly are performed by one person, while other steps allegedly are performed by another person. *See, e.g.*, *Akamai Techs., Inc. v. Limelight Networks, Inc.*, No. 06-11109, 2009 WL 1164570, at *20–*26 (D. Mass. Apr. 24, 2009) (Zobel, J.). For example, the district court in *Akamai* initially upheld a jury verdict of $45 million because it believed the "control or direction" standard of *BMC* was satisfied by evidence of "a contractual relationship between [the defendant] and its customers" and evidence that the defendant "provided those customers with instructions explaining how to utilize its [allegedly infringing] service." *Id.* at *22. The district court changed its mind, however, after reading the Federal Circuit's decision in *Muniauction*. *See id.* at *23–*26.

In *Muniauction*, the plaintiff alleged — much like PartsRiver alleges in this case — that the defendant's website infringed a method for conducting an auction. *See* 532 F.3d at 1322–23. The jury agreed and returned a verdict of $77 million. *See id.* at 1321. On appeal, the Federal Circuit overturned the jury verdict and found non-infringement as a matter of law. *See id.* at 1328–30. In the process, the Federal Circuit clarified its previous holding in *BMC*. "[W]here the actions of multiple parties combine to perform every step of a claimed method, the claim is directly infringed only if one party exercises 'control or direction' over the entire process such that every step is

attributable to the controlling party, i.e., the 'mastermind.'" *Id.* at 1329. Turning to the facts of the case before it, the Federal Circuit found that the plaintiff could not meet this standard as a matter of law: "That [the defendant] controls access to its system and ***instructs*** bidders on its use is not sufficient to incur liability for direct infringement. . . . [The defendant] neither performed every step of the claimed method nor had another party perform steps on its behalf." *Id.* at 1330 (emphasis added).

After *Muniauction*, it is clear that a website that performs only some steps of a patented process, while other steps are performed by customers, does not directly infringe the patent. The district court in *Akamai* recognized the significance of *Muniauction* when it overturned the jury's verdict of $45 million:

> I find no material difference between [the defendant's] interaction with its customers and that of [the defendant] in *Muniauction*. . . . [The defendant's] customers, following [the defendant's] instructions, do [perform one of the claimed steps of the patent] in order to take advantage of [the defendant's] service. However, this step is performed by [the defendant's] customers not because they are contractually obligated to do so; rather, they do so because they wish to avail themselves of [the defendant's] service. Under *Muniauction*, this is insufficient to establish the requisite direction or control by [the defendant] of its customers necessary to find it liable for direct infringement.

2009 WL 1164570, at *26.

The same is true here. To the extent Defendants' customers perform the "displaying" step of claim 1 of the '821 patent, they do so because they wish to avail themselves of Defendants' services, not because they are contractually obligated to do so. Accordingly, under the holdings of *BMC* and *Muniauction*, Defendants do not directly infringe claim 1 of the '821 patent as a matter of law.

### 3. The facts of this case are indistinguishable from those in *Global Patent*, where the district court *dismissed* a complaint in light of *BMC* and *Muniauction*, and the Federal Circuit summarily affirmed

The impact of *BMC* and *Muniauction* on this case is confirmed by *Global Patent Holdings, LLC v. Panthers BRHC LLC*, 586 F. Supp. 2d 1331 (S.D. Fla. 2008), *aff'd*, 2009 WL 886300 (Fed. Cir. Apr. 1, 2009) (per curiam). The facts of *Global Patent* are indistinguishable from the facts of this case. In *Global Patent*, like this case, the asserted claim included the step of "displaying a

presentation" on the user's computer. *See id.* at 1332 n.1. The plaintiff in *Global Patent* alleged in

its complaint that the defendant's website "controlled" all the steps of the method claim — including

the "displaying" step — and thus the defendant directly infringed the patent:

> Plaintiff alleges the following "control" over home users by
> Defendant:
>
> . . . [Defendant's] website stores a set of computer programs which
> it then sends to the user's computer for execution by that computer.
> Since the programs which the user's computer eventually executes
> are all supplied to the user's computer by [Defendant's] own
> website, operating on [Defendant's] own server, [Defendant]
> controls and directs the operation of those programs on the user's
> computer. Nothing happens at the user's computer in connection
> with the method steps of claim 17 that is not a direct result of the
> execution of programs and website material supplied by
> [Defendant's] website.

*Global Patent*, 586 F. Supp. 2d at 1333.

The district court rejected the plaintiff's argument and *dismissed* the complaint without ever

construing the claims:

> Plaintiff claims that this action is "controlled" by Defendant because
> Defendant puts Javascript programs on the remote user's computer to
> allow the process to begin. Nevertheless, ***the Court does not believe
> this "control" is sufficient "direction or control" over the remote
> computer user***. Plaintiff has, in no way, alleged that remote users are
> contractually bound to visit the website, it has not alleged that the
> remote users are Defendant's agents who visit the website within the
> scope of their agency relationship nor has it alleged any facts which
> would render Defendant otherwise vicariously liable for the acts of the
> remote user. Using Plaintiff's analogy, Defendant may give home
> users the keys to the truck, but home users have no obligation to use
> those keys to start the truck and drive away.

*Id.* at 1335 (emphasis added).

On appeal, the Federal Circuit summarily affirmed without an opinion. *See* 2009 WL

886300. The Federal Circuit affirms without an opinion when "a judgment or decision has been

entered without an error of law" and publishing another opinion "would have no precedential value."

Fed. Cir. R. 36. In other words, "the appeal lacked merit." *Sparks v. Eastman Kodak Co.*, 230 F.3d

1344, 1345 (Fed. Cir. 2000). The Federal Circuit undoubtedly believed that the district court's

decision in *Global Patent* was mandated by the Federal Circuit's earlier opinions in *BMC* and

*Muniauction*, and thus the Federal Circuit did not feel that it was necessary to publish yet another

1   opinion repeating the same points that were previously made in *BMC* and *Muniauction* and correctly

2   applied by the district court.

3          This case is as clear cut as *Global Patent* was to the Federal Circuit: Defendants do not

4   "direct or control" the "displaying" step performed by the user's computer, and thus Defendants do

5   not directly infringe claim 1 of the '821 patent.

6          **4.     Without direct infringement of claim 1, there cannot be
                      infringement of dependent claim 2, or indirect infringement
7                     under 35 U.S.C. § 271(b) or (c)**

8          Furthermore, without direct infringement of claim 1, Defendants cannot infringe dependent

9   claim 2 and cannot indirectly infringe under 35 U.S.C. § 271(b) or (c), as explained below.

10         ***Dependent claim 2***: "A conclusion of noninfringement as to the independent claims [e.g.,

11  claim 1] requires a conclusion of noninfringement as to the dependent claims [e.g., claim 2]."

12  *Muniauction*, 532 F.3d at 1328 n.5; *see also* 35 U.S.C. § 112, ¶ 4.

13         ***Indirect infringement under 35 U.S.C. § 271(b) or (c)***: "[A]bsent direct infringement of the

14  claims of a patent, there can be neither contributory infringement [under § 271(c)] nor inducement of

15  infringement [under § 271(b)]." *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263,

16  1277 (Fed. Cir. 2004) (affirming summary judgment of non-infringement); *see also, e.g.*, *Global

17  Patent*, 586 F. Supp. 2d at 1335 (dismissing claims under § 271(b) and (c) because "Plaintiff has not

18  sufficiently alleged a predicate finding of direct infringement" under the holdings of *BMC* and

19  *Muniauction*).

20         Accordingly, Defendants are entitled to summary judgment of non-infringement of claims 1

21  and 2 of the '821 patent under 35 U.S.C. § 271(a), (b), and (c).

22         **C.     Invalidity**

23         Defendants are also entitled to summary judgment of invalidity. Invalidity of the '821 patent

24  is the subject of several counterclaims for declaratory relief, *see* Docket Nos. 31–33, so granting

25  Defendants' motion for summary judgment of non-infringement would *not* moot the question of

26  invalidity: "A party seeking a declaratory judgment of invalidity presents a claim independent of the

27  patentee's charge of infringement." *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 96

28

1    (1993). Accordingly, the Court should grant summary judgment on *both* grounds presented by this

2    motion.

3                    **1.    Standard for the on-sale bar, 35 U.S.C. § 102(b)**

4            Section 102(b) provides the following:

5            **§ 102. Conditions for patentability; novelty and loss of right to
               patent**

6

7                    A person shall be entitled to a patent unless—

8                    (b) the invention was patented or described in a printed
                 publication in this or a foreign country or in public use or ***on sale***
                 in this country, more than one year prior to the date of the
9                application for patent in the United States

10   35 U.S.C. § 102(b) (emphasis added).[2]

11           "The determination of whether an invention was on sale within the meaning of § 102 is a

12   question of law." *Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1327 (Fed. Cir. 2001)

13   (affirming summary judgment of invalidity). A claim is invalid due to the on-sale bar when two

14   conditions are satisfied before the "critical date": "First, the product must be the subject of a

15   commercial offer for sale. . . . Second, the invention must be ready for patenting." *Pfaff v. Wells

16   Elecs., Inc.*, 525 U.S. 55, 67 (1998). Both conditions are satisfied in this case.

17                   **2.    The asserted claims of the '821 patent were ready for
                           patenting long before the critical date**
18

19           The inventors of the '821 patent both admitted that the asserted claims were reduced to

20   practice as early as March 5, 1992, and no later than April 1992 — long before the "critical date" of

21   October 14, 1993. *See* Ex. F, Response to Interrogatory Nos. 1–2 (verified by Danish); Chandler

22   Decl. ¶ 7 & Ex. S at TWC 1563, 1566; Ex. G at 143:9–144:2; Ex. H at 149:19–150:6.[3] If the

23

24           [2] Defendants contend that the asserted claims are invalid for several reasons under 35 U.S.C.
     § 102(b), including that they were "in public use" before the critical date, but for purposes of this
     motion, Defendants are only asserting invalidity due to the "on-sale" bar. *See also supra* p. 3, note
25   1.

26           [3] Danish and Kimbrough stated in the cited testimony that the "demo" described in phase 3 of the
     Navigator proposal existed as of March 5, 1992, and that the asserted claims were reduced to
27   practice by March 5, 1992. The cited interrogatory response, by way of contrast, states that the
     "demo" existed "by April 1992" and that the asserted claims were reduced to practice "in April
28   1992." There is no evidence of a first reduction to practice "in" April 1992, however; all the

                                                                              *(Footnote continued)*

invention has been reduced to practice before the critical date, then the "ready for patenting" prong of the on-sale bar is satisfied. *See Pfaff*, 525 U.S. at 67.

### 3.    The Navigator proposal in March 1992 was a commercial offer for sale of the claimed invention

The claimed invention was also the subject of a commercial offer for sale in March 1992 — again, long before the "critical date" of October 14, 1993. *See supra* Part III.C, pp. 5–7. In particular, phase 3 of the Navigator proposal in March 1992 offered to sell software[4] embodying the asserted claims for $200,000. *See* Chandler Decl. ¶ 7 & Ex. S at TWC 1563, 1566, 1568; Ex. G at 14:5–:14, 143:9–144:2; Ex. H at 149:19–150:6.

There is no factual dispute about what happened. Nor is there any dispute about what the Navigator proposal says; the writing speaks for itself. With these facts undisputed, all that remains is a question of law for this Court to decide: Was this proposal a "commercial offer for sale"? To determine what qualifies as a "commercial offer for sale," the Federal Circuit has turned to the "law of contracts as generally understood," citing sources such as the Uniform Commercial Code and the Restatement (Second) of Contracts. *See Group One Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047–48 (Fed. Cir. 2001). "Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b)." *Id.* at 1048. Proposals may qualify as commercial offers when they meet this criteria, even if the proposals are never actually accepted. *See, e.g., Dow Chem. Co. v. Mee Indus. Inc.*, 341 F.3d 1370, 1374, 1375 (Fed. Cir. 2003); *Scaltech*, 269 F.3d at 1328–29 (Fed. Cir. 2001).

---

evidence points to a first reduction to practice "by" April 1992, consistent with the testimony that the asserted claims were reduced to practice at the time of the Navigator proposal on March 5, 1992. In any event, the precise date of the first reduction to practice is not material to this motion because it is not necessary that the invention be ready for patenting prior to the *offer for sale*, only that it be ready for patenting prior to the *critical date*. *See Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 249 F.3d 1307, 1313 (Fed. Cir. 2001).

[4] An offer to sell software "implementing and thus embodying the claimed method" is "an offer for sale within the meaning of the on-sale bar." *Minton v. Nat'l Ass'n of Sec. Dealers*, 336 F.3d 1373, 1378 (Fed. Cir. 2003) (affirming summary judgment of invalidity); *see also Robotic Vision*, 249 F.3d at 1310–13 & n.1 (invalidating method claim based on an offer to sell a device and accompanying software that practiced the claimed method).

The Navigator proposal satisfies the criteria for a "commercial offer for sale." It contains detailed information on the scope of work and pricing for each of the five phases of the project. *See* Chandler Decl. Ex. S at TWC 1564–68. "The fact that certain terms were not finalized . . . does not preclude the conclusion that an offer was made. The UCC specifically states that a contract for sale may be formed even though multiple terms . . . are left open." *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, No. 04-2000, 2007 WL 3231709, at *3 (N.D. Cal. Oct. 30, 2007) (Wilken, J.), *aff'd*, 558 F.3d 1341 (Fed. Cir. 2009). The types of terms that must be present to rise to the level of a commercial offer for sale will differ depending on the subject matter of the offer. *See Space Systems/Loral, Inc. v. Lockheed Martin Corp.*, No. 96-3418, 2006 WL 279331, at *4 (N.D. Cal. Feb. 6, 2006) (Illston, J.). For example, terms like quantity and the manner of delivery may be necessary for an ordinary sale of goods, but they "simply are inapposite" for a software development project like the Navigator proposal. *See id.*

The Navigator proposal contained sufficient detail that AMP could have made it into a binding contract by simple acceptance, thus satisfying the criteria for a "commercial offer for sale." Indeed, the Navigator proposal contained the same type of information found in the earlier AMPFAX proposal that AMP accepted: both proposals provided information on the scope of the work and a specific price for the work. *Compare* Chandler Decl. Ex. S at TWC 1564–68, *with* Ex. G at 22:22–23:24. The similarity between the two proposals confirms that the Navigator proposal was a "commercial offer for sale" and *could have been* made into a binding contract by simple acceptance, even though in fact that did not happen.

Additionally, the fact that the Navigator proposal was sent specifically to AMP *at AMP's request* further confirms that the Navigator proposal was a "commercial offer for sale." Danish testified that he created a demo of his invention on his own initiative, and then used that demo to see if AMP would be interested in receiving a formal proposal. *See* Ex. G at 155:19–156:10. (According to Kimbrough, Danish typically created a demo of an idea to increase his chances of completing a sale. *See* Ex. H at 171:25–172:15.) Danish testified that after talking with AMP about his idea, either someone at AMP suggested that he submit a formal proposal, or someone at AMP agreed to receive a formal proposal. *See* Ex. G at 140:12–141:5. Either way, this was an offer made

*at AMP's request*.  Furthermore, shortly after Danish sent the proposal on March 5, 1992, he resent the proposal a second time *at AMP's request*.  *See* Chandler Decl. Ex. S at TWC 1571.

Sending a proposal in response to a request for proposal traditionally has been considered a commercial offer for sale.  *See, e.g.*, *Space Systems/Loral*, 2006 WL 279331, at \*3–\*6; *Restatement (Second) of Contracts* § 26 cmt. d (1981); Richard A. Lord, *Williston on Contracts* § 4.10, at 338–39 (4th ed. 1990).  The fact that Danish sent the proposal to a specific individual at AMP, rather than the general public, sets this proposal apart from basic advertisements and price lists, which traditionally have *not* been considered offers for sale.  *See, e.g.*, *Restatement (Second) of Contracts* § 26 cmt. c (1981).

Finally, Danish testified that if AMP had accepted the Navigator proposal, he would have performed the work at the stated price:

> Q.  Did you think the Navigator proposal was made at a fair price?
>
> A.  At the time I believe so.
>
> Q.  Would you have performed at that price?
>
> A.  Yes.
>
> . . . .
>
> Q. . . . [Y]ou wanted them to accept the proposal so that Danish International could start this new project?
>
> A.  Yes.

Ex. G at 88:25–89:4, 150:8–:10; *see also id.* at 142:1–:13.

Thus, Danish's own testimony confirms what is clear from the language of the Navigator proposal itself:  the proposal was a commercial offer for sale that could have been accepted by AMP to form a binding contract.  Accordingly, both prongs of the on-sale bar test are satisfied, and the asserted claims are invalid under 35 U.S.C. § 102(b).

## V.    **CONCLUSION**

For all of these reasons, Defendants' motion for summary judgment of non-infringement and invalidity due to the on-sale bar should be GRANTED.

Dated: May 28, 2009

By: /s/ Richard A. Cederoth

David T. Pritikin (*pro hac vice*)
   <dpritikin@sidley.com>
Richard A. Cederoth (*pro hac vice*)
   <rcederoth@sidley.com>
SIDLEY AUSTIN LLP
One S. Dearborn Street
Chicago, Illinois 60603
Telephone:   (312) 853-7000
Facsimile:   (312) 853-7036

Theodore W. Chandler (Bar No. 219456)
   <tchandler@sidley.com>
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone:   (213) 896-6000
Facsimile:     (213) 896-6600

Marc R. Ascolese (Bar No. 251397)
   <mascolese@sidley.com>
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, California 94104
Telephone:   (415) 772-1200
Facsimile:   (415) 772-7400

<SF-PartsRiver-MS-eBay@sidley.com>

David E. Killough (Bar No. 110719)
   <davkill@microsoft.com>
MICROSOFT CORPORATION
One Microsoft Way, 8/2076
Redmond, Washington 98052
Telephone:   (425) 703-8865
Facsimile:   (425) 869-1327

*Counsel for Defendant and Counterclaim-Plaintiff Microsoft Corporation*

Dated: May 28, 2009          By: /s/ Richard A. Cederoth

            David T. Pritikin (*pro hac vice*)
               <dpritikin@sidley.com>
            Richard A. Cederoth (*pro hac vice*)
               <rcederoth@sidley.com>
            SIDLEY AUSTIN LLP
            One S. Dearborn Street
            Chicago, Illinois  60603
            Telephone:    (312) 853-7000
            Facsimile:    (312) 853-7036

            Theodore W. Chandler (Bar No. 219456)
               <tchandler@sidley.com>
            SIDLEY AUSTIN LLP
            555 West Fifth Street, Suite 4000
            Los Angeles, California  90013
            Telephone:    (213) 896-6000
            Facsimile:    (213) 896-6600

            Marc R. Ascolese (Bar No. 251397)
               <mascolese@sidley.com>
            SIDLEY AUSTIN LLP
            555 California Street, Suite 2000
            San Francisco, California  94104
            Telephone:    (415) 772-1200
            Facsimile:    (415) 772-7400

            <SF-PartsRiver-MS-eBay@sidley.com>

            *Counsel for Defendant*
            *eBay Inc.*

1

2   Dated: May 28, 2009                    By: /s/ Dan D. Davison
                                              _____
3                                             Dan D. Davison (*pro hac vice*)
                                                 <ddavison@fulbright.com>
4                                             FULBRIGHT & JAWORSKI L.L.P.
                                              2200 Ross Avenue, Suite 2800
5                                             Dallas, Texas 75201
                                              Telephone:   (214) 855-8000
6                                             Facsimile:   (214) 855-8200

7                                             Richard S. Zembek (*pro hac vice*)
                                                 <rzembek@fulbright.com>
8                                             Daniel S. Leventhal (*pro hac vice*)
                                                 <dleventhal@fulbright.com>
9                                             FULBRIGHT & JAWORSKI L.L.P.
                                              1301 McKinney, Suite 5100
10                                            Houston, Texas 77010
                                              Telephone:   (713) 651-5151
11                                            Facsimile:   (713) 651-5246

12                                            John A. O'Malley, (Bar No. 101181)
                                                 <jomalley@fulbright.com>
13                                            FULBRIGHT & JAWORSKI L.L.P.
                                              555 S. Flower Street, 41st Floor
14                                            Los Angeles, California 90071
                                              Telephone:   (213) 892-9200
15                                            Facsimile:   (213) 892-9494

16                                            <Yahoo@fulbright.com>

17                                            *Counsel for Defendant and Counterclaim-*
                                              *Plaintiff Yahoo! Inc.*
18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT — No. 09-811-CW

1

2    Dated: May 28, 2009                              By:  /s/ Jordan Trent Jones

3                                                     Jordan Trent Jones (Bar No. 166600)
                                                          <jtjones@townsend.com>
4                                                     Heidi J. Kim (Bar No. 247699)
                                                          <hjkim@townsend.com>
5                                                     TOWNSEND AND TOWNSEND AND CREW LLP
                                                      379 Lytton Ave
6                                                     Palo Alto, California  94301
                                                      Telephone:    (650) 326-2400
7                                                     Facsimile:     (650) 326-2422

8                                                     <Shopzilla@townsend.com>

9                                                     *Counsel for Defendant and Counterclaim-
                                                      Plaintiff Shopzilla, Inc.*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SIGNATURE ATTESTATION

Pursuant to General Order No. 45(X)(B), I hereby certify that concurrence in the filing of this document has been obtained from each of the other signatories shown above.

                                   /s/ Marc R. Ascolese

1

## EXHIBITS

2

Ex. A:   The patent-in-suit:  U.S. Patent No. 6,275,821

3

Ex. B:   The parent to the patent-in-suit:  U.S. Patent No. 5,983,219

4

Ex. C:   The grandparent to the patent-in-suit:  U.S. Patent No. 5,715,444

5
Ex. D:   Affidavit of Sherif Danish, the first-named inventor of the '821 patent-in-suit, on the conception and reduction to practice of his invention (Feb. 12, 1997) [PR 0000240–245, 252–64]
6

7
Ex. E:   Screenshots of the AMP Navigator, which PartsRiver and Danish contend was the first reduction to practice of the asserted claims of the '821 patent-in-suit
8

9
Ex. F:   Interrogatory response by PartsRiver, verified by Danish, contending that the AMP Navigator was the first reduction to practice of the asserted claims of the '821 patent-in-suit [Danish Dep. Ex. 1015]
10

11
Ex. G:   Excerpts from the deposition of Sherif Danish about the meaning of the claim term "displaying" and his proposal to AMP before the "critical date" (Jan. 20, 2009)

12
Ex. H:   Excerpts from the deposition of Kris Kimbrough, the second-named inventor of the '821 patent-in-suit, about Danish's proposal to AMP before the "critical date" (Jan. 22, 2009)
13

14
Ex. I:   PartsRiver's infringement contentions (Feb. 18, 2008), with page numbers added for ease of reference

15
Ex. J:   Patent Rules for the Eastern District of Texas

16
Ex. K:   The parties' Joint Claim Construction Statement (Dec. 15, 2008) [Docket No. 141]

17
Ex. L:   PartsRiver's opposition to Defendants' motion to transfer the action from the Eastern District of Texas to this Court (Dec. 6, 2007) [Docket No. 45]
18

19
Ex. M:   PartsRiver's oral argument in opposition to Defendants' motion to transfer (Apr. 10, 2008)

20
Ex. N:   Order transferring the action to this Court (Jan. 30, 2009) [Docket No. 151]

21
Ex. O:   Order by the Patent Office granting an *ex parte* reexamination of the validity of claims 1 and 2 of the '821 patent-in-suit (Dec. 22, 2008)

22
Ex. P:   Non-final rejection by the Patent Office of claims 1 and 2 of the '821 patent-in-suit (May 1, 2009)
23

24

25

26

27

28

# Exhibit 24



1



2



3



**4**



**5**



6



**7**



8



9



**10**



**11**



**12**



**13**

# Exhibit 25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

| | | |
|---|---|---|
| PARTSRIVER, INC., | ) | Certified Copy |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | NO. C 09-00811CW |
| | ) | |
| SHOPZILLA, INC., YAHOO! INC.; | ) | |
| EBAY INC.; AND MICROSOFT | ) | PAGES 1 - 30 |
| CORPORATION, | ) | |
| | ) | |
| DEFENDANTS. | ) | OAKLAND, CALIFORNIA |
| | ) | THURSDAY, JULY 16, 2009 |

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFF:        BALDWIN & BALDWIN, LLP
                     400 WEST HOUSTON STREET
                     MARSHALL, TEXAS   75671
              BY:    JACK B. BALDWIN, ATTORNEY AT LAW

                     MCMANIS FAULKNER & MORGAN
                     FAIRMONT PLAZA, TENTH FLOOR
                     50 WEST SAN FERNANDO STREET
                     SAN JOSE, CALIFORNIA   95113
              BY:    MATTHEW SCHECHTER, ATTORNEY AT LAW


FOR DEFENDANT        TOWNSEND AND TOWNSEND AND CREW
SHOPZILLA INC.:      379 LYTTON AVENUE
                     PALO ALTO, CALIFORNIA   94301
              BY:    JORDAN TRENT JONES, ATTORNEY AT LAW


        (APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:         RAYNEE H. MERCADO, CSR NO. 8258

**A P P E A R A N C E S (CONT'D.)**

```
FOR DEFENDANT            SIDLEY & AUSTIN
MICROSOFT CORPORATION    ONE S. DEARBORN STREET
AND EBAY INC.:           CHICAGO, ILLINOIS  60603
               BY:  RICHARD A. CEDEROTH,
                    THEODORE W. CHANDLER, ATTORNEYS AT LAW


FOR DEFENDANT            FULBRIGHT & JAWORSKI LLP
YAHOO! INC.:             1301 MCKINNEY, SUITE 5100
                         HOUSTON, TEXAS  77010
               BY:  RICHARD S. ZEMBEK, ATTORNEY AT LAW
```

--oOo--

```
 1   THURSDAY, JULY 16, 2009                          3:36 P.M.

 2                    P R O C E E D I N G S

 3        THE CLERK:  CALLING THE MATTER OF PARTSRIVER VS.

 4   SHOPZILLA, CIVIL ACTION NO. C09-0811.

 5        COUNSEL, PLEASE COME FORWARD, AND STATE YOUR

 6   APPEARANCES FOR THE RECORD.

 7        MR. BALDWIN:  JACK BALDWIN AND MATT SCHECHTER ON

 8   BEHALF OF PARTSRIVER.

 9        MR. CEDEROTH:  GOOD AFTERNOON, YOUR HONOR.  RICH

10   CEDEROTH ON BEHALF OF EBAY AND MICROSOFT.

11        MR. ZEMBEK:  RICHARD ZEMBEK ON BEHALF OF YAHOO!,

12   YOUR HONOR.

13        MR. JONES:  JORDAN JONES ON BEHALF OF SHOPZILLA,

14   YOUR HONOR.

15        MR. CEDEROTH:  YOUR HONOR, IN TERMS OF MANAGEMENT,

16   IF IT'S ACCEPTABLE TO THE COURT, I'M PREPARED TO ADDRESS THE

17   ISSUES RELATED TO THE DIVIDED INFRINGEMENT PORTION OF THE

18   MOTION.  MR. ZEMBEK IS PREPARED TO ADDRESS ANY ISSUES RELATED

19   TO THE 102B INVALIDITY. AND THEN AS FAR AS CASE MANAGEMENT,

20   I'VE BEEN ELECTED TO SPEAK ON BEHALF OF THE GROUP.

21        THE COURT:  OKAY.  WELL, YOU CAN GO AHEAD AND START,

22   THEN, WITH THE INFRINGEMENT QUESTION.

23        MR. CEDEROTH:  OKAY.

24        WOULD THE COURT -- DOES THE COURT HAVE QUESTIONS, OR

25   WOULD YOU PREFER TO SIMPLY ADDRESS THE MOTION IN TERMS OF
```

1   ORIGINS, MERITS, LAW?

2            **THE COURT:** WELL, I GUESS THE THING THAT SEEMED TO

3   ME TO BE DIVIDED REALLY IS NOT THE RIGHT THING; THAT IS,

4   THERE'S CLEARLY INTERACTION FROM THE USER.

5            **MR. CEDEROTH:** RIGHT.

6            **THE COURT:** THE USER -- I MEAN, THEY DON'T JUST

7   HIJACK MY COMPUTER AND TELL ME WHAT AMP PARTS I MIGHT WANT.

8   THE USER HAS TO ASK FOR THEM. AND THEN THE USER HAS TO SAY

9   WHAT FEATURES THEY'RE INTERESTED IN AND ALL OF THAT. BUT I

10  GUESS THAT ISN'T REALLY THE CONTROL THAT WE'RE LOOKING FOR.

11           IT'S REALLY A QUESTION OF ONCE THE USER SAYS WHAT

12  THEY WANT, YOU GIVE IT TO THEM, AND THE ONLY ISSUE SEEMS TO BE

13  WHETHER -- THE FACT THAT HTML DOESN'T PRODUCE NICE PICTURES

14  UNTIL THE HTML IS TRANSLATED INTO GRAPHICS AND IF THE ACT OF

15  THE TRANSLATION OF HTML INTO GRAPHICS COUNTS AS DISPLAYING AND

16  AS PARTICIPATION BY THE USER, OR IF THAT'S REALLY JUST A FORM

17  WITHOUT SUBSTANCE, AND IT'S REALLY THE SERVER THAT'S SENDING

18  WHAT TRULY, IN EFFECT, CAUSES THE NICE PICTURES TO SHOW UP ON

19  THE SCREEN, THAT THE FACT THAT IT HAS TO BE TRANSLATED FROM

20  HTML INTO A PICTURE IS REALLY A MEANINGLESS DISTINCTION.

21           **MR. CEDEROTH:** SURE. AND I'LL -- LET ME DIVE IN

22  THEN AT THAT POINT, YOUR HONOR. I THINK, FIRST, THE CLAIM

23  CONSTRUCTION --

24           **THE COURT:** I MEAN, I GUESS THAT'S YOUR CLAIM,

25  RIGHT, THAT IT'S THE FACT THAT THE USER'S COMPUTER HAS TO

1    TRANSLATE THE HTML CODE INTO NICE PICTURES THAT CONSTITUTES ITS

2    CONTROL OR DISPLAY AS A PART OF THE PROCESS?

3         **MR. CEDEROTH:**  YES, YOUR HONOR.  OUR -- YOU KNOW,

4    THE ROOT OF ALL THIS IS, IN FACT, THE CLAIM LANGUAGE.  AND THE

5    ELEMENT IN THE CLAIM LANGUAGE REQUIRES THE DISPLAY OF EITHER,

6    IN CLAIM ONE, THE FEATURE SCREEN OR IN, CLAIM TWO, OF A

7    PARTICULAR GROUPING THAT'S BEEN FORMED.

8         SO THERE'S -- THERE'S ACTUAL -- A METHOD STEP IN

9    BOTH CLAIMS WHICH REQUIRES DISPLAY.  AND THE PARTIES HAVE

10   STIPULATED THAT "DISPLAYING" MEANS SHOWING EITHER THE FEATURE

11   SCREEN OR THE GROUPING ON THE DISPLAY SCREEN OF THE USERS'

12   COMPUTER.

13        THERE'S REALLY NO DISPUTE THAT WHAT SHOWS, WHAT --

14   WHAT SOFTWARE SHOWS THAT ON THE USER'S SCREEN IS THE USER'S

15   BROWSER.  IT IS THE USER'S COMPUTER.

16        **THE COURT:**  RIGHT.  BUT THAT'S REALLY A MINISTERIAL

17   ACT.  IT'S JUST -- EVERYBODY KNOWS WHAT HTML IS GOING TO LOOK

18   LIKE ON THE SCREEN.

19        **MR. CEDEROTH:**  WELL, THAT DOES DEPEND.  IN TODAY'S

20   WORLD, THERE'S A CERTAIN AMOUNT OF THE STANDARDIZATION AROUND

21   HTML.  THERE CERTAINLY WAS NOT 15 YEARS AGO.

22        **THE COURT:**  RIGHT.

23        **MR. CEDEROTH:**  HOW THINGS APPEARED DEPENDED IN LARGE

24   MEASURE ON WHICH BROWSER WAS USED AND --

25        **THE COURT:**  WOULDN'T HAVE BEEN A SUBSTANTIVE

```
 1    DIFFERENCE.  IT MIGHT HAVE SAID, OH, IN THIS BROWSER, IT'S
 2    GOING TO HAVE BETTER GRAPHICS, AND IN THAT BROWSER, MAYBE IT'S
 3    NOT GOING TO SHOW UP AS WELL, OR SOMETHING LIKE THAT.  BUT IT
 4    ISN'T A SUBSTANTIVE DIFFERENCE.  IT ISN'T A -- WELL, IT ISN'T A
 5    SUBSTANTIVE DIFFERENCE.
 6              MR. CEDEROTH:  YOUR HONOR, I THINK WE'RE STRAYING A
 7    LITTLE BIT FROM THE RECORD.  BUT HAPPY TO ENGAGE ON THIS ONE.
 8              THERE IS -- CAN, IN FACT, BE SOME VERY SUBSTANTIVE
 9    DIFFERENCES IN HOW BROWSERS DEAL WITH PARTICULAR HTML CODE.
10    THERE IS TODAY, AS WE DISCUSSED, A FAIR AMOUNT OF THE
11    STANDARDIZATION.  THAT HASN'T ALWAYS BEEN THE CASE.  AND IT
12    DEPENDS UPON THE PARTICULAR FEATURES THAT ARE INVOLVED, THE --
13    YOU KNOW, WHAT IS DESIRED TO BE DISPLAYED AND HOW THAT'S
14    COMMUNICATED FROM THE -- FROM THE SERVER.
15              TAKE US BACK, THOUGH, SPECIFICALLY TO THE RECORD
16    FACTS HERE, THE CLAIM LANGUAGE HERE, AND THE CONSTRUCTION.  AS
17    I SAID, THE CONSTRUCTION IS UNDISPUTED.  THE CLAIM LANGUAGE
18    REQUIRES DISPLAYING.
19              THE COURT:  WELL, YOU'RE ESSENTIALLY SAYING EVEN IF
20    THE CONSTRUCTION IS AS PLAINTIFF SAYS, WE ACCEPT THAT FOR
21    PURPOSES OF THE MOTION AND WE SAY THAT EVEN WITH THAT
22    CONSTRUCTION, WE WIN.
23              MR. CEDEROTH:  YOUR HONOR, THAT IS OUR CASE.  WE
24    HAVE NEGOTIATED THE -- THE -- YOU KNOW, WHILE WE WERE IN TEXAS,
25    WE EXCHANGED TERMS FROM THE CLAIMS, EXCHANGED PROPOSED
```

1    CONSTRUCTIONS.  THIS IS -- AND A NUMBER OF THE TERMS WERE

2    DISPUTED.  I FORGET THE TOTAL NUMBER, MAYBE TEN OR SO IN THE

3    COURSE OF THE TWO CLAIMS ARE DISPUTED.

4              THIS IS ONE TERM THAT PARTIES AGREED ON HOW IT

5    SHOULD BE CONSTRUED, AND IT -- IT'S AGREED THAT IT SHOULD BE

6    CONSTRUED AS SHOWING ON THE DISPLAY DEVICE OF THE USER'S

7    COMPUTER.

8              THINK THERE'S ALSO NO DISPUTE THAT IT IS THE

9    BROWSER, IT IS THE USER'S SOFTWARE THAT DOES THE SHOWING.  THE

10   DISPUTE -- WHAT PLAINTIFF IS TRYING TO CREATE AS A DISPUTE IS

11   WHETHER THAT IS SIMPLY A MINISTERIAL ACT AND THEREFORE

12   UNIMPORTANT, OR WHETHER IT'S THAT IS -- IS, IN FACT, THE NUB OF

13   THE ISSUE.

14             HERE, IT IS THE NUB OF THE ISSUE BECAUSE THE CLAIM

15   REQUIRES DISPLAYING.  AS CONSTRUED, IT REQUIRES SHOWING ON THE

16   DISPLAY DEVICE OF THE USER'S COMPUTER.  THE CASES THAT WE CITED

17   ON THIS ARE ACTUALLY QUITE INSTRUCTIVE, YOUR HONOR.

18             IF -- PARTICULARLY THE GLOBAL PATENT HOLDINGS CASE.

19   IN THAT INSTANCE, AT THE PLEADING STAGE, THE COURT DISMISSED

20   THE CASE FOR FAILURE TO STATE CAUSE OF ACTION FOR INFRINGEMENT

21   BASED ON SPLIT INFRINGEMENT.

22             IN THAT CASE, THE SERVERS DIDN'T JUST SEND HTML.

23   THEY ACTUALLY PLANTED ON THE USER'S COMPUTER JAVA SCRIPT

24   PROGRAMS WHICH THEN INTERACTED WITH THE SERVER CREATING THIS,

25   AS THE COURT USED THE EXPRESSION, MINISTERIAL -- BASICALLY

```
1    MINISTERIAL ACTIONS ON THE USER'S COMPUTER, DICTATED AND
2    ARGUABLY CONTROLLED BY THE WEB SERVERS THAT THE DEFENDANTS
3    THEMSELVES OPERATE IN.
4              THE COURT FOUND THERE, THOUGH, THAT THAT IS NOT THE
5    CONTROL OR DIRECTION REQUIRED UNDER BMC AND MUNIAUCTION; THAT,
6    IN FACT, YOU STILL HAVE TWO PARTIES, THE OPERATORS OF THE WEB
7    SERVERS AND THEIR SOFTWARE, THE OPERATORS -- THE USERS AND
8    THEIR COMPUTERS AND THE SOFTWARE OPERATING THERE THAT HAVE TO
9    WORK BOTH OF THEM BEFORE ALL THE STEPS OF THE CLAIM COULD BE
10   MET.  AND THAT THAT -- BECAUSE OF THAT, IT FAILED TO STATE A
11   CLAIM.
12             THE COURT:  SO YOU AREN'T RELYING ON THE FACT THAT
13   THE USER HAS TO PUT IN THE FEATURES THAT IT WANTS AND THAT SORT
14   OF THING.  THAT ISN'T YOUR POINT.
15             MR. CEDEROTH:  NO, AND WITH RESPECT TO THIS CLAIM,
16   THE USER'S COMPUTER HAS TO DO THE DISPLAYING.  IT'S AN ACTUAL
17   ELEMENT IN THE CLAIM.
18             THE COURT:  NO, I KNOW THAT.
19             MR. CEDEROTH:  RIGHT.
20             THE COURT:  BUT YOU'RE NOT RELYING FOR YOUR DIVIDED
21   INFRINGEMENT ON THE ARGUMENT THAT IT'S THE USER WHO CONTROLS --
22   WHO GIVES INPUT, WHO INTERACTS, WHO PARTICIPATES.  THAT'S NOT
23   YOUR POINT.
24             MR. CEDEROTH:  NO.  NOT -- NOT -- I WOULDN'T PUT
25   THAT IT WAY, YOUR HONOR.  ABSENT THE USER, OF COURSE, WE'RE NOT
```

1    HERE AT ALL BECAUSE IT NEVER HAPPENS.  RIGHT?  SO THEY HAVE TO

2    DO -- YOU KNOW, THEY DO HAVE TO GO TO THEIR COMPUTER, THEY HAVE

3    TO LOG ON, THEY HAVE TO GO TO ONE OF THE SITES, AND THEN THERE

4    ARE CERTAINLY OTHER ELEMENTS IN THE CLAIM.

5            **THE COURT:**  THEY HAVE TO MAKE SELECTIONS, ASK FOR

6    CERTAIN THINGS TO BE SENT TO THEM.

7            **MR. CEDEROTH:**  RIGHT.  BUT THE CLAIM -- THIS IS

8    REALLY ALL A FUNCTION OF HOW THE CLAIM IS DRAFTED.  THE CLAIM

9    COULD HAVE BEEN DRAFTED SOLELY FROM A PERSPECTIVE OF THE

10   OPERATIONS OF THE SERVER.  COULD HAVE BEEN DRAFTED SOLELY FROM

11   THE OPERATIONS OF THE USER.  BUT IT'S A METHOD CLAIM.

12           AND IN THIS INSTANCE, TO READ THAT METHOD, TO GET

13   ALL THE STEPS, TO BE INFORMED, INCLUDING THE DISPLAYING STEP,

14   YOU HAVE TO SWEEP IN THE OPERATION WHICH OCCURS SOLELY AT THE

15   USER'S END.

16           IF -- IF I COULD GO BACK AGAIN FOR JUST A MINUTE

17   TO -- TO LOOK AT GLOBAL PATENT HOLDINGS AND THE MUNIAUCTION

18   CASE AND THE BMC CASE.  IN THEIR BRIEF, PLAINTIFF DID -- IN HIS

19   BRIEF, PLAINTIFF DID -- TOOK THE TACK OF DISTINGUISHING THOSE

20   CASES ON THE BASIS THAT IN EACH OF THEM, THE PLAINTIFF CONCEDED

21   THAT THERE WERE MULTIPLE PARTIES THAT WERE REQUIRED.  AND THEY

22   SAY, WE DON'T CONCEDE.  WE DON'T CONCEDE THAT POINT.  IT'S A

23   DISTINCTION WITHOUT A DIFFERENCE HERE THOUGH, YOUR HONOR.

24           IN EACH OF THOSE CASES, THE PLAINTIFF DID CONCEDE IT

25   BECAUSE ON THE FACTS, THE SAME FACTS HOLD AS HERE.  THE USER OR

```
 1    THE USER'S COMPUTER HAD TO PERFORM SPECIFIC OPERATIONS REQUIRED
 2    BY THE CLAIM.  IN EACH OF THOSE CASES, THE PLAINTIFF MADE THE
 3    ARGUMENT, WELL, THAT DOESN'T MATTER BECAUSE IT'S -- IT'S JUST A
 4    MINISTERIAL ACTION OR THE USER IS SIMPLY FOLLOWING THE
 5    INSTRUCTIONS DICTATED BY THE WEB SERVER AND THE OPERATORS OF
 6    THE WEB SERVER.
 7              IN EACH OF THOSE CASES, THE COURT FOUND THAT TO BE
 8    AN INSUFFICIENT DIRECTION OR CONTROL TO -- TO CREATE THE
 9    UNIFIED ENTITY NECESSARY TO PERFORM ALL THE STEPS OF THE CLAIM
10    AND HAVE DIRECT INFRINGEMENT.
11              READING THE CASES AND PLAINTIFF TOOK -- TOOK A TACK
12    HERE THAT THEY CONCEDE THAT THEY ARE NOT ARGUING DIRECTION OR
13    CONTROL.  SO THEY SAY THAT -- SAY THAT FLAT OUT IN THEIR BRIEF,
14    THAT THEY ARE NOT CONTENDING THAT THE DEFENDANTS DIRECT OR
15    CONTROL THEIR USERS' ACTIVITIES OR DIRECT OR CONTROL THE USERS'
16    COMPUTERS.
17              THE COURT:  WELL, BUT THEY'RE ARGUING THAT THE
18    WEBSITE CREATES THE GRAPHICS ON THE USERS' COMPUTERS BY VIRTUE
19    OF THE HTML THAT IT SENDS.
20              MR. CEDEROTH:  THAT'S RIGHT, YOUR HONOR.  BUT IF YOU
21    LOOK AT THE CASES AND LOOK AT THE FACTS, THAT'S -- THAT'S A
22    DISTINCTION WITHOUT A DIFFERENCE BECAUSE THE SAME THING WAS
23    TRUE IN EACH OF THOSE CASES, PARTICULARLY IN THE GLOBAL PATENT
24    HOLDING CASE.  THE USER'S COMPUTER COULD DO NOTHING WITH
25    RESPECT TO THOSE WEB SITES THAT WEB SERVERS DID NOT ALLOW.
```

```
 1            HERE, THE -- THE WEB SERVERS -- AS IN GLOBAL PATENT

 2   HOLDING, THE WEB SERVERS SEND THE INFORMATION; THE USER'S

 3   COMPUTER DISPLAYS IT.

 4            IF YOU READ THROUGH PLAINTIFF'S BRIEF, DESPITE THIS

 5   ARGUMENT, THEY ACTUALLY, TO SOME EXTENT, FALL OVER THEMSELVES

 6   TRYING TO MAKE THE ARGUMENT BECAUSE WHENEVER THEY COME AROUND

 7   TO SAYING THAT, YOU KNOW, HOW IT -- WELL, HAS TO SHOW UP ON THE

 8   SCREEN, RIGHT?  THEY ALWAYS END UP SAYING, WELL, THE USER'S

 9   COMPUTER SHOWS IT OR THE USER'S COMPUTER DISPLAYS IT.

10            THE COURT:  WELL, IT'S ON THE USER'S COMPUTER.

11   THAT'S THE ONLY OTHER WAY IT CAN BE THERE.  THEY CAN'T PROJECT

12   IT OUT OF THE SKY AND MAKE IT SHOW UP ON THE WALL IN THE USER'S

13   HOUSE.

14            MR. CEDEROTH:  YOUR HONOR, THAT'S EXACTLY THE POINT.

15   THE USER'S COMPUTER IS A NECESSARY ELEMENT TO GET THIS ALL

16   TOGETHER FOR THEM TO MEET -- YOU KNOW, THEY CAN'T HAVE EACH OF

17   THE STEPS PERFORMED ANYWHERE UNTIL YOU GET THE USER'S COMPUTER

18   IN THE LOOP.

19            THE COURT:  OKAY.

20            DID YOU WANT TO RESPOND?  WHY DON'T YOU TALK ABOUT

21   THAT AS WELL AS THE ON-SALE BAR, AND THEN WE COULD HEAR FROM

22   THE OTHER SIDE.  OR ARE YOU DIVIDING UP EVERYTHING TOO?

23            MR. BALDWIN:  NO, YOUR HONOR.  I'M NOT.

24            THE COURT:  OKAY.

25            MR. BALDWIN:  I'VE BEEN CHOSEN.
```

1          **THE COURT:**  OKAY.  GO AHEAD, THEN.

2          **MR. BALDWIN:**  AND TO ADDRESS THE -- THE

3     NON-INFRINGEMENT ISSUE AND THE -- THE GLOBAL PATENT CASE,

4     MUNIAUCTION AND BMC, IN PARTICULAR, GLOBAL PATENT, AND IN THAT

5     CASE, AS MR. CEDEROTH INDICATED, IS -- WAS A MOTION TO DISMISS

6     FOR FAILURE TO STATE A CLAIM.

7          THE COURT IN THAT CASE, I BELIEVE, HELD THAT YES, I

8     WILL DISMISS THE CASE BECAUSE THE PLAINTIFF FAILED TO

9     SUFFICIENTLY ALLEGE A JOINT INFRINGER THEORY IN THE COMPLAINT.

10    AND THE COURT ALSO HELD AND DISMISSED THE CASE BECAUSE

11    PLAINTIFF FAILED TO EVEN ALLEGE A LITERAL INFRINGEMENT CLAIM

12    IN -- IN THE PLAINTIFF'S PLEADINGS OR IN THE COMPLAINT.

13         IT -- THE PLAINTIFF IN THAT CASE ALSO ADMITTED OR

14    CONCEDED, I GUESS, IS -- WOULD BE THE WORD THAT -- AS THE

15    CLAIMS WERE WRITTEN IN THAT PATENT, THE '341 PATENT, IN THE

16    GLOBAL PATENT CASE, THE -- THE METHOD COULD NOT AGAIN, UNTIL

17    THE COMPUTER -- SOMEBODY WENT TO A COMPUTER TO DO SOMETHING

18    THAT THEY -- THEY CONCEDED THAT IT TOOK, I GUESS -- OKAY, TWO

19    TO TANGO, IF YOU WILL.

20         THAT PATENT IN THAT CASE FROM A READING OF THE CASE,

21    IT'S -- IS A VERY SHORT CASE, BUT IT DID HAVE THE CLAIMS OF THE

22    PATENT THAT ARE DISTINCT AND DIFFERENT FROM THE CLAIMS IN -- IN

23    THE '821, OBVIOUSLY.

24         IT WAS WRITTEN SUCH -- IN SUCH A FASHION THAT THE

25    PATENT -- THE CLAIMS IN THE PATENT OF THE '341 AND THE GLOBAL

1   PATENT HOLDING CASE SUCH THAT IT WAS OBVIOUS THAT MORE THAN ONE

2   PARTY HAD TO ACT TO INFRINGE THE METHOD THAT WAS CLAIMED.

3                 THE '821, I SUBMIT, THE CLAIMS WERE WRITTEN DIRECTED

4   SOLELY TOWARDS THE SERVER PERFORMING EACH AND EVERY STEP OF THE

5   METHOD CLAIM.

6                 **THE COURT:**  WELL, I DON'T KNOW THAT THAT MATTERS.

7   THE POINT IS THAT SOMETHING HAS TO BE DONE AT THE USER'S

8   COMPUTER OR NO PICTURES ARE GOING TO SHOW UP ON THE SCREEN, SO

9   THAT THE ONLY QUESTION IN MY MIND, IS THAT SIMPLY A MINISTERIAL

10  ACT THAT DOESN'T COUNT AND CAN THAT BE HELD IN THE LIGHT OF

11  THESE THREE CASES?  OR IS THAT -- IS THAT NOT -- ARE THOSE

12  CASES NOT DISTINGUISHABLE ON THAT POINT?

13                **MR. BALDWIN:**  I THINK THE CASES ARE DISTINGUISHABLE

14  ON THAT POINT, YOUR HONOR.  AND I THINK THAT THE CONTROL

15  THAT -- I'M SORRY.  DID --

16                **THE COURT:**  NO, GO AHEAD.

17                **MR. BALDWIN:**  THE CONTROL THAT IS EXERCISED BY THE

18  SERVER IN THIS CASE DICTATES THAT EACH AND EVERY STEP IN THE

19  METHOD IS PERFORMED AT THE SERVER.  AND, AS YOUR HONOR HAS --

20  HAS POINTED OUT, THIS --

21                **THE COURT:**  WELL, NO, THE STEP OF TRANSLATION FROM

22  HTML INTO PICTURES IS PERFORMED ON THE USER'S COMPUTER

23  OBVIOUSLY.  AND COUNSEL SAYS, WELL, OKAY, NOW THAT'S PRETTY

24  MUCH ROUTINE AND EVERYBODY'S HTML TURNS OUT THE SAME WAY.  BUT

25  BACK IN THE EARLY '90S, IT WASN'T SO CLEAR, AND HTML TURNED UP

1  DIFFERENT WAYS IN DIFFERENT BROWSERS AND DIFFERENT SOFTWARE.  I

2  DON'T KNOW IF THAT'S SIGNIFICANT OR NOT.  BUT THAT MAY WELL BE

3  TRUE.

4           WHY IS THAT NOT SIGNIFICANT?  WHY IS THAT DIFFERENT

5  FROM THE THREE CASES THAT THEY'RE RELYING ON?

6           **MR. BALDWIN:**  THAT THE HTML IS -- THAT THE

7  BROWSERS --

8           **THE COURT:**  ARE REQUIRED TO DO SOMETHING TO MAKE A

9  PICTURE SHOW UP.

10          **MR. BALDWIN:**  BECAUSE I BELIEVE IS THE WAY THAT --

11 AS YOU -- AS YOU'VE SAID THIS AFTERNOON, THAT IT'S -- IT'S

12 SIMPLY A MINISTERIAL ACT.

13          **THE COURT:**  WELL, AS THE DEVIL'S ADVOCATE, I SAY

14 THAT TO HIM, BUT DON'T COUNT ON IT.

15          **MR. BALDWIN:**  I UNDERSTAND.

16          **THE COURT:**  I'M ASKING YOU WHY THAT'S TRUE.

17          **MR. BALDWIN:**  YES, YOUR HONOR.

18          AND IT -- I -- AND OUR POSITION IS -- IS THAT EACH

19 STEP OF THE METHOD IS PERFORMED AT THE SERVER.  AND THE HANDING

20 OFF OF THE FEATURE SCREEN AND AT LEAST THE ONE GROUPING WITH

21 THE FEATURE SCREEN IS -- IS -- AMOUNTS TO NO CONTROL ON THE

22 PART OF THE BROWSER.  ALL THE BROWSER DOES AND CAN DO IS

23 RECEIVE WHAT IS SENT TO IT FROM THE SERVER.

24          THE SERVER OR THE BROWSER DOES -- HAS NOTHING TO DO

25 WITH THE CONFIGURATION OF THE FEATURE SCREEN.  IT HAS NOTHING

```
 1    TO DO WITH THE CONCATENATION OF THE SEARCH.  IT CAN ONLY SHOW

 2    ON THE SCREEN WHAT IT GETS FROM THE SERVER, AND THE SERVER 100

 3    PERCENT DETERMINES WHAT IS SENT TO THE USER.

 4         THE COURT:  AND IS THAT TRUE EVEN IF BACK IN THE

 5    OLDEN DAYS, HTML TURNED UP DIFFERENTLY ON DIFFERENT COMPUTERS

 6    DEPENDING ON THE CONFIGURATIONS OF THEIR BROWSERS AND WHAT SORT

 7    OF BROWSER THEY WERE USING?

 8         MR. BALDWIN:  WELL, I MUST CONFESS I DON'T KNOW THE

 9    ANSWER TO THAT QUESTION, IS THE HONEST ANSWER.  I JUST DON'T

10    KNOW WHAT WAS TAKING PLACE BACK AT THAT JUNCTURE.

11         I DON'T BELIEVE THAT FOR THE -- THE WAY THIS PATENT

12    READS, AS THE CLAIMS ARE WRITTEN, THAT THERE WOULD BE MUCH --

13    MUCH DISTINCTION --

14         THE COURT:  WHAT DID --

15              (SIMULTANEOUS COLLOQUY.)

16         THE COURT:  WHAT DID THE USERS' COMPUTERS DO IN THE

17    THREE CASES THAT WE'RE DISCUSSING THAT CONSTITUTED MORE CONTROL

18    OR MORE ACTIVITY THAN WHAT YOUR USERS' COMPUTERS DO?

19         MR. BALDWIN:  IN THE -- GLOBAL PATENT CASE, I

20    BELIEVE THE -- THE -- THERE WAS DOWNLOADING -- PROGRAMMING WAS

21    DOWNLOADED ON THE USER'S REMOTE INPUT DEVICE, I THINK IT WAS

22    CALLED.

23         THE COURT:  WHAT, THE JAVA PROGRAMS?

24         MR. BALDWIN:  YES.  AND IT APPARENTLY WAS RESIDED ON

25    THE WEBSITE, SO -- OF THE DEFENDANT AND WAS TRANSFERRED TO
```

```
1    THE -- THE USERS' --

2              THE COURT:  OKAY.

3              MR. BALDWIN:  -- COMPUTER.

4              THE COURT:  WHAT ABOUT THE OTHER TWO?

5              MR. BALDWIN:  AND THE OTHER TWO, IT ESCAPES ME AT

6    THIS -- RIGHT NOW.  I'M SORRY.  I DON'T KNOW.

7              THE COURT:  OKAY.

8              DO YOU WANT TO TALK ABOUT THE ON-SALE BAR?

9              MR. BALDWIN:  I WILL IF -- IF THAT'S THE WAY YOU

10   WOULD LIKE -- YES.

11             THE COURT:  THAT'S THE OTHER ISSUE THAT WE HAVE

12   BEFORE US.

13             MR. BALDWIN:  THE ANSWER IS YES.

14             THE COURT:  AND I HAVE TO SAY I'M INCLINED TO THINK

15   THAT THERE IS AN ON-SALE BAR HERE, BUT AMP WAS YOUR CUSTOMER, I

16   GUESS, AND YOU WERE THINKING OF TRYING TO SELL YOUR SYSTEM TO

17   AMP.

18             AND WHAT YOU ESSENTIALLY SAY IS, WELL, IT WASN'T

19   REALLY FINISHED.  WE COULDN'T -- HADN'T GOTTEN TO THE POINT

20   WHERE WE COULD SHOW EVERYTHING IN AMP'S CATALOG.  IT WAS A BIG

21   CATALOG AND SO ON.  BUT I'M NOT SURE THAT'S THE POINT.

22             THE PATENT DOESN'T HAVE TO BE CONCEIVED ENOUGH TO BE

23   FULLY WORKABLE IN A GIVEN APPLICATION.  IT HAS TO BE CONCEIVED

24   SO THAT THE CONCEPT IS THERE AND COULD BE APPLIED TO A GIVEN

25   APPLICATION.  BUT THIS ISN'T A PATENT FOR DISPLAYING ALL OF
```

1    AMP'S PARTS.  THIS IS A PATENT FOR PERFORMING A CERTAIN

2    FUNCTION THAT COULD BE APPLIED TO AMP OR OTHER THINGS.

3            BUT THE FACT THAT IT WAS PROPOSED TO AMP IN A

4    COMMERCIAL WAY AND SAID HERE'S WHAT WE CAN DO AND HERE'S THE

5    FIRST STEP AND HERE'S HOW MUCH THE FIRST STEP COSTS, WHY IS

6    THAT NOT A REDUCTION TO PRACTICE AND AN ON-SALE BAR?

7           **MR. BALDWIN:**  TO ANSWER YOUR QUESTION, YOUR HONOR, I

8    WOULD -- WOULD GIVE YOU JUST A LITTLE BIT OF HISTORY.

9            THE PTO -- THE EXAMINER THAT LOOKED AT THIS -- THIS

10    PATENT APPLICATION ALSO HAD THE BENEFIT OF THE -- I GUESS IT

11    WAS A DECLARATIONS OF MR. DANISH, ONE OF THE INVENTORS,

12    MR. KIMBROUGH, AND THE DEMO THAT IS REFERENCED IN THE -- IN THE

13    RECORD.  AND THERE WAS NO ON-SALE BAR ISSUE RAISED AT THAT

14    TIME.

15            AS FAR AS THE ISSUE AS IT'S BEEN RAISED BY THE

16    DEFENDANTS TODAY, IF -- WE BELIEVE THAT THERE -- NUMBER OF

17    THINGS HAS TO OCCUR TO -- TO REACH THE CONCLUSION THAT IT WAS

18    READY FOR PATENTING.  AND I THINK -- WHICH IS A QUESTION OF ALL

19    THAT WILL GET TO WHETHER IT WAS A COMMERCIAL OFFER OF SALE

20    OF -- IN SOME CASES, IT SEEMED TO INDICATE THAT THERE -- THE

21    CLAIMS OF THE PATENT WOULD THEN BE CONSTRUED AND THEN TO

22    DETERMINE WHETHER OR NOT IT IS READY FOR PATENTING, WHICH IS

23    YOUR QUESTION, IT HAS TO MEET OR BE SHOWN BY THE MOVING PARTY

24    THAT EACH AND EVERY LIMITATION CONTAINED IN THE PATENTED

25    INVENTION WAS CONTAINED IN THE INVENTION THAT WAS ALLEGEDLY

1    OFFERED -- OFFERED FOR SALE.

2            AND ONE, WE DON'T THINK THAT -- THAT THAT SHOWING

3    HAS BEEN -- HAS BEEN MADE OR CARRIED BY THE DEFENDANTS.

4    LIKEWISE, THE -- THE -- DON'T THINK THAT THERE'S BEEN A SHOWING

5    THAT EVERY -- EVERY LIMITATION OF THE CLAIMS OF THE '821 HAVE

6    BEEN SHOWN TO BE PRESENT IN THE DEMO THAT WAS -- THAT HAS

7    BEEN -- THAT'S PART OF THIS RECORD.

8            **THE COURT:**  WHAT'S MISSING?

9            **MR. BALDWIN:**  WELL, ACCORDING TO TIPTON COLE

10   WHO'S -- WE'VE SUBMITTED AN AFFIDAVIT OR DECLARATION THAT HE

11   MADE THAT HE POINTED OUT THAT THE SCREEN SHOTS THAT WERE USED

12   BY THE DEFENDANTS IN THE MOTION AND REPLY, THAT THEY'RE LACKING

13   IN -- I THINK IT'S STEP H.  AND AS SUCH, THERE'S BEEN --

14           **THE COURT:**  WHAT WAS THAT?

15           **MR. BALDWIN:**  IT IS NO DEMONSTRATION THAT THE THING

16   HAD -- THAT HAS BEEN REDUCED TO PRACTICE OR THAT IT CONTAINS

17   THAT PARTICULAR LIMITATION AND -- AND I'VE GOT THAT --

18   ACCEPTING -- STEP H OF THE CLAIM ONE IS ACCEPTING A SECOND

19   SELECTION CRITERIA COMPRISING THE ALTERNATIVE OR ALTERNATIVES

20   OF THE FIRST SELECTION CRITERIA PLUS AT LEAST ONE ALTERNATIVE

21   SELECTED FROM THE REVISED FEATURE SCREEN.

22           AND I -- I DON'T BELIEVE THAT -- THAT IS PRESENT IN

23   THE DEMO AT -- MATTER OF FACT, I -- WELL, I JUST DON'T -- I

24   DON'T THINK IT IS.

25           **THE COURT:**  HMM.

```
 1          MR. BALDWIN:  AND I THINK THAT -- AN ISSUE OF FACT
 2   EXISTS FOR JURY -- JURY TO DETERMINE WHETHER OR NOT EACH AND
 3   EVERY LIMITATION OF THE '821 ARE PRESENT IN THE INVENTION THAT
 4   WAS ALLEGEDLY OFFERED FOR SALE IN THIS CASE.
 5          THE COURT:  ALL RIGHT.  IS THERE ANYTHING ELSE YOU
 6   WANTED TO ARGUE IN RESPONSE TO ANY OF THEIR MOTION?
 7          MR. BALDWIN:  YOU KNOW, YOUR HONOR, NOT -- WE
 8   DON'T -- WE HAVEN'T -- PUT IT IN OUR PAPERWORK, SO I -- I WON'T
 9   TAKE THE COURT'S TIME.
10          THE COURT:  OKAY.  DID YOU WANT TO RESPOND?
11          MR. ZEMBECK:  BRIEFLY, YOUR HONOR.
12          WITH RESPECT TO THE TIPTON COLE DECLARATION, THAT'S
13   A EXPERT DECLARATION.  IT'S NOT SUPPORTED BASED ON ANY FACTS.
14   THE UNDISPUTED FACTS THAT WE'VE PUT IN THE RECORD WOULD BE
15   PARTSRIVER'S SWORN INTERROGATORY, AND IN PARTSRIVER'S SWORN
16   INTERROGATORY, THE ANSWER WAS YES, THE CLAIMED INVENTION WAS
17   REDUCED TO PRACTICE BEFORE THE CRITICAL DATE.
18          AND AS THE SUPREME COURT HELD -- YOU COULD
19   DEMONSTRATE READY FOR PATENTING BY AN ACTUAL REDUCTION TO
20   PRACTICE.  THAT PARTICULAR SWORN INTERROGATORY FROM PARTSRIVER
21   WAS SIGNED BY SHERIF DANISH, ONE OF THE NAMED INVENTORS.  WE
22   THEN WENT FORWARD, AND WE TOOK MR. DANISH'S DEPOSITION.  IN HIS
23   DEPOSITION, HE AGAIN CONFIRMED UNDER OATH THAT HE REDUCED THE
24   CLAIMED INVENTIONS TO PRACTICE BEFORE THE CRITICAL DATE IN THE
25   FORM OF THE SOFTWARE IMPLEMENTATION THAT WE'VE PUT IN THE
```

```
 1   RECORD AND THE VERY SCREEN SHOTS IN THE EXECUTABLE COPY THAT
 2   WE'VE FILED WITH OUR PAPERS.
 3             THE COURT:  WHAT ABOUT THIS STEP H?
 4        MR. ZEMBECK:  THAT STEP H IS -- THERE'S NO EVIDENCE
 5   THAT SUPPORTS STEP H IS NOT THERE OTHER THAN A (SIC)
 6   UNSUPPORTED EXPERT STATEMENT.  WE DON'T THINK THAT THAT IS
 7   EVIDENCE WHATSOEVER, AND WE ALSO BELIEVE FROM THE SCREEN SHOTS
 8   THAT WE PUT FORWARD IN OUR PAPERS, WE'VE DEMONSTRATED THAT
 9   STEP H IS SATISFIED WITHIN THE SOFTWARE DEMONSTRATION.
10             THE COURT:  AND WILL I BE ABLE TO FIGURE THAT OUT IF
11   I LOOK AT THE SCREEN SHOT?  WILL I SEE WHEN THE SECOND FEATURE
12   COMES UP AND THE --
13             MR. ZEMBECK:  (REVIEWING DOCUMENTS.)
14             THE COURT:  WHATEVER IT IS THAT HE WAS SAYING ABOUT
15   STEP H?
16             MR. ZEMBECK:  THE SCREEN SHOTS ARE EXHIBIT E TO OUR
17   PAPERS, AND WHAT WE'LL SEE WHEN WE GO THROUGH THE DIFFERENT
18   SCREEN SHOTS, THIS IDEA OF YOU DO A FIRST SEARCH AND THEN YOU
19   DO A SECOND SEARCH, YOU'LL SEE THAT THE TERMS ARE BEING
20   PRESERVED FROM THE FIRST SEARCH WHEN YOU'RE DOING THE SECOND
21   SEARCH.
22             IT'S THIS NARROWING THAT THEY'RE TAKING THE POSITION
23   IS PART OF THEIR INVENTION, AND THIS IS WHAT THE INVENTOR
24   TESTIFIED TWICE IN THE FORM OF THE INTERROGATORIES AND HIS
25   DEPOSITION WAS REDUCED TO PRACTICE IN THE SOFTWARE THAT WE
```

1    PRESENTED TO THE COURT AS EXHIBIT E AS WELL AS THE ACTUAL

2    EXECUTABLE VERSION OF THE SOURCE CODE FROM 1994, WHICH IS

3    EXHIBIT P -- EXCUSE ME -- EXHIBIT Q.

4              **THE COURT:**  THAT'S NOT GOING TO DO ANYTHING FOR ME,

5    THOUGH, IS IT?

6              **MR. ZEMBECK:**  ACTUALLY, IT WILL, YOUR HONOR.  YOU

7    COULD PUT THAT CD INTO YOUR COMPUTER, ASSUMING THAT WE HAVEN'T

8    ALL SWITCHED OVER TO USB ALREADY, BUT YOU CAN PUT THAT CD INTO

9    YOUR COMPUTER, AND YOU COULD CLICK THROUGH THESE SCREEN SHOTS.

10   THESE SCREEN SHOTS ARE GENERATED FROM THAT ACTUAL --

11             **THE COURT:**  OH, I SEE.  I THOUGHT YOU WERE GIVING ME

12   THE SOURCE CODE AND TELLING ME TO READ IT.

13             **MR. ZEMBECK:**  WE WOULDN'T DARE DO THAT, YOUR HONOR.

14             **THE COURT:**  OKAY.  AND I DON'T KNOW IF YOU HAVE

15   ANYTHING FURTHER YOU WANT TO SAY IN RESPONSE TO HIS COMMENTS ON

16   THE -- ON THE INFRINGEMENT.

17             **MR. CEDEROTH:**  I WOULD, YOUR HONOR, JUST VERY --

18   VERY BRIEFLY.

19             WITH RESPECT TO -- TO THE THREE CASES, THE BMC, THE

20   MUNIAUCTION, AND THE GLOBAL PATENT HOLDINGS CASE -- BMC, THE

21   OTHER PARTY THAT WAS INVOLVED WAS PARTIES THAT PROCESSED THE

22   DEBIT TRANSACTIONS.  IT WASN'T -- WASN'T A USER/WEB SERVER

23   INTERACTION.  IN MUNIAUCTION, IT WAS A SITUATION WHERE THE WEB

24   SERVERS PROVIDED A SCREEN THAT USER THEN INPUT DATA TO.  USERS

25   COULD ONLY INPUT DATA IN THE FIELDS PROVIDED.  IT WASN'T AN

1   ESSAY TEST.  IT WAS -- THERE WERE FIELDS PROVIDED.  THEY WERE

2   CONTROLLED, JUST -- JUST AS, YOU KNOW -- THEY WERE GENERATED BY

3   HTML AND AS CONTROLLED, AS OUR PAGES ARE TODAY.

4          AND THE USER COULD ONLY INTERACT WITH THEM IN THE

5   WAY SPECIFIED BY THE WEB SERVERS.  AGAIN, THE COURT THERE FOUND

6   THAT INSUFFICIENT.  IN THE GLOBAL PATENT --

7          **THE COURT:**  AND THAT WAS A DIVIDED PATENT?

8          **MR. CEDEROTH:**  THAT WAS A DIVIDED PATENT.

9          **THE COURT:**  OR DIVIDED METHOD, OR WHATEVER YOU SAY?

10         **MR. CEDEROTH:**  YES, YOUR HONOR.  IT'S THE

11  MUNIAUCTION CASE.  AND THEN IN THE GLOBAL PATENT CASE, IT'S A

12  LITTLE MORE TECHNICAL.  BUT IT'S A REMOTE QUERY METHODOLOGY

13  WHERE THE -- AGAIN, THE -- THE -- WHAT OCCURRED ON THE USER'S

14  COMPUTER WAS THE FUNCTION OF JAVA SCRIPT PROGRAMS WHICH WERE

15  DOWNLOADED TO THE USER'S COMPUTER BY THE WEB SERVER AND

16  INTERACTED -- THEY SPOKE SOLELY TO THE WEB SERVER.  NEITHER THE

17  USERS NOR THE USER'S COMPUTER COULD CHANGE THOSE IN ANY WAY.

18  BUT THEY WERE REQUIRED ELEMENTS IN THE STEPS OF THE METHOD.

19         AS THE FEDERAL CIRCUIT HAS SAID, THERE HAS TO BE ONE

20  PERSON THAT PERFORMS ALL THE STEPS OF THE METHOD IN ORDER FOR

21  THERE TO BE DIRECT INFRINGEMENT.  AND THAT YOU CAN ONLY HAVE

22  DIRECT INFRINGEMENT WHEN MULTIPLE PARTIES ARE INVOLVED IN

23  PERFORMING THE STEPS IF ONE PARTY OR THE OTHER DIRECTS OR

24  CONTROLS THE ACTIVITY OF -- OF THE SECOND PARTY INVOLVED.

25         AND IN -- GOING BACK TO GLOBAL PATENT IN PARTICULAR,

```
 1   MUNIAUCTION, WHERE THE WEB SERVERS CONTROL THE RANGE OF ACTIONS

 2   THAT ARE POSSIBLE IN THE COURSE OF THE TRANSACTION ON THE

 3   USER'S COMPUTER, IN EACH OF THOSE CASES, THOUGH, THE FEDERAL

 4   CIRCUIT SAID THAT IS INSUFFICIENT TO SHOW DIRECTION OR CONTROL.

 5            BRINGING THAT BACK TO OUR CASE HERE, THE WEB SERVER

 6   DOES SEND THE HTML FILE.  AND AS DISCUSSED IN THE BRIEFS, THAT

 7   IS -- THAT IS ACTUALLY A DIFFERENT ACTION THAN THE DISPLAY.

 8            IT'S THE USER'S COMPUTER THAT ACTUALLY PERFORMS THE

 9   PHYSICAL SHOWING OF THE -- OF THE SCREEN WHAT -- WHAT THE USER

10   SEES ON THEIR DISPLAY SCREEN, WHICH IS THE AGREED CONSTRUCTION

11   OF THE TERM.

12            AND I THINK THAT CLOSES THE BOOK ON THAT, YOUR

13   HONOR, THAT THERE ARE TWO PARTIES INVOLVED TO SATISFY ALL THE

14   CLAIM ELEMENTS, AND THE CASE LAW HOLDS THAT IN THIS SITUATION,

15   THERE IS INSUFFICIENT DIRECTION OR CONTROL.

16            THE COURT:  ALL RIGHT.

17            YOU CAN RESPOND BRIEFLY, IF YOU LIKE, ON THE ON-SALE

18   BAR, SINCE YOU STARTED ON THAT ONE, IF YOU HAVE ANYTHING YOU

19   WANTED TO SAY.

20            MR. BALDWIN:  YOUR HONOR, I'D -- THE ONLY THING THAT

21   I WOULD SAY IS THERE IS -- THERE'S ALSO EVIDENCE IN -- IN THE

22   RECORD AS IT STANDS NOW TO THE EFFECT THAT -- THAT THE DEMO WAS

23   NOT A REDUCTION TO PRACTICE OF THE CLAIMS OF THE '821.

24            THE COURT:  ARE YOU TALKING ABOUT THIS EXPERT SAYING

25   THAT STEP H ISN'T IN THERE?
```

1    **MR. BALDWIN:**  YES.  YES, YOUR HONOR.  AND -- AND I

2   MIGHT ALSO ADD THAT -- THAT ALL'S THE DEFENDANTS HAVE DONE IS

3   SUBMIT SCREEN SHOTS TO -- THERE'S NOTHING --

4    **THE COURT:**  WELL, THE ADMISSIONS ARE PRETTY

5   COMPELLING.  BUT IF WE WANT TO GO BEYOND THE ADMISSIONS AND

6   WORRY ABOUT THE SCREEN SHOTS AND STEP H, I GUESS WE COULD LOOK

7   AT THE SCREEN SHOTS AND SEE IF THEY'RE THERE.  HE SAYS THEY

8   ARE.

9    **MR. BALDWIN:**  AND I -- I WOULD -- WAS JUST MAKING

10  THE COMMENT THAT -- THAT THE SCREEN SHOTS ARE THERE, BUT I

11  DON'T BELIEVE THAT THERE'S ANY SCREEN SHOT THAT SHOWS YOU THAT

12  STEP H WAS -- WAS PERFORMED.

13   **THE COURT:**  THE SECOND FEATURE, THE SELECTION OF

14  SECOND FEATURES?

15   **MR. BALDWIN:**  YES.  AND THAT'S -- THAT'S ALL.

16   **THE COURT:**  OKAY.

17   WELL, TURNING TO THE CASE MANAGEMENT CONFERENCE,

18  THEN IF I FIND EITHER LACK OF INFRINGEMENT OR ON-SALE BAR, THAT

19  WOULD BE THE END OF THE CASE.

20   **MR. CEDEROTH:**  YES, YOUR HONOR.

21   **THE COURT:**  BUT IF NOT, WE'LL NEED TO GO FORWARD

22  WITH DATES.  SO I GUESS WE MIGHT AS WELL SET THOSE JUST IN

23  CASE.  IF YOU WANT TO TAKE ONE OF THOSE SCHEDULING ORDERS,

24  WE'LL FILL IN THE DATES.  I'LL FILL IN -- WELL, YOU HAVE

25  DISPUTES ABOUT THEM, BUT WE'LL PICK A DATE.  YOU CAN WRITE THEM

```
 1   DOWN AS WE SET THEM.  YOU'LL GET ANOTHER COPY THROUGH EFILING.

 2   ATTACHED TO IT YOU'LL FIND THE ORDER FOR PRETRIAL PREPARATION

 3   WHICH WILL TELL YOU THE PAPERWORK THAT NEEDS TO BE FILED IN

 4   ADVANCE OF PRETRIAL CONFERENCE.

 5           ALTERNATIVE DISPUTE RESOLUTION, NORMALLY WE DON'T

 6   SEND THE CASES TO A MAGISTRATE JUDGE IN THE FIRST INSTANCE, BUT

 7   SINCE YOU ALREADY TRIED PRIVATE MEDIATION, I WILL REFER YOU TO

 8   A SETTLEMENT CONFERENCE WITH A MAGISTRATE JUDGE.  AND YOU'RE

 9   READY TO DO THAT ASAP, I GUESS?  WE COULD TRY FOR THE NEXT 60

10   DAYS.

11           MR. CEDEROTH:  YES, YOUR HONOR.

12           MR. BALDWIN:  YES, YOUR HONOR.

13           THE COURT:  WHICH WOULD BE SEPTEMBER SOME -- WITH A

14   DEADLINE, LET'S SAY OF SEPTEMBER 15TH.

15           AND AS A DEADLINE TO ADD ADDITIONAL PARTIES OR

16   CLAIMS, ONE SIDE SAYS YOU ALREADY HAD A DEADLINE FOR THAT AND

17   IT'S PASSED, AND THE OTHER PARTY PROPOSES JANUARY OF 2010.

18   THAT'S A LITTLE LATE.  IF THERE'S REALLY SOMETHING PARTICULAR

19   YOU THINK YOU MIGHT WANT TO ADD, I CAN GIVE YOU A BIT MORE TIME

20   BUT NOT TILL JANUARY OF 2010.

21           MR. BALDWIN:  AND THAT -- THAT'S -- ANY TIME THAT

22   YOU GIVE US, WE WOULD APPRECIATE.  WE DON'T NEED UNTIL JANUARY

23   THOUGH; YOU'RE RIGHT.

24           THE COURT:  WHAT DO YOU WANT TO THINK ABOUT ADDING,

25   MORE PARTIES, MORE CLAIMS?
```

```
 1              MR. BALDWIN:  I WAS -- WHEN WE --

 2                  (SIMULTANEOUS COLLOQUY.)

 3              THE COURT:  ABUNDANCE OF CAUTION?

 4              MR. BALDWIN:  THE -- THAT -- THAT IS THE ANSWER.

 5         OUT OF ABUNDANCE OF PRECAUTION (SIC), AND I WAS

 6    WORRIED THAT OUR COMPLAINT AS IT STANDS NOW DID NOT COMPLY WITH

 7    THE LOCAL RULES OUT HERE --

 8              THE COURT:  HMM.

 9              MR. BALDWIN:  -- IN THE NORTHERN DISTRICT.  I DON'T

10    KNOW THAT FOR A FACT, BUT --

11              THE COURT:  OKAY.  WELL, LET'S SAY 30 DAYS, THEN.

12    AUGUST 16TH.

13              MR. CEDEROTH:  AND THAT'S --

14              THE COURT:  THAT'S A SUNDAY.  AUGUST 17TH FOR ADDING

15    ADDITIONAL PARTIES OR CLAIMS.

16         YES, SIR?

17              MR. CEDEROTH:  I WAS JUST -- WHILE WE WERE TALKING

18    ABOUT CONFORMING THE STYLE OF THE COMPLAINT TO MATCH NORTHERN

19    DISTRICT PLEADINGS RULES OR WHETHER WE WERE TALKING ABOUT

20    ADDING PARTIES OR CLAIMS.

21              THE COURT:  WHATEVER.

22              MR. CEDEROTH:  OKAY.

23              THE COURT:  NOW, AS FAR AS THE MARKMAN HEARING, I

24    DON'T HAVE LIVE TESTIMONY AT THOSE.  I HAVE A -- WHAT IT REALLY

25    IS TO ME IS MORE OR LESS OF A SUMMARY JUDGMENT TYPE OF
```

```
 1    ARGUMENT.  IF I FOUND THAT I NEEDED LIVE TESTIMONY, I WOULD

 2    SCHEDULE SOME DATE IN THE FUTURE AND TELL YOU WHO I WANTED TO

 3    HEAR FROM, BUT I DOUBT THAT I WILL.

 4              I DON'T PARTICULARLY LIKE THE TUTORIALS, AND I DON'T

 5    THINK I NEED ONE IN THIS CASE.  IF YOU THINK I NEED TO

 6    UNDERSTAND SOMETHING ABOUT THE TECHNOLOGY, PUT IT IN THE BRIEF

 7    THAT YOU'RE FILING.

 8              MR. CEDEROTH:  WOULD -- DOES THE COURT EVER

 9    ENTERTAIN TUTORIALS ON DISC?

10              THE COURT:  I WOULD RATHER NOT.

11              MR. CEDEROTH:  OKAY.

12              THE COURT:  I WOULD RATHER HAVE IT IN WRITING WITH

13    PICTURES, IF NECESSARY, AS PART OF THE BRIEF.

14              MR. CEDEROTH:  THANK YOU.  SURE.

15              THE COURT:  SO YOUR FIRST DISPUTED DATE IS -- OH,

16    YOU HAD WANTED YOUR SETTLEMENT CONFERENCE TO BE BY JULY 31ST.

17    THAT'S NOT GOING TO HAPPEN 'CAUSE THERE -- WE JUST WON'T --

18    THERE WON'T BE A MAGISTRATE JUDGE THAT'S GOING TO HAVE TIME

19    BETWEEN NOW AND JULY 31ST.

20              MR. CEDEROTH:  WE UNDERSTAND.  WE --

21              THE COURT:  MAKE AVAILABLE OPINION OF COUNSEL,

22    YOU'RE NOT THAT FAR APART ON THAT.  LET'S JUST SPLIT THE

23    DIFFERENCE AND CALL IT NOVEMBER 1ST OF '09.

24              YOU'VE AGREED ON COMPLETION OF FACT DISCOVERY,

25    JANUARY 8TH OF 2010.
```

```
1                AND I THINK THAT PLAINTIFF'S PROPOSAL ABOUT THE

2     BRIEFING SCHEDULE IS GENERALLY WORKABLE EXCEPT THAT WE SHOULD

3     HAVE A SURREPLY IN CASE THERE'S CROSS-MOTIONS.  SO LET'S SAY

4     PLAINTIFF FILES ON SEPTEMBER 14TH, DEFENDANT ON OCTOBER 5TH,

5     PLAINTIFF ON OCTOBER 12TH, AND THEN WE CAN HAVE A REPLY TO THE

6     CROSS-MOTION ON OCTOBER 19TH, AND WE CAN HEAR IT ON NOVEMBER --

7     TWO WEEKS LATER, WHICH WOULD BE, I GUESS, NOVEMBER 12TH?

8                THE COURT:  AM I AVAILABLE, SHEILAH?

9                THE CLERK:  OH, ARE WE TALKING '09?

10               THE COURT:  '09.

11               THE CLERK:  OH, '09.  YEAH, NOVEMBER 12TH IS FINE.

12               THE COURT:  AND THEN WE CAN USE THE DEFENDANTS'

13    APPROACH OF HAVING THE EXPERT DATES TEED OFF OF THE RULING ON

14    THE MOTIONS.  BUT I THINK THE DEFENDANTS' DATES ARE A LITTLE

15    MORE GENEROUS THAN WE NEED, SO LET'S SAY 30 DAYS AFTER THE

16    CLAIM CONSTRUCTION AND DISPOSITIVE MOTION ORDER, YOU WOULD

17    DISCLOSE YOUR EXPERTS; 21 DAYS AFTER THAT, REBUTTAL EXPERTS; 30

18    DAYS AFTER THAT, COMPLETE EXPERT DISCOVERY.

19               AND THEN IN TERMS OF THE TRIAL, I CAN'T GIVE YOU A

20    DATE AS QUICK AS PLAINTIFFS WANT ANYWAY, SO WE'LL GO WITH

21    DEFENDANTS' TRIAL DATE, AND EVEN THAT ACTUALLY IS SOONER THAN I

22    HAVE ANYTHING.  THE EARLIEST DATE THAT I WOULD HAVE FOR A

23    TEN-DAY TRIAL WOULD BE NOVEMBER 29TH, AND THAT WOULD MEAN WE

24    COULD HAVE A PRETRIAL CONFERENCE ON NOVEMBER 16TH AT 2:00

25    O'CLOCK.
```

```
 1          AND TO THE EXTENT THAT YOU HAVE DATES FOR FILING
 2    PAPERS BEFORE THE PRETRIAL CONFERENCE, THE PRETRIAL ORDER WILL
 3    TELL YOU THE SCHEDULING FOR ALL OF THAT, SO THAT WILL ALL BE
 4    KEYED OFF THE PRETRIAL CONFERENCE DATE.
 5          WE'LL HAVE A FURTHER CASE MANAGEMENT CONFERENCE ON
 6    THE DATE THAT I SET FOR THE HEARING EVEN IF NO MOTIONS ARE
 7    NOTIFIED FOR THAT DATE.  WE'LL STILL GET TOGETHER ON THAT DATE
 8    AND TALK ABOUT CASE MANAGEMENT AND SETTLEMENT AND SO FORTH.
 9          IF YOU AREN'T ABLE TO SETTLE EARLY WITH THE
10    MAGISTRATE JUDGE, YOU CAN ALWAYS GO BACK TO THAT PERSON AFTER
11    YOU'VE DONE YOUR DISCOVERY OR PERHAPS STARTED YOUR BRIEFING AND
12    SEE IF YOU CAN TRY AGAIN LATER.
13          SO I THINK THAT'S ALL.
14          MR. BALDWIN:  THANK YOU, YOUR HONOR.
15          MR. CEDEROTH:  THANK YOU, YOUR HONOR.
16          THE COURT:  THANK YOU.
17          (PROCEEDINGS WERE CONCLUDED AT 4:16 P.M.)
18                        --OOO--
19
20
21
22
23
24
25
```

1

2

3

4                    **CERTIFICATE OF REPORTER**

5          I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED

6    STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY

7    THAT THE FOREGOING PROCEEDINGS IN C09-0811CW, PARTSRIVER, INC.

8    V. SHOPZILLA INC., ET AL., WERE REPORTED BY ME, A CERTIFIED

9    SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY

10   DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL,

11   COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT

12   THE TIME OF FILING.

13          THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID

14   TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE

15   COURT FILE.

16

17   _____

18        RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR

19             WEDNESDAY, JULY 22, 2009

20

21

22

23

24

25

# Exhibit 26

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PARTSRIVER, INC.,                           No. C 09-811 CW

      Plaintiff,                        ORDER GRANTING
                                            DEFENDANTS' MOTION
   v.                                     FOR SUMMARY JUDGMENT
                                            (Docket No. 201)
SHOPZILLA, INC.; YAHOO! INC.; EBAY
INC.; AND MICROSOFT CORPORATION,

      Defendants.
_____/

SHOPZILLA, INC.; YAHOO! INC.; EBAY
INC.; AND MICROSOFT CORPORATION,

      Counterclaim-Plaintiffs,

   v.

 PARTSRIVER, INC.,

      Counterclaim-Defendant.
_____/

    Defendants Shopzilla, Inc., Yahoo! Inc., eBay Inc. and

Microsoft Corporation move for summary judgment on Plaintiff

PartsRiver, Inc.'s patent law claims against them, based on non-

infringement and invalidity due to the on-sale bar.  Plaintiff

opposes the motion.  The matter was heard on July 16, 2009.  Having

considered all of the papers filed by the parties and oral argument

on the motion, the Court GRANTS the motion for summary judgment.

BACKGROUND

Plaintiff alleges Defendants[1] infringe its patent, U.S. Patent No. 6,275,821 (the '821 patent). Defs.' Ex. A.  The '821 patent, entitled "Method and System for Executing a Guided Parametric Search," is generally directed at a system and method for assisting a user in "identifying a single item from a family of items." Defs.' Ex. A, Abstract.  Sherif Danish and Kris Kimbrough are the inventors of the '821 patent, which was assigned to Saqqara Systems, Inc.  The '821 patent issued on August 14, 2001, and is the third in a series of patents that all claim priority to an application filed on October 14, 1994.  Defs.' Exs. A-C.  The "critical date" for the on-sale bar under 35 U.S.C. § 102(b) is October 14, 1993, one year before the patent application was filed.

Plaintiff sells software products and services and has offices in Fremont, California.  In April, 2006, Plaintiff acquired the assets of Saqqara Systems including the '821 patent.

The '821 patent has two embodiments:  a local embodiment on a stand-alone computer and an internet embodiment for a computer connected to a network.  Defs.' Ex. A at col. 18:11-19:35.  Only the internet embodiment is at issue in this suit.

Plaintiff alleges infringement of claims 1 and 2 of the '821 patent.  Defs.' Ex. I.  Claim 2 depends from claim 1.  Each Defendant allegedly infringes claims 1 and 2 directly through its

---

[1]  The claims against Defendants ValueClick, Inc. and PriceRunner Ltd. were dismissed with prejudice by stipulation in June, 2008 (Docket No. 107).

United States District Court
For the Northern District of California

2

Case 4:09-cv-04987-CW Document 234 Filed 08/11/09 Page 243 of 384

website or by contributing to or inducing infringement by others. Compl. ¶¶ 18-25, 33-41, 49-65 (Doc. No. 1); Defs.' Ex. I.  The text of claims 1 and 2 of the '821 patent is as follows:

    1.  A method for assisting a user in identifying a subfamily of items within a family of items, comprising the steps of:

    (a)   providing a computer readable data file of stored information representing at least one family of items, said data file identifying at least one alternative for each item,

    (b)   reading said data file,

    (c)   displaying a feature screen indicating said alternatives represented in the family,

    (d)   accepting a first selection criteria of at least one alternative,

    (e)   determining a first subfamily of items wherein each said item in the first subfamily satisfies said first selection criteria,

    (f)   determining available alternatives represented in the first subfamily,

    (g)   revising said feature screen to indicate the available alternatives of the first subfamily,

    (h)   accepting a second selection criteria comprising the alternative or alternatives of the first selection criteria plus at least one alternative selected from the revised feature screen,

    (i)   determining a second subfamily of items of the family wherein each item in the second subfamily satisfies said second selection criteria,

    (j)   determining available alternatives represented in the second subfamily, and

    (k)   revising said feature screen to indicate the available alternatives of the second subfamily.

    2.  The method of claim 1 wherein each family has at least one feature associated therewith and further comprising the step of

    displaying at least one grouping wherein each said grouping comprises one of said features visually related to respective alternatives.

3

**United States District Court**
For the Northern District of California

Defs.' Ex. A.

In March, 1992, Danish's company, Danish International, prepared and sent a proposal to AMP Incorporated, a company which had previously accepted a proposal for work from Danish International. Defs.' Ex. S; Pl.'s Ex. K (Doc. No. 218); Defs.' Ex. G (Danish Dep. at 141:6-14, 143:9-20). The proposal described the development of a "navigation tool which allows users to locate AMP part numbers," called the "Navigator." Defs.' Ex. S at TWC001564. The AMP proposal described a project with five phases and included prices for phase one and estimated costs for phases two through five. Id. at TWC001567-68. Phase three was estimated at $200,000, and was described as providing a navigation system with

> [t]he ability to locate a part number by selecting product features in any order. Each time a feature is selected, the list of other selectable features is narrowed down to reflect only those remaining selectable features.

Id. at TWC001566, TWC001568. Phase three also referred to a "demo" of a navigation system "available at Danish International." Id. at TWC001566. A Danish International memorandum to AMP dated April 22, 1992 provided instructions for installing, running and using the demo. Id. at TWC001572. AMP did not accept the Navigator proposal.

According to Danish's sworn affidavit before the U.S. Patent and Trademark Office (PTO) on February 12, 1997, the idea for the '821 patent was conceived before November 23, 1992. Danish Aff. ¶ 8 (Defs.' Ex. D). "Shortly after conceiving the idea," Danish and Kimbrough "implemented a demonstration" of the idea through the

4

United States District Court
For the Northern District of California

Navigator demo. Id. at ¶¶ 9-10. "At least Claim 1 as filed in the present patent application is supported by the demonstration described" in Danish's memorandum to AMP providing instructions on the Navigator demo. Id. at ¶ 10; Pl.'s Ex. D at PR0000260-61 (Doc. No. 218). Danish testified in his January, 2009 deposition that claims 1 and 2 of the '821 patent were reduced to practice in April, 1992 in this Navigator demo. Danish Dep. at 143:9-144:2 (Defs.' Ex. G). The demo was a local embodiment, and it was not a useable product. Id. at 143:13-20. In its interrogatory responses, Plaintiff likewise stated that claims 1 and 2 of the '821 patent were reduced to practice in April, 1992. Defs.' Ex. F at 2-3. The internet embodiment was reduced to practice between August and October, 1994. Danish Aff. ¶ 19 (Defs.' Ex. D).

Plaintiff originally filed this action in the Eastern District of Texas in October, 2007 and it was transferred to this Court in February, 2009.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other

United States District Court
For the Northern District of California

evidentiary material. <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. <u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Id</u>.

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. <u>Id</u>.; <u>see also</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990); <u>Bhan v.</u>

6

United States District Court
For the Northern District of California

NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation.  Nissan, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  Id. at 1103.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition.  Id. at 1102-1103.  This is true even though the non-moving party bears the ultimate burden of persuasion at trial.  Id.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a prima facie showing in support of its position on that issue.  UA Local 343 v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994).  That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue.  Id.; see also Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir. 1991).  Once it has done so, the non-moving party must set

United States District Court
For the Northern District of California

forth specific facts controverting the moving party's <u>prima facie</u> case. <u>UA Local 343</u>, 48 F.3d at 1471. The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible." <u>Id</u>. This standard does not change merely because resolution of the relevant issue is "highly fact specific." <u>See id</u>.

DISCUSSION

I.   On-Sale Bar

A patent is invalid pursuant to 35 U.S.C. § 102(b) "if the claimed invention is offered for sale more than one year before the filing date of the patent application." <u>Scaltech, Inc. v. Retec/Tetra, LLC</u>, 269 F.3d 1321, 1325 (Fed. Cir. 2001). Here, the "critical date" is October 14, 1993, which is one year before the filing date of the '821 patent application.

Under this statutory bar, a patent is invalid pursuant to 35 U.S.C. § 102(b) if the invention is both: (1) the subject of a commercial offer for sale in the United States more than one year prior to the date of the patent application; and (2) ready for patenting at the time of the offer. <u>Pfaff v. Wells Elecs., Inc.</u>, 525 U.S. 55, 67 (1998).

A.   Commercial Offer For Sale

In order for the on-sale bar to apply where, as here, no actual sale was consummated prior to the critical date, a defendant must demonstrate, by clear and convincing evidence, activity that rises to the level of a formal offer under general principles of contract law. <u>Group One, Ltd. v. Hallmark Cards, Inc.</u>, 254 F.3d 1041, 1045-47 (Fed. Cir. 2001). Plaintiff argues that the AMP

8

United States District Court
For the Northern District of California

proposal did not constitute such an offer.

What constitutes an offer will depend on the facts of the particular case. In determining whether an offer has been made, courts may look to interpretive principles contained in the Uniform Commercial Code (UCC) and the Restatement of Contracts. See Group One, 254 F.3d at 1047-48. The Restatement defines an offer as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24.

Here, the AMP proposal was a formal, written proposal that described the Navigator project in five phases, identifying the work to be performed in each phase. Defs.' Ex. S at TWC001563-68. Danish initially sent the proposal to AMP on March 5, 1992 and a second time at AMP's request on March 24, 1992. Id. at TWC001563, TWC001571. The proposal referred to a demo of phase three and Danish sent a memorandum to AMP in April, 1992 providing instructions for installing, running and using the demo. Id. at TWC001566, TWC001572. Danish testified that claims 1 and 2 of the '821 patent were reduced to practice in April, 1992 in this Navigator demo. Danish Dep. at 143:9-144:2 (Defs.' Ex. G). The AMP proposal also included a price and time-line for completion of the first phase and estimated costs for phases two through five, broken out by development and data entry. Defs.' Ex. S at TWC001567-68. Phase three was estimated at $200,000 and Danish testified that he believed that each phase of the AMP proposal was offered at a fair price. Id. at TWC001568; Danish Dep. at 142:1-15

9

**United States District Court**
For the Northern District of California

1   (Defs.' Ex. G).

2       Under these facts, a commercial offer for sale of the patented

3   invention was made. Danish International's willingness to enter

4   into a bargain with AMP is clear and AMP could have accepted the

5   proposal. The parties' past dealings also support a finding of a

6   commercial offer. In the past, AMP had accepted a proposal from

7   Danish International for another fixed fee project. Danish Dep. at

8   22:22-23:24 (Defs.' Ex. G). The fact that certain terms were not

9   finalized does not preclude finding that an offer was made. The

10  UCC specifically states that a contract for sale may be formed even

11  though multiple terms, including the price term, are left open.

12  U.C.C. §§ 2-204, 2-305. The fact that AMP did not accept the

13  proposal likewise does not prevent a finding that a commercial

14  offer for sale was made. See Scaltech, 269 F.3d at 1328-29

15  (finding two proposals constituted a commercial offer for sale

16  though the proposals were not accepted).

17      Plaintiff argues that the AMP proposal was not a commercial

18  offer, but part of the patentee's experimentation, which negates

19  the application of the on-sale bar. See EZ Dock v. Schafer

20  Systems, Inc., 276 F.3d 1347, 1351-52 (Fed. Cir. 2002). However,

21  because experimental use cannot preclude the on-sale bar after a

22  reduction to practice and Plaintiff concedes that the invention

23  here was reduced to practice, Plaintiff cannot claim experimental

24  use. See In re Cygnus Telecommunications Tech., LLC, Patent

25  Litigation, 536 F.3d 1343, 1356 (Fed. Cir. 2008).

26      B.    Ready For Patenting

27      The second Pfaff element that the invention be "ready for

28                                  10

**United States District Court**
For the Northern District of California

patenting" at the time of the offer requires the defendant to prove that (1) the invention was reduced to practice; or (2) the inventor prepared drawings or descriptions sufficiently specific to enable someone skilled in the art to practice the invention. <u>Pfaff</u>, 525 U.S. at 67-68. <u>Pfaff</u> does not require that an invention be reduced to practice in order to be complete and ready for patenting. <u>Id</u>. at 66. It requires only that the concept of the invention be complete. <u>Id</u>. at 60-61, 66.

As noted above, Danish, a co-inventor of the '821 patent, and Plaintiff have conceded that claims 1 and 2 were reduced to practice in April, 1992. Danish Dep. at 143:9-144:2 (Defs.' Ex. G); Defs.' Ex. F at 2-3; Danish Aff. ¶¶ 8-10 (Defs.' Ex. D). In his sworn affidavit before the PTO, Danish stated, "At least Claim 1 as filed in the present patent application is supported by the demonstration" provided to AMP. Danish Aff. ¶¶ 8-10 (Defs.' Ex. D). Danish also testified that claims 1 and 2 of the '821 patent were reduced to practice in April, 1992 in the Navigator demo. Danish Dep. at 143:9-144:2 (Defs.' Ex. G). In its interrogatory responses, Plaintiff admitted that claims 1 and 2 of the '821 patent were reduced to practice in April, 1992. Defs.' Ex. F at 2-3.

Plaintiff does not respond to Defendants' argument, explain its admissions or even provide a reason for its inconsistent positions. Instead, Plaintiff repeats that the demo was part of the patentees' testing and development and argues that therefore the invention was not ready for patenting. Plaintiff has not provided sufficient evidence to "undermine the force of [Danish's]

11

sworn admission," Danish's deposition testimony and Plaintiff's interrogatory responses regarding the date of the invention's reduction to practice. See Cygnus Telecommunications, 536 F.3d at 1353-54. The admissions of Danish and Plaintiff are supported by the AMP proposal, Danish's memorandum to AMP describing the demo and the screen shots of the demo.

Plaintiff next argues that it could not have reduced the invention to practice in April, 1992 before it even conceived of the internet embodiment, which Plaintiff alleges occurred in April, 1994. Plaintiff contends that, because the demo was a local embodiment and not the internet embodiment, the invention was not reduced to practice. The Federal Circuit has held that it is "not necessary for [a defendant] to show that all embodiments of the invention were on sale more than one year before filing. It is sufficient to show that one embodiment of the invention was offered for sale during the one-year period." Scaltech, 269 F.3d at 1330. The local and internet embodiments of the '821 patent share the same underlying concept. The fact that the inventors did not fully understand the "full potential" of their invention or still needed to work on the internet embodiment does not preclude a finding that the invention was reduced to practice. See id. at 1331.

Finally, Plaintiff contended during oral argument that step (h) of claim 1 is missing from the demo and referred the Court to the declaration of its expert, J. Tipton Cole. See Cole Dec. (Pl.'s Ex. H)(Doc. No. 218). The Cole declaration merely states, "The example screens do not show element (h) of claim 1, in which the initial selection criteria are supplemented with additional

12

United States District Court
For the Northern District of California

criteria to create a 'second selection criteria.'" <u>Id</u>. at ¶ 7.
Cole is correct that the demo snapshots included in Defendants'
motion do not show step 1(h)'s second selection criteria.  Defs.'
Mot. 3-5.  Defendants' Exhibit E, however, does include demo
snapshots showing step 1(h).  Defs.' Ex. E.  Defendants also
submitted CDs containing a copy of the actual demo program.  Defs.
Exs. Q & R (Doc. Nos. 228 & 229).  The demo program recreates the
snapshots provided in Defendants' Exhibit E, including step 1(h).
Plaintiff's contention therefore fails.

The Court concludes that claims 1 and 2 of the '821 patent are
invalid due to the on-sale bar because they were the subject of a
commercial offer for sale of an invention that was reduced to
practice before October 14, 1993.  The Court grants Defendants'
motion for summary judgment of invalidity.

II.  Infringement

Because the Court finds that the patent is invalid, it need
not rule on the question of infringement.  Although <u>Cardinal
Chemical Co. v. Morton International, Inc.</u>, 508 U.S. 83 (1993),
held that a determination of non-infringement does not moot the
question of validity, the rationale underlying <u>Cardinal</u> does not
support the reverse proposition.

III.  Defendants' Objections To Plaintiff's Expert Declaration

Defendants object to the declaration of Plaintiff's expert, J.
Tipton Cole, under Federal Rule of Evidence 702 and Federal Rule of
Civil Procedure 56(e) as improperly providing conclusory opinions
without identifying specific facts.  Cole Dec. (Pl.'s Ex. H) (Doc.
No. 218).  Because the Court does not find support for Plaintiff's

**United States District Court**
For the Northern District of California

13

position in the Cole declaration, the Court overrules Defendants'
objections, and gives the Cole declaration the weight it deserves,
finding in Defendants' favor notwithstanding.

CONCLUSION

For the foregoing reasons, Defendants' summary judgment motion
is GRANTED.

IT IS SO ORDERED.

Dated: 8/21/09

CLAUDIA WILKEN
United States District Judge

14

# Exhibit 27

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4    PARTSRIVER, INC.,                          No. C 09-00811 CW

5         Plaintiff,                            JUDGMENT

6      v.

7    SHOPZILLA, INC.; YAHOO! INC.; EBAY,
     INC.; AND MICROSOFT CORPORATION,
8

9         Defendants.
     _____/

10

11        This action came on for hearing before the Court, Honorable

12   Claudia Wilken, United States District Judge, presiding, and the

13   issues having been duly heard and a decision having been duly

14   rendered,

15        IT IS ORDERED AND ADJUDGED

16        That Plaintiff PartsRiver, Inc., take nothing, that summary

17   judgment is entered in favor of Defendants Shopzilla, Inc., Yahoo!

     Inc., eBay, Inc., and Microsoft Corporation, and that Defendants
18
     Shopzilla, Inc., Yahoo! Inc., eBay, Inc., and Microsoft Corporation
19
     recover of Plaintiff PartsRiver, Inc., their costs of action.
20
          Dated at Oakland, California, this 21st day of August, 2009.
21

22                                 RICHARD W. WIEKING
                                   Clerk of Court
23

24                                 _Sheilah Cahill_____
                            By:    _____
25                                 SHEILAH CAHILL
                                   Deputy Clerk
26

27

28

# Exhibit 28

# TIMELINE OF EVENTS

| Date | Event in Federal Court | Event in Patent Office |
|---|---|---|
| Aug. 14, 2001 | | Patent Office issues the '821 patent. *See* Ex. 2. |
| 2006–2007 | Danish (first-named inventor of the '821 patent) encourages PartsRiver to assert his patent against many companies, including Defendants. *See* Exs. 3, 6, 7; *see also* Ex. 15 at 51:6–:21, 194:3–195:1. PartsRiver decides (in part based on a N.Y. Times article, *see* Ex. 4) that E.D. Tex. would be a favorable forum. *See* Ex. 5. PartsRiver retains Danish as a consultant to help with the litigation, agreeing to pay him $10,000/month plus 10% of any licenses, settlements, or judgments. *See* Ex. 8; *see also* Ex. 15 at 35:4–37:9. | |
| Oct. 3, 2007 | PartsRiver sues Defendants in E.D. Tex. *See* Ex. 9. | |
| Nov. 20, 2007 | Defendants move to transfer the action from E.D. Tex. to this Court. *See* Ex. 11. | |
| Feb. 18, 2008 | PartsRiver serves its infringement contentions, which assert claims 1 and 2 of the '821 patent. *See* Ex. 12. | |
| Oct. 28, 2008 | | Defendants file a request for an *ex parte* reexamination of the validity of claims 1 and 2 of the '821 patent. *See* 13. |
| Dec. 22, 2008 | | Patent Office grants request for *ex parte* reexamination. *See* Ex. 14. |
| Jan. 30, 2009 | Judge in E.D. Tex. grants motion to transfer action to this Court. *See* Ex. 17. | |
| May 1, 2009 | | Patent Office issues initial rejection of claims 1 and 2 of the '821 patent in light of an earlier printed publication. *See* Ex. 18. |
| May 22, 2009 | In this Court, the parties stipulate that Defendants may file an early motion for summary judgment of invalidity. *See* Ex. 19. | |
| May 28, 2009 | Defendants file their motion for summary judgment of invalidity due to the on-sale bar. *See* Ex. 20. | |

| Date | Event in Federal Court | Event in Patent Office |
|---|---|---|
| June 5, 2009 | | PartsRiver argues to the Patent Office that claims 1 and 2 of the '821 patent are not invalid. *See* Ex. 21. |
| June 18, 2009 | | Patent Office issues final rejection of claims 1 and 2 of the '821 patent in light of an earlier printed publication. *See* Ex. 22. |
| Aug. 21, 2009 | This Court grants Defendants' motion for summary judgment and finds claims 1 and 2 of the '821 patent invalid due to the on-sale bar. *See* Exs. 23, 24. | |
| Sept. 18, 2009 | PartsRiver files notice of appeal. *See* Ex. 26, signed by the Manatt law firm. | PartsRiver files notice of appeal. *See* Ex. 25. |
| Oct. 6, 2009 | This Court awards $37,865.68 in costs to Defendants. *See* Ex. 27. | |
| Jan. 29, 2010 | PartsRiver files brief in Federal Circuit arguing this Court's summary judgment should be reversed. *See* Ex. 28, signed by the Manatt law firm. | |
| Apr. 14, 2010 | Defendants file brief in Federal Circuit arguing this Court's summary judgment should be affirmed. *See* Ex. 29. | |
| May 2010 | Danish becomes the CEO of PartsRiver. *See* Ex. 30. | |
| May 20, 2010 | | PartsRiver voluntarily amends claims 1 and 2 of the '821 patent "for the purpose of terminating the present reexamination to avoid lengthy appeal proceedings," but at the same time PartsRiver argues that the scope of the amended claims is "legally identical" to that of the original claims. *See* Ex. 31 at 7. |
| June 2, 2010 | PartsRiver files reply brief in Federal Circuit arguing this Court's summary judgment should be reversed. *See* Ex. 32, signed by the Manatt law firm. | |

| Date | Event in Federal Court | Event in Patent Office |
|------|------------------------|------------------------|
| June 24, 2010 | | Patent Office dismisses PartsRiver's appeal as moot, and issues Notice of Intent to Issue Reexamination Certificate allowing claims 1 and 2, as amended, and new claim 9. *See* Ex. 33. |
| June 29, 2010 | Danish secretly registers the domain name "KELORA.COM". *See* Exs. 34, 35. | |
| Sept. 21, 2010 | The Federal Circuit notifies the parties that PartsRiver's appeal will be heard on November 3, 2010. *See* Ex. 36. | |
| Sept. 28, 2010 | Kelora is secretly formed in Delaware as a Limited Liability Company. *See* Ex. 37. | |
| Oct. 7, 2010 | PartsRiver secretly assigns rights in the '821 patent to Kelora. *See* Ex. 38. | |
| Oct. 12, 2010 | Kelora secretly registers with California and identifies its place of business as being in Cupertino, California, where Danish lives. *See* Ex. 39; *see also* Ex. 15 at 7:11–:12. | |
| Oct. 15, 2010 | PartsRiver files motion in Federal Circuit to dismiss its appeal and to vacate this Court's summary judgment of invalidity, but makes no mention of Kelora. *See* Ex. 40, signed by the Manatt law firm. | |
| Oct. 22, 2010 | Defendants oppose PartsRiver's motion to vacate this Court's summary judgment of invalidity, but do not oppose PartsRiver's motion to dismiss its own appeal. *See* Ex. 41. | |
| Oct. 27, 2010 | PartsRiver files reply brief in Federal Circuit to dismiss its appeal and to vacate this Court's summary judgment of invalidity, but again makes no mention of Kelora. *See* Ex. 42, signed by the Manatt law firm. | |
| Oct. 29, 2010 | | Kelora records its assignment with the Patent Office, but the assignment is not immediately available to the public. *See* Ex. 38. |

| Date | Event in Federal Court | Event in Patent Office |
|------|------------------------|------------------------|
| Nov. 2, 2010 | eBay and Microsoft file declaratory judgment action against PartsRiver in this Court alleging that the reexamined claims of the '821 patent are invalid, not infringed, and/or that intervening rights applies. *See* Ex. 44 (Civil Action No. 10-4947). | Patent Office issues reexamination certificate for the '821 patent. *See* Ex. 43. |
| Nov. 3, 2010 | Instead of hearing oral arguments, the Federal Circuit grants PartsRiver's motion to dismiss its appeal, but remands for this Court to consider in the first instance PartsRiver's request to vacate the summary judgment of invalidity. *See* Ex. 45. | |
| Nov. 8, 2010 | Kelora files complaint in W.D. Wisc. accusing 13 defendants of infringing the reexamined claims of the '821 patent. *See* Ex. 46, signed by the Manatt law firm. | |
| Nov. 10, 2010 | eBay and Microsoft file declaratory judgment actions against PartsRiver and Kelora in this Court alleging that the reexamined claims of the '821 patent are invalid, not infringed, and/or that intervening rights applies. *See* Ex. 47 (Civil Action No. 10-5106); Ex. 48 (Civil Action No. 10-5108). | |
| Nov. 23, 2010 | Kelora amends its complaint in W.D. Wisc. to name 20 defendants. *See* Ex. 49, signed by the Manatt law firm. | |
| Dec. 16, 2010 | This Court sets a briefing schedule on PartsRiver's motion to vacate. *See* Docket No. 254. | |
| Dec. 21–22, 2010 | eBay and Microsoft amend their declaratory judgment actions and serve them on PartsRiver and Kelora. *See* Exs. 50–53. | |

# Exhibit 29

MANATT, PHELPS & PHILLIPS, LLP
ROBERT D. BECKER (Bar No. CA 160648)
E-mail: rbecker@manatt.com
RONALD S. KATZ (Bar No. CA 085713)
E-mail: rkatz@manatt.com
SHAWN G. HANSEN (Bar No. CA 197033)
E-mail: shansen@manatt.com
1001 Page Mill Road, Building 2
Palo Alto, CA  94304-1006
Telephone:  (650) 812-1300
Facsimile:  (650) 213-0260

*Attorneys for Defendant*
KELORA SYSTEMS, LLC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

|  |  |
|---|---|
| EBAY INC. & MICROSOFT CORPORATION,<br><br>              Plaintiffs,<br><br>    vs.<br><br>PARTSRIVER, INC., & KELORA SYSTEMS, LLC,<br><br>              Defendants. | Case No. 4:10-cv-4947-CW<br><br>**KELORA SYSTEMS, LLC'S FRCP 7.1 CORPORATE DISCLOSURE STATEMENT AND CIVIL L.R. 3-16 CERTIFICATION OF INTERESTED ENTITIES OR PERSONS** |

<u>**FRCP 7.1 CORPORATE DISCLOSURE STATEMENT**</u>

Pursuant to Federal Rule of Civil Procedure 7.1, and to enable the Court to evaluate possible disqualification or recusal, the undersigned counsel for Defendant Kelora Systems, LLC ("Kelora") hereby files this disclosure statement and certifies that:

(1) There is no parent corporation for Kelora; and

(2) There is no publicly held corporation owning 10% or more of the stock of Kelora.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

KELORA SYSTEMS, LLC'S
CORPORATE DISCLOSURE STATEMENT AND
CERTIFICATION OF INTERESTED ENTITIES

**CIVIL L.R. 3-16 CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

Pursuant to Civil L.R. 3-16, the undersigned certifies that the following listed persons, associations of persons, firms, partnerships, corporations (including parent corporations) or other entities (i) have a financial interest in the subject matter in controversy or in a party to the proceeding, or (ii) have a non-financial interest in that subject matter or in a party that could be substantially affected by the outcome of this proceeding:

Mohamed Sherif Danish, Member of Kelora Systems, LLC;

Robert Dailey, Member of Kelora Systems, LLC;

Kris Kimbrough, Member of Kelora Systems, LLC; and

Susan St. Ledger, Member of Kelora Systems, LLC.

Dated:    March 9, 2011                Respectfully submitted,

                                       MANATT, PHELPS & PHILLIPS, LLP

                                       By: */s/ Robert D. Becker*
                                            Robert D. Becker

                                       *Attorneys for Defendant*
                                       KELORA SYSTEMS, LLC

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

2

KELORA SYSTEMS, LLC'S
CORPORATE DISCLOSURE STATEMENT AND
CERTIFICATION OF INTERESTED ENTITIES

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 9, 2011, all counsel of record who are deemed to have consented to electronic service are being served, via the Court's CM/ECF system pursuant to Civil L.R. 5-4 and General Order 45, with a copy of the foregoing KELORA SYSTEMS, LLC'S FRCP 7.1 CORPORATE DISCLOSURE STATEMENT AND CIVIL L.R. 3-16 CERTIFICATION OF INTERESTED ENTITIES OR PERSONS.

By: _/s/ Robert D. Becker_____
Robert D. Becker

300224239.1

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

3

KELORA SYSTEMS, LLC'S
CORPORATE DISCLOSURE STATEMENT AND
CERTIFICATION OF INTERESTED ENTITIES

# Exhibit 30

Pages 1 - 39

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE


PARTSRIVER, INC.,                )
                                 )
              Plaintiff,          )
     v.                          )   NO. C 09-00811 CW
                                 )
SHOPZILLA, INC., ET AL.,         )
                                 )
              Defendants.         )
_____)
                                 )
EBAY, INC., ET AL.,              )
                                 )
              Plaintiffs,         )
     v.                          )   NO. C 10-04947 CW
                                 )
PARTSRIVER, INC.,                )
                                 )
              Defendant.          )
_____)
                                 )
EBAY, INC.,                      )
                                 )
              Plaintiff,          )
     v.                          )   NO. C 10-05106 CW
                                 )
PARTSRIVER, INC., ET AL.,        )
                                 )
              Defendants.         )  (Caption continued on following
_____)   page.)

                                     San Francisco, California
                                     Thursday, March 17, 2011

                  **TRANSCRIPT OF PROCEEDINGS**


Reported By:        Leo T. Mankiewicz, CSR 5297 RMR, CRR
                    Official Reporter

(Caption continued:)

```
MICROSOFT CORPORATION,          )
                                )
                Plaintiff,      )
      v.                        )   NO. C 10-05108 CW
                                )
PARTSRIVER, INC., ET AL.,       )
                                )
                Defendants.     )
_____)
                                )
SHOPZILLA, INC.,                )
                                )
                Plaintiff,      )
      v.                        )   NO. C 11-00502 CW
                                )
KELORA SYSTEMS, LLC,            )
                                )
                Defendant.      )
_____)
```

**APPEARANCES**:

For Plaintiff/Defendant:
(Parts River, Inc.)          Manatt, Phelps & Phillips, LLP
and Kelora)                  1001 Page Mill Road, Building 2
                             Palo Alto, California  94304
                        BY:  **ROBERT BECKER**
                             **RONALD S. KATZ**
                             **SHAWN G. HANSEN**

For Plaintiffs/Defendants:
(eBay, Inc. and              Sidley Austin LLP
 Microsoft Corp.)            555 West Fifth Street, Suite 4000
                             Los Angeles, California  90013
                        BY:  **THEODORE W. CHANDLER**
                             **MARC R. ASCOLESE**


For Plaintiff/Defendant:
(Shopzilla, Inc.)            Law Offices of Jordan Trent Jones
                             100 Spear Street, 18th floor
                             San Francisco, California  94105
                        BY:  **JORDAN TRENT JONES**
                             **HOGENE CHOI**

                                              (cont.)

**APPEARANCES**: (cont.)


For Defendant:          Fulbright & Jaworski LLP
(Yahoo, Inc.)           3101 McKinney, Suite 5100
                        Houston, Texas  77010-3095
                   BY:  **DANIEL LEVANTHAL**


                        Yahoo!
                        701 First Avenue
                        Sunnyvale, California  94089
                   BY:  **CHRISTIANA STATE**

<u>Thursday, March 17, 2011</u>

                                                              2:39 p.m.

                            P R O C E E D I N G S

                **THE CLERK:**  We're calling C 09-811, PartsRiver, Inc.

versus Shopzilla, Inc., et al., we're calling C 10-4947, eBay,

Inc., et al., versus PartsRiver; we're calling C 10-5106, eBay

versus PartsRiver, Inc., et al., we're calling 10-5108,

Microsoft Corporation versus PartsRiver, et al., and we're

calling 11-502, Shopzilla versus Kelora Systems, LLC.

                Would you state your appearances for the record.

                **MR. CHANDLER:**  Good afternoon, your Honor.  Ted

Chandler, Sidley Austin, on behalf of eBay and Microsoft, and

with me is Marc Ascolese.

                **THE COURT:**  And you're representing those two

entities in all the cases in which they appear?

                **MR. CHANDLER:**  Correct, your Honor.

                **MR. JONES:**  Jordan Trent Jones on behalf of

Shopzilla, and with me is Hogene Choi.

                **THE COURT:**  And you represent Shopzilla in all of

the cases in which it appears?

                **MR. JONES:**  Yes.

                **MR. BECKER:**  Good afternoon, your Honor.  Robert

Becker from Manatt, Phelps & Phillips.  I represent PartsRiver

and Kelora in all the cases, and with me are Ron Katz and Shawn

Hansen.

1          **MR. LEVENTHAL:**  And Daniel Leventhal, your Honor.  I

2    represent Yahoo, Inc., and with me is Christiana State, and we

3    are only in the 09-811 case.

4          **THE COURT:**  Okay.  Well, I don't -- I'm going -- I

5    don't understand what's going on here.  I feel like something

6    is going on that you all know about that I don't, as to why we

7    have all these cases and why it really matters which one goes

8    forward.  They are eight days apart.  Is that the only

9    difference?

10          **MR. CHANDLER:**  It's on the motion to dismiss.

11          **THE COURT:**  Eight days' more worth of damages or

12    what?

13          **MR. CHANDLER:**  No, the issue is that the first filed

14    action is less likely to be transferred to Wisconsin, and vice

15    versa.  The Wisconsin court is more likely to transfer the --

16          **THE COURT:**  Oh, I see.  I knew there was something

17    out there that I was missing.

18          **MR. CHANDLER:**  I mean, that's one reason.  Another

19    reason, there is a different between the complaints.  The

20    complaints that were filed eight days later have additional

21    allegations of a case or controversy based on the fact that

22    there was this Wisconsin action which shows an increased reason

23    that eBay and Microsoft fear being sued, and they were, in

24    fact, sued by a counterclaim by Kelora.

25          **THE COURT:**  So who's trying to move this to

1   Wisconsin and who's trying to move the Wisconsin case here?

2          **MR. CHANDLER:**  So far, no one has tried to move

3   these cases to Wisconsin.  We're the first filed case.  All the

4   defendants in Wisconsin are trying to get before you.

5          **THE COURT:**  Okay, and what about Delaware?

6          **MR. CHANDLER:**  That case was recently filed.  I

7   don't believe there's been any activities since the Complaint,

8   but Kelora would know the most.

9          **MR. BECKER:**  That's correct, your Honor.  No one's

10  tried to move that case, and it's just been filed.

11         **THE COURT:**  And no one's trying to move any cases to

12  Delaware.

13         **MR. CHANDLER:**  No, your Honor.

14         **THE COURT:**  All right, well, the reason I wanted you

15  to come in on the old 811 case is, I now wonder why PartsRiver

16  can try to defend the patent in that case, if PartsRiver has no

17  further interest in it.  Why don't I just vacate the judgment?

18  Who would object?  Kelora didn't own it then and PartsRiver

19  doesn't known it now.  So why would I vacate that judgment?

20         **MR. KATZ:**  Well, PartsRiver has -- still has an

21  interest with respect to the costs, your Honor.

22         **THE COURT:**  With respect to what?

23         **MR. KATZ:**  Costs.  I think there's $37,000 worth of

24  costs that are pending against PartsRiver.

25         **THE COURT:**  That's all we're looking at here?

1          **MR. KATZ:**  PartsRiver has assigned all of its rights

2   to Kelora, but I think there are reasons that the decision

3   should be vacated.  It's basically just an advisory opinion at

4   this point about claims that no longer exist, claims that were

5   not construed, and certainly could not even have been construed

6   with respect to the continuing prosecution history that

7   resulted from the reexamination.

8          **THE COURT:**  But if I vacate the judgment, that means

9   I have to go back and deal with that case again, and if it's

10  moot and doesn't matter to anyone, why would I want to do that?

11         **MR. KATZ:**  Well, if you vacate the judgment, it's

12  over.  That case is over.

13         **THE COURT:**  Well, no, that case, I presume, is

14  pursued.

15         **MR. KATZ:**  Well, Kelora -- I don't believe that that

16  case would be pursued.  If the judgment is vacated --

17         **MR. CHANDLER:**  We have an interest in invalidating

18  that patent in that case, in this case, and every other case

19  that we're involved in.

20         **THE COURT:**  You don't have to invalidate the one

21  that was in that case, because that patent doesn't exist

22  anymore.

23         **MR. CHANDLER:**  Well, but they're taking the position

24  that the amended claims are exactly the same --

25         **THE COURT:**  Oh, I know, but we would litigate that

```
1    in the course of the new case, not the old case, either way.

2              MR. KATZ:  The fact that they brought the new case

3    acknowledges that.

4              THE COURT:  Acknowledges what?

5              MR. KATZ:  That it's different, and that there needs

6    to be a new case in order to do that.

7              MR. CHANDLER:  No, we disagree with that, your

8    Honor.  The issues that were resolved by your Honor's summary

9    judgment motion are the same issues that we would be -- that

10   are going to be at issue again --

11             THE COURT:  You're going to against the --

12                       (Simultaneous colloquy.)

13             MR. CHANDLER:  -- exactly, that there was commercial

14   offer for sale, that it is ready for patenting, that there is

15   no experimental use defense.  The amendments to the claims

16   during reexamination have no impact on your Honor's rulings

17   about the commercial offer for sale, et cetera.

18             THE COURT:  Well, they say the prior offer doesn't

19   apply to the claims as modified.

20             MR. CHANDLER:  It's the same invention, your Honor,

21   that was actually sold, and we can use that as prior art,

22   whether it's anticipatory or for an obviousness argument.  It's

23   still -- your Honor found that that invention was in the prior

24   art, and we can use that judgment to show that that invention

25   was in prior art and use that as prior art against the new
```

1    claims whether the new claims have exactly the same scope of

2    different scope.

3            THE COURT:  If the new claims were somewhat

4    different than the prior art, although it's still prior art,

5    might not invalidate the new claims.  I don't know.

6            MR. CHANDLER:  Well, we would certainly -- we still

7    believe it would invalidate it.  Certainly if they're, quote,

8    "legally identical," which is as they said, and again, even if

9    they did change one -- a couple of words, it's clear that

10   on-sale bar can be used for an obviousness argument.

11           There were 11 limitations in that claim.  They

12   changed a few words in one of those limitations.  There's no

13   dispute that all 10 of the other limitations would be in the

14   prior art, under your Honor's summary judgment of invalidity.

15   That's why it's very important for us to preserve that

16   judgment.

17           THE COURT:  Now, PartsRiver has -- is it the case

18   that PartsRiver has no right to sue on the '821 patent under

19   any circumstances?

20           MR. KATZ:  They have assigned all their rights to

21   Kelora.

22           THE COURT:  So they're not the owner, they're not an

23   exclusive licensee, they have no ability or interest in suing

24   on that ever again.

25           MR. KATZ:  They have a duty to help Kelora, but they

1    do not -- they've assigned all their rights.

2             **THE COURT:**  And there's no -- is there any way

3    around that?  Is that definitive?

4             **MR. CHANDLER:**  We disagree with that, your Honor.  I

5    mean, I think -- we haven't seen all the agreements.  We've see

6    one, quote, "Assignment Agreement."  It refers to a

7    "Contribution Agreement" which has never been produced.

8             **THE COURT:**  Yes, I was thinking maybe you should

9    produce that, so we could assure ourselves that you aren't

10   going to be coming back tomorrow saying, oh, now it's been

11   assigned back to us, or something; or now I can sue for some

12   other theory that I haven't disclosed yet.

13            **MR. KATZ:**  Right, we're glad to do that, your Honor.

14   There's no secrecy in this.  They themselves submitted

15   Exhibit 38, which is part of the file history, and that was --

16   it completely reveals the assignment, but if your Honor wants

17   us to produce an additional document, we'll do that.

18            **THE COURT:**  Why don't you give them the Contribution

19   Agreement, or whatever it's called, so that we can be sure

20   we're clear on what this status is.

21            **MR. KATZ:**  I just need a little definition as to --

22            **MR. BECKER:**  We have it.

23            **MR. KATZ:**  Okay, we got it.

24            **THE COURT:**  All the agreements that relate to the

25   ownership or any rights with respect to the '821 patent as

1    between PartsRiver and Kelora.

2              **MR. CHANDLER:**  And then we just heard from the first

3    time that there's some requirement that PartsRiver "assist" in

4    the litigation.  I mean, that's what we believe, is that

5    PartsRiver and Kelora are run by the same person, which is the

6    first named inventor, they're being represented by the same

7    lawyers, they're working together and we --

8              **THE COURT:**  That's all fine, but I just don't want

9    PartsRiver as an entity coming back.

10             **MR. KATZ:**  Your Honor, that's a little tiresome to

11   hear --

12             **THE COURT:**  Back and forth, but let me just go on,

13   here.  But your declaratory -- all the declaratory relief

14   claims relate to the new '821 patent, I guess.

15             **MR. CHANDLER:**  No, I mean, they refer to whatever it

16   is that they assert.  I mean, under the statute, 35 U.S.C.

17   252 --

18             **THE COURT:**  I guess what I'm getting at is, if I

19   deny the motion to vacate so that the judgment against the

20   original '821 patent stands, does that affect any of the

21   declaratory relief actions?

22             **MR. CHANDLER:**  It would be used -- that judgment

23   would be used as prior art in the declaratory judgment relief

24   actions.

25             **THE COURT:**  Right, but those declaratory relief

```
 1    actions relate to a declaration regarding the new '821 patent,

 2    is that right?

 3              MR. CHANDLER:  Well, yes and no.  Again, the way the

 4    statute works is if the new claims are legally identical or

 5    substantially identical, however they've been -- it's the same

 6    as the, quote, "old patent."  So there's really no such thing

 7    as a new patent and old patent.  It's -- under the statute, you

 8    look to whether the claims are the same scope or not.

 9              THE COURT:  Okay.  Well, getting back to the

10    vacating the judgment, tell me why it is that you want to

11    vacate the judgment exactly?

12              MR. KATZ:  Well, it's an advisory opinion at this

13    point, and it is an equitable --

14              THE COURT:  No, it isn't.  That was a judgment that

15    was not appealed.

16              MR. KATZ:  No, no, we did appeal.

17              THE COURT:  It's not advisory of anything.  Things

18    may have changed since the entry of it, but it wasn't advisory.

19              MR. KATZ:  We did appeal.  Well, things changed

20    because of what they did.  They started a reexamination.

21              THE COURT:  Just because things change, you don't go

22    back and vacate judgments because things change.  At the time

23    it entered, it was not an advisory opinion, it was an opinion.

24    It was appealed, the appeal was withdrawn, so it stands.

25              I'm asking more a practical question:  Why, in
```

1    practical effect, do you want to vacate, or what will you do if

2    it's vacated?  What effect would it have?  Why should I do it,

3    in a practical sense?

4           **MR. KATZ:**  I think the main reason for vacating a

5    judgment is that a judgment now exists which my client did not

6    have an opportunity to appeal.

7           **THE COURT:**  Oh, you've had an opportunity to appeal.

8    You did appeal it and then you withdrew your --

9           **MR. KATZ:**  But it became moot as a result of the

10   reexamination.  It was nothing left to appeal.  Those claims

11   were non-existent, as your Honor said.  So that is the whole

12   reason behind vacating this, what the *Monsignor* case says.

13   That is the inequity that falls to the person --

14          **THE COURT:**  What I'm really asking is, why do you

15   want it vacated, you were answering me earlier it's because you

16   don't want to pay the costs?

17          **MR. KATZ:**  Yes, that's one reason.

18          **THE COURT:**  And you're not, even after it's vacated,

19   you're not going to then purchase that case?  You are the

20   plaintiff.  If I vacate the judgment, that means the case isn't

21   over and you could pursue.  It, I thought you meant you wanted

22   to pursue it now.

23          **MR. KATZ:**  Well, we've got a plethora of cases right

24   now.

25          **THE COURT:**  So it's --

```
 1                     (Simultaneous colloquy.)

 2          MR. KATZ:  I think what your Honor wants to do is to

 3   rationalize this process --

 4          THE COURT:  Exactly.

 5          MR. KATZ:  -- and we are willing to participate in

 6   the rationalization of that process.  We're not going to

 7   concede any claims, but we don't think that there should be

 8   five cases, or however many cases there are right now.  That's

 9   what -- we're trying to make sense.

10          THE COURT:  That's the bottom line.  I'm trying to

11   get to is how many cases do we need here, and can't we just

12   have one, and if so, which one is it?

13          MR. CHANDLER:  The parties have agreed, your Honor,

14   that at least through the end of discovery, all the cases can

15   be consolidated, and the lowest-numbered action that survives,

16   the lowest numbered declaratory judgment action.

17          So they have moved to dismiss the lowest-numbered

18   action.  They concede that the second declaratory judgment

19   action will proceed.  So the parties are in agreement that we

20   don't need to E-file in five different cases, that we can

21   consolidate, certainly through the end of discovery, all the

22   cases, into lowest numbered action.

23          When it gets ready for trial, since we don't know

24   whether all these defendants from Wisconsin will be here, it's

25   a little difficult for us to predict what the trial would look
```

1    like.  So at that point, there may need to be separate trials,

2    et cetera, but it's just kind of too early to figure out that

3    far in advance.

4            THE COURT:  So what do I actually have to decide,

5    then, when you say you want to consolidate it into the lowest

6    number, you don't agree on which one that is?

7            MR. CHANDLER:  Kelora has moved to dismiss the

8    lowest-numbered action.  So once you resolve that motion to

9    dismiss, I think the parties would be able to stipulate as to

10   mechanically which action; everything would be consolidated

11   into --

12           THE COURT:  So it would be the current lowest

13   numbered action, which is --

14           MR. CHANDLER:  10-4947 is what we believe should be

15   the lowest-numbered action.  They're trying to dismiss that.

16   If that motion were granted against our opposition, the lowest

17   number will be 10-5106.

18           THE COURT:  Okay.

19           MR. KATZ:  May I make myself a little bit clearer on

20   the question that you asked before, your Honor?

21           THE COURT:  Sure.

22           MR. KATZ:  We believe that your Honor's decision was

23   erroneous.  That's why we appealed it.  We now do not have an

24   opportunity for that appeal.  That's the reason why it should

25   be vacated.  It's just confusing to have it out there.  It's

1    unfair for a decision to stand when a party was not able to

2    consummate its appeal, when the party was not able to

3    consummate its appeal by virtue of action of the other side,

4    which was the reexamination.  That's our point.

5            THE COURT:  And so what would be the status of the

6    case if I vacated the judgment?

7            MR. KATZ:  Well, if you vacated the judgment,

8    obviously, there's still litigation that's going to be going on

9    in one of these cases.

10            THE COURT:  Right, but what will happen to this

11   case?  If I vacate the judgment, what will be the status --

12            MR. KATZ:  If that's the lowest-numbered case and

13   they want to litigate these issues through that case, we need

14   Kelora in that case, obviously.

15            PartsRiver no longer has standing, because they have

16   assigned all their rights to Kelora.

17            THE COURT:  Well, like I said, it gets me back to my

18   earlier question of why you would want to move to vacate if you

19   no longer have standing and no longer have a legal interest in

20   the case.

21            MR. KATZ:  Well, PartsRiver does have a legal

22   interest.  They have the cost issue, and then they have this

23   obligation to help Kelora to perfect its rights, which is in

24   this very assignment that they submitted as an exhibit.  It's

25   not a surprise to them.  They just maybe just didn't read it,

1    but it has that clause in it.

2              **THE COURT:**  And then, what else do you want to say

3    about any of the other cases that you are interested in?

4              **MR. KATZ:**  Well, we have motions to dismiss that are

5    pending, which Mr. Becker's going to argue.

6              **MR. CHANDLER:**  May I be heard on the vacatur

7    question?

8              **THE COURT:**  Let me just hear their whole pitch, and

9    then we'll see.

10             **MR. BECKER:**  So the motions to dismiss, those are

11   pretty simple.  The first two motions, or -- the original cases

12   that did not name Kelora, there's no standing for those cases,

13   and that can't be fixed.  So there's no choice, I believe, in

14   that, and that they have to be dismissed.

15             **THE COURT:**  Which ones are those, now?  4947, or --

16             **MR. BECKER:**  I think it's 5106 and 5108.

17             **MR. CHANDLER:**  That's incorrect.

18             **THE COURT:**  Probably 811 has to be dismissed, I

19   guess.  If I were to vacate the judgment in 811, I would have

20   to dismiss it.

21             **MR. BECKER:**  That's right.

22             **THE COURT:**  Is that what you're saying?

23             **MR. HANSEN:**  And the entirety of case 10-4947 should

24   be dismissed, because there was no jurisdiction at the

25   inception of that suit.

1      **MR. BECKER:**  At the time that suit was filed, the

2    party that they sued had no right to sue on the patent, and

3    therefore, there's no jurisdiction on that party, and that

4    can't be cured by an amendment.

5          **THE COURT:**  I'm not sure about that, if it were

6    amended before you moved to dismiss it, which it was, but go

7    ahead.

8          **MR. BECKER:**  I think that that sums up --

9          **THE COURT:**  That's it?

10         **MR. BECKER:**  Um-hum.

11         **THE COURT:**  Okay.  So what did you want to say about

12   any of this?

13         **MR. CHANDLER:**  Well, if you have any questions, I

14   can respond to those in particular.  I think your last comment

15   was the correct one; a motion to dismiss that, under the

16   *ConnectU* case, we amended before there was any activity, and

17   therefore, the amendment supersedes the original complaint, and

18   therefore, you look at jurisdiction as alleged in the amended

19   complaint.

20         On the vacatur question, I mean, why does PartsRiver

21   want to vacate?  Because PartsRiver and Kelora are working

22   together.  PartsRiver is trying to help Kelora, so that Kelora

23   can go out and re-litigate these patents that were previously

24   found invalid.  Kelora knows that there's this on-sale bar

25   problem.  Whether it's anticipation or obviousness, it's a big

1   problem for the validity of that patent.  Kelora has named many

2   defendants across the country.  It puts those defendants to the

3   burden and expense of trying to re-litigate what this Court has

4   already decided, and that creates a settlement opportunity for

5   them to go out and demand licenses from all of those

6   defendants, use those licenses to come build up their war chest

7   and come after my clients.

8           I mean, that's what this is really about, and it's

9   important for us to preserve the judgment, because again, the

10  issues of whether there was an on-sale -- whether there was a

11  commercial offer for sale, whether it was ready for patenting,

12  whether there's experimental use, that's been decided.  There's

13  nothing that's changed in the reexam that will affect those

14  decisions.  There's no reasons for the parties to re-litigate

15  those issues, which were heavily contested before, had been

16  decided.

17          They could have appealed that.  There was nothing

18  that we did that mooted that appeal.  They had the appeal, they

19  waited until the eve of oral argument, they read our brief in

20  the Federal Circuit, and then on the eve of oral argument, they

21  went and said, "No, we don't want to argue this, you know,

22  withdraw the appeal, and vacate the judgment, so we can start

23  all over again."

24          **THE COURT:**  What do you suppose would have happened

25  had they not done that?

1        **MR. CHANDLER:**  Well, their position is, again, that

2    the claims are the same, and that therefore --

3        **THE COURT:**  Let's say they didn't withdraw the

4    appeal in the Federal Circuit.  What would have happened?

5    They're saying, "Oh, don't -- you can't hold us to this, we

6    didn't have our chance to appeal."  I'll ask them this again

7    too, but it was they who technically withdrew the appeal, so

8    I'm wondering what would have happened had they not withdrawn

9    the appeal and gone to the Federal Circuit and said, "We think

10   this is wrong, we still want to appeal, throw this out."

11       **MR. CHANDLER:**  They were entitled to do that.  They

12   didn't.  I mean, they --

13       **THE COURT:**  What would the Federal Circuit have done

14   with that, do you suppose?

15       **MR. CHANDLER:**  I think if the look at the Federal

16   Circuit's opinion, they recognize that there's ongoing

17   litigation, which was one of the points that the Federal

18   Circuit noted in its opinion, that plaintiff had not said that

19   there's no more litigation on these patents.  The Federal

20   Circuit would recognize that this Court's judgment was still a

21   relevant dispute between the parties and there was no reason to

22   avoid the appeal.  They could have pressed forward with their

23   appeal.

24       There's no reason for us to be talking

25   hypotheticals.  If they were interested in the appeal, they had

1    every opportunity to pursue it and raise that question with the

2    Federal Circuit.

3              **MR. BECKER:**  Your Honor, may I comment on that?

4              **THE COURT:**  Let me just see if they....

5              Is that everything you had to say on any of the

6    pending motions?

7              **MR. CHANDLER:**  The most important point for vacatur

8    is whether the losing party took any voluntary action, and they

9    took the voluntary action of amending their claims and then

10   voluntarily withdrawing their appeal.  Neither one of those

11   actions was required.  They did not have to amend those claims.

12   They could have continued to appeal those claims, as they were

13   actually doing at the time the amendments were made.  So they

14   made two voluntary actions.  They were strategically timed on

15   the eve of oral argument.

16             I think it's important to recognize, this

17   reexamination, the only thing they point to that defendants did

18   was file a reexamination in 2008.  After that point in time,

19   there was no involvement that the defendants had in the

20   reexamination.  Reexaminations are ex parte.  Only the

21   plaintiff is allowed to make amendments.  Only a patent owner

22   is allowed to make amendments during reexamination.

23             So after 2008, there was nothing that the defendants

24   either did, or could have done, during the reexamination.

25             Furthermore, the final rejection in the

1    reexamination, that took place before the summary judgment

2    motion was even heard.  So if they wanted to argued that there

3    was some mootness issue, they could have raised that at the

4    summary judgment hearing.

5            They never raised that, they never tried to stay

6    this case, they never tried to do anything in this court until,

7    or -- with respect to the summary judgment until after the

8    appeal had been filed, after they'd filed their appellate brief

9    with the Federal Circuit, after they had read our brief, and

10   then, on the eve of oral arguments, then they suddenly

11   voluntarily amend their claims, voluntarily withdraw the

12   appeal, and that's exactly the type of conduct that the Supreme

13   Court has said disentitles you to vacatur.

14           **MR. BECKER:**  Can I be heard on that, your Honor?

15           **THE COURT:**  Yes.

16           **MR. BECKER:**  First of all, there absolutely is

17   nothing voluntarily about the actions of PartsRiver in that

18   proceeding.  They were thrown into reexamination, they did not

19   want to be there, and they were not a willing participant.

20           The result of a reexamination, if you don't

21   participate, is that your claims are canceled.  It's not a

22   situation where you're amending at your leisure.  Prosecution

23   on the merits is reopened.  PartsRiver fought against the

24   examiner for a very long period and actually filed an appeal in

25   the Patent Office, and the examiner would not budge.

1    PartsRiver was facing cancellation of its claims, and finally,

2    amended the claims as an act of prosecution.

3           It would not be in prosecution had it not been for

4    the defendants that sent PartsRiver into reexamination.  It was

5    by no means voluntary.  They fought it as much as they could.

6           As to the appeal, what would have happened on the

7    appeal is that the Fed Circuit would have dismissed it.  We had

8    an obligation to bring it to the Federal Circuit's attention

9    that the case had become moot.  The appeal had become moot,

10   because the claims at issue no longer existed.  We did not

11   voluntarily withdraw our appeal.  It was dismissed as moot.

12   That's what the Federal Circuit order says.  And then it was

13   sent back to the Court.

14          **THE COURT:**  You're saying it really isn't moot,

15   because it really now matters and it should be vacated.  So

16   what if you had said to the Federal Circuit, "We are in

17   reexamination, we've amended the claims, but we still want a

18   ruling on this because we think it may apply to our new claims,

19   and we think it's wrong and we want it reversed," and maybe

20   they would have thrown it out if you had told them that, but

21   that isn't what you told them.  You just said, "We want to

22   voluntarily dismiss this as moot."

23          **MR. BECKER:**  I think we said, we think the case is

24   moot, and the Court agreed and dismissed it.  I don't see how

25   you can continue to fight a moot action.

1        As to the timing, PartsRiver was waiting for a

2    reexamination certificate from the PTO.  It wasn't reading

3    plaintiff's brief and timing things.  They would have done this

4    much, much earlier because the patent has very little life left

5    on it, and therefore, it would have done earlier if it could

6    have, but it couldn't.

7        **THE COURT:**  Okay.  Well, I'm inclined not to vacate

8    the judgment and not to dismiss the 4947 case, but I'm going to

9    give that a little more thought, but it doesn't really matter

10   in terms of case management and pressing forward at this point;

11   and we wouldn't be dismissing the other claims, we would be

12   consolidating them all into the 4947.

13       So let's go ahead and do the case management

14   conference.

15       **MR. CHANDLER:**  The threshold issue, your Honor, in

16   the case management --

17       **THE COURT:**  Yeah, well, that's all about whether you

18   needed early motion on this intervening rights claim or not.

19       **MR. CHANDLER:**  And to be clear, it's section 252

20   which has -- it's not just intervening rights.  The intervening

21   rights is an issue that has some factual components.

22       The threshold issue, which is the only issue that we

23   would raise and is purely a question of law, is whether the

24   scope of the claims have changed, and it's either one or the

25   other.  Either the new claims are the same, or they're

```
 1   different, and it's a relatively easy question, and to be

 2   honest, I believe that if we were to file this motion, that

 3   would force Kelora to take a position.  They would take a

 4   position, and then I think the parties may be able to agree on

 5   that, because I have a feeling that they're not going to want

 6   to argue that the claims are identical, because if they're

 7   identical, then they're invalid for all the reasons that this

 8   Court has already found.

 9             So we want to file an early summary judgment motion

10   to force this issue to force them to take a position.  I think

11   the position they'll take is that the claims are different in

12   scope, and if that's true, it has a very big impact on

13   discovery, because if you -- if the scope of the claims has

14   changed, then our section 252, there's no infringement before

15   the reexamination certificate issued in late 2010.

16             Otherwise, their position --

17             THE COURT:  -- more important to --

18             MR. CHANDLER:  Exactly.  No damages, no

19   infringement, and there really is no reason for discovery into

20   all those accused products going back six years.  That's the

21   reason we want to get this raised to the threshold, because

22   there's a big impact on practical matters, like the scope of

23   discovery and also, I mean, settlement value.  We've got a

24   mediation with Infante coming up.

25             THE COURT:  And did you say there's been a motion to
```

1  transfer filed in Wisconsin?

2          **MR. CHANDLER:**  Yeah, the last brief was filed

3  earlier this week.

4          **THE COURT:**  Is it set for hearing or just under

5  submission?

6          **MR. CHANDLER:**  I believe they do it on the papers in

7  Wisconsin.

8          **THE COURT:**  Who is it in front of?

9          **MR. CHANDLER:**  Judge Crabb.

10         **MR. BECKER:**  That's correct.

11         **THE COURT:**  And do you have any past history to have

12  an idea of when we would know best?  She's a hard working

13  judge.

14         **MR. CHANDLER:**  Yeah, I'm ashamed to admit that --

15         **THE COURT:**  She's a senior judge, but --

16         **MR. CHANDLER:**  She's pretty quick.  Judge Crabb

17  transferred me pretty quickly --

18         **MR. LEVENTHAL:**  Your Honor, Daniel Leventhal.  We

19  represent several of the defendants in that case, and we had

20  our initial case management telephone conference two weeks ago,

21  I believe, and Magistrate Judge Crocker at that time said he

22  would be looking at the order, when the last brief was

23  submitted, which is Monday.  So we would expect two, three,

24  four weeks, and what he did say, he would have it on the

25  papers.

1          **THE COURT:**  Okay.  Well, if you want to just address

2     that specific question about the timing of the motion for

3     summary judgment --

4          **MR. BECKER:**  Sure.  I don't see how it's going to

5     save the Court and the parties any time or money.  All of the

6     issues that he's seeking to eliminate from the case, even if

7     he's right -- and I think he's completely wrong -- are still

8     going to be the subject of discovery.  The products that they

9     have today were made in the past.  It's true that if everything

10    he says is right, there could be a cutoff as to damages, but

11    it's just a cutoff.  We're still going to have damages

12    discovery, we're still going to take our depositions, we're

13    still going to have interrogatories and discovery requests.  At

14    most, it's going to cut off damages.  It won't cut off any

15    discovery.

16          And I also disagree that --

17          **THE COURT:**  Well, it will affect the settlement

18    value of the case.

19          **MR. BECKER:**  Well, it could, but it's not -- it's

20    certainly not going to be the dramatic change that they think

21    lit will be.

22          In addition, it's simply not true that it's a binary

23    choice:  Either the claims are invalid or there's no

24    intervening rights.  That's simply not the case.  The claims

25    that are in the case now are -- everybody agrees there are

1    different words in them, so they're different.  They have to be

2    construed and they have to be construed against the whole file

3    history, not just the new file history, but what happened

4    before and what happened since then.

5            Once those are construed, then we'll have to

6    determine whether there's an on-sale bar, and we'll also have

7    to determine whether those claims, as the Court construes them,

8    are, quote, "substantially identical" to what was there before,

9    and there's a whole body of case law as to what that means with

10   respect to intervening rights.

11           And even if all of that happens, there's still the

12   issue of whether plaintiff is entitled to intervening rights,

13   because intervening rights really doesn't apply to a party in

14   their position.

15           **THE COURT:**  Did I construe the claims before?

16           **MR. BECKER:**  Part of our appeal was that we believe

17   that they were not fully construed.

18           **THE COURT:**  Okay, but there was a claim construction

19   motion and I decided it?

20           **MR. BECKER:**  No, there was not.

21           **THE COURT:**  There wasn't.

22           **MR. BECKER:**  No.

23           **THE COURT:**  Oh.  Okay.  Well, all right.  We'll do

24   the case scheduling order.  I don't....

25           Nicky, do they have the order?

1        **THE CLERK:**  Yes, they have it in the podium.

2        **THE COURT:**  If you want to reach under the podium

3   and get a scheduling order, you can fill in the dates as we set

4   them.  Attached to it you'll find the order for pretrial

5   preparation, which will tell you the paperwork that needs to be

6   filed in advance of the pretrial conference.  You'll get

7   another copy through e-filing.

8        For alternative dispute resolution, you've already

9   agreed on a settlement conference with Judge Infante, did you

10  say?

11       **MR. CHANDLER:**  Correct.

12       **THE COURT:**  And you have a date for that of...?

13       **MR. CHANDLER:**  Late April, we agreed to a May 31st

14  cutoff.

15       **THE COURT:**  Okay, so May 31st cutoff.

16       Adding additional parties or claims, I don't want to

17  wait until September 16th, because too much water will have

18  gone under the bridge by that time.  So why don't we just say

19  30 days from today --

20       **THE CLERK:**  April 18th, your Honor.

21       **THE COURT:**  -- April 18th to add additional parties

22  or claims.  If something happens that you didn't know about at

23  this point and you need later to move for leave to amend for

24  some reason that you couldn't have raised right now, then you

25  can always do that.

1      **MR. BECKER:**  Okay.

2      **THE COURT:**  These disputes about the document

3   searches and metadata and so on, I don't really want to try to

4   resolve those today.  We do have a model order on the website.

5   I don't know if it addresses these points, but I guess if you

6   can't resolve them, I would refer you to a magistrate judge for

7   a discovery dispute over what the scope of your searches should

8   be, or you can take defendant's idea and wait until there's

9   actually some discovery requests on the table, and then decide

10  how -- what the scope of the search for them should be, rather

11  than trying to do it in advance.

12      **MR. CHANDLER:**  The parties had previously agreed on

13  something.  We thought that same agreement could apply.  We'll

14  try to work with them to come up with something, your Honor.

15      **THE COURT:**  Okay, and I guess I will let you file an

16  early summary judgment motion on the -- if you think there's

17  something that can be decided without claim construction and

18  without discovery that will be meaningful, I'll let you file

19  that, and if you can't respond to it because you need

20  discovery, then you'd have to comply with the Rule 56 -- they

21  call it (d) now -- explanation as to why you aren't able to

22  respond to it early.

23      **MR. BECKER:**  I can tell you right now that we would

24  definitely need discovery, because it's an equitable decision

25  based on their actual manufacturing activities before the date

1      of the reexamination certificate, and it's based on the

2      equities as to whether they should be able to continue

3      manufacturing and selling products.

4              This is a search engine, so it's not really a widget

5      case, which is what section 252 is designed to cover.  So there

6      will be a lot of factual discovery that would be involved in

7      that.

8              **THE COURT:**  Okay.  Well, if there are aspects of it

9      that don't involve facts, you're going to need to answer them,

10     and if there's the question of substantial identity and you

11     need to take a position on it, you're going to need to do that.

12     So if all that's missing is your decision as to what position

13     you're going to take, you're going to have to take one.

14             **MR. BECKER:**  With all due respect, I can't do that

15     until the claims are construed.  I don't know how I can say

16     there's substantial identity without knowing how they're

17     construed.

18             **THE COURT:**  Okay.  Well, then you could say -- you

19     could include that in your -- it wouldn't be a 56(d), it would

20     be -- I suppose your response could be, you think the claims

21     mean X, and if they mean X, then it's our position that we are

22     or are not substantially identical, whichever it is that you

23     want, and maybe I'll have to construe some claims in the course

24     of the motion.

25             **MR. BECKER:**  I think what would happen is I would

1    either put off the motion or accelerate claim construction.  I

2    don't know how we can have it partially.

3            THE COURT:  Well, it would accelerate claim

4    construction.  So if that's what you need, you can include that

5    in your response; only the ones that relate to the question of

6    whether it's substantially identical or not.

7            MR. BECKER:  I think all the claims are going to be

8    subject to this.

9            THE COURT:  All the claims are the same except the

10   one new phrase.

11           MR. BECKER:  That's not true.  There's also a brand

12   new claim.

13           THE COURT:  Okay.  Then the other problem with your

14   proposed schedule is that apart from this early motion that

15   I'll let you file, although I don't normally like to do that,

16   is that I do the claim construction and the case-dispositive

17   motions at the same time, in a single brief.

18           So you've got your schedule based on doing claim

19   construction first, and then going back and doing expert

20   discovery and then doing further case-dispositive motions.

21           MR. CHANDLER:  Both parties think it would be much

22   more efficient to have the expert reports after claim

23   construction, and we -- eBay and Microsoft certainly believe

24   that there are dispositive motions that both parties could file

25   at the time of claim construction.  But again, it's just easier

1    for the parties to have expert reports after they're submitted

2    on claim construction, even if the claim construction is later

3    in the case.

4              **THE COURT:**  Okay.  Well, then we'll put the claim

5    construction on the tracks of the case-dispositive motions, in

6    terms of timing, then.

7              **MR. CHANDLER:**  That's what we had proposed --

8              **MR. BECKER:**  I think it has to be.

9              **MR. CHANDLER:**  Yeah.  The parties also proposed -- I

10   mean, sometimes damages sort of issues unrelated to claim

11   construction may be subject to dispositive motions way at the

12   end of the case.

13             **THE COURT:**  Okay.  Well, I'll have two dates for

14   dispositive motions, but not more than two --

15             **MR. CHANDLER:**  Okay.

16             **THE COURT:**  -- so you can do this one early one --

17             **MR. CHANDLER:**  All right.

18             **THE COURT:**  -- and then everything else needs to be

19   done at one time, later on.  Don't be dribbling them in, at

20   will.

21             Getting back to discovery, though, I see where you

22   have a dispute about expanding the discovery.  I'm just going

23   to have to go by the Federal Rules, and if you're unable to

24   persuade them --

25             **MR. CHANDLER:**  We'll come back.

1          **THE COURT:**  -- that an exception should be made or

2     that additional discovery for both sides is necessary, then

3     you'll have to make a motion for more discovery and I'll refer

4     it to a Magistrate Judge.

5          You might try, even if they won't agree in the

6     abstract, try just telling them what the other discovery is

7     that you want to demonstrate its reasonableness and how likely

8     it is to be granted if you ask for it, and then perhaps you can

9     reach some sort of agreement at some point.  If it gets -- I

10    sort of don't like the way it's shaping up, and if it gets too

11    burdensome, I won't let a magistrate judge spend a lot of time

12    on it and I'll send you out to a special master who you can

13    both pay.  So I hope that you'll try to resolve your discovery

14    issues.

15          **MR. BECKER:**  I'm sure we can, your Honor.

16          **MR. CHANDLER:**  Yes.

17          **THE COURT:**  I don't usually do tutorials.  I'll ask

18    for one if I want one, but I don't think I'll need one in this

19    case.

20          I've never had a claim construction last four hours,

21    so I don't think this one will.  I deal with them as if they

22    were, basically, a motion for summary judgment.  They'll be on

23    a motion calendar on a Thursday afternoon, and we might have an

24    hour or so for it.  I don't take live testimony.  If I found

25    the need for live testimony, I'd put it over to some other

1    date.  There is a limit on the number of claims that can be

2    construed, in the Local Rules.

3              And as far as your dates, I actually didn't -- you

4    don't have firm -- well, I guess the defendants, or -- yeah,

5    the defendants have proposed firm dates for the

6    case-dispositive motions in March of 2012, and the plaintiffs

7    don't have any, because they're keying it off of other dates

8    that are keyed off of claim construction.  So I guess I could

9    just use the defendant's dates.  They're not all that far

10   apart, really.

11             **MR. CHANDLER:**  To be clear, we had a hearing date

12   for claim construction and dispositive motions of

13   September 15th, 2011.

14             **THE COURT:**  Well, you're filing them on March 15th.

15             **MR. CHANDLER:**  I think you're looking at -- as I

16   mentioned before, we had proposed that there may be these

17   damages issues at the end of the case.  That would be, I think,

18   March 2012.  But for claim construction and dispositive

19   motions --

20             **THE COURT:**  Oh, I see.

21             **MR. CHANDLER:**  -- we had September 15th, 2011.

22             **THE COURT:**  Oh, I see.  You were anticipating doing

23   all your dispositive motions at that point.

24             **MR. CHANDLER:**  All the ones that we could take care

25   of that turn on a claim construction, yeah, but -- and I

1    understand that your Honor only wants one round of disposition

2    motions, and if we only can have one round, we'll take it at

3    the same time as claim construction on September 15th, 2011.

4            **THE COURT:**  Before the expert discovery?

5            **MR. CHANDLER:**  If the clear enough that it should be

6    dispositive, our position would be, you don't need expert

7    discovery.  That's not uncommon.

8            **MR. BECKER:**  I would not agree to that.  If there's

9    only going to be one date, I think it has to be the normal end

10   date.

11           **THE COURT:**  Well, what were you planning on doing on

12   March 15th, just damages?

13           **MR. CHANDLER:**  Exactly, if there's anything sort of

14   unrelated to claim construction that would arise.

15           **THE COURT:**  Well, so if we're going to do claim

16   construction and dispositive motions after expert disclosures,

17   then when do you want to do it?

18           **MR. CHANDLER:**  I guess it would have to be --

19           **THE COURT:**  In March of 2012?  Do you want --

20           **MR. JONES:**  Your Honor, could we consult for a

21   moment?

22           **THE COURT:**  You want to go back to the drawing board

23   and see if you can agree on something, not that you know how

24   it's going to come out, or will you have as little luck at

25   agreeing on anything as you did already?

1            **MR. CHANDLER:**  I mean, in general, I think it would

2       be helpful to have a claim construction earlier in the case,

3       and we don't want to have this case dragged on.  I mean,

4       discovery is expensive.

5            **MR. BECKER:**  Your Honor, I think so many things key

6       off of claim construction that we should put a claim

7       construction in where it's noted.  We proposed October of 2011,

8       they propose September, and then have the dispositive motions

9       one time, later on.  If they want to bring this --

10           **THE COURT:**  But I'm not going to do that.  I'm going

11      to do them at the same time.  So the only question is, when do

12      you want that to be?

13           **MR. BECKER:**  So I would say, then, March of 2012.

14           **MR. CHANDLER:**  And we would say earlier, your Honor,

15      September 15th, 2011.  I mean the case -- the parties have been

16      litigating these patents, they have taken positions before.

17      There was actually claim construction positions taken before

18      the case was transferred here.  When this case arrived -- the

19      previous case arrived, it was at that point that the case was

20      going to go right into claim construction briefing, and the

21      only reason it didn't is because we immediately moved for

22      summary judgment.

23           **MR. BECKER:**  Your Honor, Kelora wasn't a part of any

24      of that, and the claims have now been reexamined.  There's a

25      new prosecution and new claims.  So we feel we're entitled to a

 1  full schedule, as any other party would be.

 2          **MR. CHANDLER:**  I mean, the date that was picked is

 3  pretty consistent with how it would work under the default

 4  normal Northern District rules.

 5          **THE COURT:**  Well, I'm just going to have to go

 6  through your respective things, and I don't want to do it right

 7  now because I have another case that's waiting for you.  So

 8  I'll just give you a scheduling order with all these dates.

 9          **MR. JONES:**  Your Honor, may I be heard for a moment?

10  Jordan Jones on behalf of Shopzilla.  I just wanted to alert

11  the Court.  Not knowing what dates you're going to select, I --

12          **THE COURT:**  Well, I'm going to try to make it end up

13  sooner than March of 2012, by tightening up the earlier dates.

14          **MR. CHANDLER:**  We've to some conflicts that I

15  think --

16          **MR. JONES:**  I have a trial date in the Eastern

17  District of Texas in October, and into November.  That's what I

18  wanted to alert the Court to, so there wasn't a conflict, if we

19  can avoid it.

20          I've got select a jury on November 7th, and then we

21  start our trial on November 14th, and I also have to be in

22  Texas on Thursday, October 20th, for a final pretrial

23  conference.  I'm trying to keep that window open, if we can

24  avoid it.

25          **THE COURT:**  In terms of what?

1          **MR. JONES:**  In terms of a claim construction, due to

2   the claim construction hearing.

3          **THE COURT:**  Well, what firm are you with?

4          **MR. JONES:**  I'm on my own at this point, your Honor.

5          **THE COURT:**  Well, I'm not sure I can avoid that.

6          **MR. JONES:**  Okay, we'll figure it out once we see

7   your order, but it's --

8          **THE COURT:**  All right.

9          **MR. CHANDLER:**  The September date is one that works

10  for all the parties, and I'd point out in the Wisconsin action,

11  Kelora asked for an early --

12         **THE COURT:**  September isn't going to work.  That's

13  going to be too soon.  I'm going to do the expert discovery

14  first.  So September isn't going to work.  It will be somewhere

15  between September and March, and it might have to be March, but

16  if I can tighten it up and make it, like, January or December

17  or something, I'll do that.  Or maybe you can agree on it.  If

18  you can agree on something, that would make it easier.  You

19  could send it in.

20         **MR. CHANDLER:**  I think we should try.

21         **MR. BECKER:**  We can try, sure.

22         **THE COURT:**  Okay.  Good.

23         **MR. CHANDLER:**  Thank you, your Honor.

24                                                      3:23 p.m.

25

## CERTIFICATE OF REPORTER

I, LEO T. MANKIEWICZ, a pro tem reporter in the United States Court, Northern District of California, and Certified Shorthand Reporter duly licensed in the State of California, hereby certify that the foregoing proceedings in Case Nos. C 09-00811 CW, C 10-04947 CW, C 10-05106 CW, C 10-05108 and C 11-00502 CW,  PartsRiver v. Shopzilla, et al.; eBay, Inc., et al., v. PartsRiver, Inc., et al.; eBay, Inc. v. PartsRiver, Inc., et al.; Microsoft Corporation v. PartsRiver, Inc., et al.; and Shopzilla, Inc. v. Kelora Systems, LLC, were reported by me, and were thereafter transcribed under my direction into typewriting; that the foregoing is a true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

Leo T. Mankiewicz, CSR 5297, RMR, CRR

Friday, March 18, 2011

# Exhibit 31

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PARTSRIVER, INC.,

      Plaintiff,

  v.

SHOPZILLA, INC.; YAHOO! INC.; EBAY
INC.; AND MICROSOFT CORPORATION,

      Defendants.

_____/

No. C 09-0811 CW

ORDER DENYING
PARTSRIVER, INC.'S
MOTION TO VACATE
JUDGMENT
(Docket No. 260)

SHOPZILLA, INC.; YAHOO! INC.; AND
MICROSOFT CORPORATION,

      Counterclaim-Plaintiffs,

  v.

PARTSRIVER, INC.,

      Counterclaim-Defendant.

_____/

United States District Court

For the Northern District of California

    Plaintiff and Counterclaim-Defendant PartsRiver, Inc., moves
to vacate the judgment in this action. Defendant eBay, Inc., and
Defendants and Counterclaim-Plaintiffs Shopzilla, Inc.; Yahoo!
Inc.; and Microsoft Corporation (collectively, Defendants) oppose
the motion. The motion was heard on March 17, 2011. Having
considered oral argument and the papers submitted by the parties,
the Court DENIES PartsRiver's motion.

BACKGROUND

    On October 3, 2007, PartsRiver initiated this action in the
Eastern District of Texas, alleging that Defendants infringe its
U.S. Patent No. 6,275,821 ('821 patent). In November, 2007,

United States District Court
For the Northern District of California

Defendants moved to transfer the action to this judicial district.

On October 28, 2008, while their motion to transfer was under submission, Defendants filed a request with the U.S. Patent and Trademark Office (PTO) for an *ex parte* reexamination of the '821 patent. Specifically, Defendants argued that reexamination of claims 1 and 2 of the '821 patent was necessary because they were anticipated and obvious based on prior art not cited or disclosed previously to the PTO. On December 22, 2009, the PTO granted Defendants' request for an *ex parte* reexamination.

On January 30, 2009, the Texas district court granted Defendants' motion to transfer venue.

On May 1, 2009, the PTO issued its first office action on the reexamination, indicating that claims 1 and 2 were subject to rejection based on anticipation by prior art. On June 18, 2009, the PTO issued a final office action rejecting claims 1 and 2.

Meanwhile, on May 28, 2009, Defendants moved for summary judgment of non-infringement and of invalidity based on the on-sale bar, 35 U.S.C. § 102(b). On August 21, 2009, the Court granted summary judgment in favor of Defendants, concluding that claims 1 and 2 were invalid based on the on-sale bar. On September 18, 2009, PartsRiver appealed this decision to the Federal Circuit.

On November 3, 2009, after two failed attempts to amend the '821 patent to avoid the PTO's finding of invalidity based on anticipation, PartsRiver appealed that decision to the Board of Patent Appeals and Interferences (BPAI). In the PTO's Answer to PartsRiver's appeal, the patent examiner suggested that limiting language PartsRiver added to another claim of the '821 patent, if

2

inserted into claim 1, could save it from invalidity. This amendment would also affect claim 2, which incorporated claim 1. On May 20, 2010, PartsRiver filed amendments to claim 1. In its submission to the PTO, PartsRiver stated,

> Claim 1 is now believed to reflect, albeit explicitly, the legal scope of claim 1 as previously invented. As such, although the text of claim 1 has been altered by amendment, the claim scope is legally identical to that of originally issued claim 1. This change in language has been adopted for the sole purpose of terminating the present reexamination to avoid lengthy appeal proceedings.

Hansen Decl., Ex. C., at 8. On June 24, 2010, the PTO issued, in light of PartsRiver's amendments, a notice of intent to issue a reexamination certificate. On November 2, 2010, the PTO issued a re-examination certificate, stating that claims 1 and 2 were patentable, as amended.

PartsRiver then asked the Federal Circuit to dismiss its appeal as moot because claims 1 and 2, as litigated in this Court, no longer exist. PartsRiver also moved the Federal Circuit to vacate this Court's judgment. Defendants did not oppose PartsRiver's motion to dismiss, but opposed its motion to vacate. The Federal Circuit granted PartsRiver's motion to dismiss its appeal and remanded to this Court the matter of whether judgment should be vacated.

DISCUSSION

"When a civil case becomes moot pending appellate adjudication, '[t]he established practice . . . in the federal system . . . is to reverse or vacate the judgment below and remand with a direction to dismiss.'" <u>Arizonans for Official English v.</u>

3

**United States District Court**
For the Northern District of California

_Arizona_, 520 U.S. 43, 71 (1997) (quoting _United States v._
_Munsingwear, Inc._, 340 U.S. 36, 39 (1950)).  To determine whether
vacatur is appropriate, a court considers primarily "whether the
party seeking relief from the judgment . . . caused the mootness by
voluntary action."  _U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship_,
513 U.S. 18, 24 (1994).  For instance, vacatur is required when a
controversy is rendered moot through "'happenstance,'" that is,
"'due to circumstances unattributable to any of the parties.'"
_Id._ at 23 (quoting _Karcher v. May_, 484 U.S. 72, 82, 83 (1987)).
Vacatur must also "be granted where mootness results from the
unilateral action of the party who prevailed in the lower court."
_U.S. Bancorp_, 513 U.S. at 23.

The parties' primary dispute in this motion is whether
mootness -- that is, the elimination of claims 1 and 2, as
presented in this litigation -- was caused by PartsRiver's
voluntary action.  PartsRiver maintains that Defendants' request
for an _ex parte_ reexamination of the '821 patent led to the
amendment of claims 1 and 2.  Defendants assert that PartsRiver's
actions in the reexamination proceeding were voluntary and, as a
result, vacatur is inappropriate.

It is true that Defendants precipitated the reexamination
proceedings.  However, Defendants' act could not render moot
PartsRiver's appeal, which had not yet been taken.  Indeed, at the
time Defendants petitioned for reexamination, this case was not
even before this Court.

By voluntarily amending claims 1 and 2 during reexamination,
PartsRiver gave up its right to appeal this Court's judgment.  The

4

**United States District Court**
For the Northern District of California

exercise of PartsRiver's volition can be seen in the positions it took before the PTO, the BPAI and the Federal Circuit. At the beginning of the reexamination, PartsRiver "believed that the '821 Patent was valid as issued." PartsRiver's Reply 4:4. When the examiner rejected PartsRiver's position, PartsRiver appealed to the BPAI. During the pendency of the appeal, PartsRiver changed course and agreed to amend the claims, albeit for the "purpose of terminating the present reexamination to avoid lengthy appeal proceedings" in the BPAI. Defs.' Opp'n Ex. 31, at 7. PartsRiver's appeal to the BPAI was then dismissed. Defendants' reexamination request did not compel PartsRiver to make the strategic decision in May 2010 to amend claims 1 and 2 "to avoid lengthy appeal proceedings." After the reexamination proceedings concluded, PartsRiver could have attempted to pursue its appeal before the Federal Circuit and insisted that its appeal was not moot. It could have asserted, as it did to the examiner, that the amended claims were "legally identical" to claims as published in the original '821 patent. <u>Id.</u> PartsRiver chose not to.

Even though it took action voluntarily, PartsRiver insists that the equities weigh in favor of vacatur, arguing that its amendments were intended to respond to the examiner's rejections, not the Court's summary judgment order. However, PartsRiver knew that, if it made such amendments, it could then attempt to vacate the Court's summary judgment order, as it has. Further, PartsRiver has disavowed any interest in the '821 patent, pointing to its assignment of the patent to Kelora Systems, LLC. Its lack of a stake in the '821 patent weighs against a conclusion that

United States District Court
For the Northern District of California

1   PartsRiver will suffer an inequitable result.

2       PartsRiver, by its own acts, circumvented appellate review of

3   the Court's judgment.  Thus, vacatur is not appropriate.  <u>Dilley v.</u>

4   <u>Gunn</u>, 64 F.3d 1365, 1372 (9th Cir. 1995).

5                              CONCLUSION

6       For the foregoing reasons, the Court DENIES PartsRiver's

7   motion to vacate the judgment.  (Docket No. 260.)

8       IT IS SO ORDERED.

9

10  Dated: April 21, 2011

11                              CLAUDIA WILKEN
                                United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              6

# Exhibit 32

**United States District Court**
For the Northern District of California

1           IN THE UNITED STATES DISTRICT COURT

2

3         FOR THE NORTHERN DISTRICT OF CALIFORNIA

4

5 EBAY INC. and MICROSOFT CORPORATION,    No. C 10-4947 CW

6         Plaintiffs,          ORDER GRANTING IN
                           PART AND DENYING IN
7    v.                    PART PARTSRIVER, INC.
                           AND KELORA SYSTEMS
8 PARTSRIVER, INC., and KELORA SYSTEMS,  LLC'S MOTION TO
  LLC,                       DISMISS
9         Defendants.         (Docket No. 17)
  _____/

10

11

12 EBAY INC.,                  No. C 10-5106 CW

13         Plaintiff,         ORDER GRANTING
                           PARTSRIVER, INC.'S
14    v.                    MOTION TO DISMISS
                           (Docket No. 22)
15 PARTSRIVER, INC., and KELORA SYSTEMS,
  LLC,

16

17         Defendants.
  _____/

18 MICROSOFT CORPORATION,         No. C 10-5108 CW

19         Plaintiff,         ORDER GRANTING
                           PARTSRIVER, INC.'S
20    v.                    MOTION TO DISMISS
                           (Docket No. 19)
21 PARTSRIVER, INC., and KELORA SYSTEMS,
  LLC,

22

23         Defendants.
  _____/

24

25     In these related cases, Plaintiffs eBay Inc. and Microsoft

26 Corporation seek declaratory judgments of non-infringement and

27 invalidity of U.S. Patent No. 6,275,821 ('821 patent). Defendants

28 PartsRiver, Inc., and Kelora Systems, LLC, move to dismiss Case No.

C 10-4947 CW (4947 action) in its entirety for lack of subject matter jurisdiction. PartsRiver, on its own, moves to dismiss the claims against it in Case Nos. C 10-5106 CW (5106 action) and 10-5108 CW (5108 action). eBay and Microsoft oppose the motions. The motions were heard on March 17, 2011. Having considered oral argument and the papers submitted by the parties, the Court GRANTS in part and DENIES in part PartsRiver and Kelora's motion to dismiss the 4947 action and GRANTS PartsRiver's motions to dismiss the claims brought against it in the 5106 and 5108 actions.

BACKGROUND

The three above-captioned cases and Shopzilla, Inc. v. Kelora Systems, LLC, Case No. C 11-0502 CW (0502 action), are related to PartsRiver, Inc. v. Shopzilla, Inc., Case No. C 09-0811 CW. However, PartsRiver is not named as a defendant in the 0502 action.

In PartsRiver, eBay, Microsoft and Shopzilla, Inc., counterclaimed for declarations of non-infringement and invalidity with regard to claims 1 and 2 of the '821 patent. The Court held that the claims were invalid based on the on-sale bar, 35 U.S.C. § 102(b). During the pendency of its appeal of the Court's judgment, PartsRiver proposed amendments to claims 1 and 2 in ex parte re-examination proceedings in the U.S. Patent and Trademark Office (PTO).

On November 2, 2010, the day before the Federal Circuit was to hold oral argument on PartsRiver's appeal, the PTO re-published the '821 patent, reflecting PartsRiver's amendments to claims 1 and 2. PartsRiver then moved to dismiss its appeal, asserting that the appeal was moot because the claims this Court held to be invalid no

United States District Court
For the Northern District of California

2

**United States District Court**
For the Northern District of California

1   longer existed.  The Federal Circuit granted PartsRiver's motion on

2   November 8, 2010, but left it to this Court to determine whether

3   vacatur was appropriate.

4       eBay and Microsoft filed the 4947 action on November 2, 2010,

5   seeking declarations that they do not infringe amended claims 1 and

6   2 of the '821 patent and that these claims are invalid.  eBay and

7   Microsoft also seek a declaration that amended claims 1 and 2 are

8   not legally identical to the scope of any of the original claims of

9   the '821 patent.  Originally, PartsRiver was the only named

10  Defendant.  On December 21, 2010, Plaintiffs filed an amended

11  complaint to add Kelora Systems, LLC, as a Defendant.

12      On November 10, 2010, eBay filed the 5106 action, which

13  involves the same claims brought in the 4947 action.  However, at

14  the time it filed the 5106 action, eBay asserted its claims against

15  PartsRiver and Kelora.  The same day, Microsoft filed the 5108

16  action, which also involves the same claims brought in the 4947

17  action.  Microsoft named PartsRiver and Kelora as Defendants in its

18  complaint in the 5108 action.  In the 5106 and 5108 actions, Kelora

19  has answered eBay's and Microsoft's respective complaints and has

20  counterclaimed for infringement of the '821 patent.

21      PartsRiver disavows any ownership or rights to the '821

22  patent.  It points to a patent assignment, effective October 11,

23  2010, which transferred ownership of the '821 patent, among others,

24  from PartsRiver to Kelora.  The assignment states,

25      [PartsRiver] hereby irrevocably assigns, transfers and
        sells, and confirms the assignment, transfer and sale, to
26      [Kelora] all of [PartsRiver's] rights, title and interest
        in and to the Patents, including without limitation all
27      inventions claimed or disclosed therein, any patents that

28                                  3

**United States District Court**
For the Northern District of California

> may issue from such patent applications, any foreign
> counterparts, patents, or patent applications to which
> any of the Patents claims priority, divisionals,
> continuations in whole or in part, substitutes,
> reexaminations, reissues or extensions, the right to
> claim priority to any of the preceding, all claims for
> damages or equitable remedies by reason of past
> infringements of any of the Patents, and the right to sue
> for and collect damages and seek all other remedies as
> may be available.

Hansen Decl., Ex. A, at 0635.  The patents were transferred

pursuant to the patent assignment and a "Contribution Agreement"

and "for and in consideration of the sum of One Dollar ($1.00) and

other good and valuable consideration."  Id.

LEGAL STANDARD

Subject matter jurisdiction is a threshold issue which goes to

the power of the court to hear the case.  Federal subject matter

jurisdiction must exist at the time the action is commenced.  GAF

Building Materials Corp. v. Elk Corp. of Dallas, 90 F.3d 479, 483

(Fed. Cir. 1996).  To sustain subject matter jurisdiction in the

declaratory judgment context, an "actual controversy" must exist.

Janssen Pharmaceutica, N.V. v. Apotex, Inc., 540 F.3d 1353, 1359

(Fed. Cir. 2008).  When such a controversy is lacking, dismissal is

appropriate under Rule 12(b)(1) because the district court lacks

subject matter jurisdiction over the claim.  Fed. R. Civ. P.

12(b)(1).

DISCUSSION

The Declaratory Judgment Act permits a federal court to

"declare the rights and other legal relations" of parties to "a

case of actual controversy."  28 U.S.C. § 2201.  The "actual

controversy" requirement of the Act is the same as the "case or

4

**United States District Court**
For the Northern District of California

controversy" requirement of Article III of the United States Constitution. <u>Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.</u>, 482 F.3d 1330, 1337 (Fed. Cir. 2007). Exercise of declaratory judgment jurisdiction is discretionary. <u>Cat Tech LLC v. TubeMaster, Inc.</u>, 528 F.3d 871, 883 (Fed. Cir. 2008).

Once jurisdiction is challenged, the "burden is on the party claiming declaratory judgment jurisdiction to establish that such jurisdiction existed at the time the claim for declaratory relief was filed and that it has continued since." <u>Benitec Australia, Ltd. v. Nucleonics, Inc.</u>, 495 F.3d 1340, 1344 (Fed. Cir. 2007). In cases implicating federal question jurisdiction, when "a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." <u>Rockwell Int'l Corp. v. United States</u>, 549 U.S. 457, 473 (2007); <u>see also</u> <u>Connectu LLC v. Zuckerberg</u>, 522 F.3d 82, 91 (1st Cir. 2008). Although "later events may not create jurisdiction where none existed at the time of filing, the proper focus in determining jurisdiction are the facts existing at the time the complaint <u>under consideration</u> was filed." <u>Prasco, LLC v. Medicis Pharm. Corp.</u>, 537 F.3d 1329, 1337 (Fed. Cir. 2008) (citation and quotation and editing marks omitted; emphasis in original).

PartsRiver's motions to dismiss for lack of subject matter jurisdiction are both based on the same argument: because it no longer has any rights to the '821 patent, it lacks standing to bring an infringement suit against eBay and Microsoft and, therefore, eBay and Microsoft cannot maintain their declaratory

5

judgment actions regarding the '821 patent against it. PartsRiver proffers the October 11, 2010 patent assignment, which transfers all rights to the '821 patent to Kelora.

eBay and Microsoft do not have an actual controversy with PartsRiver. They offer no evidence suggesting that PartsRiver may, notwithstanding the assignment, bring a patent infringement action based on the '821 patent. Further, eBay and Microsoft have not justified their request for jurisdictional discovery into the relationship between PartsRiver and Kelora. Even if the two entities were connected, such a link would not enable PartsRiver to sue for infringement of the '821 patent. PartsRiver has repudiated, through its representations before the PTO and this Court, any rights to the '821 patent, including the right to bring an infringement lawsuit. Accordingly, the Court grants PartsRiver's motions to dismiss the claims against it in the 5106 and 5108 actions. In addition, PartsRiver and Kelora's motion to dismiss in the 4947 action must be granted, to the extent it seeks dismissal of the claims against PartsRiver in that case.

PartsRiver and Kelora's motion, however, also seeks dismissal of the 4947 action in its entirety. They assert that, because PartsRiver was the only Defendant named in the original complaint, the Court lacked subject matter jurisdiction over that action at the time it was filed. However, eBay and Microsoft amended their complaint to name Kelora as a Defendant, with which they had an actual controversy at the time they initiated the 4947 action. Subject matter jurisdiction "'depends on the state of things at the time of the action brought.'" Rockwell, 549 U.S. at 473 (quoting

6

United States District Court
For the Northern District of California

1  *Mullan v. Torrance*, 9 Wheat. 537, 539 (1824)). As the *Rockwell*

2  Court noted, "The state of things and the originally alleged state

3  of things are not synonymous." 549 U.S. at 473. Neither

4  PartsRiver nor Kelora dispute that eBay and Microsoft had an actual

5  controversy with Kelora at the time the 4947 action was filed.

6  Thus, that eBay and Microsoft named Kelora in their Amended

7  Complaint and not in their original pleading does not require

8  dismissal of the 4947 action for lack of subject matter

9  jurisdiction. *See* *id.* 549 U.S. at 473.

10     PartsRiver and Kelora cite *Schreiber Foods, Inc. v. Beatrice*

11 *Cheese, Inc.*, 402 F.3d 1198 (Fed. Cir. 2005), and *Enzo APA & Son,*

12 *Inc. v. Geapaq A.G.*, 134 F.3d 1090 (Fed. Cir. 1998), neither of

13 which addressed the issue here. *Schreiber* was a coercive action

14 brought by the patentee, not a declaratory judgment action. 402

15 F.3d at 1200-01. Thus, the inquiry there was whether the plaintiff

16 patentee had a right to sue for infringement at the time the

17 lawsuit was filed. *Id.* at 1203. In *Enzo*, the Federal Circuit

18 determined that the declaratory judgment defendant lacked standing

19 to sue for patent infringement at the time the action was filed.

20 134 F.3d at 1094. Because the actual patentee was never joined,

21 the court concluded that the court lacked jurisdiction over the

22 declaratory judgment action. *Id.* ("Having found Geapag to be

23 without standing for failing to join the patentee, it follows that

24 the court lacks jurisdiction over Enzo's declaratory judgment

25 claims under Fed. R. Civ. P. 19 for nonjoinder."). Here, eBay and

26 Microsoft had an actual controversy concerning the '821 patent at

27 the time they filed the 4947 action and they have named Kelora, the

28                                                    7

**United States District Court**
For the Northern District of California

1  current holder of the '821 patent, as a Defendant.

2      Accordingly, PartsRiver and Kelora's motion is denied, to the

3  extent that they seek dismissal of the 4947 action in its entirety.

4                              CONCLUSION

5      For the foregoing reasons, the Court GRANTS in part and DENIES

6  in part PartsRiver and Kelora's motion to dismiss the 4947 action

7  (Case No. C 10-4947 CW, Docket No. 17).  eBay and Microsoft's

8  claims against PartsRiver in the 4947 action are dismissed for lack

9  of subject matter jurisdiction.  However, the 4947 action is not

10  dismissed in its entirety; the claims against Kelora remain.  The

11  Court GRANTS PartsRiver's motions to dismiss the claims against it

12  in the 5106 (Case No. C 10-5106 CW, Docket No. 22) and 5108 actions

13  (Case No. C 10-5108 CW, Docket No. 19).  eBay's and Microsoft's

14  claims against PartsRiver in the 5106 and 5108 actions are

15  dismissed for lack of subject matter jurisdiction.

16      Within fourteen days of the date of this Order, Kelora shall

17  answer eBay and Microsoft's complaint in the 4947 action.

18      IT IS SO ORDERED.

19

20  Dated: 4/21/2011

21                              CLAUDIA WILKEN
                               United States District Judge

22

23

24

25

26

27

28
                                   8

# Exhibit 33

1   [JOINT FILING — SEE SIGNATURE PAGE FOR COUNSEL]

2

3

4

5

6

7                     UNITED STATES DISTRICT COURT

8                NORTHERN DISTRICT OF CALIFORNIA

9                       OAKLAND DIVISION

10

| | |
|---|---|
| 11   eBay Inc. and Microsoft Corporation,   ) | No. 4:10-cv-4947-CW (filed Nov. 2, 2010) |
| 12                 ) | No. 4:10-cv-5106-CW (filed Nov. 10, 2010) |
|       *Plaintiffs and Counterclaim-Defendants,*   ) | No. 4:10-cv-5108-CW (filed Nov. 10, 2010) |
| 13                 ) | No. 4:11-cv-0502-CW (filed Feb. 2, 2011) |
|     vs.   ) | |
| 14               ) | **JOINT STIPULATION AND ORDER** |
|   PartsRiver, Inc. and Kelora Systems, LLC,   ) | **REGARDING CASE SCHEDULE** |
| 15               ) | |
|       *Defendants and Counterclaim-Plaintiff.*   ) | |
| 16               ) | |
| 17   Shopzilla, Inc.,   ) | **[Civil L.R. 6-2 and 7-12]** |
|           ) | |
| 18       *Plaintiff,*   ) | |
| 19     vs.   ) | |
| 20   Kelora Systems, LLC,   ) | |
| 21       *Defendant.*   ) | |
| 22            ) | |

23

24

25

26

27

28

The Court held an Initial Case Management Conference for these four actions on March 17, 2011. Rather than set a schedule for these four actions, the Court encouraged the parties to meet and confer in an effort to reach agreement on a schedule for each action. The parties have met and conferred and have reached agreement on the following deadlines:

| Description | Kelora's Proposal | Plaintiffs' Proposal |
|---|---|---|
| Deadline for joining parties and amending pleadings | 21 days from Court's decision on the motions to dismiss heard on 3/17 | |
| Disclosure of Asserted Claims and Infringement Contentions (Patent L.R. 3-1)<br><br>Document Production Accompanying Disclosure (Patent L.R. 3-2) | Thursday<br>May 12, 2011 | |
| Invalidity Contentions (Patent L.R. 3-3)<br><br>Document Production Accompanying Invalidity Contentions (Patent L.R. 3-4) | Tuesday<br>June 28, 2011 | |
| Exchange of Proposed Terms for Construction (Patent L.R. 4-1) | Thursday<br>July 14, 2011 | |
| Exchange of Preliminary Claim Constructions and Extrinsic Evidence (Patent L.R. 4-2) | Thursday<br>August 4, 2011 | |
| Joint Claim Construction and Prehearing Statement (Patent L.R. 4-3) | Thursday<br>August 25, 2011 | |
| Completion of Claim Construction Discovery (Patent L.R. 4-4) | Friday<br>September 2, 2011 | |
| DJ Plaintiffs to file opening brief re: claim construction and any dispositive motions related to claim construction (contained within a single 25-page brief) | Thursday<br>September 15, 2011 | |
| DJ Defendant(s)' opposition and any cross-motion contained within a single brief | Thursday<br>October 6, 2011 | |
| DJ Plaintiffs' reply / opposition to cross-motion (contained within a single brief) | Thursday<br>October 27, 2011 | |

| Description | Kelora's Proposal | Plaintiffs' Proposal |
|---|---|---|
| DJ Defendant(s)' surreply | Thursday<br>November 3, 2011,<br>by DJ Defendants ||
| Hearing on claim construction and related dispositive motions | Thursday<br>November 17, 2011<br>2:00 p.m. ||
| Completion of Fact Discovery | Friday<br>February 3, 2012 ||
| DJ Plaintiffs to produce or make available opinion of counsel and related documents relied upon as defense to willful infringement, etc. (Patent L.R. 3-7) | 50 days after Claim Construction Order ||
| Disclosure of identities and reports of expert witnesses | 50 days after Claim Construction Order ||
| Rebuttal expert reports | 21 days after<br>opening reports ||
| Completion of Expert Discovery | 49 days after opening reports ||
| Case Management Conference to finalize schedule(s) for trial(s) | Tuesday<br>April 10, 2012,<br>2:00 p.m. ||
| Parties to exchange (but not file or lodge) the papers described in Civil L.R. 16-10(b) (7), (8), (9), and (10), and their motions in limine<br><br>(Standing Order for Pretrial Preparation, ¶ 1) | 30+ days before final pretrial conference ||
| Deadline to meet and confer regarding Pretrial Conference Statement<br><br>(Standing Order for Pretrial Preparation, ¶ 2) | 21 days before final pretrial conference ||
| File Joint Pretrial Conference Statement, exhibit list and objections, witness list, discovery responses, trial briefs, motions in limine, joint proposed voir dire, joint proposed jury instructions, and proposed verdict forms<br><br>(Standing Order for Pretrial Preparation, ¶ 3) | 14 days before final pretrial conference ||

| Description | Kelora's Proposal | Plaintiffs' Proposal |
|---|---|---|
| Final Pretrial Conference | 14 days before trial | |
| Trial(s) | 10 days of trial(s) beginning July 16, 2012 (with the format of the trial(s) to be determined at the CMC on April 10, 2012) | |

Although the Court indicated during the March 17, 2011 Case Management Conference that it was inclined to have expert discovery before claim construction, both parties agree that it is more efficient to have expert reports after claim construction. The Court previously granted the parties' request to have expert discovery after claim construction in the original matter. *See* Case No. 09-0811, Docket No. 232; Ex. A at 1-2.

The only previous time modification for these cases was to continue their CMCs to March 17, 2011. The schedules for each of these cases have yet to be fully set by the Court, and the requested changes to the case schedules will have no significant effect on those dates already scheduled by the Court.

In addition, in accordance with the Court's instructions during the March 17, 2011, Case Management Conference, Kelora advises the Court that Kelora produced to Plaintiffs' counsel on March 23, 2011, copies of agreements that relate to the ownership and/or rights with respect to the '821 patent as between PartsRiver and Kelora.

1    IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

2

3

4 Dated: April 19, 2011      By: /s/ Robert D. Becker

5               Robert D. Becker (Bar No. 160648)
                 <rbecker@manatt.com>
6               Ronald S. Katz (Bar No. 85713)
                 <rkatz@manatt.com>
7               Shawn G. Hansen (Bar No. 197033)
                 <shansen@manatt.com>
8               MANATT, PHELPS & PHILLIPS, LLP
               1001 Page Mill Road, Building 2
9               Palo Alto, CA 94304-1006
               Telephone: (650) 812-1300
10              Facsimile: (650) 213-0260

11              *Counsel for PartsRiver, Inc. and Kelora*
               *Systems, LLC*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: April 19, 2011                    By: /s/ Marc R. Ascolese

David T. Pritikin (*pro hac vice*)
   <dpritikin@sidley.com>
Richard A. Cederoth (*pro hac vice*)
   <rcederoth@sidley.com>
SIDLEY AUSTIN LLP
One S. Dearborn Street
Chicago, Illinois  60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036

Theodore W. Chandler (Bar No. 219456)
   <tchandler@sidley.com>
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California  90013
Telephone:    (213) 896-6000
Facsimile:    (213) 896-6600

Marc R. Ascolese (Bar No. 251397)
   <mascolese@sidley.com>
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, California  94104
Telephone:    (415) 772-1200
Facsimile:    (415) 772-7400

<Kelora-Microsoft-eBay@sidley.com>

David E. Killough (Bar No. 110719)
   <davkill@microsoft.com>
MICROSOFT CORPORATION
One Microsoft Way, 8/2076
Redmond, Washington  98052
Telephone:    (425) 703-8865
Facsimile:    (425) 869-1327

*Counsel for Microsoft Corporation*

1

2    Dated: April 19, 2011                    By: /s/ Marc R. Ascolese

3                                             David T. Pritikin (*pro hac vice*)
                                                  <dpritikin@sidley.com>
4                                             Richard A. Cederoth (*pro hac vice*)
                                                  <rcederoth@sidley.com>
5                                             SIDLEY AUSTIN LLP
                                              One S. Dearborn Street
6                                             Chicago, Illinois  60603
                                              Telephone:    (312) 853-7000
7                                             Facsimile:     (312) 853-7036

8                                             Theodore W. Chandler (Bar No. 219456)
                                                  <tchandler@sidley.com>
9                                             SIDLEY AUSTIN LLP
                                              555 West Fifth Street, Suite 4000
10                                            Los Angeles, California  90013
                                              Telephone:    (213) 896-6000
11                                            Facsimile:     (213) 896-6600

12                                            Marc R. Ascolese (Bar No. 251397)
                                                  <mascolese@sidley.com>
13                                            SIDLEY AUSTIN LLP
                                              555 California Street, Suite 2000
14                                            San Francisco, California  94104
                                              Telephone:    (415) 772-1200
15                                            Facsimile:     (415) 772-7400

16                                            <Kelora-Microsoft-eBay@sidley.com>

17                                            *Counsel for eBay Inc.*

18

19

20

21

22

23

24

25

26

27

28

Dated: April 19, 2011         By:   /s/ Jordan Trent Jones

Jordan Trent Jones (Bar No. 166600)
<jtjones@jordanjonesiplaw.com>
Law Offices of Jordan Trent Jones
100 Spear Street, 18th Floor
San Francisco, CA 94105
Telephone:     (415) 357-8940
Facsimile:      (415) 371-0500

James G. Gilliland Jr. (Bar No. 107988)
<jgilliland@kilpatricktownsend.com>
KILPATRICK TOWNSEND & STOCKTON LLP
Two Embarcadero Center, Eighth Floor
San Francisco, California 94111
Telephone:     (415) 576-0200
Facsimile:      (415) 576-0300

Eric M. Hutchins (Bar No. 245462)
<ehutchins@kilpatricktownsend.com>
Hogene L. Choi (Bar No. 256617)
<hchoi@kilpatricktownsend.com>
379 Lytton Avenue
Palo Alto, CA 94301
Telephone:     (650) 326-2400
Facsimile:      (650) 326-2422

*Counsel for Shopzilla, Inc.*

**SIGNATURE ATTESTATION**

Pursuant to General Order No. 45(X)(B), I hereby certify that concurrence in the filing of this document has been obtained from each of the other signatories shown above.

                                              _____/s/ Marc R. Ascolese_____

## SCHEDULING ORDER

IT IS HEREBY ORDERED that the following schedule shall apply to Civil Action Nos. 4:10-cv-4947-CW, 4:10-cv-5106-CW, 4:10-cv-5108-CW, and 4:11-cv-00502-CW:

| Description | Kelora's Proposal | Plaintiffs' Proposal |
|---|---|---|
| Deadline for joining parties and amending pleadings | 21 days from Court's decision on the motions to dismiss heard on 3/17 | |
| Disclosure of Asserted Claims and Infringement Contentions (Patent L.R. 3-1)<br><br>Document Production Accompanying Disclosure (Patent L.R. 3-2) | Thursday<br>May 12, 2011 | |
| Invalidity Contentions (Patent L.R. 3-3)<br><br>Document Production Accompanying Invalidity Contentions (Patent L.R. 3-4) | Tuesday<br>June 28, 2011 | |
| Exchange of Proposed Terms for Construction (Patent L.R. 4-1) | Thursday<br>July 14, 2011 | |
| Exchange of Preliminary Claim Constructions and Extrinsic Evidence (Patent L.R. 4-2) | Thursday<br>August 4, 2011 | |
| Joint Claim Construction and Prehearing Statement (Patent L.R. 4-3) | Thursday<br>August 25, 2011 | |
| Completion of Claim Construction Discovery (Patent L.R. 4-4) | Friday<br>September 2, 2011 | |
| DJ Plaintiffs to file opening brief re: claim construction and any dispositive motions related to claim construction (contained within a single 25-page brief) | Thursday<br>September 15, 2011 | |
| DJ Defendant(s)' opposition and any cross-motion contained within a single brief | Thursday<br>October 6, 2011 | |
| DJ Plaintiffs' reply / opposition to cross-motion (contained within a single brief) | Thursday<br>October 27, 2011 | |

| Description | Kelora's Proposal | Plaintiffs' Proposal |
|---|---|---|
| DJ Defendant(s)' surreply | Thursday November 3, 2011, by DJ Defendants | |
| Hearing on claim construction and related dispositive motions | Thursday November 17, 2011 2:00 p.m. | |
| Completion of Fact Discovery | Friday February 3, 2012 | |
| DJ Plaintiffs to produce or make available opinion of counsel and related documents relied upon as defense to willful infringement, etc. (Patent L.R. 3-7) | 50 days after Claim Construction Order | |
| Disclosure of identities and reports of expert witnesses | 50 days after Claim Construction Order | |
| Rebuttal expert reports | 21 days after opening reports | |
| Completion of Expert Discovery | 49 days after opening reports | |
| Case Management Conference to finalize schedule(s) for trial(s) | Tuesday April 10, 2012, 2:00 p.m. | |
| Parties to exchange (but not file or lodge) the papers described in Civil L.R. 16-10(b) (7), (8), (9), and (10), and their motions in limine (Standing Order for Pretrial Preparation, ¶ 1) | 30+ days before final pretrial conference | |
| Deadline to meet and confer regarding Pretrial Conference Statement (Standing Order for Pretrial Preparation, ¶ 2) | 21 days before final pretrial conference | |
| File Joint Pretrial Conference Statement, exhibit list and objections, witness list, discovery responses, trial briefs, motions in limine, joint proposed voir dire, joint proposed jury instructions, and proposed verdict forms (Standing Order for Pretrial Preparation, ¶ 3) | 14 days before final pretrial conference | |

| Description | Kelora's Proposal | Plaintiffs' Proposal |
|---|---|---|
| Final Pretrial Conference | June 26, 2012 at 2:00 p.m. | |
| Trial(s) | 10 days of trial(s) beginning July 16, 2012 (with the format of the trial(s) to be determined at the CMC on April 10, 2012) | |

SO ORDERED.

Dated: _____4/21/2011_____

_Claudia Wilken_
CLAUDIA WILKEN
United States District Judge

# Exhibit 34

Pages 1 - 32

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

| | |
|---|---|
| CABELA'S, INC., ) | |
| ) | |
| Plaintiff, ) | No. C11-1398 CW |
| ) | C11-1548 CW |
| vs. ) | C11-2284 CW |
| ) | |
| KELORA SYSTEMS, LLC, ) | |
| ) | |
| ) | Oakland, California |
| Defendant. ) | Tuesday, May 31, 2011 |
| ) | |
| ) | |
| AND RELATED CASES ) | |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

| | |
|---|---|
| **FOR KELORA:** | MANNATT, PHELPS & PHILIPS |
| | 1001 PAGE MILL ROAD, BUILDING 2 |
| | PALO ALTO, CALIFORNIA 94304 |
| BY: | **Robert Becker, Attorney at Law** |
| | **Ben Kleinman, Attorney at Law** |
| | **Ron Katz, Attorney at Law** |
| | |
| **FOR HPDC, COSTCO,** | FULBRIGHT & JAWORSKI, LLP |
| **TARGET, OFFICE DEPO,** | 1301 MCKINNEY, SUITE 5100 |
| **AMAZON.COM** | HOUSTON, TEXAS 77010 |
| BY: | **Richard Zembek, Attorney at Law** |

(FURTHER APPEARANCES ON NEXT PAGE.)

REPORTED BY: SARAH GOEKLER, CSR NO. 13446
Computerized Technology by Eclipse

1    **APPEARANCES CONTINUED:**

2    **FOR OFFICEMAX:**                    WILDMAN, HARROLD, ALLEN &
                                           DIXON, LLP
3                                          225 W. WACKER DRIVE, SUITE 2800
                                           CHICAGO, ILLINOIS 60606
4                            **BY:**       **John Letchinger, Attorney at Law**

5

6    **FOR MASON**                         MORRISON & FOERSTER, LLP
     **COMPANIES:**                        425 MARKET STREET
                                           SAN FRANCISCO, CALIFORNIA 94105
7                            **BY:**       **Daniel Muino, Attorney at Law**

8

9    **FOR DELL:**                         WINSTON & STRAWN
                                           101 CALIFORNIA STREET
                                           SAN FRANCISCO, CALIFORNIA 94111
10                           **BY:**       **David Bloch, Attorney at Law**

11

12   **FOR 1-800-FLOWERS:**               KILPATRICK, TOWNSEND &
                                           STOCKTON, LLP
                                           TWO EMBARCADERO CENTER, 8TH FLOOR
13                                         SAN FRANCISCO, CALIFORNIA 94111
                             **BY:**       **David Perry, Attorney at Law**

14

15   **FOR SHOPKO:**                       COX, SMITH, MATTHEWS,
                                           INCORPORATED
16                                         112 E. PECAN STREET, SUITE 1800
                                           SAN ANTONIO, TEXAS 78205
17                           **BY:**       **J. Daniel Harkins,**
                                           **Attorney at Law**

18

19   **FOR ROCKLER**                       BARNES & THORNBURG, LLP
     **COMPANIES, INC.:**                  225 SOUTH 6TH STREET, SUITE 2800
20                                         MINNEAPOLIS, MINNESOTA 55402
                             **BY:**       **Niall MacLeod, Attorney at Law**

21

22   (FURTHER APPEARANCES ON NEXT PAGE)

23

24

25

1   **APPEARANCES CONTINUED:**

2   **FOR CABELA'S:**                    LUCE, FORWARD, HAMILTON &
                                         SCRIPPS, LLP
3                                        600 WEST BROADWAY, SUITE 2600
                                         SAN DIEGO, CALIFORNIA 92101
4                     **BY:**            **Callie Bjurstrom,**
                                         **Attorney at Law**
5

6   **FOR CABELA'S:**                    QUARLES & BRADY, LLP
                                         ONE RENAISSANCE SQUARE
7                                        TWO NORTH CENTRAL AVENUE
                                         PHOENIX, ARIZONA 85004
8                     **BY:**            **Gregory Sitrick, Attorney at Law**

9

10  **FOR CIRCUITCITY.COM:**             GREENBERG TRAURIG, LLP
                                         153 TOWNSEND STREET, 8TH FLOOR
                                         SAN FRANCISCO, CALIFORNIA 94107
11                    **BY:**            **Sarah Barrows, Attorney at Law**

12

13  **FOR NEWEGG, INC.:**                FOX ROTHSCHILD, LLP
                                         235 PINE STREET, SUITE 1500
                                         SAN FRANCISCO, CALIFORNIA 94104
14                    **BY:**            **Phillip Shinn, Attorney at Law**

15
16  **FOR PC CONNECTION,**               FOLEY & LARDNER, LLP
    **BRIGGS & STRATTON:**               975 PAGE MILL ROAD
                                         PALO ALTO, CALIFORNIA 94304
17                    **BY:**            **GINA BIBBY, ATTORNEY AT LAW**

18
19  **FOR NEBRASKA**                     FARELLA, BRAUN & MARTEL, LLP
    **FURNITURE MART:**                  235 MONTGOMERY STREET, 17TH FLOOR
                                         SAN FRANCISCO, CALIFORNIA 94104
20                    **BY:**            **Roderick Thompson,**
                                         **Attorney at Law**
21

22                          ---o0o---

23

24

25

```
 1   Tuesday, May 31, 2011                          2:00 p.m.

 2                      P R O C E E D I N G S

 3        THE CLERK:  Calling civil action C11-1398, Cabela's,

 4   Inc. versus Kelora Systems.  Calling civil action C11-1548,

 5   Kelora Systems versus Target Corporation, et al.  Calling civil

 6   action C11-2284, Nebraska Furniture Mart, Inc. versus Kelora

 7   Systems.

 8        Counsel, please slowly state your name for the

 9   record.

10        MR. BECKER:  Good afternoon, Your Honor.  I'm Robert

11   Becker from Mannatt, Phelps & Phillips for Kelora.  Also with

12   me are Ron Katz and Ben Kleinman.

13        MR. ZEMBEK:  Good afternoon, Your Honor.  Rich Zembek

14   with Fulbright & Jaworski.  I'm here for HP Development

15   Company, Costco, Target, Office Depo, and Amazon.com.

16        THE COURT:  You better say which of the cases you're

17   appearing on as well.

18        MR. ZEMBEK:  I apologize.  We're here in the Target

19   case.

20        THE COURT:  And you're here for Kelora on all the

21   cases, I take it?

22        MR. BECKER:  All cases.

23        MR. LETCHINGER:  Good afternoon, Your Honor.  John

24   Letchinger.  I represent Office Max in the Target case.

25        MR. MUINO:  Good afternoon, Your Honor.  Daniel Muino
```

1    of Morrison  & Foerster for Mason Companies, Inc. in the Target

2    case.

3            **MR. BLOCH:**  Good afternoon, Your Honor.  David Bloch

4    of Winston & Strawn.  We represent Dell in the Target case.

5            **MR. PERRY:**  Good afternoon, Your Honor.  David Perry

6    from Kilpatrick, Townsend & Stockton on behalf of 1-800-Flowers

7    in the Target case, 11-1548.

8            **MR. HARKINS:**  Your Honor, Dan Harkins at Cox Smith on

9    behalf of Shopko Stores in the Target case, 1548.

10           **MR. MACLEOD:**  Your Honor, Niall MacLeod for Rockler

11   Companies in the Target case.

12           **MS. BJURSTROM:**  Good afternoon, Your Honor.  Callie

13   Bjurstrom, Luce, Forward, Hamilton & Scripps, appearing on

14   behalf of Cabela's in the Cabela's/Kelora case and on behalf of

15   National Business Furniture in the Target case.

16           **MR. SITRICK:**  Hello, Your Honor.  Greg Sitrick from

17   Quarles & Brady, appearing on behalf of Cabela's in the

18   Cabela's matter.

19           **MS. BARROWS:**  Good afternoon, Your Honor.  Sarah

20   Barrows, Greenberg Traurig.  Here for Circuitcity.com in the

21   Target matter, 1548.

22           **MR. SHINN:**  Good afternoon, Your Honor.  Phillip

23   Shinn from Fox Rothschild for Newegg in the Target case.

24           **MS. BIBBY:**  Good afternoon, Your Honor.  Gina Bibby,

25   Foley & Lardner in the Target case appearing on behalf of PC

1    Connection and Briggs Stratton.

2            **MR. THOMPSON:**  Good afternoon, Your Honor.  Rod

3    Thompson, from Farella, Braun & Martel.  And I have plaintiff

4    Nebraska Furniture in the Nebraska Furniture case, 02284.

5            **THE COURT:**  All right.  Is that it?

6            Okay.  This is on for case management conference.  We

7    have here, I think, all the cases except the sort of original

8    case of eBay and Microsoft versus Kelora.  We've got someone

9    here from Kelora.  I guess there's no one here who can speak

10   for eBay and Microsoft, but my goal, as you know, is to try to

11   have some sort of coordination amongst all of these cases, at

12   least up to the point of trial or through the pretrial stages.

13           I'd like to try to set as many of the scheduling

14   order dates as we can.  Unfortunately, I don't think I have

15   enough of the blank orders for all of you, but you'll get

16   another copy through E-filing after we set them.  You can get

17   the attachment that goes with it on the website.

18           We can start with alternative dispute resolution, and

19   here I need to ask the Kelora people, what are we doing in the

20   eBay and Microsoft cases?  Are we having private mediation

21   there?

22           **MR. BECKER:**  We're having private mediation with

23   Judge Infante.  We already had one session, which resulted in

24   one settlement, and we're right now discussing new dates with

25   Judge Infante.

1          **THE COURT:**  Nobody is on the phone, I don't think.

2          **MR. BECKER:**  I don't believe so.

3          **THE COURT:**  Is anyone on the phone?

4          Well, how would you feel about everybody going to --

5    not that I'm pushing any particular person but just because he

6    will have some expertise, based on the first cases, could we

7    get an agreement that everyone would go to Judge Infante at

8    some point in either mass or individual settlement discussions?

9    Would that be agreeable?

10          **MR. ZEMBEK:**  Your Honor --

11          **THE COURT:**  I normally don't order people to go to

12    private mediation.  And if you really don't want to, I won't,

13    and I'll send you -- whoever doesn't want to -- to

14    court-connected mediation.  But given this particular case, I

15    think it might make sense if everyone could see their way to

16    agreeing to Judge Infante.

17          **MR. ZEMBEK:**  My name is Rich Zembek, Your Honor.  The

18    defendants agree that the private mediation makes the most

19    sense.  People are still working to get approval of Judge

20    Infante from their respective clients.  We hope to be able to

21    reach that, and we'll continue to confer with Mr. Becker and

22    hopefully we'll be able to agree to one mediator, given that

23    he's already invested the time and effort in this case.

24          **THE COURT:**  And he's also very good, and you can tell

25    your clients to the extent they're not familiar with him, he's

1    a former magistrate judge -- chief magistrate judge from our

2    district, and prior to that, a chief magistrate judge in

3    San Diego.  He's done many, many of these types of cases for me

4    and other judges, so I think everyone would find that useful.

5    As I say, I'm not pushing him for any particular reason other

6    than the fact that I know he's good and that he's already

7    started on this case.  So that's why I'm pressing it in this

8    instance.

9            When do you think it would be good to try to have an

10   initial session?  Can we do anything in 90 days, or do you want

11   six months or longer than that?

12       **MR. ZEMBEK:**  I was visiting with Mr. Becker on those

13   issues before we met today, and one of the challenges that we

14   have to do is define a workable structure, should it be all of

15   the defendants at once or should it be some smaller subset of

16   the defendants.  I think it would be great if we had the goal

17   of having some initial mediations within 90 days.  But given

18   some are holidays and that there are about 20 parties involved,

19   it may take a little bit longer to coordinate the schedules.

20       **THE COURT:**  Yeah, I would suggest maybe one big

21   session to start with where he could sort of talk to everybody,

22   and everybody can be present and figure out -- it's unlikely it

23   would actually globally settle at that time, but at least you

24   could talk about structures and talk about ways to go forward.

25            Alternatively, if you can figure out some other way

 1   where you go in smaller groups, maybe case by case or a

 2   bellwether conference or whatever you can all work out, but why

 3   don't we aim for trying to have something within 120 days.

 4           **MR. ZEMBEK:**  Yes, Your Honor.

 5           **THE COURT:**  You can always stipulate to extend that,

 6   and I'll put you in charge -- since you're the only common

 7   thread we have for all these cases -- of making sure something

 8   happens within 120 days.  You could perhaps all submit

 9   proposals to Judge Infante, as far as how you think a

10   settlement conference structure might work, and he could maybe

11   look at them on paper or have one of those big phone-in phone

12   conferences where everyone talks about it to avoid spending too

13   much money.

14           **MR. BECKER:**  Sure.

15           **THE COURT:**  But if you could try to make something

16   happen to at least plan in 120 days, that would be October 1.

17           **MR. BECKER:**  We're trying to do it much sooner than

18   that.  In fact, he has a date of June 14th if we could take

19   advantage of that, we would love to.

20           **THE COURT:**  I don't want to order that because that

21   might be difficult, but that would be something to think about,

22   at least maybe for a big phone-in session or a session where

23   some people come in person, and everybody participates on the

24   phone at least to discuss timing and future dates and

25   structures for carrying out settlement discussions.  I think

1    that would be useful.  He can help you settle how you settle, I

2    think, if you would all just maybe find a way to talk to him on

3    the 14th.

4           Then in terms of adding additional parties or claims,

5    I was a little confused about that because in one place I think

6    you said that you had agreed that the deadline would be

7    August 11th of 2011.  And then on the omnibus chart, it seemed

8    like you were in disarray about what the dates would be.

9           **MR. ZEMBEK:**  Yes --

10           **THE COURT:**  It certainly makes sense that defendants

11   might need a later date than plaintiffs just to respond to any

12   amended complaints that plaintiffs might come up with first.

13           But what was your -- what were you thinking on this?

14           **MR. ZEMBEK:**  My thinking on that candidly is that we

15   had a typo in the scheduling order.  And per your instructions,

16   we did meet before this conference and we were able to reach

17   some additional agreements at this point in time.

18           **THE COURT:**  Okay.

19           **MR. ZEMBEK:**  With respect to the deadline for the

20   parties to submit the joint proposed protective order, we

21   agreed to the June 27th date --

22           **THE COURT:**  Okay.

23           **MR. ZEMBEK:**  -- which is shown on the chart on page

24   13.  With respect to initial disclosures, we agreed to

25   June 29th.

1          **THE COURT:**  Okay.

2          **MR. ZEMBEK:**  With respect to the last date to amend

3     complaints, we agreed to the date you identified earlier in the

4     pleading of August 11th.

5          **THE COURT:**  Okay.

6          **MR. ZEMBEK:**  And then corresponding dates to amend

7     answers August 31.

8          **THE COURT:**  Okay.  And then we had an issue about

9     when the answers would be due.  There was a proposal for a

10    stipulation, which frankly I couldn't exactly understand.  And

11    then Kelora was pushing for answers on June 7th.

12         Did you come up with any agreement on that?

13         **MR. BECKER:**  We did not.

14         **THE COURT:**  June 7th might be pushing it a little

15    bit.

16         **MR. BECKER:**  We did not.

17         **THE COURT:**  Okay.

18         **MR. BECKER:**  It's our position that the case has been

19    pending for a very long time.

20         **THE COURT:**  And your -- the defendants propose, or at

21    least some of them, was to file answers 30 days after the

22    infringement contentions --

23         **MR. ZEMBEK:**  Your Honor, given --

24         **THE COURT:**  -- which would seem a little odd to me.

25         **MR. ZEMBEK:**  Your Honor, given your order today on

1    the Dell motion, what I would propose to my clients and I

2    believe all the other defendants would agree to would be

3    June 14th, which would be the rule date of 14 days after today.

4              **THE COURT:**  Okay.

5              **MR. ZEMBEK:**  We would then withdraw our pending

6    motions, which we have not noticed for hearing, to dismiss.

7              **THE COURT:**  Okay.  That's a wise move.  And I think

8    June 14th is good.  I'll tell you, the pleading is obviously

9    about as bare bones as you could get.  My reason for denying

10   the motion was not so much because I would like to see

11   pleadings like that in every case, but that in this particular

12   case, at least with respect to Dell, it was clear from the

13   opposition and clear from what I know about the case that what

14   they were complaining about was Dell.com and the way you order

15   computers by saying whether you want a DVD drive or do you want

16   a whatever, and that that was what they were complaining about.

17             Now, if any of the other plaintiffs or potential

18   infringers -- I guess, you're not all plaintiffs, not all

19   defendants, but if any others are in a situation where you

20   truly don't know what they're talking about, then I would say

21   the first thing would be just to ask them.  I mean, it seems

22   like what they're talking about is basically online shopping,

23   so I'm presuming all of you do some kind of online shopping for

24   your customers, and that's what they don't like.

25             But surely you would be willing to tell them just

1    like you told them about Dell.com if they actually don't

2    understand which website it is or what you think they're doing

3    to infringe your patents.  You'll do that, right, if anyone

4    asks you?

5             MR. BECKER:  Absolutely and we have.

6             THE COURT:  That was my thinking in denying the

7    motions to dismiss.  I think you can figure out what it is

8    they're claiming.  It may or may not have any merit, but at

9    least I think it's pretty clear what it is.  And rather than

10   spend a bunch more time with motions to dismiss and leaves to

11   amend and new answers and all of that, I would rather just move

12   forward.  So I would be disinclined to grant anybody else's

13   motion to dismiss either.  So not bringing them is even a

14   better idea.

15            So then you have the proposed stipulation to sue

16   Hewlett-Packard Company, HPC rather than HPDC.  Are you willing

17   to do that, or are you not sure that's right?  Who's the HP

18   person?

19            MR. ZEMBEK:  Me, Your Honor.  Rich Zembek, Your

20   Honor.

21            THE COURT:  Is that something you are prepared to

22   stipulate to, or maybe you just need to be assured by them that

23   that is the right person.  You obviously want to sue the right

24   entity.

25            MR. BECKER:  We think we have sued the right entity.

1  There may be some liability on behalf of HP as well, so we're

2  certainly willing to stipulate to add them.  The question is

3  whether we would also stipulate to release the current party,

4  and we're disinclined to do that at this time.

5          THE COURT:  Well, they seem to be some sort of subset

6  of HP, so it doesn't seem like you'd be any worse off.  And if

7  they would stipulate not to raise some sort of defense to say

8  that it's really HPDC that did it and not HPC.  And if they did

9  make such a claim, you would be able to re-instate them as a

10  defendant.

11          MR. BECKER:  If there was a stipulation like that, we

12  would be amendable to stipulate.

13          THE COURT:  Why don't you see if you can't work

14  something out.  It would seem to be a waste of time to have

15  motion practice on this issue.  Surely you can satisfy yourself

16  as to who's sued and who's going to defend and who's going to

17  pay a judgment and who's not going to play a shell game about

18  who isn't the real defendant.

19          MR. ZEMBEK:  Exactly, Your Honor.  And that's why we

20  had proposed substituting who we believe is the appropriate

21  party.

22          THE COURT:  If you could talk to them about what

23  assurances they would need to make sure they weren't getting

24  the wool pulled over their eyes, then I would presume that they

25  would agree with that.

1          **MR. ZEMBEK:**  Yes, Your Honor.

2          **THE COURT:**  The hearing on Dell's motion of course we

3     don't need anymore.

4          Someone was thinking of a third-party action against

5     vendors.  It seems like we have enough parties here as it is.

6     But if anyone really wants to do that, all I would say is -- I

7     guess I can't stop you, but please do it sooner rather than

8     later so we can get everybody on board that's going to be on

9     board.

10         Then we have -- oh, initial disclosures -- you

11    already addressed that.

12         **MR. ZEMBEK:**  Yes, Your Honor.

13         **THE COURT:**  We can talk about discovery in a minute.

14    In terms of claim construction, there's a couple answers that I

15    can give you.  And that is that I don't take live testimony at

16    Markman hearings.  If I had the Markman hearing, which is

17    basically held as if it were an argument on a summary judgment

18    motion.  If at that hearing I found that there was some sort of

19    factual dispute that did require live testimony, I would set it

20    for live testimony in the future, but don't bring any witnesses

21    or plan on any live testimony at the actual scheduled Markman

22    hearing.

23         I usually put them on a summary judgment or law and

24    motion calendar at 2:00 o'clock on a Thursday afternoon.  I

25    wouldn't set it -- I wouldn't hear it on a date when I had a

1    lot of other matters on.  If it turned out to be on a date

2    where I had a lot of other matters, we might have to adjust the

3    date.  But most often I hear them on Thursdays at 2:00 o'clock,

4    so that will be the default unless you look at my calendar and

5    see that you're one of a number of big items, then you might

6    try to pick a new date and send in a stipulation to have it

7    specially set some other afternoon.  But I certainly have not

8    ever spent a day on a Markman hearing.

9         **MR. ZEMBEK:**  I understand, Your Honor.  We have to

10   accommodate all the defendants' views as we try to prepare

11   this.

12        **THE COURT:**  Right.

13        **MR. ZEMBEK:**  If I may, a number of defendants have

14   asked what the Court's preference would be with respect to

15   summary judgment briefing.  In connection with the claim

16   construction briefing, should it be a summary judgment motion

17   on not infringement invalidity, all points should be --

18        **THE COURT:**  Yeah.  It's most understandable and the

19   least repetitious if I just get one brief.  Because otherwise

20   I'm reading the statement of facts over and over again.  So the

21   fewer -- obviously it's going to be probably longer than 25

22   pages, but I would rather read more pages in one brief than

23   read the same thing over and over and over from one defendant

24   after another, from one issue after another even between

25   invalidity infringement, claim construction.  There's just a

1    lot of common things there like what the patent is and things

2    like that, it's just so much more efficient to read once

3    instead of a number of times.

4         So the fewer number of briefs I can have, the better.

5    I recognize that you're all different defendants, and maybe you

6    have separate issues.  To the extent you can figure out what

7    your common issues are and do one brief on your common issue --

8    one brief that includes certain number of pages on your common

9    issues and everybody contributes a couple of pages on the

10   separate issues that each people -- that each defendant might

11   have or groups of defendants might have common issues.  I'm

12   kind of hoping that by the time this rolls around, there will

13   be some settlements or some consolidations or dismissals or

14   something that will narrow things down a bit.

15        But it's certainly in my interest and I think

16   actually in your own interest to try and really spend some time

17   sitting down and figuring out in advance what are all the

18   issues, how many of them are common, what can we do to organize

19   them into a more efficient briefing schedule.

20        And then because -- well, Kelora is the plaintiff in

21   some cases and the defendant in other cases, I'm just going to

22   call them -- or think of them as the plaintiff or as the first

23   person to file briefs because they're the ones who have the

24   patent and are trying to get people to stop infringing it.  So

25   what I would like is to have Kelora file the opening brief,

 1   which I hope is how I did it in the other case, but maybe I

 2   didn't.  I didn't?  I have eBay and Microsoft file on the first

 3   brief?  Oh.  Then we'll stick with that.

 4          MR. ZEMBEK:  That's what we've done in our proposed

 5   schedule, Your Honor.

 6          THE COURT:  So we'll do it that way.  In any event,

 7   it's not a question of simultaneous briefs.  We don't have

 8   people filing briefs at the same time.  We alternate the filing

 9   of them as you've done.

10          One other thing about claims construction.  I

11   generally don't find the tutorials helpful, and in this

12   particular case I don't think I need one, so we won't have one.

13          But in terms of the briefing schedule, you had

14   some -- well, I guess the big dispute is can you fall in with

15   the eBay/Microsoft briefing schedule.  Plaintiffs think you

16   can; defendants think you can't.  I think you can, and I think

17   I'd like to try it.  And I think that you will get help from

18   eBay and Microsoft.  They've been dealing with this company for

19   quite some time.  They have a pretty clear understanding of the

20   patent and the prosecution history.  And I think that you may

21   find it even helpful to do it with them because you can ride

22   their coattails to some degree.

23          So what I'm inclined to do is to take Kelora's

24   schedule, which tracks the eBay/Microsoft schedule, and ask you

25   to try to do it.  Now, if a couple of months go by and you find

1    that it's just impossible, you can't do it, you can try to

2    negotiate something.  I would even prefer to delay Microsoft

3    and eBay to accommodate you, rather than break it out and end

4    up with two separate sets.

5              So I would say if you try it for a couple of months

6    and find that you just think it's impossible to meet that

7    schedule, talk to Kelora, talk to eBay and Microsoft and see if

8    you can't come up with an agreement that puts everybody over.

9    If you can't do that, see if you can come up with an agreement

10   with Kelora to put your case over and not eBay and Microsoft

11   and failing both of those, file of motion.  You can do an

12   administration motion under 7-11 on shortened time and

13   shortened briefing and just tell me that it was too optimistic,

14   you can't possibly do it, and I'll come up with some kind of

15   accommodation.

16             **MR. ZEMBEK:**  I think the date that -- I'll just call

17   the group on this side, the defendants, the most heartburn was

18   the invalidity contentions being due by July 7th.  Even by the

19   local rule date, that was July 18th, and we had added two weeks

20   to that so that we could try to have one consensus group of

21   invalidity contentions so that we had the August 8th date

22   there.

23             **THE COURT:**  Well, how about that?  You don't really

24   need their invalidity contentions to -- the next date after

25   that that it's running up against is proposed terms for claim

```
 1    construction.  But the invalidity contentions aren't really

 2    necessary to propose terms for claim construction.  So how

 3    about if we give them until August 8th to do their invalidity

 4    contention?

 5              MR. BECKER:  They really might be relevant.

 6              THE COURT:  They're relevant, but they're not

 7    essential.  We used to do it where you do the whole claims

 8    construction all in a vacuum before the invalidity contentions

 9    came up at all.

10              MR. BECKER:  So the question is as to what date, Your

11    Honor?

12              THE COURT:  August 8th was their proposal.

13              MR. BECKER:  Okay.

14              THE COURT:  All right.  So we'll do that.

15              MR. ZEMBEK:  And one other question, if I may, Your

16    Honor.

17              THE COURT:  Yes?

18              MR. ZEMBEK:  In the eBay/Microsoft claim, there was

19    the -- it would be a 25-page single brief on claim construction

20    and summary judgment issues.  The reason that we did ask for

21    two separate briefs is simply to try to accommodate 17

22    different parties.  So we would respectfully request more than

23    25 pages for that, if we are put on the same track.

24              THE COURT:  Okay.  Well, what I'd really like you to

25    do is to join with Microsoft and eBay on things that are common
```

1    to them.  So why don't we -- let me not set a page limit.  I

2    mean, I recognize it's going to be more than 25, but what I'd

3    really like you to do is sit down with eBay and Microsoft and

4    everybody maybe a little later once -- don't make it too late

5    but a little later when you know what issues everybody is going

6    to raise and how many of them are common and how many of them

7    are separate and make a proposal.

8             **MR. ZEMBEK:**  We know it's in our interest to be

9    brief.

10            **THE COURT:**  And to be joint.

11            **MR. ZEMBEK:**  Absolutely, Your Honor.

12            **THE COURT:**  To the extent you can agree, you're more

13   likely to win if you're in agreement against them than if you

14   got a big disarray of all kinds of constructions and

15   contentions that have to be chosen between as opposed to

16   something that makes sense that all of you think is the case.

17            So do it -- as I say, don't give it to me the day the

18   brief is due or the day before the brief is due, but give it to

19   me far enough in the future so that you've really made some

20   conservative effort to figure out how many pages you really do

21   need and how many separate pages you really do need, and add in

22   the separate pages as little add-on sections to the big brief

23   or the big two briefs, if necessary.

24            **MR. ZEMBEK:**  Understood, Your Honor.

25            **THE COURT:**  Okay.

1          **MR. THOMPSON:**  Your Honor, Rod Thompson for Nebraska

2    Furniture.

3          **THE COURT:**  Yes?

4          **MR. THOMPSON:**  We have a separate declaratory relief

5    action, and I was just hired last Friday, and we were just

6    related to this Court, I think, Monday last week, so we had a

7    separate proposed schedule that requested further leeway in

8    claim construction briefing.

9          I recognize the Court's strong preference for trying

10   to do everything together, but I wanted to alert you that there

11   are other -- there was another defendant here -- actually,

12   declaratory relief plaintiff.  And we're brand new to the case,

13   and we would really like to have enough time to assess the case

14   before we commit to very fast track dates.

15         **THE COURT:**  Well, you brought the case.

16         **MR. THOMPSON:**  We brought the case in Delaware.  We

17   had a scheduled hearing called for a claims construction next

18   year in January 2012.  So we got transferred here, and now

19   we're on a --

20         **THE COURT:**  You stipulated to be transferred here --

21         **MR. THOMPSON:**  We did stipulate, given --

22         **THE COURT:**  -- knowing the track that the cases were

23   on here.  And again, just call eBay and Microsoft.  They'll be

24   happy to help you out.  I do want you to follow the same

25   schedule.

1          And again, if you absolutely can't and after lengthy

2     discussions with everyone else and they're just not the same

3     issues, and you're marching to the beat of your own drummer and

4     have different claim constructions and different invalidity

5     claims and everything else, you can make a motion in a couple

6     of months, if that's really the case.  Otherwise, I'd really

7     like you to get up to speed and try to join in with everybody

8     else.

9          **MR. THOMPSON:**  Yes, Your Honor.

10         **THE COURT:**  Then once we have the -- well, so if what

11    we're aiming at then is a claim construction and dispositive

12    motion hearing on November 17th at 2:00 o'clock.  We'll also

13    have a further case management conference on that day, and

14    we'll probably talk about a trial date at that point as opposed

15    to later because we need to set one, or you'll be too far out

16    in the future.

17         Then you've picked your other dates as X dates after

18    the claim construction order, which certainly is prudent since

19    we don't know how long it would take for it to come up.  But

20    just to give us something to shoot for, I think I'd rather sort

21    of guesstimate what those dates might be, guessing it based on

22    let's hope I get an order out within 30 days of the hearing,

23    what would the dates look like then?

24         And the dates to me would look then like -- something

25    like your opinion of counsel, deadline February 23rd of 2012.

1    Your disclosure of experts February 23rd of 2012.  Your

2    rebuttal expert reports, March 15th of 2012.  Your completion

3    of expert discovery, May 1st of 2012.  And then we would

4    perhaps be looking at a trial somewhere in the neighborhood of

5    Julyish.

6             **MR. BECKER:**  Your Honor, we do have a trial scheduled

7    for July 16 in the eBay/Microsoft cases.

8             **THE COURT:**  Yeah.  Well, it's not at all clear that

9    we'll be able to try them all together.  We do have that, and

10   if the case had become streamlined or the issues had been

11   unified or a lot of defendants had gone away, it's conceivable

12   we could fold you into that same July 16th trial.  It's also

13   quite possible if that wouldn't work, that we would trail you

14   that we'd have a bellwether trial, that their trial would moot

15   out some of your issues.

16            So we're just going to have to -- certainly we

17   wouldn't try your case any sooner than July 16th.  But if you

18   could all hold that as a conceivable possibility that you'd be

19   folded into that July 16th trial, and if not that you'd be

20   trailing at or that we'd be setting some other date after

21   July 16th.  But just to give us something to shoot for.

22            Somebody has demanded a trial by jury.  You say

23   you're expecting the trial to last ten days.  You were thinking

24   of that as a trial of basically just the Target case and the

25   Cabela's case, or what did that ten-day estimate entail?

1          **MR. ZEMBEK:**  That is unclear at this point in time,

2    Your Honor, because some of the parties are considering moving

3    to sever for separate trials.  Whichever group of defendants

4    may still exist at that point in time and move forward in some

5    subset of the 20 or so parties currently involved would be on

6    the ten days.

7          **THE COURT:**  Well, don't make motions to sever.  We

8    will -- we're not severing or not severing at the moment.

9    We're being agnostic on it, so we'll need to talk about it at

10   some point.  We'll just talk about it in terms of case

11   management, we won't talk about it in motions to sever.  That

12   would all be discretionary anyway.  We'll talk about it at the

13   summary judgment hearing.  We'll set another CMC after that,

14   once we've seen what is surviving and what isn't surviving.  So

15   that's what we'll try to do.

16         **MR. LETCHINGER:**  Your Honor, John Letchinger for

17   Office Max.  I'm going to take one plea of the Court because I

18   know there's about half of the defendants who are looking at

19   this schedule and thinking it's still very, very aggressive.

20   Our goal -- and I can tell you, it took probably eight joint

21   calls with this group just to be able to propose that.  Our

22   goal was to try to honor your urges -- request that we try to

23   be on one track.

24         Our thought was slowing the other case down by two or

25   three months so that people who have just literally gotten into

1    the case as of last week can catch up.  I'm looking at a

2    calendar and looking at an exchange of claim construction terms

3    in a month when we haven't even answered the complaint yet.  So

4    what we tried to do is compromise, and the compromise had eBay

5    and Microsoft extending a bit but everything was extended only

6    by three months.

7              **THE COURT:**  Did you talk to eBay and Microsoft about

8    that?

9              **MR. ZEMBEK:**  Your Honor, I talked to them, and they

10   were not in favor of slowing down their schedule for us to join

11   them.

12             **THE COURT:**  I'm just going to ask you again to see

13   what you can do.  And if you find that even with their help --

14   you can tell them I said that if they won't help you, then you

15   will win on a motion to delay their case.  So they need to make

16   it work for you.  If they won't or can't and it's just truly

17   impossible after you really try, then make a motion.

18             **MR. LETCHINGER:**  Thank you, Your Honor.

19             **THE COURT:**  And whatever you can do to help them

20   out -- you're interested in pushing the thing along, you're

21   going to need to be as cooperative as you possibly can and do

22   everything you can to help them make these dates; otherwise, it

23   is aggressive, and we won't be able to keep it up.

24             **MR. BECKER:**  Absolutely.  I would only point out that

25   the prior case not only did they move to transfer here, but we

1    did have an initial case management conference some time ago in

2    that case.

3              THE COURT:  Which case?

4         MR. BECKER:  In the Wisconsin case that was

5    transferred, the Target case.  And so they've been aware of

6    this for sometime.  Mr. Thompson in the Nebraska Furniture Mart

7    case may have just been hired, but they have other Saint Louis

8    counsel that's been working for them the whole time and handled

9    the initial case management conference in that case in Delaware

10   about a month ago.

11             THE COURT:  Okay.  Well, still.  It is an aggressive

12   schedule for the newer people, and you need to do what you can

13   to help them out.  And if you are the least bit uncooperative,

14   you will be finding the case delayed.

15        MR. BECKER:  Certainly.

16             THE COURT:  So the only other thing that I had was

17   that you had some discovery disputes, and I don't know if I can

18   really deal with those right now or if you all think you can

19   deal with them on your own with further negotiations or if I

20   should set you for more of an omnibus discovery conference with

21   a Magistrate Judge who can make a discovery plan for you or

22   what.

23        MR. ZEMBEK:  I think that there are two main

24   discovery limit points to discuss, and I think that we're on

25   the same page as to one of those two points.  That is with

1    respect to 30(b)(6) depositions.  The defendants had proposed

2    that the 30(b)(6) deposition time of each defendant would be

3    seven hours.  And Kelora had proposed that it would be the

4    federal rules, which we would interpret to be seven hours for

5    purposes of the 30(b)(6) deposition, absent some sort of

6    agreement to extend it or some motion to extend it beyond the

7    seven hours.  I think that we have the same understanding on

8    that point.

9             MR. BECKER:  We would just say the federal rules,

10    which are seven hours.

11             THE COURT:  I'm not seeing the difference.  Seven

12    hours for --

13             MR. ZEMBEK:  For 30(b)(6) depositions.  We were just

14    unclear whether there was or was not a disagreement.  I think

15    we have an agreement that seven hours --

16             THE COURT:  Whether that applies to the 30(b)(6)?

17             MR. ZEMBEK:  Yes, Your Honor.

18             THE COURT:  So we're saying it does?

19             MR. ZEMBEK:  It does, and we have an agreement.

20             MR. BECKER:  Well, we're saying it's just what the

21    federal rules say.  You get seven hours, and if there's a need

22    for more time, it's demonstrated that the Court will grant the

23    additional time.  I don't know --

24             THE COURT:  Yes.

25             MR. ZEMBEK:  Yes.  We know it's in our interest to

1   work out discovery disputes and not bring them to you

2   unnecessarily.

3          **THE COURT:**  And you said there's one other one that

4   you thought could probably be addressed right now?

5          **MR. ZEMBEK:**  The other was with respect to the scope

6   of discovery.  Given the order in the eBay case, the defendants

7   believe that discovery concerning liability and damages should

8   be limited to the time after November 2nd, 2010, when the

9   re-examination certificate issue.

10         **THE COURT:**  You didn't really take that on.

11         **MR. BECKER:**  Well, we've not going to stipulate to

12  that.  That's an issue that --

13         **THE COURT:**  You didn't make any argument as to why

14  that shouldn't be the case.

15         **MR. BECKER:**  In the case management statement.  It's

16  because you ruled against us in the --

17         **THE COURT:**  Again, very prudent.  So you're in

18  agreement then; although, you disagree that that's right, you

19  do agree that given what I've ruled, it makes sense to limit

20  discovery on liability and damages to that, which would begin

21  on November 2nd.

22         **MR. BECKER:**  Right.  If you were to make that ruling

23  applicable in this case, yes.

24         **THE COURT:**  I would, yes.  Okay.  Now, here it says

25  Target defendant may file a motion for limited stay of

1    discovery to allow for early briefing on motions for summary

2    judgment of invalidity.  I take it you've thought the better of

3    that?

4              **MR. ZEMBEK:**  Yes, Your Honor.  Some defendants may

5    elect to file some additional briefing if the accelerated

6    schedule is just impossible to them.

7              **THE COURT:**  Right.  You can file briefs that say the

8    schedule is impossible, we need a continuance of the schedule.

9    You can do that, but don't file early summary judgment motions

10   or separate motions.

11             **MR. ZEMBEK:**  Understood, Your Honor.

12             **MR. PERRY:**  Your Honor, David Perry on behalf of

13   1-800-Flowers.  I'm just thinking about pragmatically on the

14   schedule, if Your Honor orders today Kelora's schedule, I think

15   we're going to have a tough time convincing s eBay and

16   Microsoft to slow down because we'll all be on this faster

17   track.

18             I wonder if you order that the cases should all be on

19   the same schedule, and then we can work among -- with eBay and

20   Microsoft to what the schedule is going to be rather than

21   issue -- I understand the Court wants to get dates set, but I

22   wonder if -- I fear that if the Court orders all the dates that

23   Kelora has proposed, eBay and Microsoft will have no

24   incentive -- co-counsel has said that they're not interested in

25   slowing things down.  I fear that if you order the Kelora

1    schedule that matches their schedule, they will have no

2    incentive to slow things down.

3         **THE COURT:**  Well, they will because the motion that

4    you make will be a motion to slow their schedule down as well.

5    In other words, if you make a successful motion to slow your

6    schedule down, then I will also slow theirs down, and you can

7    tell them that.

8         **MR. PERRY:**  So the process is you're going to order

9    the accelerated schedule and then wait for the parties here to

10   agree on a slower schedule.  We'll move for that slower

11   schedule, and then eBay and Microsoft will be forced to adopt

12   the slower schedule as well?

13        **THE COURT:**  Correct.

14        **MR. PERRY:**  Okay.  Thank you, Your Honor.

15        **MR. BECKER:**  Your Honor, quick point of clarification

16   with respect to the discovery limitation on damages.  We would

17   still be entitled to seek discovery on matters that are

18   relevant to damages going forward even if they do request

19   documents that predate November 2nd; is that correct?

20        **THE COURT:**  Perhaps.  But you'd have to be able to

21   explain why it is that a document before November 2nd was

22   relevant to damages that happened in the future.  But if it

23   was, and it wasn't burdensome and done for purposes of

24   harassment or delay and you can explain it, then, yes, you

25   could ask for it.

1          **MR. BECKER:**  Okay.  Thank you.

2          **THE COURT:**  Anything else?

3          **MR. ZEMBEK:**  Nothing else, Your Honor.

4          **MR. BECKER:**  Nothing.  Thank you, Your Honor.

5          **THE COURT:**  Again, I apologize for keeping you all

6     waiting, and we will see you at the next hearing date.

7          **MR. ZEMBEK:**  Thank you, Your Honor.

8          **THE COURT:**  Thank you.

9          (Conclusion of proceedings.)

10                      ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, SARAH L. GOEKLER, a Certified Shorthand Reporter, hereby certify that the foregoing proceedings were taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the said proceedings were thereafter reduced to typewriting, by computer, under my direction and supervision;

I further certify that I am not of counsel or attorney for either or any of the parties nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: June 13, 2011.

_Sarah L. Goekler_

SARAH L. GOEKLER, CSR 13446

# Exhibit 35

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3   CABELA'S INC.,                        No. C 11-01398 CW

4           Plaintiff,                    <u>MINUTE ORDER AND
                                          CASE MANAGEMENT</u>
5       v.                                <u>ORDER</u>

6    KELORA SYSTEMS, LLC,

7           Defendant.
    _____/
8   KELORA SYSTEMS, LLC,                  No. C 11-01548 CW
                                          (Related)
9           Plaintiff,

10      v.

11  TARGET CORPORATION, ET AL.,

12          Defendant.                    No. C 11-02284 CW
    _____/     (Related)
13  NEBRASKA FURNITURE MART, INC.,

14          Plaintiff,

15      v.

16  KELORA DYSTEMS LLC,

17          Defendant.
    _____/
18

19
    Clerk: Lashanda Scott          Reporter: Sarah Goekler
20  Plaintiff Attorney: Calli Bjurstrom, Gregory P. Sitrick,
    Defendant Attorney: Robert Becker, Calli Bjurstrom and
21  Gregory P. Sitrick

22      A case management conference was held on: <u>May 31, 2011</u>.  The Case
    Management Statement and Proposed Order filed by the parties is hereby
23  adopted by the Court as the Case Management Order for the case, except
    as may be noted below.  The Court's standard Order for Pretrial
24  Preparation also applies.

25  The case is hereby referred to the following ADR process:
    Non-binding Arbitration: [  ]     Early Neutral Evaluation: [  ]
26  Court-connected mediation: [  ]     Private mediation: [ X ]
    Magistrate Judge settlement conference: [  ]
27  ADR session to be held by:                              <u>10/1/2011</u>
    (or as soon thereafter as is convenient to the mediator's schedule)
28

**United States District Court**
For the Northern District of California

Deadline to add additional parties or claims:                     (8/11/2011)
Date of next case management conference:                          (11/17/2011)

Completion of Fact Discovery:                                      (2/3/2012)
Disclosure of identities and reports of expert witnesses:         (2/23/2012)
Completion of Expert Discovery:                                    (5/1/2012)

All case-dispositive motions to be heard at 2:00 P.M.
    on or before:                                                 (11/17/2011)

Final Pretrial Conference at 2:00 P.M. on:                        ()
A 10 day Jury Trial will begin at 8:30 A.M. on:                   (7/16/2012)

Additional Matters:  Copy of Court's Order for Pretrial Preparation given to attys in court.  **A Further Case Management Conference will be held on 11/17/2011 at 2:00 p.m. whether or not dispositive motions are filed (or on whatever date dispositive motions are set).** Answers due or otherwise response due 6/14/2011. Deadline for parties to submit Joint Proposed Protective Order due 6/27/2011. Deadline for Initial Disclosures due by 6/29/2011. Exchange of Proposed Terms for Construction due by 7/14/2011. Exchange of Preliminary Claim Constructions and Extrinsic Evidence due by 8/4/2011. Joint Claim Construction and Prehearing Statement due by 8/25/2011. Completion of Claim Construction Discovery due by September 2, 2011. Cabela's and Target Defendants to file opening briefs re: claim construction and any dispositive motions related to claim construction (contained within a single brief) due by September 15, 2011. Invalidity Contentions and Document Production Accompanying Invalidity Contentions due 8/8/2011. Last day to amend Answers without leave of Court by 8/31/2011. Kelora's opposition and any cross-motion contained within a single brief due by 10/6/2011. Cabela's and Target Defendants' reply/opposition to cross-motion (contained within a single brief) due by 10/27/2011. Kelora's surreply due by 11/3/2011. The Claims Construction Hearing and Dispositive Motion Hearing set for 11/17/2011 at 2:00 p.m. Cabela's and Target Defendants to produce or make available Opinion of counsel and Related Documents relied upon as Defense to Willful Infringement, etc. due by 2/23/2012. Disclosures of Identities and Reports of Expert Witnesses due by 2/23/2012. Rebuttal Expert Reports due 3/15/2012. Completion of Expert Discovery due 5/1/2012.

        IT IS SO ORDERED.

Dated: May 31, 2011

                                    _____
                                    CLAUDIA WILKEN
                                    United States District Judge

Copies to:  Chambers; ADR Department

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28