[JOINT FILING — SEE SIGNATURE PAGE FOR LIST OF COUNSEL]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| eBay Inc. and Microsoft Corporation,<br><br>    *Plaintiffs and Counterclaim-Defendants,*<br><br>  vs.<br><br>Kelora Systems, LLC,<br><br>    *Defendant and Counterclaim-Plaintiff.* | No. 4:10-cv-4947-CW (filed Nov. 2, 2010)<br><br>**DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR RENEWED MOTION FOR SUMMARY JUDGMENT OF OBVIOUSNESS** |
| Cabela's Inc.,<br><br>    *Plaintiff and Counterclaim-Defendant,*<br><br>  vs.<br><br>Kelora Systems, LLC,<br><br>    *Defendant and Counterclaim-Plaintiff.* | No. 4:11-cv-1398-CW (filed Mar. 23, 2011) (related case) |

| | |
|---|---|
| Kelora Systems, LLC, | No. 4:11-cv-1548-CW (filed Nov. 8, 2010) (related case) |
| *Plaintiff and Counterclaim-Defendant*, | |
| vs. | |
| Target Corporation; Rockler Companies, Inc.; Amazon.com, Inc.; Dell, Inc.; Office Depot, Inc.; Newegg Inc.; Costco Wholesale Corporation; Hewlett-Packard Company; Audible, Inc.; and Zappos.com, Inc., | |
| *Defendants and Counterclaim-Plaintiffs*. | |

DEFENDANTS' SUPPLEMENTAL BRIEF ON OBVIOUSNESS
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW

## NOTICE

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:  Pursuant to the Court's order on December 6, 2011, eBay Inc.; Microsoft Corporation; Cabela's Inc.; Target Corporation; Rockler Companies, Inc.; Amazon.com, Inc.; Dell, Inc.; Office Depot, Inc.; Newegg Inc.; Costco Wholesale Corporation; Hewlett-Packard Company; Audible, Inc.; and Zappos.com, Inc. (collectively, "Defendants") hereby file this supplemental brief in support of their renewed motion for summary judgment that amended claims 1–4 and 9 of the patent-in-suit (U.S. Patent No. 6,275,821) are obvious.  Pursuant to the Court's order, Kelora shall file its opposition, if any, to this renewed motion, which may not exceed ten pages, by January 20, 2012.  Defendants shall file their reply to Kelora's opposition, if any, which may not exceed five pages, by January 25, 2012.  The Court will decide the renewed motion on the papers.

As permitted by the Court's order on December 6, 2011, this renewed motion may refer to the following papers previously submitted by the parties:

| Abbreviation | Description | Date |
|---|---|---|
| Mot. | Defendants' Memorandum of Points and Authorities | 9/15/11 |
| Exs. 1–42 | Exhibits 1 to 42 to Defendants' Memorandum | 9/15/11 |
| Ascolese Decl. | Declaration of Marc R. Ascolese and attached Exhibits 1 to 53 (Feb. 24, 2011), which summarizes the previous litigation involving the '821 patent-in-suit | 9/15/11 |
| Arnett Decl. | Declaration of Nick Arnett and attached Exhibits A to C (Sept. 12, 2011), which corroborates that persons of ordinary skill knew in 1994 that web servers were "stateless" | 9/15/11 |
| Chandler Decl. | Declaration of Theodore W. Chandler and attached Exhibits Q to S (May 28, 2009), which includes a copy of the AMP Navigator software that this Court found to be § 102(b) prior art to the '821 patent-in-suit | 9/15/11 |
| Leventhal Decl. | Declaration of Daniel Leventhal and attached Exhibits 1 to 24 (Sept. 15, 2011), which includes additional prior art to the '821 patent-in-suit | 9/15/11 |
| '444 Prosecution | Prosecution history of U.S. Patent No. 5,715,444, the grandparent to the patent-in-suit | 9/15/11 |
| '821 Prosecution | Prosecution history of U.S. Patent No. 6,275,821, the patent-in-suit | 9/15/11 |

| **Abbreviation** | **Description** | **Date** |
|---|---|---|
| '821 Reexam | Prosecution history of the reexamination of U.S. Patent No. 6,275,821 | 9/15/11 |
| Opp'n | Kelora's opposition brief | 10/11/11 |
| Danish Decl. | Declaration of Sherif Danish | 10/11/11 |
| Kimbrough Decl. | Declaration of Kris Kimbrough and attached Exhibit A | 10/11/11 |
| Gafford I Decl. | Declaration of Thomas A. Gafford and attached Exhibits 1 to 3 | 10/11/11 |
| Kleinman Decl. | Declaration of Benjamin Kleinman and attached Exhibits A to P | 10/11/11 |
| Reply | Defendants' reply brief | 10/27/11 |
| Exs. 43–47 | Exhibits 43 to 47 to Defendants' reply brief | 10/27/11 |
| Arnett Dep. | Excerpts from the deposition of Nick Arnett (Sept. 26, 2011) | 10/27/11 |
| Larson Dep. | Excerpts from the deposition of Dr. Larson (Oct. 3, 2011) | 10/27/11 |
| Sur-reply | Kelora's sur-reply | 11/3/11 |

As permitted by the Court's order on December 6, 2011, this renewed motion also refers to the following papers being submitted today, January 13, 2012:

    i.    the attached Exhibits 48–49 ("Ex.");

    ii.    Defendants' expert declaration by Ray R. Larson and attached Exhibits 1 to 7 (Dec. 20, 2011) ("Larson II Decl.");

    iii.    Kelora's new expert declaration by Thomas A. Gafford (Dec. 27, 2011) ("Gafford II Decl."); and

    iv.    Kelora's new expert declaration by Johnette Hassell (Dec. 27, 2011) ("Hassell Decl.").

# **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................ 1

II.   ARGUMENT ............................................................................................................... 3

    A.   Multiple "rational underpinnings," not hindsight, demonstrate that it was
obvious to use "resubmission" with applications that utilized iterative search,
including AMP Navigator ................................................................................... 3

        1.   Stateless servers using resubmission were known ............................................ 4

        2.   The nature of the problem, market forces, common sense, and known
finite solutions motivated use of resubmission with stateless servers ............. 5

        3.   Explicit teachings motivated use of resubmission with stateless Web
servers ............................................................................................................... 6

        4.   One of ordinary skill would have been capable of using any well-
known resubmission method ............................................................................. 7

    B.   Kelora's purported "factual disputes" are legally irrelevant ........................................ 8

        1.   Kelora cannot use "level of ordinary skill" to remove undisputed prior
art from the prior art .......................................................................................... 8

        2.   "Porting" of Kimbrough's AMP Navigator demo source code is not
the proper starting point for the obviousness analysis ..................................... 9

        3.   A known solution need not be the "best" solution to be obvious ..................... 9

III.  CONCLUSION .......................................................................................................... 10

# TABLE OF AUTHORITIES

## Cases

*Amazon.com, Inc. v. barnesandnoble.com, inc.*,
    239 F.3d 1343 (Fed. Cir. 2001).................................................................2, 8

*Dow Jones & Co. v. Ablaise Ltd.*,
    606 F.3d 1338 (Fed. Cir. 2010)....................................................................6

*In re Kahn*,
    441 F.3d 977 (Fed. Cir. 2006).....................................................................3

*KSR Int'l Co. v. Teloflex, Inc.*,
    550 U.S. 398 (2007)........................................................................3, 5, 6, 10

*Lockwood v. American Airlines, Inc.*,
    107 F.3d 1565 (Fed. Cir. 1997)............................................................2, 3, 8, 9

*Merck & Co., Inc. v. Biocraft Labs., Inc.*,
    874 F.2d 804 (Fed. Cir. 1989)......................................................................9

*Muniauction, Inc. v. Thomson Corp.*,
    532 F.3d 1318 (Fed. Cir. 2008)....................................................................6

*Rothman v. Target Corp.*,
    556 F.3d 1310 (Fed. Cir. 2009)................................................................2, 8

*Ruiz v. A.B. Chance Co.*,
    234 F.3d 654 (Fed. Cir. 2000)......................................................................3

*Spectra-Physics, Inc. v. Coherent, Inc.*,
    827 F.2d 1524 (Fed. Cir. 1987)....................................................................7

*W. Union Co. v. MoneyGram Payment Sys., Inc.*,
    626 F.3d 1361 (Fed. Cir. 2010)....................................................................6

*Wyers v. Master Lock Co.*,
    616 F.3d 1231 (Fed. Cir. 2010), *cert. denied*, 131 S. Ct. 1531 (2011) ..........................3, 5, 7

## Statutes

35 U.S.C. § 102(b) ...........................................................................................9

## Other Authorities

*Manual of Patent Examining Procedure* § 2256 (8th ed. rev. 7, July 2008) .......................................4

## Rules

Fed. R. Civ. P. 56(g) .........................................................................................10

DEFENDANTS' SUPPLEMENTAL BRIEF ON OBVIOUSNESS
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW

# I.    **INTRODUCTION**

At the hearing on Defendants' motion for summary judgment of invalidity, the Court observed that the asserted claims "seem obvious, but I have some concerns that it's — hindsight is — is simple, and that perhaps it wasn't obvious back whenever it happened."  Ex. 48 ("Hr'g Tr.") at 22:18–:20.  The Court subsequently granted Defendants leave to supplement their motion for summary judgment to address the obviousness of "resubmission."  *See* Order at 3:13–4:7 (Dec. 6, 2011).  Pursuant to that Order, Defendants present this brief and the expert declaration of Dr. Ray Larson ("Larson II Decl.").  Dr. Larson demonstrates through the prior art evidence already of record, his own personal knowledge from the relevant time period, and documents of which he was aware that to one of ordinary skill in the art ("One of Ordinary Skill"):

- Resubmission was a well-known technique for performing multiple related queries on a stateless server (i.e., a server that does not remember prior queries);

- Kelora ***does not contest*** (and Dr. Larson agrees) that One of Ordinary Skill would have been motivated to adapt AMP Navigator to (a) client-server arrangements generally and (b) Web client-server arrangements specifically;

- Following these uncontested motivations to adapt AMP Navigator, there were multiple "rational underpinnings" that motivated One of Ordinary Skill to use resubmission in that adaptation, including (a) the explicit teachings of *Arnett* to "re-sen[d]" parameters to the server, (b) the nature of the problem that stateless servers, including Web servers, do not remember prior queries, (c) the established function of resubmission to maintain state information across multiple related queries in stateless server systems, (d) resubmission being one of a known finite number of solutions for maintaining state information, and (e) common sense.

Each of the "rational underpinnings" identified by Dr. Larson provides an independent basis recognized by the Federal Circuit for demonstrating obviousness without using hindsight.

In response to Dr. Larson's declaration, Kelora provided two declarations purporting to raise "fact issues."  *See generally* Gafford II Decl. (Dec. 27, 2011); Hassell Decl. (Dec. 27, 2011).  But each of those supposed "fact issues" either ignores the admitted motivations or are contrary to the

1  proper *legal* analysis.

2  For example, Kelora's declarants attempt to disqualify undisputed Web prior art from use in

3  the obviousness analysis by relying on a low "level of ordinary skill," and relying on recollections of

4  *personal* observations from 1994.  *See, e.g.*, Hassell Decl. ¶¶ 20, 23–24; Gafford I Decl. ¶¶ 21–22,

5  64; Gafford II Decl. ¶¶ 27–34.  Such an approach is incorrect *as a matter of law* because the

6  hypothetical person of ordinary skill is deemed to have knowledge of *all* relevant prior art.  *See, e.g.*,

7  *Rothman v. Target Corp.*, 556 F.3d 1310, 1317–18 (Fed. Cir. 2009); *Amazon.com, Inc. v.*

8  *barnesandnoble.com, inc.*, 239 F.3d 1343, 1364 (Fed. Cir. 2001).  As another example, Kelora's

9  declarants focus on *alternative* ways to adapt AMP Navigator to *non*-Web embodiments.  *See, e.g.*,

10  Gafford II Decl. ¶¶ 15–19.  That there were multiple obvious alternatives fails to rebut that adapting

11  AMP Navigator to use resubmission was also obvious, especially when Mr. Gafford admits

12  "[m]otivation to adapt applications, in general, to the web, *is not contested*."  Gafford I Decl. ¶ 47

13  (Oct. 11, 2011).[1]

14  Finally, Kelora's declarants argue it would be difficult to "port" the source code for the AMP

15  Navigator program to a client-server embodiment.  *See, e.g.*, Gafford II Decl. ¶ 13; Hassel Decl.

16  ¶¶ 18–20.  But the patent itself provides no details about how to "port" the standalone embodiment

17  described in the specification to a client-server embodiment that uses "resubmission," *compare* Ex. 2

18  at 5:30–18:10 (detailed description of standalone embodiment), *with id.* at 18:11–19:35 (high-level

19  description of client-server embodiment, with no mention of "resubmission"), which is an admission

20  that both "porting" and "resubmission" were so obvious and easily understood that they did not need

21  to be described in any detail at all.  *See, e.g.*, *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565,

22  1570 (Fed. Cir. 1997) (affirming summary judgment of obviousness) ("[The] patent itself does not

23  disclose the level of detail that [the patentee] would have us require of the prior art."); Hr'g Tr. (Ex.

24  48) at 34:21–:23 ("[The '821 patent] doesn't go into any analogous level of detail.  It just says we're

25  going to do this.  It doesn't say how.").  Moreover, this argument ignores that the general *concept* of

26  parametric search as reflected in the originally claimed features is prior art, rather than merely the

27  ───────────────

28  [1] Unless stated otherwise, all emphasis in quotes throughout this brief has been added.

1   AMP Navigator source code, making the "porting" argument irrelevant.  *See Lockwood*, 107 F.3d at

2   1570.

3          Consistent with the evidence already before the Court, Dr. Larson's declaration confirms that

4   resubmission was the most straightforward and obvious way to conduct any iterative search on a

5   stateless server, such as a Web server.  *See* Larson II Decl. ¶¶ 16(a)–(j), 34, 43, 55, 62–65.

6   Summary judgment should therefore be granted.

7   **II.**    **ARGUMENT**

8         **A.**    **Multiple "rational underpinnings," not hindsight, demonstrate that it was**
              **obvious to use "resubmission" with applications that utilized iterative**

9              **search, including AMP Navigator**

10         In *KSR International Co. v. Teloflex, Inc.*, the Supreme Court acknowledged the dangers of

11   "hindsight bias" and encouraged district courts to set forth "articulated reasoning with some rational

12   underpinning to support the legal conclusion of obviousness."  550 U.S. 398, 418, 421 (2007)

13   (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).  Such "rational underpinnings" include an

14   explicit or implicit motivation to combine found "1) in the prior art references themselves; 2) in the

15   knowledge of those of ordinary skill in the art that certain references, or disclosures in those

16   references, are of special interest or importance in the field; or 3) from the nature of the problem to

17   be solved."  *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1238 (Fed. Cir. 2010) (quoting *Ruiz v. A.B.*

18   *Chance Co.*, 234 F.3d 654, 665 (Fed. Cir. 2000)), *cert. denied*, 131 S. Ct. 1531 (2011).  Additionally,

19   "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of

20   identified, predictable solutions, a person of ordinary skill has good reason to pursue the known

21   options within his or her technical grasp.  If this leads to the anticipated success, it is likely the

22   product not of innovation but of ordinary skill and common sense."  *KSR Int'l Co.*, 550 U.S. at 421.

23   Similarly, a combination is likely obvious when it is nothing "more than the predictable use of prior

24   art elements according to their established functions."  *Id.* at 417.

25          Dr. Larson's declaration demonstrates multiple "rational underpinnings" of the type

26   identified by the Supreme Court and Federal Circuit, thereby providing several independent bases to

27   conclude that there is no "hindsight bias" here as a matter of law.

28

1

### 1.    Stateless servers using resubmission were known

2       Stateless servers, their properties, and the use of resubmission with stateless servers to

3   perform iterative searches were well-known at the time of the invention.  Larson II Decl. ¶¶ 26–28.

4   A stateless server does not remember a previous query and therefore when a user wishes to perform

5   several related queries, the server cannot be relied upon to track the state between queries.  *Id.*  As

6   Dr. Larson explains, the most obvious way to overcome the server's inability to maintain state

7   information was to resubmit the original search criteria together with the new search criteria.  *Id.*

8   This use of resubmission was not only obvious, but it was well known and used, for example, in the

9   Sun NFS system.  *Id.* ¶ 27 ("The NFS uses a stateless protocol. The parameters to each procedure

10  call contain **all** of the information necessary to complete the call, and the server does not keep track

11  of any past requests."); *see also id.* ¶¶ 45–47 (describing known methods of encoding parameters to

12  implement resubmission in a Web system); ¶¶ 56–62 (describing *Suzuki*'s use of resubmission).[2]

13  Mr. Gafford neither contests Dr. Larson's description of resubmission on the Web, nor the

14  resubmission of all parameters with each request in Sun NFS.  *See* Gafford II Decl. ¶¶ 7–11.[3]

15

16

17

---

18       [2] Mr. Gafford argues that the Examiner already determined these claims to be valid in
    reexamination and he "see[s] no reason to second guess [the examiner's] decision."  Gafford II Decl.
19  ¶ 37.  But the principal prior art before the Court — including the AMP Navigator and *Arnett* —
    were not before the Examiner.  While *Suzuki* was submitted to the Examiner, "the requisite degree of
20  consideration to be given to such information will be normally **limited** by the degree to which the
    party filing the information citation has **explained** the content and relevance of the information."
21  *Manual of Patent Examining Procedure* § 2256, at 2200-87 (8th ed. rev. 7, July 2008), *available at*
    Ex. 49.  The applicants never discussed or distinguished *Suzuki* (particularly the portions cited by
22  Dr. Larson, including Figure 7) and thus there is no reason to conclude that the Examiner considered
    *Suzuki* in allowing the amended claims.  Moreover, the **combination** of *Suzuki* and the AMP
23  Navigator was never before the Examiner, and thus not considered.

24       [3] Mr. Gafford's criticisms of Dr. Larson's summary of the prior art take on a familiar pattern in
    which Mr. Gafford does not dispute Dr. Larson's description of a reference or the point for which it
25  is cited, but instead he criticizes the reference for not addressing some **other** issue, thus tacitly
    admitting the point made by Dr. Larson.  *See, e.g.*, Gafford I Decl. ¶¶ 45–46 (Web servers known to
26  be stateless); *id.* ¶ 47 (example of motivation to adapt existing system to Web and need to include all
    parameters in URL); Gafford II Decl. ¶ 7 (resubmission was known method of maintaining state in a
27  stateless systems, including Sun NFS); *id.* ¶¶ 8–11 (prior art included known techniques for
    communicating parameters between Web client and server).

28

DEFENDANTS' SUPPLEMENTAL BRIEF ON OBVIOUSNESS
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW

2.   **The nature of the problem, market forces, common sense, and known finite solutions motivated use of resubmission with stateless servers**

Mr. Gafford, Dr. Larson, and the Patent Office all agree that there was a motivation to adapt stand-alone systems (such as AMP Navigator) to a client-server arrangement. *See* Larson II Decl. ¶¶ 32–33. There was additional motivation to select a stateless client-server system (over a stateful system) to avoid complex crash recovery, to simplify the client-server communication protocol, and to decrease the overhead load on the server. *Id.* ¶¶ 29–31. The benefits of using a stateless server were known and made explicit in the prior art. *Id.* (citing Larson II Decl. Ex. 3 at 120). In fact, the patent owner admitted during reexamination of the '821 patent that using a ***stateless*** Web server had obvious advantages over a stateful server.[4] *Id.* ¶ 31.

Once One of Ordinary Skill elected to adapt AMP Navigator to a stateless client-server system, that person would necessarily select a way to maintain state information between multiple related searches. *Id.* ¶ 34. As Dr. Larson explains, resubmission — a solution already used in stateless systems to address this exact problem — was the first, simplest, and most obvious choice. *Id.* Thus, the use of resubmission in such an adaptation would have been nothing "more than the predictable use of prior art elements according to their established functions." *KSR Int'l Co.*, 550 U.S. at 417. Mr. Gafford does not contest that resubmission was known in the art. *See supra* p. 4 & note 3. Moreover, the very nature of the problem to be solved — a stateless server cannot remember prior search results — leads directly to the known solution — resubmit the prior search terms — and thereby provides additional motivation. *See* Larson II Decl. ¶ 28; *see also Wyers*, 616 F.3d at 1238 (motivation may come from "nature of the problem to be solved"). Finally, even if other solutions also existed, it is uncontested that resubmission was, at a minimum, one of "a finite number of identified, predictable solutions" for maintaining state information, and that is sufficient to conclude

---

[4] "If the webserver has to identify and track individual sessions with each such user in order to know what criteria the user previously searched in earlier search iterations, there is clearly a tremendous overhead load on the webserver to service such individual search sessions." '821 Reexam, Ex. 5, at 10 (filed Sept. 15, 2011); *see also* Larson II Decl. ¶¶ 29–31, 40–42 (discussing cost and complexity advantages of stateless protocols over stateful protocols).

resubmission was obvious.  *See* Larson II Decl. ¶ 27; Gafford II Decl. ¶ 7; *KSR Int'l Co.*, 550 U.S. at 421.

Thus, numerous "rational underpinnings" would have led One of Ordinary Skill to adapt AMP Navigator to a stateless client-server environment and to use resubmission to maintain state information for multiple related searches in that adaptation.  Larson II Decl. ¶¶ 16, 63–64.

### 3.  Explicit teachings motivated use of resubmission with stateless Web servers

Mr. Gafford and Dr. Larson also agree that there was motivation to adapt stand-alone systems such as AMP Navigator to the Web.[5]  *See* Gafford I Decl. ¶ 47; Larson II Decl. ¶ 36.  Given this ***admitted*** motivation, the only remaining question is whether One of Ordinary Skill would have been motivated to use resubmission in a Web adaptation of AMP Navigator.  Web servers were known to be stateless and, in fact, the stateless nature of Web servers was touted as a key characteristic.  *Id.* ¶¶ 35, 37.  Therefore, the motivations discussed above apply and the answer is yes.  *Id.* ¶ 38.[6]

In addition to the motivation to use resubmission because of "several obvious and necessary implications of" any stateless server, *Arnett* provides ***explicit*** motivation to include resubmission in a Web embodiment.  *See* Larson II Decl. ¶¶ 28, 39–40, 51–52.  *Arnett* identifies the problem — maintaining state information during multiple related searches — and explicitly identifies resubmission as a solution ("I'm attacking ***that problem*** by passing parameters, which are kept by

---

[5] Further emphasizing the point, on at least three occasions the Federal Circuit has found adapting an existing application to the Web to be obvious as a matter of law.  *See W. Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1370–71 (Fed. Cir. 2010) (reversing jury verdict and finding as a matter of law that adding "internet-based communications" to a money-transfer system would have been obvious); *Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1349–53 (Fed. Cir. 2010) (affirming summary judgment of obviousness given motivation between 1990 and 1995 to "bring the established features of various computer programs to the web platform"); *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1326 (Fed. Cir. 2008) (reversing jury verdict and finding as a matter of law that combining prior-art device with web browser functionality "represent[ed] a combination of two well known prior art elements to a person of ordinary skill in the art").

[6] The benefits of using resubmission, rather than building a completely new type of server to maintain state information, was specifically recognized in the Web context where a single server is used by many thousands of users at the same time.  Larson II Decl. ¶¶ 41–42.  The patent owner likewise recognized during prosecution that tracking state on a Web server would create "a tremendous overhead load."  *Id.* ¶ 31 (quoting '821 Reexam, Ex. 5, at 10).

1   the *browser* and **re-sent**.").  *Id.* ¶ 52; *see also Wyers*, 616 F.3d at 1238 (motivation may come

2   from the reference itself).  Moreover, *Arnett* was published on WWW-Talk, precisely where One of

3   Ordinary Skill looked for solutions to Web implementations.  *See* Larson II Decl. ¶¶ 53–54.

4       Thus, One of Ordinary Skill would have been motivated to adapt AMP Navigator to a Web

5   embodiment, and numerous "rational underpinnings," including the explicit teachings of *Arnett*,

6   would have led One of Ordinary Skill to use resubmission.

7               **4.    One of ordinary skill would have been capable of using any
                        well-known resubmission method**
8

9       Dr. Larson's declaration demonstrates that One of Ordinary Skill would not need further

10  guidance to implement resubmission beyond the simple direction to resubmit needed parameters.

11  *See* Larson II Decl. ¶ 44.  For example, in a Web implementation, there were multiple known ways

12  to instruct the browser to return to the server previous parameters along with newly selected

13  parameters, including using forms with hidden input fields and embedding parameters in a URL.  *Id.*

14  ¶¶ 45–47.  Selection of any one of these methods was a simple design choice, and any one of these

15  methods would satisfy the language of the asserted claims.  *Id.* ¶ 48.  Thus, while Mr. Gafford

16  criticizes *Arnett* for leaving "important fundamentals such as when any information would be stored,

17  where it would be stored, under what circumstances it would be stored, and under what

18  circumstances it would be accessed," *see* Gafford II Decl. at 12–13, 20–21, 25–26 ("factual

19  disputes" 2, 3, 12, 19), it was not necessary to include such details in *Arnett* because numerous

20  design choices that answer those questions were known and any known implementation could be

21  used, *see* Larson II Decl. ¶ 48.

22      Tellingly, the '821 patent itself does not specify any of the "important fundamentals" that

23  Mr. Gafford claims are lacking from *Arnett*.  *See* Larson II Decl. ¶ 50; Hr'g Tr. (Ex. 48) at 34:21–:23

24  ("[The '821 patent] doesn't go into any analogous level of detail.  It just says we're going to do this.

25  It doesn't say how.").  The lack of disclosure in the '821 patent is an admission that the inventors

26  knew that One of Ordinary Skill understood how to perform resubmission in a Web embodiment and

27  thus did not need to be told the obvious.  *See Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524,

28  1534 (Fed. Cir. 1987) ("A patent need not teach, and preferably omits, what is well known in the

1  art."); *Lockwood*, 107 F.3d at 1570 ("[The] patent itself does not disclose the level of detail that [the

2  patentee] would have us require of the prior art.").  Similarly, while Mr. Gafford criticizes Arnett

3  and Jared Rhine for providing no additional detail beyond specifying resubmission of all parameters,

4  the fact that they did not include more details is consistent with Dr. Larson's opinion that such

5  details were unnecessary.  *See* Larson II Decl. ¶ 49.  The purpose of the WWW-TALK listserve was

6  to teach developers how to build applications, so if more detail was necessary, the authors would

7  have included it or other users would have requested it.  *Id.*

8      Thus, the prior art provided sufficient knowledge and motivation to One of Ordinary Skill to

9  adapt AMP Navigator to a stateless client-server arrangement using resubmission.

10      **B.    Kelora's purported "factual disputes" are legally irrelevant**

11      Mr. Gafford states that he "identified at least 19 questions of fact in dispute."  Gafford II

12  Decl. ¶ 39.  As detailed below, these purported "factual disputes" simply repeat a handful of themes

13  that are either legally incorrect or are irrelevant because they ignore the undisputed motivations.  No

14  actual material issues of fact remain.

15      **1.    Kelora cannot use "level of ordinary skill" to remove
          undisputed prior art from the prior art**

16

17      Both of Kelora's declarants, Mr. Gafford and Dr. Hassell, argue that persons having the

18  proper "level of ordinary skill" would not have had familiarity with Web-related references such as

19  the HTML standard, WWW-TALK listserve messages, and numerous other Web related documents,

20  even though those documents were undisputedly in the prior art.  *See, e.g.*, Gafford II Decl. at 25

21  ("factual dispute" 18) (citing Hassel Decl. ¶ 20).  But the proper ***legal*** framework for the

22  obviousness inquiry assumes that "a ***hypothetical*** person of ordinary skill in the field [is] ***attributed***

23  ***knowledge of the relevant prior art.***"  *Rothman*, 556 F.3d at 1318; *see also Amazon.com, Inc.*, 239

24  F.3d at 1364 ("Whatever Dr. Lockwood did or did not ***personally*** realize at the time based on his

25  actual knowledge is irrelevant.").[7]  Thus, Kelora's experts do not raise a factual issue, but instead

26  _____

27  [7] Similarly, Mr. Gafford's reference to Nick Arnett's actual level of skill is irrelevant since it is
   undisputed that his posting on WWW-TALK was prior art and thus known as a matter of law to the
   hypothetical person of ordinary skill.  In any event, Mr. Gafford's argument that Arnett is "among
   the elite developers whose skills exceed those of ordinary skill in the art" in the art in 1994 (Gafford
28  II Decl. ¶ 26) is contrary to Mr. Arnett's declaration, which states Arnett obtained a non-technical

*(Footnote continued)*

1  commit **legal error** by arguing one of ordinary skill would not have access to knowledge

2  undisputedly in the prior art.

3        **2.**      **"Porting" of Kimbrough's AMP Navigator demo source**
                        **code is not the proper starting point for the obviousness**

4                          **analysis**

5        Mr. Gafford's "factual disputes" 6, 8, 9, 10, 11, 12, 13, and 17 and the majority of the Hassell

6  Declaration (Section 4.2) focus on the specific source code of the AMP Navigator demo and

7  speculate what one of ordinary skill in the art would have done to "port" that particular code to a

8  client-server arrangement.  As explained in Defendants' Reply Brief and not rebutted by Kelora,

9  such an approach is incorrect **as a matter of law**.  *See* Reply at 11:16–:26.  Danish's offer for sale

10  under § 102(b) did not place the source code in the prior art, but rather "place[d] the **claimed**

11  features . . . in the public's possession."  *Lockwood*, 107 F.3d at 1570 (affirming summary judgment

12  of obviousness).  Thus, Kelora's focus on specific unclaimed details of the AMP Navigator source

13  code — instead of the fact that the offer for sale placed the relevant concept in the prior art — is

14  **legal error**, rendering the accompanying factual analysis irrelevant.

15        **3.**      **A known solution need not be the "best" solution to be**
                        **obvious**

16

17        Mr. Gafford and Dr. Hassell argue that there is a "factual" dispute regarding whether One of

18  Ordinary Skill would be motivated to adapt AMP Navigator in an alternative manner "**in lieu of** a

19  web-based solution."  *See, e.g.*, Gafford II Decl. at 18–19 ("factual dispute" 10).  This "factual"

20  dispute would only be relevant if one (a) ignores an admitted motivation to adapt to the Web and

21  (b) assumes that only one path can be obvious.  To do so would be **legal error**.  *See, e.g.*, *Merck &*

22  *Co., Inc. v. Biocraft Labs., Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989) ("That the [prior art] patent

23  discloses a multitude of effective combinations does not render any particular formulation less

24  obvious.").  That there may be multiple obvious paths to adapt AMP Navigator does not make the

25  paths discussed by Dr. Larson, each of which are supported by multiple "rational underpinnings,"

26  degree, took some computer science courses, ran a consulting company where he monitored trends
(not technical work), and did not join the WWW-TALK listserve until mid 1992.  Arnett Decl. ¶¶ 3,

27  5.  This background fits exactly in Kelora's definition of level of ordinary skill.  Gafford I Decl.
¶ 60.  Mr. Gafford again confuses level of knowledge with level of skill.

28

1    any less obvious.  *See id.*  This is especially true where Mr. Gafford ***admits*** that motivation to adapt

2    to the Web exists.  Gafford I Decl. ¶ 47.  With such an admitted motivation, whether One of

3    Ordinary Skill would ***also*** be motivated to perform alternative adaptations "***in lieu of*** a web-based

4    solution" is irrelevant to the key issue of whether it would have been obvious to adapt AMP

5    Navigator to a Web embodiment using resubmission.

6           Mr. Gafford's advocacy for adapting AMP Navigator into "Networked Navigator," which he

7    argues has benefits over resubmission (Gafford II Decl. ¶¶ 15–19), is irrelevant for the same

8    reasons.[8]  At best, Mr. Gafford demonstrates that adapting AMP Navigator (a) using a stateless

9    server and resubmission and (b) using "Network Navigator" are two of "a finite number of

10   identified, predictable solutions, [that] a person of ordinary skill has good reason to pursue." *KSR*

11   *Int'l Co.*, 550 U.S. at 421.  In such a case, One of Ordinary Skill would be motivated to use any of

12   those finite solutions, and all are equally obvious.  *See id.*

13   **III.   CONCLUSION**

14          For all of these reasons, summary judgment of obviousness should be GRANTED.[9]

---

[8] Mr. Gafford's argument about a "Networked Navigator" alternative is misplaced and incomplete.  *See* Gafford II Decl. ¶¶ 15–19.  First, Mr. Gafford argues that "Networked Navigator" has an advantage because "it retains known, existing, working code."  *Id.* ¶ 19.  As discussed above, focusing on "porting" the specific source code in the prior art is a ***legally erroneous*** approach.  *See supra* Part II.B.2, p. 9.  Second, Mr. Gafford argues that "Resubmission requires more bandwidth because increasing numbers of parameters must be sent between the client and server."  Gafford II Decl. ¶ 18.  To the contrary, "Networked Navigator" would require the server to return to the client ***all*** the matching results for ***each*** and ***every*** query term, which would vastly increase the bandwidth needed by unnecessarily transmitting to the client items that match one, but not all, of the query terms.  Thus, Mr. Gafford actually demonstrates cost considerations that would motivate the use of resubmission.

[9] If summary judgment of obviousness is not granted, then ***partial*** summary judgment should be granted with respect to all the invalidity issues raised in Defendants' motion (other than the question of whether "resubmission" was obvious, which would then be the sole issue for trial with respect to obviousness).  *See* Fed. R. Civ. P. 56(g).  This would be consistent with the Court's observation that "the only thing that perhaps one can imagine wasn't obvious was the resubmission idea," Ex. 48 at 22:20–:22, and would significantly narrow the case and the focus of the upcoming expert reports on invalidity (presently due February 23, 2012).  Thus at least partial summary judgment should be granted to establish that (a) collateral estoppel applies (Mot. at 17:13–19:14; Reply at 2:11–3:12; Ex. 48 at 36:25–38:25, 43:7–44:12); (b) the relevant date for prior art is October 14, 1994 — and thus *Arnett* is prior art — because Kelora has failed to corroborate an earlier date of invention (Mot. at 19 n.6, 24 n.11, 27:10–28:16; Reply at 8:1–:20); (c) the secondary considerations do not support a finding of non-obviousness (Mot. at 28:21–29:19; Reply at 13:17–15:8); and (d) if independent claim 1 is obvious, then dependent claims 2–4 are also obvious (Mot. at 17:1–:12, 29:23–33:27; Reply at 15:9–:14).

1    Dated:  January 13, 2012                    By:   /s/ Richard A. Cederoth

2                                                      David T. Pritikin (*pro hac vice*)
                                                        <dpritikin@sidley.com>
3                                                      Richard A. Cederoth (*pro hac vice*)
                                                        <rcederoth@sidley.com>
4                                                      SIDLEY AUSTIN LLP
                                                      One S. Dearborn Street
5                                                      Chicago, Illinois  60603
                                                      Telephone:    (312) 853-7000
6                                                      Facsimile:     (312) 853-7036

7                                                      Sandra S. Fujiyama (Bar No. 198125)
                                                        <sfujiyama@sidley.com>
8                                                      Theodore W. Chandler (Bar No. 219456)
                                                        <tchandler@sidley.com>
9                                                      Aaron M. Farber (Bar No. 270851)
                                                        <afarber@sidley.com>
10                                                     SIDLEY AUSTIN LLP
                                                      555 West Fifth Street, Suite 4000
11                                                     Los Angeles, California  90013
                                                      Telephone:    (213) 896-6000
12                                                     Facsimile:     (213) 896-6600

13                                                     <Kelora-Microsoft-eBay@sidley.com>

14                                                     *Counsel for Plaintiff and Counterclaim-
                                                      Defendant eBay Inc.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-11-
DEFENDANTS' SUPPLEMENTAL BRIEF ON OBVIOUSNESS
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW

1

By:  /s/ Richard A. Cederoth

2
David T. Pritikin (*pro hac vice*)

3
<dpritikin@sidley.com>
Richard A. Cederoth (*pro hac vice*)

4
<rcederoth@sidley.com>
SIDLEY AUSTIN LLP

5
One S. Dearborn Street
Chicago, Illinois  60603

6
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036

7
Sandra S. Fujiyama (Bar No. 198125)

8
<sfujiyama@sidley.com>
Theodore W. Chandler (Bar No. 219456)

9
<tchandler@sidley.com>
Aaron M. Farber (Bar No. 270851)

10
<afarber@sidley.com>
SIDLEY AUSTIN LLP

11
555 West Fifth Street, Suite 4000
Los Angeles, California  90013

12
Telephone:    (213) 896-6000
Facsimile:    (213) 896-6600

13
<Kelora-Microsoft-eBay@sidley.com>

14

15
David E. Killough (Bar No. 110719)
<davkill@microsoft.com>

16
MICROSOFT CORPORATION
One Microsoft Way, 8/2076

17
Redmond, Washington  98052
Telephone:    (425) 703-8865
Facsimile:    (425) 869-1327

18

19
*Counsel for Plaintiff and Counterclaim-
Defendant Microsoft Corporation*

20

21

22

23

24

25

26

27

28

-12-

1

By:  /s/ Wendy K. Akbar
_____

2

3    Gregory P. Sitrick (*pro hac vice*)
         <gregory.sitrick@quarles.com>
     Wendy K. Akbar (*pro hac vice*)

4        <wendy.akbar@quarles.com>
     QUARLES & BRADY LLP

5    One Renaissance Square
     Two North Central Avenue

6    Phoenix, Arizona  85004
     Telephone:     (602) 229-5200

7    Facsimile:     (602) 420-5198

8    Jeffrey L. Fillerup (Bar No. 120543)
         <jfillerup@luce.com>

9    LUCE, FORWARD, HAMILTON & SCRIPPS LLP

10   Rincon Center II
     121 Spear Street, Suite 200

11   San Francisco, California  94105
     Telephone:     (415) 356-4600

12   Facsimile:     (415) 356-3881

13   Callie A. Bjurstrom (Bar No. 137816)
         <cbjurstrom@luce.com>

14   LUCE, FORWARD, HAMILTON & SCRIPPS LLP
     600 West Broadway, Suite 2600

15   San Diego, California  92101
     Telephone:     (619) 699-2586

16   Facsimile:     (619) 645-5323

17   *Attorneys for Plaintiff and Counterclaim-
     Defendant Cabela's Inc.*

18

19

20

21

22

23

24

25

26

27

28

1

By:  /s/ Richard S. Zembek

2

Dan D. Davison (*pro hac vice*)
 <ddavison@fulbright.com>

3

Robert L. Greeson (*pro hac vice*)
 <rgreeson@fulbright.com>

4

FULBRIGHT & JAWORSKI L.L.P.

5

2200 Ross Avenue, Suite 2800
Dallas, Texas  75201

6

Telephone:    (214) 855-8000
Facsimile:    (214) 855-8200

7

Richard S. Zembek (*pro hac vice*)

8

 <rzembek@fulbright.com>
Daniel S. Leventhal (*pro hac vice*)

9

 <dleventhal@fulbright.com>
FULBRIGHT & JAWORSKI L.L.P.

10

Fulbright Tower

11

1301 McKinney, Suite 5100
Houston, Texas  77010

12

Telephone:    (713) 651-5151
Facsimile:    (713) 651-5246

13

Gilbert A. Greene (*pro hac vice*)

14

 <ggreene@fulbright.com>
FULBRIGHT & JAWORSKI L.L.P.

15

600 Congress Avenue, Suite 2400
Austin, Texas  78701

16

Telephone:    (512) 474-5201
Facsimile:    (512) 536-4598

17

John A. O'Malley (Bar No. 101181)

18

 <jomalley@fulbright.com>
Aaron D. Gopen (Bar No. 268451)

19

 <agopen@fulbright.com>
FULBRIGHT & JAWORSKI L.L.P.

20

555 South Flower Street, 41st Floor

21

Los Angeles, California  90071
Telephone:    (213) 892-9200

22

Facsimile:    (213) 892-9494

23

*Attorneys for Defendants and
Counterclaim-Plaintiffs Target*

24

*Corporation; Amazon.com, Inc.; Office
Depot, Inc.; Costco Wholesale*

25

*Corporation; Hewlett-Packard Company;
Audible, Inc.; and Zappos.com, Inc.*

26

27

28

-14-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By: /s/ Niall A. MacLeod

Niall A. MacLeod (*pro hac vice*)
    <niall.macleod@btlaw.com>
Aaron A. Myers (*pro hac vice*)
    <aaron.myers@btlaw.com>
BARNES & THORNBURG LLP
225 South Sixth Street, Suite 2800
Minneapolis, Minnesota 55402
Telephone:    (612) 333-2111
Facsimile:     (612) 333-6798

Stephen R. Mick (Bar No. 131569)
    <smick@btlaw.com>
BARNES & THORNBURG LLP
2049 Century Park East
Los Angeles, California 90067
Telephone:    (310) 284-3880
Facsimile:     (310) 284-3894

*Attorneys for Defendant and Counterclaim-Plaintiff Rockler Companies, Inc.*

By:  /s/ Joseph A. Micallef
_____

Joseph A. Micallef (DC Bar No. 443679)
    <jmicallef@sidley.com>
Michael R. Franzinger (Bar No. 222155)
    <mfranzinger@sidley.com>
Scott M. Border (*pro hac vice*)
    <sborder@sidley.com>
Wonjoo Suh (Bar No. 269500)
    <wsuh@sidley.com>
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC  20005
Telephone:    (202) 736-8000
Facsimile:     (202) 736-8711

Theodore W. Chandler (Bar No. 219456)
    <tchandler@sidley.com>
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California  90013
Telephone:    (213) 896-6000
Facsimile:     (213) 896-6600

Kimball R. Anderson (*pro hac vice*)
    <kanderson@winston.com>
Marlon E. Lutfiyya (*pro hac vice*)
    <mlutfiyya@winston.com>
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601
Telephone:    (312) 558-5600
Facsimile:     (312) 558-5700

Howard I. Shin (*pro hac vice*)
    <hshin@winston.com>
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York  10166
Telephone:    (212) 294-6700
Facsimile:     (212) 294-4700

David S. Bloch (State Bar No. 184530)
    <dbloch@winston.com>
WINSTON & STRAWN LLP
101 California Street
San Francisco, California  94111
Telephone:    (415) 591-1000
Facsimile:     (415) 591-1400

*Attorneys for Defendant and Counterclaim-Plaintiff Dell, Inc.*

-16-
DEFENDANTS' SUPPLEMENTAL BRIEF ON OBVIOUSNESS
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW

By:  /s/ Kent E. Baldauf, Jr.
_____

Kent E. Baldauf, Jr. (*pro hac vice*)
   <kbaldaufjr@webblaw.com>
Bryan P. Clark (*pro hac vice*)
   <bclark@webblaw.com>
THE WEBB LAW FIRM
One Gateway Center
420 Ft. Duquesne Blvd., Suite 1200
Pittsburgh, Pennsylvania 15222
Telephone:   (412) 471-8815
Facsimile:   (412) 471-4094

Phillip F. Shinn (State Bar No. 112051)
   <pshinn@foxrothschild.com>
FOX ROTHSCHILD LLP
235 Pine Street, Suite 1500
San Francisco, California  94104
Telephone:   (415) 364-5558
Facsimile:   (415) 391-4436

*Attorneys for Defendant and Counterclaim-Plaintiff Newegg Inc.*

**SIGNATURE ATTESTATION**

Pursuant to General Order No. 45(X)(B), I hereby certify that concurrence in the filing of this document has been obtained from each of the other signatories shown above.


_____/s/ Theodore W. Chandler_____

DEFENDANTS' SUPPLEMENTAL BRIEF ON OBVIOUSNESS
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW

## **EXHIBITS**

Ex. 48:    Transcript of Hearing on Defendants' Motion for Summary Judgment of Invalidity (Dec. 1, 2011)

Ex. 49:    *Manual of Patent Examining Procedure* § 2256 (8th ed. rev. 7, July 2008), *available at* <http://www.uspto.gov/web/offices/pac/mpep/documents/2200_2256.htm>

# Exhibit 48

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

Certified Copy

EBAY INC. AND MICROSOFT          )
CORPORATION,                     )
                                 )          PAGES 1 - 74
    PLAINTIFFS AND               )
    COUNTERCLAIM-DEFENDANTS,     )
                                 )
    VS.                          )          NO. C 10-04947 CW
                                 )
KELORA SYSTEMS, LLC,             )
                                 )
    DEFENDANT AND                )
    COUNTERCLAIM-PLAINTIFF,      )          OAKLAND, CALIFORNIA
_____  )          THURSDAY, DECEMBER 1, 2011
                                 )
CABELA'S INC.,                   )
                                 )
    PLAINTIFF AND                )
    COUNTERCLAIM-DEFENDANT,      )
                                 )
    VS.                          )          NO. C 11-01398 CW
                                 )
KELORA SYSTEMS, LLC,             )
                                 )
    DEFENDANT AND                )
    COUNTERCLAIM-PLAINTIFF,      )
_____  )

KELORA SYSTEMS, LLC,                      )
                                          )
    PLAINTIFF AND                         )
    COUNTERCLAIM-DEFENDANT,               )
                                          )
VS.                                       )      NO. C 11-01548 CW
                                          )
TARGET CORPORATION, ET AL.                )
                                          )
    DEFENDANTS AND                        )
    COUNTERCLAIM-PLAINTIFFS,              )
                                          )
OFFICEMAX INCORPORATED,                   )
                                          )
    THIRD-PARTY PLAINTIFF,                )
                                          )
VS.                                       )
                                          )
ADOBE SYSTEMS INCORPORATED,               )
                                          )
    THIRD-PARTY DEFENDANT.                )
_____          )
NEBRASKA FURNITURE MART,                  )
INC.,                                     )
                                          )
    PLAINTIFF AND                         )
    COUNTERCLAIM-DEFENDANT,               )
                                          )
VS.                                       )      NO. C 11-02844 CW
                                          )
KELORA SYSTEMS, LLC,                      )
                                          )
    DEFENDANT AND                         )
    COUNTERCLAIM-PLAINTIFF,               )
_____          )
ADOBE SYSTEMS INCORPORATED                )
                                          )
            PLAINTIFF,                    )
                                          )
VS.                                       )      NO. C 11-03938 CW
                                          )
KELORA SYSTEMS, LLC,                      )
                                          )
            DEFENDANT,                    )
_____          )

### TRANSCRIPT OF PROCEEDINGS

REPORTED BY:  RAYNEE H. MERCADO, CSR NO. 8258

```
1                    A P P E A R A N C E S

2

3   FOR PLAINTIFFS AND       SIDLEY AUSTIN, LLP
    COUNTERCLAIM DEFENDANTS   555 WEST FIFTH STREET, SUITE 4000
    EBAY, INC. AND           LOS ANGELES, CALIFORNIA  90013
4   MICROSOFT CORP.:   BY:   THEODORE W. CHANDLER,
                             AARON FARBER, ATTORNEYS AT LAW
5

6   FOR PLAINTIFF CABELA'S    QUARLES & BRADY, LLP
    INC.:                     300 NORTH LASALLE STREET, SUITE 4000
7                             CHICAGO, ILLINOIS  60654-3422
                       BY:   CHRISTOPHER J. FAHY, ATTORNEY AT LAW
8

9   FOR PLAINTIFF NEBRASKA    MUNGER, TOLLES & OLSON, LLP
    FURNITURE MART, INC.:     355 SOUTH GRAND AVENUE, 35TH FLOOR
10                            LOS ANGELES, CALIFORNIA  90071-1560
                       BY:   ANDREW W. SONG, ATTORNEY AT LAW
11

12  FOR PLAINTIFF AND         MANATT, PHELPS & PHILLIPS, LLP
    COUNTERCLAIM DEFENDANT    1841 PAGE MILL ROAD, SUITE 200
13  KELORA SYSTEMS, LLC:      PALO ALTO, CALIFORNIA  94304
                       BY:   ROBERT D. BECKER,
14                            RHYS W. CHEUNG,
                             SHAWN G. HANSEN,
15                            RONALD S. KATZ, ATTORNEYS AT LAW

16                            MANATT, PHELPS & PHILLIPS LLP
                             1001 PAGE MILL ROAD, BUILDING 2
17                            PALO ALTO, CALIFORNIA  94304
                       BY:   BEN KLEINMAN,  ATTORNEY AT LAW
18

19

20  FOR PLAINTIFF ADOBE       FISH & RICHARDSON, P.C.
    SYSTEMS AND DEFENDANT     ONE MARINA PARK DRIVE
21  OFFICEMAX INCORPORATED:   BOSTON, MASSACHUSETTS  02210-1878
                       BY:   FRANK SCHERKENBACH, ATTORNEY AT LAW
22

23

24

25
```

4

```
 1              A P P E A R A N C E S  (CONT'D.)

 2

 3    FOR DEFENDANT TARGET,    FULBRIGHT & JAWORSKI LLP
      CORPORATION, ET AL.:     1301 MCKINNEY, SUITE 5100
 4                             HOUSTON, TEXAS  77010
                         BY:   RICHARD S. ZEMBEK, ATTORNEY AT LAW
 5
                               FULBRIGHT & JAWORSKI LLP
 6                             2200 ROSS AVENUE, SUITE 2800
                               DALLAS, TEXAS  75201-2784
 7                       BY:   DAN D. DAVISON, ATTORNEY AT LAW

 8

 9    FOR DEFENDANT DELL,      WINSTON & STRAWN, LLP
      INC.:                    101 CALIFORNIA STREET
10                             SAN FRANCISCO, CALIFORNIA  94111
                         BY:   DAVIS S. BLOCH, ATTORNEY AT LAW
11

12    FOR DEFENDANT ROCKLER    BARNES & THORNBURG, LLP
      COMPANIES, INC.:         225 SOUTH SIXTH STREET, SUITE 2800
13                             MINNEAPOLIS, MINNESOTA  55402-4662
                         BY:   NIALL A. MACLEOD, ATTORNEY AT LAW
14

15    FOR DEFENDANT NEWEGG     FOX ROTHSCHILD LLP
      INC.:                    235 PINE STREET, SUITE 1500
16                             SAN FRANCISCO, CALIFORNIA  94104-2734
                         BY:   PHILLIP F. SHINN, ATTORNEY AT LAW
17

18                             --OOO--

19

20

21

22

23

24

25
```

```
1    THURSDAY, DECEMBER 1, 2011                    2:28 P.M.

2                      P R O C E E D I N G S

3         THE CLERK:  WE'RE CALLING C09- -- WE'RE CALLING

4    10-4947, EBAY, INC., ET AL. VERSUS PARTSRIVER, INC.; C11-1398

5    CALEBA'S, INC. VERSUS KELORA SYSTEMS, LLC; C11-1548, KELORA

6    SYSTEMS, LLC VERSUS TARGET CORPORATION, ET AL.; C11-2284

7    NEBRASKA FURNITURE MART, INC. VERSUS KELORA SYSTEMS, LLC; AND

8    11-3938 ADOBE SYSTEMS, INCORPORATED VERSUS KELORA SYSTEMS, LLC.

9              PLEASE STEP FORWARD AND STATE YOUR APPEARANCES FOR

10   THE RECORD.

11        MR. CHANDLER:  GOOD AFTERNOON, YOUR HONOR.  TED

12   CHANDLER FROM SIDLEY AUSTIN ON BEHALF OF EBAY AND MICROSOFT IN

13   CIVIL ACTION NO. 10-4947.

14        MR. BECKER:  GOOD MORNING (SIC), YOUR HONOR.  ROBERT

15   BECKER FROM MANATT, PHELPS & PHILLIPS ON BEHALF OF KELORA IN

16   ALL THE ACTIONS.  AND ALSO WITH ME ARE RON KATZ, SHAWN HANSEN,

17   AND BEN KLEINMAN.

18        MR. DAVISON:  DAN DAVIS --

19              (OFF-THE-RECORD DISCUSSION.)

20        THE COURT:  YOU'RE GOING TO HAVE TO COME UP TO THE

21   PODIUM.

22        MR. DAVISON:  I'M SORRY, YOUR HONOR.

23              DAN DAVISON AND RICH ZEMBEK WITH FULBRIGHT &

24   JAWORSKI IN THE TARGET CASE FOR DEFENDANTS AMAZON, AUDIBLE,

25   ZAPPOS, HP, TARGET, AND COSTCO.
```

1          THE COURT:  DID YOU TRY AND DO THAT FROM MEMORY?

2          MR. DAVISON:  I DID.

3          BETTER LOOK AT YOUR NOTES, MAKE SURE YOU GOT THEM

4  ALL.

5          MR. DAVISON:  I DID, YOUR HONOR.

6          MR. SONG:  YOUR HONOR, ANDREW SONG ON BEHALF OF

7  NEBRASKA FURNITURE MART IN THE 2284 CASE.

8          MR. BLOCH:  GOOD AFTERNOON, YOUR HONOR.  DAVID

9  BLOCH, WINSTON & STRAWN, ON BEHALF OF DELL IN THE 1548 CASE.

10          MR. MacLEOD:  YOUR HONOR, NIALL MACLEOD FROM

11  BARNES & THORNBURG FOR ROCKLER COMPANIES IN THE TARGET CASE.

12          THE COURT:  GIVE US THE NUMBER, IF YOU WOULD.

13          MR. MacLEOD:  1548, I BELIEVE.

14          MR. SCHERKENBACH:  GOOD AFTERNOON, YOUR HONOR.

15  FRANK SCHERKENBACH OF FISH & RICHARDSON.  I'M HERE WEARING TWO

16  HATS.  FOR OFFICEMAX IN THE TARGET CASE, WHICH IS THE 1548, AND

17  FOR ADOBE IN ITS DECLARATORY JUDGMENT ACTION, WHICH IS THE 3938

18  CASE.

19          THE COURT:  OKAY.  WELL, WHY DON'T YOU STAY HERE

20  BECAUSE I WANT TO TALK ABOUT THE DECLARATORY JUDGMENT FIRST.

21          MR. SCHERKENBACH:  OKAY.

22          THE COURT:  BUT JUST STEP ASIDE A LITTLE BIT TO LET

23  THE OTHERS STATE THEIR APPEARANCES.  BUT THEN WE'LL GO TO THAT

24  ONE.

25          MR. FAHY:  GOOD AFTERNOON, YOUR HONOR.  CHRISTOPHER

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1   FAHY WITH QUARLES & BRADY ON BEHALF OF CABELA'S, INCORPORATED

2   IN THE 1398 CASE.

3           **MR. SHINN:**  GOOD AFTERNOON, YOUR HONOR.  PHILLIP

4   SHINN FOR FOX ROTHSCHILD IN THE 1548 CASE.  WE REPRESENT NEW

5   EGG.

6           **THE COURT:**  IS THAT IT?

7           OKAY.  WELL, I'D LIKE TO FIRST TAKE UP THE MOTION

8   TO -- I GUESS KELORA'S MOTION TO DISMISS ADOBE'S DECLARATORY

9   RELIEF CLAIM AGAINST IT IN THE 3938 CASE.

10          YOU MAY ADDRESS IT ON ADOBE'S BEHALF.  YOU'RE SORT

11  OF DANCING AROUND A FEW THINGS, AND I PERHAPS UNDERSTAND WHY

12  YOU WANT TO DANCE AROUND THEM AND NOT PERHAPS ADMIT THEM, BUT

13  YOU MAY BE DANCING AROUND THEM NOT SAYING ENOUGH TO JUSTIFY THE

14  DECLARATORY RELIEF YOU WANT TO ASK FOR.

15          **MR. SCHERKENBACH:**  OKAY.  WELL, OBVIOUSLY, WE DIDN'T

16  WANT TO DO THAT.

17          AND I SEE NOW -- WELL, I SEE THE LANGUAGE THEY

18  FASTENED ON IN THE COMPLAINT, THE -- THE

19  LESS-THAN-CRYSTAL-CLEAR STATEMENTS THAT OUR LICENSEES -- ACTUAL

20  LICENSEES HAVE BEEN THREATENED BY THEM.  THEY ARE ACTUAL

21  LICENSEES.

22          IF THE COURT --

23          **THE COURT:**  AND THAT THEY'RE BEING SUED BECAUSE OF

24  THEIR USE OF ADOBE'S PRODUCTS IN PART?

25          **MR. SCHERKENBACH:**  YES.

1          **THE COURT:**  HOW BIG OF A PART?

2          **MR. SCHERKENBACH:**  YES.

3          **THE COURT:**  -- TINY LITTLE PART OR --

4          **MR. SCHERKENBACH:**  NO, IT'S THE CORE -- IT'S THE

5    CORE FUNCTIONALITY, AND THIS IS ACTUALLY THE -- REALLY, THE

6    PRIMARY POINT I WANTED TO MAKE CLEAR FOR THE COURT, 'CAUSE WITH

7    ALL DUE RESPECT, I THINK WE DIDN'T DO THE JOB IN OUR PAPERS

8    MAYBE WE COULD HAVE, BUT -- SO THERE ARE 35 AND COUNTING ADOBE

9    LICENSEES THAT HAVE GOTTEN THESE THREAT LETTERS FROM KELORA.

10   ONE OF THOSE IS OFFICEMAX, WHO IS OBVIOUSLY A DEFENDANT.

11   THEY'RE THEY ARE 34 OTHERS.

12         **THE COURT:**  AND THEY'RE NOT THESE PEOPLE; THEY'RE

13   THE --

14         **MR. SCHERKENBACH:**  THEY'RE NOT --

15         **THE COURT:**  -- YET OTHER PEOPLE.

16         **MR. SCHERKENBACH:**  THERE'RE YET OTHER PEOPLE WHO ARE

17   NOT YET IN ANY OR THE ACTIONS AS FAR AS WE KNOW.  WE DON'T KNOW

18   HOW MANY OTHER LETTERS HAVE BEEN SENT.  THEY ARE ACTUAL

19   LICENSEES OF ADOBE.  AND ADOBE HAS INDEMNITY OBLIGATIONS TO

20   THOSE FOLKS IN ITS CONTRACTS THAT PROVIDE THE SOFTWARE AND THE

21   SERVICES.  SO I'M PREPARED TO PROVIDE THAT TO THE COURT IF THE

22   COURT ACTUALLY WANTS TO SEE THAT.

23         WHAT DOES ADOBE PROVIDE?

24         **THE COURT:**  YOU COULD AMEND YOUR COMPLAINT TO STATE

25   THOSE THINGS.

1          **MR. SCHERKENBACH:**  YES.  WE COULD CERTAINLY DO THAT

2   AND ARE HAPPY TO DO THAT.

3          AS TO WHAT WE PROVIDE, WE -- WE PROVIDE WEB-HOSTING

4   SERVICES TO THESE COMPANIES.  FOR THE MOST PART, THESE WEBSITES

5   ARE ONLINE SHOPPING SITES WHERE A CUSTOMER CAN, YOU KNOW,

6   NAVIGATE TO THE SITE AND SEARCH FOR PRODUCTS BY ALL SORTS OF

7   DIFFERENT PARAMETERS.

8          AND SO YOU HAVE THIS PHRASE "PARAMETRIC SEARCH."  I

9   WANT, YOU KNOW, THINGS THAT ARE -- SIZE 11 SHOES, AND I WANT

10  BLUE ONES.  YOU KNOW, SOMETHING LIKE THAT.  TO IMPLEMENT THAT

11  FUNCTIONALITY, ADOBE ACTUALLY HOSTS ON ITS SERVERS ITS OWN

12  SOFTWARE THAT DOES THE DETERMINATION AND THE ACTUAL SEARCHING

13  ON THE DATA.

14         SO IT TAKES A REQUEST FROM, SAY, AN OFFICEMAX THAT

15  COMES TO ADOBE ON ITS SERVERS, ADOBE SOFTWARE ON ADOBE SERVERS

16  PERFORM ACTIONS IN RESPONSE TO THAT, GET AN ANSWER EFFECTIVELY,

17  SEND IT BACK TO OFFICEMAX.  SO IT'S ACTUAL -- ADOBE'S OWN

18  ACTIVITIES AND OWN SOFTWARE ARE DIRECTLY IMPLICATED BY THE --

19  BY THE ALLEGATIONS.

20         IT'S NOT A CASE -- AND THIS IS, I THINK, SOMETHING

21  THAT KELORA FASTENED ON IN ITS PAPER.  IT'S NOT A SITUATION

22  WHERE WE MAKE A WIDGET, PUT IT IN THE STREAM OF COMMERCE,

23  SOMEBODY IN TEXAS BUYS THE WIDGET, IS ACCUSED OF INFRINGING

24  'CAUSE THEY'RE USING IT.  IT'S NOT THAT CASE.

25         **THE COURT:**  OR NOT EVEN THAT YOU MAKE SOFTWARE, SELL

1   IT TO SOMEBODY, AND SOMEBODY IS SUED BY USING IT ON THEIR OWN

2   SERVER.

3           **MR. SCHERKENBACH:**  INDEED.  THOUGH, I DO WANT TO

4   BE -- IN ABUNDANCE OF CANDOR HERE, WE ACTUALLY DO BOTH FOR

5   CERTAIN CUSTOMER.  WE NOT ONLY HOST, WE ALSO PROVIDE SOFTWARE

6   THAT A CUSTOMER INSTALLS ON ITS OWN SERVERS.

7           SO BOTH FLAVORS EXIST IN THIS CASE.  BUT IN ALL OF

8   THE -- CERTAINLY IN THE OFFICEMAX SITUATION AND IN THE VAST

9   MAJORITY OF THE OTHER 34, IT'S THE WEB HOSTING FLAVOR THAT IS

10  IMPLICATED BY THIS '821 PATENT.

11          **THE COURT:**  AND HOW DO YOU KNOW?  I MEAN, THEY DON'T

12  SAY IN THEIR CEASE-AND-DESIST LETTERS YOUR USE OF ADOBE

13  PRODUCTS IS DOING THIS OR YOUR USE OF ADOBE SERVICES IS DOING

14  THIS.  HOW DO YOU KNOW IT'S YOU AND THAT THESE 35 PEOPLE AREN'T

15  ALSO USING SOME OTHER SERVICE OR SOME OTHER SOFTWARE THAT'S

16  REALLY THE INFRINGING PARTY HERE AND NOT YOU ALL?

17          **MR. SCHERKENBACH:**  TWO ANSWERS TO THAT.  FIRST OF

18  ALL, WE KNOW WHAT FUNCTIONALITY KELORA ACCUSES.  IT'S A

19  USER-LEVEL FUNCTIONALITY IN PART.  AND SO WHEN A CUSTOMER --

20  WHEN A WEBSITE OPERATOR GETS THIS LETTER, THEY SAY, OH, WE GET

21  THAT TECHNOLOGY FROM ADOBE.  CUSTOMER TAKES LETTER, CONTACTS

22  ADOBE AND SAYS, HEY, THIS THING THEY'RE -- THIS FUNCTIONALITY

23  THEY'RE POINTING TO, WE GET THAT FROM YOU.

24          NOW, DO WE KNOW THEY DON'T ALSO GET IT FROM SOMEBODY

25  ELSE, TOO?  I CAN'T REPRESENT THAT TO YOU IN EVERY SITUATION.

```
 1    BUT WE HAVE A -- WE KNOW WHO'S LICENSED OUR SOFTWARE.  WE KNOW

 2    WHO HAS -- WHO WE PROVIDE WEB-HOSTING SERVICES TO, SO, YOU

 3    KNOW, WE LOOK THEM UP, YES, WE HAVE AN AGREEMENT WITH THEM;

 4    YES, THERE'S AN INDEMNITY IN THAT SERVICES AGREEMENT.  AND SO

 5    MAYBE THERE'S OTHER PEOPLE ON THE HOOK, TOO.

 6               BUT CLEARLY ADOBE IS DIRECTLY IMPLICATED.

 7               THE COURT:  SO YOU COULD AMEND YOUR COMPLAINT TO

 8    CLARIFY THAT THEY ARE YOUR LICENSEES, THAT YOU DO HAVE

 9    INDEMNIFICATION AGREEMENTS, AND THAT YOU DO HAVE REASON TO

10    BELIEVE THAT IT'S YOUR SERVICES THAT ARE BEING TARGETED.

11               MR. SCHERKENBACH:  ABSOLUTELY.  NO PROBLEM WITH

12    THAT.

13               MR. KATZ:  MAY IT PLEASE THE COURT --

14               THE COURT:  -- THAT THAT'S EVEN NECESSARY.  I MEAN,

15    IT STANDS TO REASON AND SEEMS LIKELY THAT THAT'S ALL CORRECT,

16    AND I'M NOT SURE WE NEED TO STAND ON CEREMONY.

17               BUT WHAT DID YOU WANT TO ADD?

18               MR. KATZ:  I'LL BE BRIEF, YOUR HONOR --

19                    (OFF-THE-RECORD DISCUSSION.)

20               MR. KATZ:  YEAH, RONALD KATZ.

21               YOU SAID HE WAS DANCING AROUND THE ISSUE.  I WOULD

22    SAY HE DIDN'T MAKE THE SHOWING THAT HE HAS THE BURDEN TO MAKE.

23    SO, THEREFORE, THE MOST THAT HE COULD HOPE FOR WOULD BE THAT

24    YOUR HONOR WOULD GRANT LEAVE TO AMEND.  AND EVEN THEN, I THINK

25    WE'RE GOING TO HAVE SOME PROBLEMS DOWN THE LINE, AND I DON'T
```

1   KNOW IF WHAT HE SAID STANDS TO REASON OR NOT.

2           BUT I WOULD THINK THAT THAT WOULD BE THE MOST THAT

3   YOUR HONOR COULD DO AT THIS POINT.

4           **THE COURT:**  AND IF YOU THINK IT'S NOT ADOBE, JUST

5   GIVE HIM A COVENANT NOT TO SUE AND THAT WILL BE THE END OF

6   THAT.

7               (SIMULTANEOUS COLLOQUY.)

8           **MR. SCHERKENBACH:**  -- EXTENDS TO OUR CUSTOMERS.

9   YEAH, THAT'D BE GREAT.

10          **MR. KATZ:**  WE HAVEN'T DONE THE ANALYSIS.

11          **THE COURT:**  PARDON ME?

12          **MR. KATZ:**  WE HAVE NOT MADE ANY THREATS TO ADOBE.

13  WE HAVE NOT HAD ANY CONTACT WITH ADOBE EXCEPT THROUGH --

14          **THE COURT:**  RIGHT.  BUT YOU'VE SENT LETTERS TO 35

15  PEOPLE.  AND I GUESS JUST HAVE DONE THE ANALYSIS AS TO THEM,

16  AND YOU MUST KNOW WHAT THEY'RE USING.

17          **MR. KATZ:**  WE HAVE DONE THE ANALYSIS.

18          **THE COURT:**  IF IT'S NOT ADOBE, THEN --

19          **MR. KATZ:**  WE HAVE DONE THE ANALYSIS WITH RESPECT TO

20  THEM.

21          **THE COURT:**  I'M SORRY?

22          **MR. KATZ:**  WE HAVE DONE THAT ANALYSIS, YOUR HONOR.

23  BUT I DON'T BELIEVE THAT HE'S MADE THE SHOWING THAT HE HAS TO

24  MAKE.  AND WHEN HE MAKES IT, THEN WE WILL ANALYZE IT, AND IF

25  IT'S FINE, GREAT.  IF NOT, WE'LL BE BACK WITH ANOTHER MOTION TO

1   DISMISS.

2          **THE COURT:**  HMM.

3          WELL, IT STRIKES ME AS A LOT OF UNNECESSARY

4   EXPENDITURE OF MONEY AND PAYMENT OF ATTORNEYS' FEES.  BUT I

5   GUESS YOU CAN AMEND YOUR COMPLAINT TO CLEAR UP THOSE THINGS.

6   AND I DON'T WANT TO HEAR ANY OF THE SAME ARGUMENTS AGAIN,

7   BECAUSE I THINK IT'S PRETTY CLEAR RIGHT NOW THAT -- THAT

8   DECLARATORY RELIEF IS APPROPRIATE, PARTICULARLY IF COUNSEL IS

9   REPRESENTING CORRECTLY WHAT HE CAN SAY IN AN AMENDED COMPLAINT.

10         IF HE DOES SAY THOSE THINGS IN AN AMENDED COMPLAINT,

11  AND YOU MOVE TO DISMISS IT, I DON'T WANT TO SEE A FRIVOLOUS

12  MOTION.

13         **MR. KATZ:**  WELL, WE DON'T THINK THIS MOTION WAS

14  FRIVOLOUS, YOUR HONOR.  AND WE WOULD NOT MAKE A FRIVOLOUS

15  MOTION.

16         **THE COURT:**  OKAY.

17         SO I GUESS WHAT I'M SAYING, THOUGH, IS IF HE SAYS

18  WHAT HE SAYS HE'S GOING TO SAY, I THINK THAT WILL BE ENOUGH.

19         **MR. KATZ:**  WELL, I HOPE --

20         **THE COURT:**  YOU SHOULD ONLY MOVE TO DISMISS AGAIN

21  IF -- IF THERE'S SOMETHING NEW AND DIFFERENT AND NOT THE SAME

22  ARGUMENTS AS BEFORE.

23         **MR. KATZ:**  RIGHT.  I MEAN, HAMLET WAS SORT OF

24  MISSING IN HIS PAPERS.  LET'S SEE THE INDEMNITY AGREEMENT.  WE

25  CAN ANALYZE THAT.  THE COURT CAN ANALYZE THAT.

1        **THE COURT:**  WELL, YOU DON'T HAVE TO SEE IT.   THEY'LL

2    ALLEGE THAT THERE IS ONE.

3        **MR. KATZ:**  WELL --

4        **THE COURT:**  AND THAT WILL BE ADEQUATE.

5        **MR. KATZ:**  IT MAY OR MAY NOT.

6        **THE COURT:**  WILL BE FOR ME.

7        **MR. KATZ:**  YOUR HONOR, UNDER RULE 12(B)(1), THEY

8    HAVE TO MAKE AN EVIDENTIARY SHOWING, YOUR HONOR.

9        **MR. SCHERKENBACH:**  YOUR HONOR, I CAN MAYBE CUT

10   THROUGH THIS.  I MEAN, I -- WE'RE NOT TRYING TO HIDE THE BALL

11   HERE.  WE'LL AMEND RIGHT QUICK.  OKAY?  IT'S NOT A PROBLEM.

12   WE'LL DO IT RIGHT AWAY.

13        AND, ACTUALLY, THERE WAS WASN'T ANY MEET-AND-CONFER

14   BEFORE THEY FILED THEIR MOTION, AND I DON'T OBJECT TO PRODUCING

15   UNDER THE PROTECTIVE ORDER A SAMPLE INDEMNITY AGREEMENT.  THEY

16   CAN SEE IT.  I MEAN, THE FACTS ARE WHAT THEY ARE.  I'M

17   REPRESENTING THEM TO YOU.  THAT'S WHAT THEY ARE.  AND I JUST

18   WANT TO DO IT QUICKLY BECAUSE I DON'T WANT -- YOU KNOW, THE --

19   CERTAIN TRAINS HAVE LEFT THE STATION ALREADY, AND WE DON'T WANT

20   TO GO TOO FAR BEHIND, SO -- THEY WANT TO TRY TO GET THINGS

21   MOVING IN OUR ACTION.

22        **THE COURT:**  OKAY.  SO YOU NEED TO ASK HIM WHAT YOU

23   WANT TO KNOW BEFORE YOU FILE ANY MOTION.

24        **MR. KATZ:**  WE'RE GLAD TO DO THAT.

25        **THE COURT:**  YOU WANT TO SEE AN INDEMNITY AGREEMENT.

```
 1   OKAY, HE SAYS HE'LL SHOW TO IT.
 2            WHAT, DO YOU WANT TO FILE IT IN A WEEK?
 3            MR. SCHERKENBACH:  ABSOLUTELY, NO PROBLEM.
 4            MR. KATZ:  WE'RE GLAD TO DO THAT, YOUR HONOR.  I
 5   JUST WANT TO ADD THAT WE DON'T BELIEVE THAT THEY HAVE THE RIGHT
 6   TO FILE WHAT APPEARS TO BE A CLASS ACTION ON BEHALF OF 16 OR 35
 7   OR WHOEVER.  WE BELIEVE THAT THOSE ARE NECESSARY PARTIES, SO
 8   THERE MIGHT BE SOME MOTION PRACTICE WITH RESPECT TO THAT AS
 9   WELL.
10            I JUST --
11            THE COURT:  OH, I DON'T THINK SO.
12            MR. KATZ:  -- PUT IT ALL ON THE TABLE.
13            THE COURT:  I DON'T THINK SO.
14            MR. SCHERKENBACH:  I -- I DIDN'T -- THE CLASS ACTION
15   ARGUMENT IS -- HAS NO -- I MEAN, HAS NO APPLICABILITY --
16            THE COURT:  DECLARATORY RELIEF WITH RESPECT TO THEM
17   AND THEIR PRODUCTS --
18            MR. KATZ:  JUST THEM.
19            THE COURT:  -- MIGHT HAVE SOME BENEFITS TO OTHER
20   PEOPLE.  BUT THE OTHER PEOPLE DON'T NEED TO BE PLAINTIFFS IF
21   THAT'S WHAT YOU'RE SAYING.
22            MR. KATZ:  IT APPEARS TO US THAT THEY'RE TRYING TO
23   REPRESENT THOSE OTHER PEOPLE IN THIS ACTION, BUT WE'LL SEE WHAT
24   THEIR COMPLAINT SAYS.
25            THE COURT:  OKAY.
```

1          SO YOU CAN FILE YOUR ANSWER OR YOUR MOTION TO

2     DISMISS THE FOLLOWING WEEK.

3          **MR. KATZ:**  YES.

4          **THE COURT:**  AND I'LL DECIDE IT ON THE PAPERS.

5          **MR. KATZ:**  THAT WOULD BE FINE, YOUR HONOR.

6          **MR. SCHERKENBACH:**  VERY GOOD.  THANK YOU.  WE'LL DO

7     THAT.

8          **THE COURT:**  ALL RIGHT.

9          SO ON THE OTHER PART OF IT, I DO THINK WE NEED TO DO

10    MORE CLAIM CONSTRUCTION THAN IS NECESSARY JUST FOR THE SUMMARY

11    JUDGMENT MOTION, BUT WE CERTAINLY DON'T NEED TO DO CLAIM

12    CONSTRUCTION THAT WON'T BE NECESSARY AT TRIAL.

13         SO IF KELORA IS SAYING THAT THESE DEFENDANTS -- AND

14    THIS MAY NOT BE YOU ANYMORE --

15         **MR. SCHERKENBACH:**  YEAH, I PROBABLY -- THEY'RE ALL

16    SAY -- HOPING I DON'T SAY ANYTHING IN RESPONSE TO THIS ISSUE,

17    SO I THINK I'LL STEP SIDE.  THANK YOU.

18         **MR. KATZ:**  WELL, WE ALSO HAD A CMC TODAY, YOUR

19    HONOR.  I PRESUME YOU WANT TO PUT THAT OFF WITH RESPECT TO THE

20    ADOBE CASE.

21         **THE COURT:**  YOU ALL HAVE CMC'S OR JUST YOU?

22         **MR. KATZ:**  THE ADOBE CASE HAS A CMC.

23         **MR. SCHERKENBACH:**  IT WAS JUST ADOBE, YOUR HONOR.

24    BUT, HONESTLY, I THINK WE SHOULD MEET AND CONFER OVER THE --

25    PERSONALLY OVER THE ISSUES THAT THEY -- THAT WE DISAGREED WITH

1   ON THE STATEMENT.

2           **THE COURT:** OKAY.

3           **MR. SCHERKENBACH:** IN LIGHT OF YOUR RULING, I THINK

4   WE CAN WORK ESSENTIALLY --

5           **THE COURT:** BUT WHAT I'D REALLY LIKE TO DO IS GET

6   YOU ON TRACK WITH ALL THE OTHER CASES.

7           **MR. SCHERKENBACH:** YES.

8           **MR. KATZ:** WE AGREE WITH THAT, YOUR HONOR, IF IT'S

9   POSSIBLE.  IF IT'S POSSIBLE.

10          **THE COURT:** YEAH, I THINK IT SHOULD BE.  SO, YEAH,

11  WHY DON'T YOU MEET AND CONFER AND TRY TO ENTER INTO SOME SORT

12  OF STIPULATION THAT GETS YOU ON TRACK AS MUCH AS POSSIBLE WITH

13  THE REST OF THE CASES.

14          **MR. KATZ:** THANK YOU, YOUR HONOR.

15          **MR. SCHERKENBACH:** WE'LL DO THAT.

16          **THE COURT:** SO THE OTHER CASES DON'T HAVE CMC'S.  IT

17  WAS JUST YOU?

18          **MR. SCHERKENBACH:** I THINK --

19          **THE COURT:** NO, THERE ARE OTHERS THAT HAVE THEM.

20          **THE CLERK:** THEY'RE ON FOR FURTHER.

21          **THE COURT:** OKAY.

22          SO I GUESS I WAS TALKING TO THE WRONG PEOPLE ABOUT

23  CLAIM CONSTRUCTION, BUT YOU HAVE A DISPUTE ABOUT WHICH CLAIMS

24  NEEDED TO BE CONSTRUED AND CERTAINLY ANY CLAIMS THAT -- UPON

25  WHICH THE SUMMARY JUDGMENT MOTION DEPENDS NEED TO BE CONSTRUED

1    PERHAPS.  BUT JUST BECAUSE THEY WEREN'T PART OF THE SUMMARY

2    JUDGMENT MOTION DOESN'T NECESSARILY MEAN THEY DON'T NEED TO BE

3    CONSTRUED IF THEY'RE GOING TO BE AT ISSUE AT -- AT A POTENTIAL

4    TRIAL.

5         SO I DON'T KNOW IF YOU'VE -- CAN TELL ME WHICH

6    ONES -- IF THERE'S SOME THAT DON'T NEED TO BE CONSTRUED AT ALL

7    BECAUSE THEY'RE NOT EVEN RELEVANT TO ANY DISPUTE THAT WOULD

8    COME OUT AT TRIAL.  I GUESS THAT WOULD BE ADDRESSED TO KELORA.

9         **MR. BECKER:**  WELL, YOUR HONOR, I THINK THAT THE ONLY

10   ONES THAT NEED TO BE CONSTRUED WHERE THE ONES THAT SORT OF

11   FILTERED OUT IN THIS MOTION.  THERE ARE A NUMBER --

12        **THE COURT:**  NOT NECESSARILY.  BECAUSE THOSE ARE THE

13   ONES THAT ARE RELEVANT TO SUMMARY JUDGMENT.  BUT ARE YOU SAYING

14   THAT IF SUMMARY JUDGMENT IS DENIED AND ALL THE CLAIMS GO TO

15   TRIAL, THAT THERE AREN'T ANY OTHER DISPUTED CLAIM TERMS?

16        **MR. BECKER:**  I THINK THAT'S RIGHT.

17        **THE COURT:**  HMM.

18        **MR. BECKER:**  IN FACT, EVEN WITH RESPECT TO THE

19   SUMMARY JUDGMENT MOTION.  I THINK THE DEFENDANTS HAVE CLAIMED

20   THAT THE -- THE -- THAT THIS MOTION DOESN'T TURN ON CLAIM

21   CONSTRUCTION EITHER.

22        **THE COURT:**  WELL, THEY SAY, AS MANY DO, THAT

23   WHICHEVER WAY IT GOES, THEY STILL WIN.

24        **MR. BECKER:**  RIGHT.

25        **THE COURT:**  BUT THAT DOESN'T NECESSARILY MEAN THAT

1    THEY DON'T NEED TO BE CONSTRUED.

2                    (SIMULTANEOUS COLLOQUY.)

3         **THE COURT:**  PARTICULARLY IF THEY DON'T WIN AND IT

4    GOES FORWARD.

5         **MR. BECKER:**  I THINK THE EASIEST WAY OF SAYING THIS

6    IS THAT ALMOST EVERY CLAIM CONSTRUCTION THAT'S BEEN PROPOSED --

7    AND IT'S BEEN PROPOSED -- FOR THE MOST PART HAVE BEEN PROPOSED

8    BY THE DEFENDANTS ARE JUST A RESTATEMENT OF SOME PRETTY SIMPLE

9    LANGUAGE AND -- AND TO THE EXTENT IT'S NOT REAL SIMPLE, I DON'T

10   THINK THE RESTATEMENT IS ANY BETTER TAN THE ORIGINAL LANGUAGE.

11   IT'S SIMPLY SUBSTITUTING WORDS THAT THE PATENTEES DID NOT

12   CHOOSE FOR WORDS FOR OTHER WORDS.

13        AND I DON'T THINK, QUITE FRANKLY, THAT THERE'S ANY

14   OTHER DISPUTES THAT ARE OUT THERE THAT -- THAT NEED TO BE

15   RESOLVED.  I DON'T THINK THEY'RE REAL DISPUTES.  I THINK

16   THEY'RE JUST TRYING -- THEY'RE JUST REPHRASING OF LANGUAGE

17   THAT'S ALREADY THERE.

18        **THE COURT:**  HMM.  SO IS IT YOUR VIEW THAT TERMS

19   OTHER THAN THOSE NECESSARY FOR SUMMARY JUDGMENT DO NEED TO BE

20   CONSTRUED?

21        **MR. CHANDLER:**  YOUR HONOR, TED CHANDLER ON BEHALF OF

22   EBAY AND MICROSOFT.  I WILL BE SPEAKING ON BEHALF OF ALL THE

23   DEFENDANTS WITH RESPECT TO SOME ISSUES.  MR. ZEMBEK WILL

24   ADDRESS OTHER ISSUES.  I CAN ANSWER YOUR HONOR'S QUESTION.

25        THE ANSWER IS THAT IF SUMMARY JUDGMENT OF INVALIDITY

1   IS GRANTED, THE COURT WOULD NOT NEED TO CONSTRUE THE CLAIMS AT

2   THE END OF THE BRIEF THAT WE'RE TALKING ABOUT.

3           IF SUMMARY JUDGMENT WAS DENIED AND THE CASE

4   PROCEEDS, OUR POSITION IS THAT, YES, THOSE TERMS DO NEED TO BE

5   CONSTRUED UNDER THE O2 MICRO CASE, THE REASON BEING THAT IT'S

6   INAPPROPRIATE FOR THE JURY TO COME UP WITH ITS OWN CONSTRUCTION

7   OF THESE TERMS.  SO --

8           **THE COURT:**  WELL, YEAH, ANY CLAIM THAT'S IN DISPUTE

9   THAT'S RELEVANT TO THE DISPUTE -- THAT'S MATERIAL TO THE

10  DISPUTE NEEDS TO BE CONSTRUED.

11          MY QUESTION IS, ARE ALL OF THESE MATERIAL TO THE

12  DISPUTE?  I DON'T WANT TO CONSTRUE THINGS THAT AREN'T MATERIAL

13  THAT'S --

14          **MR. CHANDLER:**  THE SHORT ANSWER IS I THINK THEY MAY

15  BE MATERIAL.  WE HAVE NOT SEEN EXPERT REPORTS.  I THINK PERHAPS

16  ONE WAY TO CUT THROUGH THIS IS THE PARTIES HAVE BRIEFED THOSE

17  TERMS.  AT THE PRETRIAL CONFERENCE, IF THERE ARE REMAINING

18  DISPUTES ON THOSE TERMS, THE PARTIES COULD ADDRESS, YOU KNOW,

19  WHICH TERMS ARE STILL IN DISPUTE AT THAT TIME.

20          THE WAY IT STANDS NOW IS KELORA HAS JUST SAID THAT

21  FOR THESE TERMS, THAT THE PLAIN-AND-ORDINARY MEANING GOVERNS.

22  IT'S VERY AMBIGUOUS WHAT THAT MEANS AND HOW THEY'RE GOING TO

23  USE THAT IN THEIR EXPERT REPORTS.

24          WHAT THE DEFENDANTS HAVE DONE FOR ALL OF THOSE TERMS

25  IS THEY HAVE PROPOSED CONSTRUCTIONS WHICH ARE THE SAME

1    CONSTRUCTIONS THAT ARE ACTUALLY AGREED UPON IN THE <u>PARTSRIVER</u>

2    CASE.  AND THESE ARE CONSTRUCTIONS THAT GIVE MEANING TO TERMS

3    THAT ON THE FACE OF THINGS HAVE A SIMPLE MEANING, SUCH AS

4    "FAMILY OF ITEMS" OR "ALTERNATIVES."

5           BUT THE WAY THAT THOSE TERMS ARE USED IN THE -- IN

6    THE PATENT HAVE A VERY SPECIFIC MEANING, AND SO WE DON'T WANT

7    THE JURY TO COME UP WITH THEIR OWN MEANING FOR EVERYDAY WORDS

8    SUCH AS FAMILY OF ITEMS OR ALTERNATIVES.

9           **THE COURT:**  OKAY.

10          WELL, MAYBE WE'LL CONSTRUE WHAT WE NEED TO FOR

11   SUMMARY JUDGMENT, AND IF SUMMARY JUDGMENT IS DENIED, THEN WE'LL

12   KNOW PERHAPS MORE ABOUT WHAT ELSE MIGHT NEED TO BE CONSTRUED,

13   SO WE'LL WAIT AND SEE ON THAT.

14          ON THE OBVIOUSNESS, CAN WE TALK ABOUT THAT NEXT?

15          **MR. CHANDLER:**  YEAH, MR. ZEMBEK WILL BE ADDRESSING

16   OBVIOUSNESS.  WE HAVE DEMONSTRATIVES THAT GO ALONG WITH THE

17   ARGUMENT.  WITH THE COURT'S PERMISSION, WE'D LIKE TO HAND THOSE

18   UP.

19          **THE COURT:**  I DON'T REALLY LIKE TO START IN ON NEW

20   THINGS.  I MEAN, I'VE READ WHAT YOU GAVE ME BEFORE, AND THERE

21   WAS PLENTY OF IT, SO I DON'T -- UNLESS IT'S SOMETHING THAT I'VE

22   ALREADY SEEN THAT YOU'RE GOING TO SHOW ME.

23          **MR. CHANDLER:**  IT IS.  IT'S WHAT YOU'VE SEEN --

24          **THE COURT:**  -- COLORS OR --

25          **MR. CHANDLER:**  EXACTLY.  SO THERE'S NOTHING NEW.

1    THESE ARE -- YOU KNOW, IT'S A SUBSET OF THE EXHIBITS, AND SO

2    IT'S JUST SOMETHING TO -- SO EVERYONE CAN BE FOLLOWING ON THE

3    SAME PAGE.  WE CAN ADDRESS IT AS --

4            **THE COURT:**  OKAY.  IT'S ALL THINGS THAT ARE ALREADY

5    IN THE EXHIBITS?

6            **MR. CHANDLER:**  EXACTLY.

7            **THE COURT:**  OKAY.  WELL, YOU CAN GIVE IT TO ME.  I'M

8    NOT SURE I'LL LOOK AT IT, BUT --

9                    (PAUSE IN THE PROCEEDINGS.)

10           **MR. ZEMBEK:**  GOOD AFTERNOON, YOUR HONOR.  RICHARD

11   ZEMBEK ON BEHALF OF -- SPEAKING ON BEHALF OF A NUMBER OF

12   DEFENDANTS IN THIS CASE.

13           **THE COURT:**  SO THE PROBLEM I HAVE WITH OBVIOUSNESS

14   IS I WILL HAVE TO SAY THAT, AS I SEE IT NOW --

15                   (PAUSE IN THE PROCEEDINGS.)

16           **THE COURT:**  GOING TO SAY SOMETHING HE DOES NOT LIKE,

17   SO I'LL WAIT TILL HE'S LISTENING BEFORE I SAY IT.

18           IT DOES SEEM OBVIOUS, BUT I HAVE SOME CONCERNS THAT

19   IT'S -- HINDSIGHT IS -- IS SIMPLE, AND THAT PERHAPS IT WASN'T

20   OBVIOUS BACK WHENEVER IT HAPPENED.  AND -- AND THE ONLY THING

21   THAT PERHAPS ONE CAN IMAGINE WASN'T OBVIOUS WAS THE

22   RESUBMISSION IDEA.

23                   AND THEN IT COMES BACK TO YOU TO SAY IF IT WAS SO

24   OBVIOUS BACK THEN, WHY DON'T WE HAVE AN EXPERT WHO WAS IN THE

25   FIELD AT THAT TIME AND WHO CAN SAY, YES, EVEN YOU'RE NOT USING

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1  HINDSIGHT, EVEN BACK THEN, THIS IDEA OF RESUBMITTING WAS

2  OBVIOUS.

3         SO IT CONCERNS ME THAT THERE ISN'T AN EXPERT.  MAYBE

4  THERE DOESN'T HAVE TO BE.  BUT IF IT'S SO OBVIOUS, THERE SHOULD

5  OBVIOUSLY BE SOMEBODY RIGHT OUT THERE WHO COULD EASILY SAY HOW

6  OBVIOUS IT WAS.

7         **MR. ZEMBEK:**  YOUR HONOR, WE CHOSE NOT TO USE AN

8  EXPERT IN THIS CASE BECAUSE IT WAS SO OBVIOUS.  TO THE EXTENT

9  THERE WERE SOME COMPLEX QUESTIONS, YOU ADDRESS THOSE IN YOUR

10  PRIOR SUMMARY JUDGMENT RULING.

11         THERE WERE TWO NARROW ISSUES TO BE ADDRESSED IN THE

12  CONTEXT OF OBVIOUSNESS, THAT BEING, ONE, WHETHER IT WOULD BE

13  OBVIOUS TO PUT THIS IN A CLIENT SERVER EMBODIMENT; AND, TWO,

14  WHETHER IT WOULD BE OBVIOUS TO HANDLE THE RESUBMISSION.

15         WHAT WE'VE IDENTIFIED ARE TWO DIFFERENT REFERENCES.

16  BOTH OF THE REFERENCES WE -- WE BELIEVE SHOWS THE CLIENT SERVER

17  EMBODIMENT AS WELL AS SHOWING THE RESUBMISSION.  THE ARNETT

18  REFERENCE, A PERSON BELOW ORDINARY SKILL IN THE ART, IS USED BY

19  THE DEFINITION OFFERED BY THEIR EXPERT, SOMEONE WITH A

20  BACHELOR'S DEGREE AND A FEW YEARS -- FEW MONTHS OF EXPERIENCE

21  AT THIS POINT IN TIME, WAS QUICKLY ABLE TO IDENTIFY THE PROBLEM

22  ASSOCIATED WITH THE STATELESS SERVER.

23         WHAT HE IDENTIFIED WAS HAVING THE BROWSER RESUBMIT A

24  PREVIOUS DESCRIPTION OF THE LAST SEARCH, TOGETHER WITH A NEW

25  SEARCH TERM, TO NARROW THE REQUIREMENTS.

1          AND NO, WE ARE NOT USING ANY SORT OF HINDSIGHT IN

2    THIS CONTEXT.  WHAT WE ACTUALLY HAVE IS A VERY CLEAR MOTIVATION

3    TO COMBINE THESE REFERENCES THAT WE'VE PRESENTED TO YOU.

4          FIRST, IN TAB I OF THE NOTEBOOK THAT WE'VE PRESENTED

5    TO YOU -- IT'S FROM KELORA'S EXPERT REPORT -- KELORA'S EXPERT

6    ADMITS THAT THERE WAS A MOTIVATION TO ADAPT APPLICATIONS IN

7    GENERAL, AND AMP NAVIGATOR WOULD BE AN APPLICATION IN GENERAL

8    TO WORK ON THE WEB.

9          SIMILARLY, THE FEDERAL CIRCUIT HAS REPEATEDLY

10   RECOGNIZED -- AND THAT'S IN THE WESTERN UNION CASE, THE DOW

11   JONES CASE, AND THE MINIAUCTION CASE, THAT IT WOULD BE OBVIOUS

12   TO TAKE EXISTING APPLICATIONS, AND YOU WOULD BE MOTIVATED TO

13   PUT THOSE APPLICATIONS ONTO WEBSITES.

14         AND IN THE CONTEXT OF WHAT HAPPENED BEFORE THE

15   PATENT OFFICE IN THE GREAT -- IN THE GRANDPARENT OF THE

16   PATENT-IN-SUIT, THE '444 PATENT, AND THAT'S TAB G OF WHAT WE'VE

17   PUT BEFORE YOU, THE PATENT OFFICE ALSO FOUND THAT THE CLIENT

18   SERVER SYSTEMS ARE WELL KNOWN IN THE ART, AND IT WOULD HAVE

19   BEEN OBVIOUS TO ONE OF ORDINARY SKILL IN THE DATA-PROCESSING

20   ART AT THE TIME OF THE APPLICANT'S INVENTION TO ADD THE CLIENT

21   SERVER EMBODIMENT.

22         BECAUSE THE CLIENT SERVER, AS ARGUED BY KELORA

23   DURING THE RE-EXAM, WAS A -- STATELESS IN NATURE, THAT CREATED

24   A PROBLEM WHICH THE KSR TEST WOULD ACTUALLY SAY YOU CAN, WHEN

25   YOU HAVE A KNOWN PROBLEM, MULTIPLE KNOWN SOLUTIONS, THAT

1    PROVIDES A MOTIVATION TO COMBINE THESE REFERENCES TOGETHER.

2           THAT'S NOT HINDSIGHT.  THAT'S WHAT THE SUPREME COURT

3    AND THE FEDERAL CIRCUIT RECOGNIZED AS CLASSIC OBVIOUSNESS.

4           **THE COURT:**  AND TELL -- MAYBE I MISSED THIS, BUT

5    TELL ME AGAIN WHAT YOU SAY ABOUT RESUBMISSION.

6           **MR. ZEMBEK:**  WHAT WE SAY ABOUT RESUBMISSION IS WE

7    GIVE TWO DIFFERENT EXAMPLES.  IN THE CONTEXT OF THE SUZUKI

8    REFERENCE, THE JAPANESE PATENT, A FIRST SEARCH IS DONE USING A

9    TERM SUCH AS "COMPUTER," AND THEN A SECOND SEARCH IS DONE, AND

10   YOU COULD ADD "ARTIFICIAL INTELLIGENCE."  AND WHAT REFERENCE

11   SAYS IS THAT YOU CREATE THE SEARCH, YOU COMBINE THE TWO, AND

12   THEN YOU RUN IT.  SO YOU'VE DONE THE CONCATENATION SO YOU'VE

13   RESUBMITTED YOUR PREVIOUS TERM CONCATENATION.

14          SIMILARLY, WHAT WE SAY IN THE CONTEXT OF ARNETT,

15   MR. -- MR. ARNETT TAUGHT THAT THERE'S NO REASON THAT SUBSEQUENT

16   QUERY CAN'T PASS BACK TO THE SERVER A SET OF PARAMETERS THAT

17   DESCRIBES THE PREVIOUS SEARCH RESULTS TO WHICH A NARROWING OR

18   WIDENING PARAMETER CAN BE ADDED.  THAT IS THE SAME LEVEL OF

19   DETAIL AS FOUND IN THE '821 PATENT TO THE EXTENT THERE'S ANY

20   DESCRIPTION OF RESUBMISSION.

21          WHAT THE '821 PATENT DID IN TERMS OF DESCRIBING

22   RESUBMISSION, IT APPEARS IN ONE COLUMN, APPROXIMATELY HALF OF

23   THAT COLUMN DESCRIBES WHAT IS ADMITTED KNOWN PRIOR ART.  AND

24   WHAT THEY SAY IS YOU SUBMIT THE PREVIOUS FEATURE SCREEN WHICH

25   IS NOT ACTUALLY A SUBMISSION OF THE PRIOR SEARCH TERMS BUT A

1    DESCRIPTION -- A DESCRIPTION OF THE PRIOR SEARCH TERMS.

2              **THE COURT:**  AND SO WHY DID THE PATENT OFFICE DO WHAT

3    IT DID ON THE RE-EXAM?

4              **MR. ZEMBEK:**  WELL, IN THE CONTEXT OF THE SUZUKI

5    REFERENCE, THE SUZUKI REFERENCE WAS BEFORE THE PATENT OFFICE.

6    KELORA DID ACTUALLY SUBMIT THAT REFERENCE TO THE PATENT OFFICE.

7    BUT WHAT KELORA DID NOT DO IS PROVIDE ANY DESCRIPTION OF THE

8    SUZUKI REFERENCE.  AND WHAT THE EXAMINER SAID HE WOULD DO IN --

9    AS REQUIRED BY THE MPEP IS CONSIDER THAT REFERENCE TO THE

10   EXTENT IT WAS ACTUALLY DESCRIBED IN CONNECTION WITH THE

11   SUBMISSION.

12             THERE WAS NO DESCRIPTION.  THEY DID NOT ACTUALLY

13   DRAW ANYTHING TO THE EXAMINER'S ATTENTION.  AND THE PORTION OF

14   THE MPEP THAT I'M REFERRING TO IS CITED BY THE EXAMINER IS MPEP

15   2256.

16             WHAT THE EXAMINER DID NOT HAVE BEFORE HIM AS WELL

17   WAS THE ARNETT REFERENCE WHERE THE ARNETT REFERENCE HAS AN

18   EXPRESS TEACHING OF CONCATENATION AND EXPRESS TEACHING OF

19   CONCATENATION IN WEB SERVER ENVIRONMENT.

20             **THE COURT:**  SO WHY DO YOU THINK THE PATENT EXAMINER

21   DID WHAT HE OR SHE DID?

22             **MR. ZEMBEK:**  IN TERMS OF ALLOWING THE CLAIMS?  I --

23   I THINK THAT THE PATENT EXAMINER DIDN'T HAVE THE REFERENCE --

24             **THE COURT:**  -- OBVIOUS --

25             **MR. ZEMBEK:**  WELL, THE PATENT EXAMINER DID NOT HAVE

1   THE MATERIAL BEFORE HIM THAT WE'VE PRESENTED TO YOU THAT

2   DEMONSTRATES THE OBVIOUSNESS NATURE OF THE CLAIMED INVENTIONS

3   AS AMENDED.

4           **THE COURT:**  HMM.

5           OKAY.  DID YOU WANT TO ADDRESS --

6           **MR. BECKER:**  THANK YOU, YOUR HONOR.  THIS IS ROBERT

7   BECKER.

8           THERE'S REALLY A -- A GROSS EXAGGERATION OF ART, ALL

9   OF THE ART HERE AND WHAT HAPPENED.  AND IT'S ALL DONE THROUGH

10  THE PRISM OF HINDSIGHT BY LOOKING AT THE PATENT ITSELF AND BY

11  LOOKING AT THE CLAIMS.

12          IF WE GO BACK TO THE PRIOR ART, THE FIRST PIECE OF

13  PRIOR ART IS SUZUKI, IT'S A JAPANESE REFERENCE.  FIRST OF ALL,

14  THERE'S A TRANSLATION ISSUE HERE.  THE PERSON WHO IS TRANSLATED

15  THE REFERENCE HAS NOT SUBMITTED A DECLARATION.

16          **THE COURT:**  YEAH, THAT SEEMS TO ME TO BE QUITE

17  FRIVOLOUS.  IF IT'S -- IF THE TRANSLATION IS WRONG, GIVE ME

18  ANOTHER TRANSLATION THAT SAYS --

19          **MR. BECKER:**  THE TRANSLATION IS NOT PRIOR ART.

20          **THE COURT:**  PARDON?

21          **MR. BECKER:**  THE TRANSLATION ITSELF IS NOT PRIOR ART

22  SO IT WOULD BE THEIR BURDEN TO -- TO COME FORWARD WITH THE

23  APPROPRIATE EVIDENCE, I WOULD THINK, INSTEAD OF OUR BURDEN TO

24  CONTRADICT IT.

25          THE TRANSLATION IS NOT PRIOR ART, SO THAT'S SORT OF

1    AKIN TO SOMEONE WHO'S EXPERT IN THE JAPANESE LANGUAGE TO COME

2    FORWARD AND FILE A REPORT ON IT.  AND THEY DIDN'T.  THE

3    TRANSLATOR FILED NOTHING IN THIS CASE.

4         **THE COURT:**  YOU'RE MAKING THAT ARGUMENT.  IT

5    DETRACTS FROM MY CONFIDENCE IN YOUR OTHER ARGUMENTS.

6         **MR. BECKER:**  WHILE I WAS ON SUZUKI, I WANTED TO

7    MENTION THAT, SO SUZUKI --

8         **THE COURT:**  I KNOW, BUT --

9              (SIMULTANEOUS COLLOQUY.)

10        **THE COURT:**  -- HOW MUCH PLAY YOU GAVE THAT IN YOUR

11   BRIEF AND I HAD THE SAME REACTION.

12        **MR. BECKER:**  OKAY.  I'LL MOVE ON, YOUR HONOR.

13        SUZUKI WAS PUBLISHED IN 1989.  WHAT WE CAN SEE FROM

14   THE TRANSLATION THAT WAS SUBMITTED IS THAT IT DOES NOT HAVE

15   RESUBMISSION.  IT DOES HAVE -- DOES NOT HAVE CONCATENATION,

16   DOES NOT EVEN HAVE A SERVER.  THEY DIDN'T SUPPLY ANY EXPERT

17   DECLARATION ON WHAT IT DISCLOSES.  WE DID.

18        OUR EXPERT GOES THROUGH IN DETAIL AND DESCRIBES WHAT

19   SUZUKI IS, AND IT DOES NOT SUPPLY THOSE ELEMENTS.

20        AT MOST, WHAT SUZUKI DOES IS SORT OF AKIN TO WHAT

21   COUNSEL REFERENCED BEFORE, WHEN YOU HAVE A SEARCH, IT ADDS ONE

22   SEARCH TERM TO ANOTHER SEARCH TERM.

23        BUT IT DOES NOT SAY WHETHER -- WHERE THOSE SEARCH

24   TERMS ARE BEING STORED, HOW THEY'RE BEING PASSED BACK AND

25   FORTH.  IT DOESN'T SAY IT'S BEING PASSED BACK AND FORTH TO A

1    SERVER.  THERE'S NO SERVER DISCUSSED, SO IF WE GO FORWARD TO

2    THE NEXT PIECE OF ART, THAT'S THE AMP NAVIGATOR DEMO THAT WAS

3    THE SUBJECT OF THE COURT'S PRIOR RULING.

4          THE AMP NAVIGATOR DEMO ACTUALLY WORKS QUITE

5    DIFFERENTLY THAN THE PLAINTIFFS POINTED OUT IN THEIR OPENING

6    BRIEF.  THE WAY THE AMP NAVIGATOR DEMO WORKS -- FIRST OF ALL,

7    IT ALSO HAD NO SERVER FUNCTIONALITY IN IT AT ALL.

8          AND WHEN YOU WOULD START TO MAKE A SEARCH, YOU WOULD

9    MAKE A SELECTION, AND WHEN YOU MAKE A SELECTION, THE -- THE

10   SOFTWARE WOULD -- WOULD FLAG IT AS MARKED.  THEN WHEN THE

11   SEARCH WAS PERFORMED, IT WOULD TAKE ALL THE TERMS THAT WERE

12   FLAGGED AS MARKED AND USE THOSE TO SEARCH THE DATABASE.

13         AS A SECOND STEP, IF YOU WERE TO PICK A NEW TERM --

14   EXCUSE ME.  ONCE THAT STEP IS FINISHED, ALL THE -- ALL THE

15   TERMS THAT WERE FLAGGED AS MARKED NOW GET FLAGGED AS SELECTED,

16   SO THEY CHANGE.

17         THEN YOU CAN -- YOU CAN MARK NEW TERMS, AND THE

18   SYSTEM WILL -- WILL MAKE A NOTE THAT THOSE ARE NOW CALLED

19   MARKED.  BUT WHEN IT DOES THE SECOND SEARCH, IT WILL ONLY

20   SUBMIT THE -- THE SECOND TERMS, THE ONES THAT ARE NOW MARKED,

21   THE FIRST SEARCH SET HAS BEEN GIVEN A NEW FLAG, AND IT'S NOW

22   CALLED SELECTED.

23         THE NEW TERMS ARE NOW FLAGGED AS MARKED, AND THOSE

24   TERMS ARE SUBMITTED.  THIS IS DESCRIBED IN DETAIL IN

25   MR. KIMBROUGH'S DECLARATION AND IS ALSO DESCRIBED IN DETAIL IN

1    GAFFORD'S DECLARATION. WHAT THIS DOES IS ACTUALLY PREVENTS

2    RESUBMISSION. THE SYSTEM HOLDS THE FIRST TERM AND WILL NOT

3    RESUBMIT IT. IT -- IT NOT ONLY DOESN'T HAVE THE CAPABILITY.

4    IT ACTUALLY PREVENTS IT.

5              SO THERE'S NO SUGGESTION ANYWHERE THAT SUZUKI, FOR

6    EXAMPLE, DOES ANYTHING OTHER THAN THAT. I'M NOT SAYING IT DOES

7    THAT BECAUSE WE DON'T KNOW WHAT IT DOES. IT DOESN'T SAY WHERE

8    THE TERMS ARE HELD, HOW THEY'RE SUBMITTED, AND -- AND MOST

9    IMPORTANTLY, WHETHER THEY'RE RESUBMITTED TO A SERVER TOGETHER.

10   IT IS -- THERE'S JUST NOTHING ON THAT.

11             ALL IT SAYS IS WHEN YOU DO A SEARCH, YOU COMBINE THE

12   TWO TERMS IN THE SEARCH, AND THAT'S ALSO WHAT AMP NAVIGATOR

13   DOES, BUT AMP NAVIGATOR EXPRESSLY PROHIBITS THAT RESUBMISSION

14   STEP.

15             SO IT'S -- IT'S QUITE A LEAP FOR COUNSEL TO SAY THAT

16   IT'S DOING RESUBMISSION TO A SERVER WHEN IT'S NOT. ALL WE KNOW

17   IS THAT TWO TERMS ARE USED IN A SEARCH, BUT WE DON'T -- BUT IT

18   SAYS NOTHING ABOUT RESUBMISSION. AND THE STATE OF THE ART AT

19   THE TIME COMING UP TO AMP NAVIGATOR, WHICH IS 1992, WAS THAT

20   RESUBMISSION WAS PREVENTED. SO WE CERTAINLY HAVE TEACHING AWAY

21   FROM -- FROM THE CLAIMED INVENTION THAT WE'RE DEALING WITH NOW,

22   WHICH EXPRESSLY REQUIRES A SERVER, WHICH NEITHER SUZUKI NOR THE

23   AMP NAVIGATOR HAD, AND EXPRESSLY REQUIRES RESUBMISSION, WHICH

24   NEITHER SUZUKI ON THE AMP NAVIGATOR HAD, AND THE AMP NAVIGATOR

25   ACTUALLY PREVENTED.

1      **THE COURT:**  NOW HE WAS MENTIONING, I THINK, ANOTHER

2  PIECE OF PRIOR ART NOW.

3      **MR. BECKER:**  SO THE NEXT ONE IS ARNETT.  SO ARNETT

4  IS -- IS -- I WOULD CALL THEM MUSINGS.  HE -- HE -- HE SAYS,

5  WELL, MAYBE I'M GOING TO WORK ON A BROWSER, AND IF I WORK ON A

6  BROWSER, I MIGHT -- I MIGHT HAVE IT STORE TERMS, AND I MIGHT

7  HAVE IT RESUBMIT TERMS.

8      IT DOESN'T SAY IT'S RESUBMITTING A SELECTION

9  CRITERIA, A SECOND ONE, TOGETHER WITH THE FIRST ONE.  THAT

10  CONCATENATION IS NOT DESCRIBED.

11      HE DOESN'T DESCRIBE A SYSTEM AT ALL.  AND WHEN WE

12  DEPOSED HIM, HE SAID HE WAS JUST WORKING ON A BROWSER.  HE

13  WASN'T WORK FOCUSING ON A SERVER AT ALL.

14      AGAIN, THIS IS A SITUATION WHERE WE HAVE AN EXPERT

15  MR. GAFFORD, WHO GOES THROUGH THE ARNETT PUBLICATION IN DETAIL

16  AND DESCRIBES HOW IT DOES NOT PERFORM THE RESUBMISSION STEP.

17  THERE'S NO COMPARABLE TESTIMONY.  THE DEFENDANTS AND, I THINK,

18  THE COURT HAS TO -- HAS TO INFER OR MAKE ALL REASONABLE

19  INFERENCES IN FAVOR OF THE NON-MOVING PARTY HERE, AND ALSO THEY

20  HAVE A VERY HIGH CLEAR-AND-CONVINCING EVIDENCE STANDARD THAT

21  THEY HAVE TO MEET.

22      BUT THERE'S EVEN A MORE IMPORTANT THING AT ISSUE

23  HERE, IS THAT THEY'RE TRYING TO USE ARNETT, WHICH -- WHICH

24  PUBLISHED JUST BEFORE THE PATENT APPLICATION WAS FILED -- ABOUT

25  SIX MONTHS BEFORE THE PATENT APPLICATION WAS FILED IN

1   COMBINATION WITH THE AMP NAVIGATOR.

2         NOW, THE AMP NAVIGATOR IS ONLY PRIOR ART BECAUSE THE

3   COURT PREVIOUSLY FOUND THAT THERE WAS AN OFFER TO SELL THE AMP

4   NAVIGATOR MORE THAN ONE YEAR BEFORE THE FILING DATE.

5         SO --

6         **THE COURT:**  WELL, RIGHT, BUT ARNETT CAN, EVEN IF ITS

7   NOT PRIOR ART, WHICH IS, I GUESS, WHAT YOU'RE GETTING TO, IT

8   COULD STILL BE EVIDENCE OF OBVIOUSNESS, RIGHT?

9         **MR. BECKER:**  IT CAN'T BE USED AS -- AS A REFERENCE

10  TO SHOW PRIOR ART.  IT COULD --

11        **THE COURT:**  NOW ABOUT --

12               (SIMULTANEOUS COLLOQUY.)

13        **MR. BECKER:**  -- LEVEL OF ORDINARY CARE PERHAPS.

14        **THE COURT:**  AND TO SHOW OBVIOUSNESS.

15        **MR. BECKER:**  NO, BECAUSE OBVIOUSNESS HAS TO BE DONE

16  AT THE TIME OF THE INVENTION.  IT'S A VERY IMPORTANT

17  DISTINCTION.

18        SO THE TIME OF THE INVENTION HERE -- THEY'RE RELYING

19  ON AMP NAVIGATOR AND, AS YOU'RE SAYING, PERHAPS ARNETT IS NOT

20  PRIOR ART.  WELL, THEY'RE RELYING ON THE AMP NAVIGATOR.  THE

21  AMP NAVIGATOR IS FROM 1992.  THIS COURT FOUND AN OFFER FOR SALE

22  OF A CONCEIVED INVENTION IN 1992.

23        SO THE TIME TO MEASURE OBVIOUSNESS, EVEN IF YOU

24  COULD CONSIDER ARNETT, IS NOT 1992.

25        YOU CAN'T -- YOU CAN'T CONSIDER IT AT ANY OTHER

1    POINT.   SECTION 103 -- 35 U.S. CODE SECTION 103 SAYS

2    OBVIOUSNESS AT THE TIME OF THE INVENTION.

3              **THE COURT:**  AND SO ARNETT WAS WHEN?

4              **MR. BECKER:**  ARNETT WAS IN 1994, MAY OF 1994, TWO

5    YEARS LATER.  SO ARNETT WAS NOT PART OF THE PRIOR ART.  THERE

6    ARE ALSO A NUMBER OF CASES THAT WE'VE CITED IN OUR BRIEFING

7    THAT TALK ABOUT THE ONLY TIME YOU CAN HAVE AN OFFER FOR SALE IS

8    WHEN IT'S MORE THAN ONE YEAR BEFORE THE FILING DATE AND EITHER

9    THE THING THAT'S BEING OFFERED, NUMBER ONE, ANTICIPATES --

10             **THE COURT:**  WE'RE NOT TALKING ABOUT AN ON-SALE BAR

11   HERE, WE'RE JUST TALKING ABOUT OBVIOUSNESS.

12             **MR. BECKER:**  RIGHT, BUT IT HAS TO BE -- THEIR

13   ON-SALE BAR -- THEIR OBVIOUSNESS IS BASED ON AN ON-SALE BAR.

14   SO THE OTHER THING THAT COULD BE DONE IS THAT IT EITHER

15   ANTICIPATES OR MAKES THE CLAIMS OBVIOUS BY ITS ADDITION INTO

16   THE PRIOR ART.

17             WELL, THIS COURT FOUND THAT IT WAS ADDED TO THE

18   PRIOR ART IN 1992, AND THE CASES SAY THAT IS THE TIME THAT YOU

19   HAVE TO MAKE THIS DETERMINATION.  IT'S -- IT'S IN SECTION 103.

20   IT'S IN PATH.  IT'S IN A NUMBER OF THE OTHER CASES THAT WE

21   CITED IN OUR BRIEFING.

22             SO JUST ASSUMING YOUR HYPOTHETICAL, THE ARNETT COULD

23   STILL BE USED, THERE'S NO BASE REFERENCE TO COMBINE IT WITH.

24   THERE'S NO OTHER REFERENCE EXCEPT SUZUKI.  WE WOULD HAVE TO GO

25   ALL THE WAY TO BACK TO -- AND USE JUST SUZUKI.  THEY MADE NO

1   REFERENCE TO SHOW THAT SUZUKI DISCLOSES THE ELEMENTS OF THE

2   CLAIMS.   THE ONLY THING THEY TALKED ABOUT WITH SUZUKI IS THIS

3   ISSUE OF RESUBMISSION.

4           THE COURT:  SO HOW MUCH DOES THE '821 TELL US ABOUT

5   HOW ONE GOES ABOUT RESUBMITTING?

6           MR. BECKER:  WELL, THE '821 GOES IN GREAT DETAIL.

7   FIRST OF ALL, IT BUILDS ON THE LOCAL EMBODIMENT AND THEN SAYS

8   ALL OF THE SERVER FUNCTION -- OR ALL THE FUNCTIONALITY FOR THE

9   INTERNET EMBODIMENT RESIDES ON THE SERVER IN THE INTERNET

10  EMBODIMENT.  AND THEN IT TALKS ABOUT SORT OF A PING-PONG BACK

11  AND FORTH BETWEEN THE CLIENT AND THE SERVER ABOUT HOW TERMS ARE

12  PASSED, HOW SCREENS ARE REVISED, ET CETERA.

13          IT -- IT IS NOT A ONE-LINE THING, SAYING, WELL,

14  MAYBE WE CAN FLY TO THE MOON, LIKE --

15          THE COURT:  -- SAY --

16          MR. BECKER:  -- IN ARNETT.

17          THE COURT:  -- MARK THE TERMS SELECTED AND THEN

18  WE'LL MARK THE TERMS --

19          MR. BECKER:  IT DOESN'T.  THAT'S FROM -- THAT'S FROM

20  THE AMP NAVIGATOR.

21          THE COURT:  IT DOESN'T GO INTO ANY ANALOGOUS LEVEL

22  OF DETAIL.  IT JUST SAYS WE'RE GOING TO DO THIS.  IT DOESN'T

23  SAY HOW.

24          MR. BECKER:  YOUR HONOR, IT ACTUALLY DOES SAY HOW.

25  IT SAYS --

```
1                    (SIMULTANEOUS COLLOQUY.)

2            MR. BECKER:  I'LL GET THE PATENT.

3            THE COURT:  I DON'T NEED --

4            MR. BECKER:  THERE'S PARAGRAPHS OF TEXT ABOUT HOW IT

5   DOES IT.

6            THE COURT:  HMM.  OKAY.

7            DID YOU WANT TO --

8            MR. BECKER:  IT'S COLUMN --

9            MR. ZEMBEK:  YEAH, I'D LIKE --

10           THE COURT:  THAT'S ALL RIGHT.  I'LL FIND IT.

11           MR. BECKER:  COLUMNS 18 AND 19.

12           MR. ZEMBEK:  -- BRIEFLY RESPOND ON EACH OF THE

13   POINTS.

14           WITH RESPECT TO THE TRANSLATOR, THERE IS A

15   TRANSLATION CERTIFICATE UNDER PENALTY OF PERJURY IN WHICH THE

16   TRANSLATOR CERTIFIES THAT HE HAS COMPETENT KNOWLEDGE OF THE

17   JAPANESE AND ENGLISH TRANSLATION AND THE TRANSLATION IS

18   ACCURATE.  THE -- THE REFERENCE IS PRIOR ART.

19           WITH RESPECT TO THE TEACHING OF SUZUKI, ON FIGURE 8,

20   THERE'S A HOST COMPUTER THAT THE LOCAL COMPUTER IS CONNECTED

21   TO.  THE HOST COMPUTER WOULD BE DESCRIBED AS A LARGE COMPUTER

22   OR A SERVER.

23           WITH RESPECT TO THE SEARCHING THAT IS DONE AND

24   TAUGHT BY SUZUKI, IT IS A CONCATENATION.  WHAT'S SHOWN ON PAGE

25   6 OF THE SUZUKI REFERENCE, WHICH IS PAGE 40 OF WHAT WAS
```

1    SUBMITTED, SEARCH PROCESSING IS PERFORMED USING A LOGICAL

2    EXPRESSION OF SEARCH KEY WORDS, "COMPUTER" AND "ARTIFICIAL

3    INTELLIGENCE," IN WHICH SEARCH KEY WORDS, "ARTIFICIAL

4    INTELLIGENCE," ARE ADDED TO THE PREVIOUSLY INPUTTED SEARCH KEY

5    WORD, "COMPUTER."  THE SEARCH PROCESSING IS DONE BY ADDING THE

6    TWO TOGETHER AND THEN RUNNING THE SEARCH.

7              WITH RESPECT TO AMP NAVIGATOR, WE RESPECTFULLY

8    SUBMIT THAT THEY'RE WRONG IN THEIR FOCUS ON 1992 AS BEING THE

9    APPLICABLE DATE FOR THE OBVIOUSNESS ANALYSIS.

10             THE OBVIOUSNESS ANALYSIS HAS TO BE AT THE TIME OF

11   THE, QUOTE, UNQUOTE, INVENTION.  WE AGREE ON THAT MUCH.  AND

12   THE TIME OF INVENTION IS WHAT IS CLAIMED HERE, AND IT'S

13   UNDISPUTED THAT THE, QUOTE, CLAIMED INVENTION OCCURRED SOMETIME

14   IN 1994, NOT 1992.

15             WHAT THE -- WHAT THE COURT'S PRIOR HOLDING DID,

16   RECOGNIZED BY THE LOCKWOOD CASE, IS PUT ALL OF THE CLAIMED

17   FEATURES IN THE PUBLIC'S POSSESSION.  ALL OF THE CLAIMED

18   FEATURES OF THE ORIGINAL CLAIMS ARE IN THE PUBLIC'S POSSESSION.

19             WHAT KELORA WANTS TO IMPROPERLY DO IS FOCUS ON

20   UNCLAIMED DETAILS OF THE AMP NAVIGATOR SYSTEM.  BUT THOSE

21   UNCLAIMED DETAILS OF THE AMP NAVIGATOR SYSTEM, LIKE IN

22   LOCKWOOD, CAN'T SERVE AS A BASIS TO SOMEHOW AVOID AN

23   OBVIOUSNESS COMBINATION.

24             AND WITH RESPECT --

25             **THE COURT:**  YEAH, I -- I DIDN'T UNDERSTAND HIS

1   ARGUMENT, AND IT WASN'T MY IMPRESSION OF WHAT THE LAW WAS.  BUT

2   HE'S BASING IT ON SECTION 103 AND ON THE PFAFF CASE, AND HE'S

3   MAKING ARGUMENTS THAT 1992 IS THE RELEVANT PERIOD.  DOESN'T

4   SEEM RIGHT TO ME, BUT YOU'RE NOT GIVING ME CITATIONS TO CASES

5   OR --

6                   **MR. ZEMBEK:**  SURE.

7                   **THE COURT:**  -- REFUTING HIS THAT TELL ME WHY THAT'S

8   WRONG.

9                   **MR. ZEMBEK:**  MY COLLEAGUE MR. CHANDLER --

10                  **THE COURT:**  -- MISSED IT IN THE BRIEFS, AND I CAN

11  JUST GO BACK AND READ IT AGAIN.

12                  **MR. CHANDLER:**  YOUR HONOR, THIS IS A NEW ARGUMENT

13  THEY HE RAISED IN THEIR SURREPLY BRIEF.

14                  **THE COURT:**  NO WONDER IT DOESN'T SOUND SO FAMILIAR.

15                  **MR. CHANDLER:**  EXACTLY.  SO LET ME QUOTE WHAT THEY

16  WROTE IN THEIR SURREPLY BRIEF AND WHY IT'S WRONG.

17          THEY SAY, QUOTE, THE LAW DOES NOT PERMIT THE AMP

18  NAVIGATOR TO BE COMBINED WITH OTHER ART THAT IS CREATED AFTER

19  THE OFFER FOR SALE, SUCH AS ARNETT, TO SHOW OBVIOUSNESS.

20          WHAT THEY NEVER DO IS RESPOND TO THE DIPPIN' DOTS

21  CASE, WHICH WE CITED BOTH IN OUR OPENING BRIEF AND OUR REPLY

22  BRIEF.  DIPPIN' DOTS SAYS THAT IF SOMETHING IS IN THE PRIOR

23  ART, THAT IT CAN BE COMBINED WITH, QUOTE, ANY OTHER RELEVANT

24  PRIOR ART.  THAT'S 476 F3D. AT 1344.

25          AND ANOTHER CASE THAT'S DIRECTLY ON POINT IS THE

1   LOCKWOOD CASE.  THE HOLDING OF THAT CASE IS THE SAME FACT

2   PATTERN THAT WE HAVE HERE WHERE YOU HAVE AN EARLIER 102(B)

3   REFERENCE COMBINED WITH A LATER PUBLICATION, TOGETHER FORMING

4   AN OBVIOUSNESS COMBINATION.  AND THE LOCKWOOD CASE IS 107 F3D.

5   1565.  AND THE DISCUSSION OF THE DATES OF THE REFERENCES IS ON

6   PAGES 1569 AND 1570.

7               SO THE -- THE OBVIOUSNESS STATUTE, SECTION 103,

8   REFERS TO -- LET ME JUST QUOTE THE RELEVANT PORTION, "WOULD

9   HAVE BEEN OBVIOUS AT THE TIME THE INVENTION WAS MADE."

10              AS MR. ZEMBEK WAS JUST STATING, THE INVENTION THAT

11  THEY'RE TALKING ABOUT IN SECTION 103 IS THE CLAIMED INVENTION,

12  WHICH IS 1994.  THE OFFER FOR SALE WAS IN 1992.  IT'S IN THE

13  PRIOR ART.  IT CAN BE COMBINED WITH ANY OTHER PRIOR ART THAT'S

14  (SIC) COMES BEFORE 1994 WHEN THE CLAIMED INVENTION WAS

15  ALLEGEDLY CONCEIVED.

16              THE ARNETT REFERENCE PREDATES WHEN THE CLAIMED

17  INVENTION WAS CONCEIVED AND, THEREFORE, IS, AS THE FEDERAL

18  CIRCUIT WOULD PUT IT, "ANY OTHER RELEVANT PRIOR ART" THAT CAN

19  BE COMBINED.

20              SO I THINK, AGAIN, THE DIPPIN' DOTS CASE THAT WAS IN

21  OUR OPENING BRIEF AND OUR REPLY BRIEF, WHICH THEY NEVER

22  RESPONDED TO, AND THE LOCKWOOD CASE -- THE HOLDING OF THE

23  LOCKWOOD CASE --

24              **THE COURT:**  OKAY.

25              **MR. CHANDLER:**  -- REFUTE THAT ARGUMENT.

1        **THE COURT:**   OKAY.   SO THIS WOULD BE KIND OF UNUSUAL

2   AND NOT ANYTHING I'VE DONE BEFORE, BUT WE SOMETIMES DISMISS

3   WITH LEAVE TO AMEND.   I HAVE SOME INCLINATION TO DENY SUMMARY

4   JUDGMENT WITH LEAVE TO AMEND AND TELL YOU TO GO AND GET ME AN

5   EXPERT BECAUSE I -- I AM CONCERNED ABOUT THE IDEA OF -- OF THE

6   HINDSIGHT AND THINKING SOMETHING LOOKS OBVIOUS FROM THIS

7   VANTAGE POINT AND NOT REALLY KNOWING -- I CAN'T REMEMBER WHAT I

8   THOUGHT ABOUT INTERNET SEARCHES IN 1994, PROBABLY NOTHING.

9        SO WHAT WOULD YOU THINK ABOUT DENYING SUMMARY

10  JUDGMENT WITH LEAVE TO AMEND AND GIVING YOU THE OPPORTUNITY TO

11  COME BACK WITH AN EXPERT WHO WOULD SAY THAT RESUBMISSION WAS

12  OBVIOUS IN 1994 AND 1992, WHENEVER IT NEEDS TO BE.

13        **MR. ZEMBEK:**   YOUR HONOR --

14        **THE COURT:**   I DON'T WANT TO TRY A CASE BECAUSE YOU

15  CHOSE NOT TO HAVE AN EXPERT AT THIS MOMENT.

16        **MR. ZEMBEK:**   YOUR HONOR, YES, WE'D BE HAPPY TO

17  SUBMIT AN EXPERT DECLARATION ON THAT POINT.   BUT WHAT WE'D ALSO

18  CITED IN OUR BRIEF ARE MULTIPLE FEDERAL CIRCUIT CASES IN WHICH

19  THE FEDERAL CIRCUIT RECOGNIZED THERE WAS NOT A NEED FOR --

20        **THE COURT:**   PERHAPS NOT, BUT I JUST -- I'M RELUCTANT

21  TO RELY ON MY OWN THINKING ABOUT IT.

22        OKAY.   IS THERE ANYTHING ELSE YOU FEEL THE NEED TO

23  SAY ABOUT OBVIOUSNESS?

24        **MR. ZEMBEK:**   OTHER THAN THE FACT THAT MR. ARNETT

25  DESCRIBED THIS AS AN OBVIOUS SOLUTION AS WELL, THE

1    RESUBMISSION.

2              **MR. BECKER:**  YOUR HONOR, JUST A COUPLE POINTS ON

3    THAT.

4              IF THEY'RE GOING TO -- IF THEY'RE GOING TO SHIFT THE

5    TIME OF INVENTION UP TO 1994, FIRST OF ALL, THERE IS A FACTUAL

6    DISPUTE ON THAT.  THE -- THE -- RECORD SHOWS THAT ARNETT WAS IN

7    MAY, BUT THE INVENTION OF THE -- THE RE-EXAMINED CLAIMS WAS IN

8    APRIL, SO THAT WOULD STILL DISQUALIFY ARNETT.  SO THEY

9    CERTAINLY HAVEN'T --

10             **THE COURT:**  -- OBVIOUS IN MAY, IT WAS PROBABLY

11   OBVIOUS IN APRIL.

12             **MR. BECKER:**  BUT STILL, IT'S NOT PRIOR ART IF

13   THAT'S --

14             **THE COURT:**  DOESN'T HAVE TO BE PRIOR ART TO

15   CONTRIBUTE TO AN OBVIOUSNESS ANALYSIS, I DON'T THINK.

16             **MR. BECKER:**  BUT THEY HAVE TO MAKE A PRIMA FACIE

17   SHOWING THAT EVERYTHING IS IN THE PRIOR ART.  AND IF ARNETT'S

18   NOT IN THE PRIOR ART, THAT'S A VERY MATERIAL ISSUE.  I'M NOT

19   SAYING --

20             (SIMULTANEOUS COLLOQUY.)

21             **THE COURT:**  EXCUSE ME.

22             **MR. BECKER:**  I'M SORRY.

23             **THE COURT:**  I DON'T THINK PEOPLE -- I DON'T THINK

24   THINGS HAVE TO BE IN THE PRIOR ART TO BE EVIDENCE OF

25   OBVIOUSNESS.  ONE CAN THINK SOMETHING IS OBVIOUSNESS -- OBVIOUS

1   IN ONE'S MIND WITHOUT ANY PRIOR ART AT ALL.

2         **MR. BECKER:**  OKAY.

3         **THE COURT:**  CAN'T ONE?

4         I MEAN, THAT'S WHAT KSR SAYS.  YOU SORT OF LOOK AT

5   THINGS.

6         **MR. BECKER:**  THAT'S -- WELL, KSR WAS TALKING ABOUT

7   WHETHER THERE (SIC) WOULD BE OBVIOUS TO COMBINE REFERENCES TO

8   MAKE UP THE DIFFERENCE, BUT THERE'S NO REFERENCE TO COMBINE

9   BECAUSE ARNETT'S NOT A PRIOR ART REFERENCE.  SO THAT'S MY

10  POINT.

11        **THE COURT:**  HMM.  OKAY.  IS THERE ANYTHING ELSE

12  YOU --

13        **MR. BECKER:**  I DO HAVE A FEW MORE POINTS, AND THAT

14  IS IF WE BRING THE DATE OF INVENTION UP TO SOME POINT IN

15  1994 --

16        **THE COURT:**  WELL, WHY WOULDN'T WE?  I MEAN, YOUR

17  INVENTION WAS IN 1994.  YOU HAVE A SORT OF A LEGAL ARGUMENT,

18  WHICH I STILL DON'T QUITE UNDERSTAND, THAT SOMEHOW WE HAVE TO

19  CONSIDER OBVIOUSNESS AS OF THE DATE OF ON-SALE BAR, INSTEAD OF

20  THE DATE OF THE INVENTION.  BUT I'LL CHECK INTO THAT.  IT

21  DOESN'T SOUND RIGHT TO ME.  BUT -- THE DATE OF THE INVENTION

22  CLEARLY WAS IN 1994, NO?

23        **MR. BECKER:**  WELL, THAT -- THAT RAISES THE WHOLE

24  PROBLEM WITH THEM RELYING ON THE COURT'S PRIOR ORDER.  THE

25  COURT'S PRIOR ORDER WASN'T THAT ALL OF THE CLAIM ELEMENTS ARE

1    IN THE PRIOR ART.  THE COURT'S PRIOR ORDER WAS THERE WAS AN

2    OFFER FOR SALE OF THE CLAIMED INVENTION.  THOSE CLAIMS DON'T

3    EXIST ANYMORE.  SO IF THEY WANT TO USE --

4            **THE COURT:**  RIGHT, BUT THEY'RE VERY SIMILAR --

5                    (SIMULTANEOUS COLLOQUY.)

6            **THE COURT:**  -- DO EXIST.

7            **MR. BECKER:**  BUT IF THEY WANT TO USE THAT ARGUMENT

8    IN THIS CASE, THEY HAVE TO SHOW THAT THERE WAS AN OFFER FOR

9    SALE OF THE RE-EXAMINED CLAIMS.

10           **THE COURT:**  I DON'T THINK SO.  THEY WOULD HAVE TO DO

11   THAT IF THEY WERE TRYING TO CLAIM ON-SALE BAR NOW, BUT NOW

12   THEY'RE TRYING TO CLAIM OBVIOUSNESS, WHICH IS A DIFFERENT

13   THING.

14           **MR. BECKER:**  WELL, BUT THAT -- THAT WOULD -- THAT

15   THINKING WOULD MEAN THAT ANYTIME SOMEONE OFFERS TO SELL

16   ANYTHING, THEN IT BECOMES PART OF THE PRIOR ART.  AND THAT'S

17   NOT THE LAW.  IT'S ONLY WITH RESPECT -- BECAUSE -- 'CAUSE

18   OFFERS FOR SALE ARE TYPICALLY --

19                   (SIMULTANEOUS COLLOQUY.)

20           **MR. BECKER:**  -- SECRET.  THEY MIGHT BE DONE UNDER

21   NDA, AND QUITE OFTEN THE DETAILS OF THE INVENTION AREN'T EVEN

22   TRANSMITTED TO THE PERSON THAT RECEIVES THE OFFER.  THE REASON

23   FOR THIS STATUTE IS THAT ONE IS NOT ENTITLED TO TAKE ADVANTAGE,

24   COMMERCIAL ADVANTAGE, OF A CLAIMED INVENTION WITHOUT FILING AN

25   APPLICATION ON THAT CLAIMED INVENTION WITHIN ONE YEAR.

1          THE CLAIMED INVENTION HERE WAS CONCEIVED IN 1994.  I

2     AGREE.  SO -- BUT THE APPLICANT FILED ITS PATENT APPLICATION

3     WITHIN ONE YEAR OF THAT INVENTION.  SO THERE CAN BE NO OFFER

4     FOR SALE IN THIS CASE WITH THESE CLAIMS BECAUSE THE -- THE

5     PATENTEE DID MAKE A FILING WITHIN ONE YEAR.

6          THE PRIOR FILING.

7          **THE COURT:**  THEY AREN'T CLAIMING ON-SALE BAR IN THIS

8     CASE.

9          **MR. BECKER:**  IF THEY'RE NOT CLAIMING ON-SALE BAR,

10    THEN THE AMP NAVIGATOR IS NOT PRIOR ART, 'CAUSE IT DOESN'T MEET

11    ANY OTHER PRIOR ART SECTION.  AND THEY HAVEN'T ASSERTED THAT IT

12    DOES.  THEY SAY IT'S A -- THEY SAY IT'S PRIOR ART BECAUSE IT'S

13    AN ON-SALE BAR UNDER SECTION 102(B).

14         **MR. CHANDLER:**  YOUR HONOR, TED CHANDLER.  THE

15    DIPPIN' DOTS CASE HOLDS THAT IF SOMETHING IS OFFERED FOR SALE,

16    IT'S IN THE PRIOR ART.  ONCE IT'S IN THE PRIOR ART, IT CAN BE

17    COMBINED WITH, QUOTE, ANY OTHER RELEVANT PRIOR ART FOR PURPOSES

18    OF OBVIOUSNESS.  THE DIPPIN' DOTS CASE FOUND A REFERENCE

19    INVALID FOR OBVIOUSNESS BASED ON THE COMBINATION OF A 102(B)

20    ON-SALE BAR REFERENCE.

21         LOCKWOOD CASE AFFIRMED SUMMARY JUDGMENT INVALIDITY

22    FOR OBVIOUSNESS, COMBINATION OF AN EARLIER 102(B) REFERENCE,

23    THE LATER PUBLICATION.

24         KELORA CITED TWO CASES.  BOTH OF THOSE CASES ALSO

25    RECOGNIZED THAT YOU COULD COMBINE A 102(B) ON-SALE BAR

1    REFERENCE FOR PURPOSES OF OBVIOUSNESS.

2              THE AUGUST CASE THEY CITED, THE FEDERAL CIRCUIT

3    DIDN'T DECIDE WHETHER OR NOT THE REFERENCE WAS IN THE PRIOR

4    ART, BUT IT RECOGNIZED THAT IF IT WAS IN THE PRIOR ART, IT

5    COULD BE COMBINED FOR OBVIOUSNESS.

6              THE OTHER CASE THEY CITED WAS THE SPARTAN CASE.

7    AGAIN, IN THAT CASE, THE FEDERAL CIRCUIT HELD THAT THERE WAS NO

8    ANTICIPATION BUT THAT THE ON-SALE -- THE REFERENCE THAT WAS

9    ON-SALE COULD BE COMBINED FOR PURPOSES OF OBVIOUSNESS.

10             **THE COURT:**  OKAY.

11             **MR. CHANDLER:**  SO THE LAW IS CLEAR ON ALL FOUR

12   CASES.

13             **MR. ZEMBEK:**  AND, YOUR HONOR, WITH RESPECT TO

14   WHETHER ARNETT IS OR IS NOT PRIOR ART, THE ONLY EVIDENCE THAT

15   THEY'VE SUBMITTED IN RESPONSE TO OUR CLEAR-AND-CONVINCING PRIMA

16   FACIE CASE OF OBVIOUSNESS IS A STATEMENT BY THE INVENTOR SAYING

17   THAT I CONCEIVED OF IT AT AN EARLIER DATE THAT IS INSUFFICIENT

18   AS A MATTER OF LAW.

19             WE'VE CITED TO THE PROCTER & GAMBLE CASE, 566 F3D.

20   989, AND THE MEDICHEM CASE, 437 F3D. 1157, BOTH OF WHICH

21   REQUIRE SOME CORROBORATION AS WELL AS SOME FACTUAL EVIDENCE OF

22   ACTUAL DILIGENCE.

23             **THE COURT:**  TWO INVENTORS, CAN THEY CORROBORATE EACH

24   OTHER OR DO YOU HAVE --

25             **MR. CHANDLER:**  NO, THEY HAVE TO HAVE NON-INVENTOR

1    TESTIMONY FOR PURPOSES OF CORROBORATION.  AND, SIMILARLY, AS

2    THIS COURT RECOGNIZED IN MONOLITHIC POWER CASE, WHERE YOU

3    GRANTED SUMMARY JUDGMENT BECAUSE THERE WAS A FAILURE TO PROVIDE

4    ANY INDEPENDENT CORROBORATING EVIDENCE OF BOTH CONCEPTION AND

5    DILIGENCE.

6              **THE COURT:**  OKAY.  LET'S TALK ABOUT DIVIDED

7    INFRINGEMENT.  COULD YOU MAKE YOUR ARGUMENT ON THAT BRIEFLY.

8              **MR. CHANDLER:**  YES, YOUR HONOR.  TED CHANDLER.

9              FOR DIVIDED INFRINGEMENT, IT'S PRIMARILY A CLAIM

10   CONSTRUCTION ARGUMENT.

11             SO IF OUR CLAIM CONSTRUCTION IS CORRECT, I DON'T

12   BELIEVE THERE ARE ANY SERIOUS DISPUTES THAT THERE WOULD BE

13   NON-INFRINGEMENT.  CONVERSELY, I WILL CONCEDE IF THEIR CLAIM

14   CONSTRUCTION IS ADOPTED, THAT THERE WOULD NOT BE A DIVIDED

15   INFRINGEMENT ARGUMENT WITH RESPECT TO THE LIMITATIONS THAT

16   WE'RE TALKING ABOUT.

17             SO I THINK THE FIRST PLACE PERHAPS THE EASIEST TO

18   START IS THE PREAMBLE, AND THE BOOK THAT WE HANDED UP, IT'S

19   USEFUL BECAUSE IT PRINTS OUT THE CLAIM LANGUAGE, AND THE CLAIM

20   LANGUAGE IS -- AND SHOWS THE AMENDMENTS.

21             I WANT TO ADDRESS THE PREAMBLE BECAUSE THAT IS AN

22   OVERARCHING ARGUMENT THAT KELORA MAKES IS THAT THE PREAMBLE

23   SAVES THEM FROM ALL OF THEIR DIVIDED INFRINGEMENT ARGUMENTS.

24   SO TAB M --

25             **THE COURT:**  WELL, SOMEONE, I FORGET WHICH OF YOU,

1   KEEPS SAYING THAT IT'S AGREED THAT THE PREAMBLE IS LIMITING.

2           **MR. CHANDLER:**  WELL --

3           **THE COURT:**  IS THAT TRUE?

4           **MR. CHANDLER:**  YES, YOUR HONOR, THE PARTIES AGREE

5   THAT THE PREAMBLE IS LIMITING, BUT THEN THE QUESTION IS WHAT IS

6   THAT LIMITATION.  SO WHAT THE PARTIES HAVE AGREED -- FOR

7   EXAMPLE, THE PREAMBLE MENTIONS A USER.  SO WE AGREE THAT THERE

8   HAS TO BE A USER.

9           THE DISAGREEMENT -- AND THIS IS WHAT WE -- I TRIED

10  TO ILLUSTRATE AT TAB M -- IS WHETHER OR NOT THE PREAMBLE

11  SOMEHOW TRANSFORMED ALL OF THE AMENDED CLAIMS INTO

12  SERVER-SIDE-ONLY CLAIMS.  AND THE PREAMBLE DID NOT.

13          SO IF YOU LOOK AT WHAT THE PREAMBLE ACTUALLY SAYS,

14  IT JUST SAYS THAT THE STEPS ARE PERFORMED WITH A SERVER

15  CONNECTED TO A CLIENT COMPUTER.  THE PREAMBLE DOES NOT SAY THAT

16  STEPS ARE PERFORMED BY THE SERVER.

17          SO, AGAIN, THE PREAMBLE SAYS, PERFORMED WITH A

18  SERVER.  AND ALL THAT MEANS IS THAT THE CLAIMS WERE AMENDED TO

19  CLAIM THE CLIENT-SERVER EMBODIMENT.

20          SO THE ORIGINAL CLAIM, WHICH IS THE TOP LINE OF THE

21  CHART, IT'S UNDISPUTED THE ORIGINAL CLAIM COVERED TWO

22  EMBODIMENTS, THE LOCAL EMBODIMENT WHICH WAS THE AMP NAVIGATOR,

23  AS WELL AS THE CLIENT-SERVER EMBODIMENT, THE INTERNET

24  EMBODIMENT.  THAT WAS THE ORIGINAL CLAIM, TWO EMBODIMENTS.

25          AND THEN DURING REEXAMINATION, THE CLAIM WAS

1   NARROWED TO JUST THE CLIENT-SERVER EMBODIMENT, AND IT WAS DONE

2   WITH THIS LANGUAGE, "PERFORMED WITH A SERVER."

3            IN THIS COURT'S MOST RECENT SUMMARY JUDGMENT MOTION,

4   THE MOTION THAT I ARGUED IN MAY, THE COURT RECOGNIZED THAT THE

5   AMENDMENTS LIMITED THE CLAIM TO A CLIENT-SERVER EMBODIMENT.

6   THIS WAS EXHIBIT 40 TO OUR MOTION, PAGE 7 TO 8.

7            THE COURT WROTE, QUOTE, ORIGINAL CLAIM 11'S LANGUAGE

8   DID NOT DELINEATE THE ROLES OF THE SERVER AND THE CLIENT.

9   AMENDED CLAIM 11 DEFINES THESE ROLES.  NEW CLAIM 9 REITERATES

10  THIS DIVISION OF TASKS BETWEEN SERVER AND CLIENT.

11           SO THE THRESHOLD ISSUE IS, DOES THE PREAMBLE SAVE

12  KELORA FROM ALL THE DIVIDED INFRINGEMENT ARGUMENTS.  THE ANSWER

13  IS NO, THE PREAMBLE DOES NOT REQUIRE EVERY SINGLE STEP TO BE

14  PERFORMED BY A SERVER.  THE PREAMBLE JUST STATES THAT AS A

15  CLIENT-SERVER EMBODIMENT, SOME OF THOSE STEPS ARE PERFORMED BY

16  THE CLIENT, OTHER STEPS ARE PERFORMED BY THE SERVER, AND

17  THEREIN LIES THE DIVIDED INFRINGEMENT PROBLEM.

18           I'M -- THE PARTIES HAD AGREED TO GO ISSUE BY ISSUE

19  AND TO GO BACK AND FORTH, SO -- I MEAN, THE DIVIDED

20  INFRINGEMENT ARGUMENT TURNS ON THE THREE TERMS, "DISPLAYING,"

21  "REVISING," AND "RESUBMISSION."  I JUST DESCRIBED THE PREAMBLE

22  ARGUMENT SO --

23           **THE COURT:**  I'D RATHER JUST DO IT ALL AT ONCE IF YOU

24  DON'T MIND.

25           **MR. CHANDLER:**  OKAY.  YES, YOUR HONOR.

1          SO THE FIRST DIVIDED INFRINGEMENT ARGUMENT IS

2    DISPLAYING.  SO TAB N REPRINTS THE CLAIM LANGUAGE AND REPRINTS

3    THE COMPETING CLAIM CONSTRUCTION PROPOSALS.

4          AND THIS IS A PRETTY STRAIGHTFORWARD ARGUMENT, WHICH

5    IS THAT THE -- WE SAY DISPLAYING IS AN ACTION THAT'S PERFORMED

6    ON THE CLIENT COMPUTER WHEN THE DISPLAY IS DONE BY THE MONITOR,

7    WHEREAS KELORA WANTS TO REWRITE THE CLAIM LANGUAGE TO SAY THE

8    DISPLAYING IS WHEN THE SERVER SENDS OUT THE DATA.

9          SO YOU CAN SEE --

10          **THE COURT:**  WELL, THE ONLY THING THAT INCLINES ME

11   TOWARDS YOUR VIEW -- OR MAYBE ONE THING THAT DOES -- IS, AGAIN,

12   A SORT OF INTUITIVE IDEA OF MY OWN, WHICH I HESITATE TO RELY

13   ON, BUT WHAT I'M THINKING OF IS THAT WHEN THE SERVER SENDS

14   SOMETHING TO THE CLIENT, IT MIGHT SEND THE SAME THING TO TWO

15   DIFFERENT COMPUTERS, AND THEY MIGHT SHOW UP DIFFERENTLY.

16          ONE MIGHT HAVE A LITTLE BOX WITH A LITTLE RED "X" IN

17   IT, AND THE OTHER MIGHT HAVE A BIG BEAUTIFUL PICTURE.  AND THAT

18   LEADS ME TO BELIEVE THAT WHAT'S SENT OUT ISN'T NECESSARILY

19   WHAT'S DISPLAYED.  THE SERVER CAN SEND SOMETHING OUT, AND IT

20   CAN BE DISPLAYED IN DIFFERENT WAYS BY THE CLIENT DEPENDING ON

21   WHAT SORT OF SOFTWARE -- WHO KNOWS WHAT THE CLIENT HAS.

22          **MR. CHANDLER:**  THAT'S ABSOLUTELY CORRECT, YOUR

23   HONOR.  AND, FURTHERMORE, THE CLIENT MAY NOT EVEN DISPLAY IT.

24   CLIENTS ARE ABLE TO REJECT WEB PAGES THAT ARE SENT TO THEM.

25   CLIENTS MAY FILTER OUT PORNOGRAPHIC WEBSITES.  OR THEY MAY

1    FILTER OUT JAVASCRIPTS OR FLASH.  THERE MAY BE CERTAIN ELEMENTS

2    THAT SERVER SENDS OUT THAT THE CLIENT CHOOSES NOT TO DISPLAY.

3          SO YOUR INTUITION IS CORRECT.  IT'S ALSO SUPPORTED

4    BY THE EXPRESS STATEMENT IN THE SPECIFICATION, WHICH WE QUOTED

5    HERE AT TAB N.  IT'S PRETTY STRAIGHTFORWARD.  IT SAYS, QUOTE,

6    THE CLIENT RECEIVES THE FEATURED SCREEN STATUS AND DISPLAYS THE

7    UPDATED FEATURE SCREEN.

8          SO THE SPEC MAKES CLEAR THAT IT'S THE CLIENT THAT

9    DOES THE DISPLAYING, NOT THE SERVER.  WHAT THE SERVER DONE

10   (SIC) IS -- WHAT THE SERVER DOES IS THE SERVER SENDS OUT WHAT

11   IS DESCRIBED IN THE PATENT AS THE FEATURE SCREEN STATUS.  THAT

12   IS ESSENTIALLY THE WEB PAGE OR THE DATA THAT CAN BE USED TO

13   DISPLAY BUT IS NOT THE ACTUAL ACT OF DISPLAYING.

14         THE DEFENDANTS' PROPOSED CONSTRUCTION WAS AGREED

15   UPON IN THE PREVIOUS CASE.  THIS WAS NOT CONTROVERSIAL.

16   EVERYBODY AGREED, INCLUDING THE PREVIOUS OWNER OF THE '821

17   PATENT, THAT THE CLAIM CONSTRUCTION THAT DEFENDANTS ARE

18   PROPOSING NOW IS CORRECT.

19         WHAT KELORA IS ARGUING IS NOW, FOR, YOU KNOW, THAT

20   "DISPLAYING" MEANS "SENDING" IS A TRANSPARENT ATTEMPT TO TRY TO

21   AVOID THE DIVIDED INFRINGEMENT PROBLEM.

22         IF YOU TURN TO -- SO WE QUOTED THE SPEC.  AND THE

23   ONE OTHER THING I WANTED TO POINT OUT ABOUT DISPLAYING IS THE

24   PROSECUTION HISTORY.  DURING PROSECUTION OF THE REEXAMINATION

25   THE PATENT OWNER ACTUALLY CONSIDERED REMOVING THE DISPLAYING

1   STEP AND MAKING IT AN OUTPUTTING STEP, OUTPUTTING DATA, WHICH

2   WOULD BE MUCH CLOSER TO WHAT KELORA IS NOW TRYING TO ARGUE.

3          IN THE END, THE APPLICANTS DID NOT GO WITH THAT.

4   THEY REVERTED TO THE DISPLAYING.  IT WOULD BE A MISTAKE TO NOW

5   REWRITE THE CLAIM TO COVER WHAT THEY EXPRESSLY CHOSE NOT TO

6   WRITE IN THEIR CLAIM.

7          WE HEARD EARLIER ABOUT -- THERE'S A SERIES OF FOUR

8   PATENTS IN THIS FAMILY.  THIS IS THE THIRD IN THE SERIES.  THE

9   FIRST PATENT, THE '444 PATENT, WHICH WAS ATTACHED AS EXHIBIT 6

10  TO THE MOTION, SHOWS THAT DISPLAYING IS A SEPARATE STEP FROM

11  THE SERVER SENDING.  YOU ACTUALLY HAVE A CLAIM, CLAIM 15, WHERE

12  THERE ARE TWO DIFFERENT STEPS.

13         SO IT SAYS THAT THERE IS A DISPLAYING THE FEATURE

14  SCREEN.  THE CLAIM GOES ON TO SPECIFY THAT THAT STEP OF

15  DISPLAYING IS EXECUTED ON A CLIENT, AND THEN THE CLAIM GOES ON

16  TO SPECIFY THAT THE SERVER PERFORMS A SENDING STEP.  SO THIS IS

17  SIGNIFICANT BECAUSE, AGAIN, IT REINFORCES THE QUOTE FROM THE

18  SPECIFICATION AT TAB N THAT THE DISPLAYING STEP AND THE SENDING

19  STEP ARE TWO DIFFERENT ACTIONS PERFORMED BY TWO DIFFERENT

20  ENTITIES, CLIENT PERFORMS THE DISPLAYING, THE SERVER PERFORMS

21  THE SENDING.

22         THE -- THE NEXT CLAIM TERM THAT IS RELEVANT TO

23  DIVIDED INFRINGEMENT IS AT THE NEXT TAB, TAB O, "REVISING THE

24  FEATURE SCREEN."  AND IT'S SIMILAR TO THE DISPLAYING STEP.  SO

25  REVISING IS A STEP THAT IS PERFORMED BY THE -- THE CLIENT

1   COMPUTER.  THE QUOTE FROM THE SPECIFICATION, AGAIN, INDICATES

2   THAT THE CLIENT IS -- DISPLAYS THE UPDATED FEATURE SCREEN.  SO

3   WHEN YOU DISPLAY THE UPDATED FEATURE SCREEN, THAT'S ANOTHER WAY

4   OF SAYING THAT YOU ARE REVISING THE FEATURE SCREEN.

5           AND DURING PROSECUTION, DURING THE RE-EXAM, IT'S

6   SIGNIFICANT THAT THE EXAMINER REJECTED THIS CLAIM LANGUAGE OF

7   "REVISING SAID FEATURE SCREEN" IN LIGHT OF THE GRANACKI

8   REFERENCE.  AND WHAT THE EXAMINER POINTED TO WAS THE DISCLOSURE

9   IN GRANACKI OF, QUOTE, THE SCREEN CHANGES.

10          SO BY POINTING TO THE TEACHING OF GRANACKI OF THE

11  SCREEN CHANGES AND EQUATING THAT WITH THE STEP OF REVISING SAID

12  FEATURE SCREEN, THAT SHOWS THAT THE EXAMINER WAS USING THE SAME

13  UNDERSTANDING THAT THE DEFENDANTS ARE THAT REVISING THE FEATURE

14  SCREEN IS A STEP PERFORMED AT THE CLIENT COMPUTER.

15          AND IT'S SIGNIFICANT WHEN AN EXAMINER ADOPTS A CLAIM

16  CONSTRUCTION.  THE FEDERAL CIRCUIT NOTED IN THE ST. CLAIR

17  DECISION THAT AN EXAMINER'S CONSTRUCTION CARRIES, QUOTE,

18  SIGNIFICANT WEIGHT.

19          ALSO IT'S WORTH POINTING OUT THAT THE INVENTOR, WHEN

20  HE WAS DEPOSED BEFORE HE KNEW THAT THERE WAS GOING TO BE A

21  SUMMARY JUDGMENT MOTION, HE WAS ASKED WHAT THE REVISING STEP

22  MEANS, AND HE ANSWERED, QUOTE, IT MEANS DISPLAYING TO THE USER.

23          SO EVEN THE INVENTOR TOOK THE NATURAL MEANING THAT

24  REVISING IS SOMETHING THAT HAPPENS AT THE CLIENT COMPUTER, AND

25  AGAIN, THAT CREATES A DIVIDED INFRINGEMENT PROBLEM.

1     THE THIRD DIVIDED INFRINGEMENT CLAIM CONSTRUCTION

2  ISSUE IS "RESUBMISSION." THAT'S TAB P. THAT SHOWS BOTH THE

3  CLAIM LANGUAGE AND THE COMPETING CLAIM CONSTRUCTIONS. SO THE

4  CLAIM LANGUAGE IS IN CLAIM 1, RESUBMISSION TO THE SERVER. IN

5  CLAIM 9, IT'S RESUBMISSION BY SAID CLIENT COMPUTER. IN BOTH

6  INSTANCES, BOTH CLAIM 1 AND CLAIM 9, THE ACT OF RESUBMISSION IS

7  AN ACT BY THE CLIENT. IT'S PERFORMED BY THE CLIENT. THE

8  REASON THE CLAIMS WERE ALLOWED IN REEXAMINATION IS BECAUSE OF

9  THIS AMENDMENT REQUIRING THAT THE CLIENT RESUBMIT.

10     THE EXAMINER STATED IN HIS REASONS FOR

11  PATENTABILITY, WHICH WE QUOTED IN TAB P, QUOTE, AMENDED CLAIM 1

12  AND NEW CLAIM 9 ARE LIMITED TO A SEARCH QUERY BEING SUBMITTED

13  BY A CLIENT COMPUTER VIA A NETWORK WHEREIN THE SEARCH IS

14  PERFORMED AT A SERVER. IN OTHER WORDS WHEN THE CLIENT COMPUTER

15  OF CLAIMS 1 OR 9 SUBMITS A SECOND QUERY, IT TRANSMITS BOTH THE

16  PREVIOUS AND CURRENT SELECTION CRITERIA TOGETHER.

17     SO THE -- THE EXAMINER AGAINST IS ADOPTING A

18  CONSTRUCTION THAT IS CONSISTENT WITH THE CONSTRUCTION PROPOSED

19  BY THE DEFENDANTS.

20     SO THOSE ARE THE THREE CLAIM CONSTRUCTION ARGUMENTS,

21  OR FOUR IF YOU COUNTED THE PREAMBLE, THAT SUPPORT THE DIVIDED

22  INFRINGEMENT DEFENSE THAT ALL THE DEFENDANTS HAVE RAISED.

23     **THE COURT:** OKAY.

24     DID YOU WANT TO RESPOND?

25     **MR. BECKER:** SURE.

```
 1                SO ON ALL OF THESE DIVIDED INFRINGEMENT QUESTIONS,
 2    WHAT THE DEFENDANTS ARE TRYING TO ASK THE COURT TO DO IS TO
 3    EXCLUDE THE SERVER, TO SAY THESE THINGS ALL MUST TAKE PLACE ON
 4    THE CLIENT WITH RESPECT TO DISPLAYING.  SERVER CAN'T DISPLAY BY
 5    SENDING PAGES TO A CLIENT.  IT MUST BE THE CLIENT ONLY.
 6    THEY'RE ASKING --
 7                THE COURT:  NO, THE QUESTION IS, WHAT -- HOW WE'RE
 8    CONSTRUING THE WORD "DISPLAY."  ARE WE CONSTRUING THAT AS
 9    SOMETHING THE SERVER DOES, OR ARE WE CONSTRUING IT AS SOMETHING
10    THE CLIENT DOES?
11                MR. BECKER:  YES.  THAT'S -- THAT'S WHAT I BELIEVE.
12    I BELIEVE THAT IS THE CORRECT QUESTION, ALTHOUGH IT'S NOT
13    "DISPLAY."  IT'S THE "DISPLAYING."  IT'S THE ACT OF DISPLAYING.
14    AND I THINK IN BOTH YOUR HONOR'S EXAMPLES THAT YOU GAVE
15    EARLIER, THE SERVER IS DISPLAYING.  WHETHER --
16                THE COURT:  WELL --
17                MR. BECKER:  WHETHER THE CLIENT ALSO DOES SOMETHING,
18    WHETHER IT ALSO CHANGES OR DISPLAYS SOMETHING ON ITS OWN IS --
19                THE COURT:  NO.  WHAT I WOULD DEFINE THE SERVER IS
20    DOING IS NOT DISPLAYING.  THE SERVER IS SENDING CODE.
21                MR. BECKER:  IT'S -- IT'S -- AN ANALOGY IS A
22    PROJECTOR DISPLAYING A MOVIE ON THE WALL.
23                THE COURT:  I DON'T THINK IT IS.
24                MR. BECKER:  PROJECTOR -- WELL, IN THIS CASE --
25                THE COURT:  SERVER ISN'T SENDING, LIKE, A SNAPSHOT.
```

1           MR. BECKER:  IT IS.

2           THE COURT:  -- .PDF.  IT'S SENDING CODE THAT THEN

3    GETS TRANSLATED BY THE CLIENT INTO CERTAIN WAYS OF SHOWING

4    HTML.

5           MR. BECKER:  THE CLIENTS ALL HAVE -- WHAT THEY DO IS

6    DISPLAYS WHAT'S GIVEN TO THEM.  THEY'RE -- THE DISPLAYING,

7    THOUGH --

8                    (SIMULTANEOUS COLLOQUY.)

9           THE COURT:  -- PICTURES.

10          MR. BECKER:  I'M --

11          THE COURT:  ISN'T THAT RIGHT?

12          MR. BECKER:  THEY DON'T -- THERE'S NOTHING

13   INDEPENDENT THAT HAPPENS IN THE CLIENT.  IT'S SIMPLY -- IT

14   TAKES THE EXACT LANGUAGE THAT'S GIVEN TO IT AND RENDERS IT --

15          THE COURT:  NOT NECESSARILY.  THEN WHY DOES ONE

16   COMPUTER SEE A BOX WITH AN "X" IN IT AND THE OTHER COMPUTER

17   SEES A PICTURE?  IT'S BECAUSE THE SOFTWARE THAT'S ON THE

18   CLIENT'S MEDIATES HOW THAT CODE IS GOING TO BE DISPLAYED OR

19   WHETHER IT'S GOING TO BE DISPLAYED.

20          MR. BECKER:  I DISAGREE THAT ONE'S GOING TO SEE A

21   BOX AND ONE'S GOING TO SEE SOMETHING ELSE.

22                    (SIMULTANEOUS COLLOQUY.)

23          MR. BECKER:  THERE'S NOTHING IN THE RECORD THAT

24   SHOWS THAT.  THERE COULD BE OTHER SOFTWARE SOMEWHERE THAT'S A

25   FILTER THAT -- THAT INTERRUPTS THE WHOLE PROCESS.  THAT

1    CERTAINLY COULD HAPPEN.  BUT THAT'S NOT WHAT WE'RE TALKING

2    ABOUT.  THOSE ARE EXTRA THINGS.

3         WE'RE SIMPLY TALKING WITH THROWING SOMETHING UP ON A

4    SCREEN.  AND THAT'S WHAT THE SERVER DOES.  THE SERVER CONTROLS

5    IT.

6         **THE COURT:**  THE SERVER SENDS CODE.

7         **MR. BECKER:**  THE SERVER SENDS CODE, AND THEN IT'S

8    RENDERED BY THE DISPLAY.  THAT'S ALL THAT'S -- THAT'S HAPPENED.

9         **THE COURT:**  OKAY.

10        **MR. BECKER:**  IN THE -- IN THE PATENT SPECIFICATION,

11   ONE PORTION WAS READ BY COUNSEL ABOUT THIS ISSUE, BUT THERE'S A

12   PRIOR PORTION, AND IT SAYS IN COLUMN 18, LINE 60 TO 62, "THE

13   CLIENT, 126, RECEIVES THE FEATURE SCREEN STATUS, 127, AND

14   DISPLAYS THE FEATURE SCREEN ACCORDINGLY."  IT'S ACCORDING TO

15   WHAT IT'S BEEN TOLD TO DO BY THE SERVER.

16        SO CERTAINLY I THINK THAT IT WOULD BE IMPROPER TO

17   SAY THE SERVER MUST BE EXCLUDED, WHICH IS WHAT IS REQUIRED FOR

18   THEIR DIVIDED INFRINGEMENT ARGUMENT.

19        THE -- THERE'S A LOT OF CASE LAW ON THIS, AND THE

20   RECENT I4I VERSUS MICROSOFT CASE, 598 F3D. 831 AT PAGE 843,

21   IT'S A FEDERAL CIRCUIT CASE FROM 2010, THEY SAY A CLAIM IS NOT

22   LIMITED TO EMBODIMENTS DESCRIBED UNLESS THE PATENTEE HAS

23   DEMONSTRATED A CLEAR INTENTION TO LIMIT WITH WORDS OF MANIFEST

24   EXCLUSION.

25        AND I WOULD SAY WITH RESPECT TO ALL THESE CLIENT

```
 1   ISSUES, CERTAINLY, THERE HAS NOT BEEN A MANIFEST EXCLUSION OF

 2   SERVER FUNCTIONALITY OR SERVERS PERFORMING THESE STEPS.  AND --

 3   AND IN ORDER FOR THE DIVIDED INFRINGEMENT TO WORK, THAT IS WHAT

 4   THEY ARE REQUESTING, THAT YOU EXCLUDE THE SERVER FROM BEING A

 5   CANDIDATE FOR PERFORMING A STEP.

 6           THE COURT:  NO, THEY'RE JUST DEFINING WHAT THE

 7   SERVER DOES DIFFERENTLY FROM WHAT THE CLIENT DOES.  IT'S NOT A

 8   QUESTION OF EXCLUDING IT FROM ANY ROLE.  IT'S NOT LIKE IT'S NOT

 9   DOING ANYTHING.  CLEARLY, IT'S SENDING CODE.

10           MR. BECKER:  WELL --

11           THE COURT:  THEY'RE JUST SAYING SENDING CODE ISN'T

12   THE SAME AS DISPLAYING.  THE SERVER SENDS THE CODE.  THE CLIENT

13   DISPLAYS.  SO THEY'RE NOT EXCLUDING THE SERVER FROM DOING

14   ANYTHING.  THEY'RE JUST DEFINING DIFFERENTLY WHAT IT IS THAT

15   THE SERVER DOES.

16           BUT ANYWAY, GO AHEAD.

17           MR. BECKER:  OKAY.

18           WITH RESPECT TO THE REVISING STEP, THE REVISING IS

19   DEFINITELY SOMETHING THAT'S NOT DONE ON A CLIENT.  THE

20   SPECIFICATION MAKES CLEAR THAT THIS IS SOMETHING DONE IN CODE

21   BY THE COMPUTER, AND ALL THE CODE FOR THE INTERNET EMBODY (SIC)

22   ESPECIALLY IS ON THE SERVER.

23           IT SAYS IN COLUMN 16, LINES 45 TO 48, THERE'S A --

24   THERE'S SOMETHING CALLED FRAME INFO.  AND IT SAYS, "FRAME INFO

25   IS USED TO REVISE THE FEATURE SCREEN, 9, BASED UPON THE RESULTS
```

1  OF THE SELECTION CRITERIA, 14."

2       AND THEN IN COLUMN 17, LINES 38 THROUGH 40, IT SAYS

3  "THE FRAME INFO AND LIST STATUS ARRAYS ARE USED TO REVISE THE

4  FEATURE SCREEN ACCORDING TO THE RESULTS OF THE SEARCH."

5       SO IT -- IT IS THE SERVER THAT IS REVISING THE

6  FEATURE SCREEN.  IT'S CERTAINLY NOT SOMETHING THAT THE CLIENT

7  IS DOING.

8       **THE COURT:**  WELL, ISN'T THAT THE CONSTRUCTION THAT

9  DEFENDANT IS PROFFERING?

10      **MR. BECKER:**  THEY'RE CLAIMING THAT IT HAS TO TAKE

11 PLACE, AGAIN, IN A -- ON A CLIENT.  BUT THIS IS NOT SOMETHING

12 THAT TAKES PLACE ON A CLIENT.

13      **THE COURT:**  WHAT IS THE CONSTRUCTION THAT THEY'RE

14 PROPOSING?  MAYBE I'M IN THE WRONG PLACE.

15      **MR. CHANDLER:**  TAB O HAS BOTH PARTIES' PROPOSED

16 CONSTRUCTION.  I'M HAPPY TO ADDRESS IT OR --

17      **MR. BECKER:**  THEY SAY THE -- THE CLAIMS REQUIRE THAT

18 THE REVISING BE DONE ON THE USER'S COMPUTER.

19      I'LL LET -- MAYBE HE'D LIKE TO SPEAK FOR HIMSELF,

20 BUT --

21      **THE COURT:**  WELL, THAT'S ALL RIGHT.

22      THAT'S WHAT YOU WERE SAYING AS WELL, NO?

23      **MR. BECKER:**  NOT -- WE DON'T REQUIRE ANYTHING TO BE

24 DONE ON THE USER'S COMPUTER.

25      **THE COURT:**  OKAY.

1    **MR. BECKER:** AND THEN WITH RESPECT TO THE ACCEPTING

2 OF THE SELECTION CRITERIA, THIS IS THE SAME ISSUE THAT THE

3 COURT ALREADY RULED ON IN THE EARLIER SUMMARY JUDGMENT MOTION.

4 THE -- THE --

5    **THE COURT:** WHICH ONE? THE ONE IN THIS CASE?

6    **MR. BECKER:** THIS --

7    **THE COURT:** HOW MANY SUMMARY JUDGMENT MOTIONS HAVE

8 BEEN --

9    **MR. BECKER:** IN THIS CASE, YES. SORRY. FROM I

10 BELIEVE, MAY OF THIS YEAR.

11    **MR. CHANDLER:** WELL, ACCEPTING GOES TO INVALIDITY.

12 THAT'S NOT AN ARGUMENT THAT I ADDRESSED.

13    **MR. BECKER:** OH OKAY.

14    **MR. CHANDLER:** RESUBMISSION WAS THE OTHER

15 NON-INFRINGEMENT ARGUMENT.

16    **MR. BECKER:** YEAH, WELL, THAT IS -- TO ME, THAT'S

17 THE SAME ARGUMENT. IT -- THE QUESTION IS IT'S NOT -- THE CLAIM

18 REQUIRES THAT YOU ACCEPT A RESUBMISSION AT THE SERVER.

19    IT DOESN'T SAY THAT IT -- THAT A CLIENT IS

20 RESUBMITTING TO THE SERVER. IT SAYS THE SERVER IS ACCEPTING A

21 RESUBMISSION. AND THE RESUBMISSION IS OF A SELECTION CRITERIA,

22 AND THAT SELECTION CRITERIA IS A SIGNAL THAT'S PASSED BACK AND

23 FORTH BETWEEN THE CLIENT AND THE SERVER. IT GOES NOT ONLY

24 FROM -- FROM THE CLIENT TO THE SERVER, IT ALSO GOES FROM THE

25 SERVER BACK TO THE CLIENT. SO IT'S NOT SOMETHING THAT'S

1   RESTRICTED AS A -- AS A USER SELECTION ON THE CLIENT COMPUTER.

2           IT IS A SIGNAL THAT'S PASSED BACK AND FORTH, AND

3   THIS PARTICULAR CLAIM ELEMENT REQUIRES THAT THAT BE ACCEPTED AT

4   THE SERVER.

5           **THE COURT:**  HMM.  WELL, WHAT THEY -- AND I GUESS

6   WHAT THEY SAY IS THAT IT'S -- THE PARAMETER IS ACCEPTED BY THE

7   USER AT THE CLIENT COMPUTER.  SO THE USER SAYS, I WANT SHOES,

8   AND I WANT THEM TO BE BLUE, AND I WANT THEM TO BE SIZE 7, AND I

9   ACCEPT THOSE AS THE CRITERIA I'M LOOKING FOR.  AND I SEND IT IN

10  AND THE SERVER SAYS, OH, SHE WANTS BLUE SHOES IN SIZE 7, I'M

11  GOING TO GO FOR THAT.

12          **MR. BECKER:**  SO, AGAIN, I WOULD DISAGREE THAT THAT'S

13  HOW THE PATENT DESCRIBES IT.

14          **THE COURT:**  THAT'S THEIR EXPLANATION.

15          **MR. BECKER:**  THE PATENT MAKES -- HAS USERS MAKE

16  CHOICES AT A CLIENT COMPUTER AND IF THE -- IF THE DEFENDANTS

17  WANT TO CALL THAT ACCEPTING, THAT'S FINE, BUT THAT'S NOT THE

18  ISSUE.  THE ISSUE IS WHAT DOES THE CLAIM REQUIRE.  THE CLAIM

19  REQUIRES THAT SERVER PERFORM AN ACCEPTING.

20          **THE COURT:**  WHAT ELSE WOULD THE SERVER DO?  THE

21  SERVER WOULD SAY, NO, NO, YOU CAN'T HAVE -- I DON'T WANT YOU TO

22  HAVE BLUE SHOES IN SIZE 7, I'D LIKE YOU TO HAVE RED?  IT HAS TO

23  ACCEPT IT.

24          **MR. BECKER:**  YOU'RE -- WE'RE AGREEING WITH EACH

25  OTHER.  THE CLAIM SAYS THAT THE SERVER MUST ACCEPT.  WHAT THEY

1    SAY IS THAT THE CLIENT DOES THE ACCEPTING AND BECAUSE THE

2    CLIENT DOES THE ACCEPTING, IT'S A DIVIDED INFRINGEMENT ISSUE.

3            **THE COURT:**  NO, I'M NOT AGREEING WITH YOU.  I'M

4    SAYING THAT THE SERVER DOESN'T HAVE A CHOICE TO ACCEPT OR NOT

5    ACCEPT, SO PROBABLY IT ISN'T THE ONE WHO'S SUPPOSED TO ACCEPT

6    BECAUSE IT'S SIMPLY RECEIVING IT.  IT ISN'T MAKING A CHOICE.

7            **MR. BECKER:**  IT -- SERVERS CAN ACCEPT OR NOT ACCEPT.

8            **THE COURT:**  HMM.  AND IT MIGHT DO THAT?  WHAT WOULD

9    IT SAY?

10           **MR. BECKER:**  JUST DOESN'T ACCEPT IT.

11           **THE COURT:**  GO AWAY USER, I DON'T WANT YOUR --

12                   (SIMULTANEOUS COLLOQUY.)

13           **MR. BECKER:**  IT CAN JUST REJECT IT AND NOT ACCEPT

14   IT.

15           **THE COURT:**  OKAY.

16           **MR. CHANDLER:**  WOULD YOU LIKE ARGUMENT ON THE

17   ACCEPTING STEP?

18           **THE COURT:**  WELL, YOU CAN RESPOND BRIEFLY TO

19   ANYTHING THAT HE SAID THAT YOU THINK IS NOT ADEQUATELY BRIEFED.

20   I GUESS WE NEED TO MOVE ON.

21           **MR. CHANDLER:**  ON THE ACCEPTING STEP, I WOULD DIRECT

22   THE COURT'S ATTENTION TO TAB L.  IT SHOWS BOTH THE FIGURE AND

23   THE DISCLOSURES AND THE SPECIFICATION ABOUT ACCEPTING.

24           OUR ARGUMENT'S CONSISTENT WITH WHAT YOU JUST

25   DESCRIBED.  A USER PRESSES BUTTONS, MAKES SELECTIONS, THEY'RE

1   ABLE TO TURN BUTTONS ON AND OFF.  WHEN THE USER IS HAPPY WITH

2   THE SELECTIONS THE USER HAS MADE, THE USER ACCEPTS THOSE

3   CRITERIA BY CLICKING ON THE CHECK BOX WHICH IS SHOWN IN FIGURE

4   8 AT TAB L.

5            AND IT'S THAT ACT OF CLICKING ON THE CHECK BOX THAT

6   ACCEPTS THE SELECTION CRITERIA, TRANSMITS IT TO THE SERVER.

7            THERE'S NO DISCLOSURE IN THE PATENT OF THE SERVER

8   EVER MAKING A CHOICE WHETHER OR NOT TO, YOU KNOW, ACCEPT WHAT

9   THE USER HAS DONE.  WHAT THE PATENT SAYS IS THAT THE SERVER

10  RECEIVES WHAT THE USER HAS SENT.  AND THE PATENT DESCRIBES THE

11  RECEIVING STEP AS A SEPARATE STEP.

12           SO TO BE CLEAR, ACCEPTING IS AN ACTION BY THE USER.

13           **THE COURT:**  OKAY.

14           **MR. BECKER:**  AND CAN I --

15           **THE COURT:**  I DON'T KNOW THAT WE HAVE TIME TO GO

16  OVER ALL THE CLAIM CONSTRUCTION TERMS.  I -- I DON'T KNOW IF

17  THERE'S ANY OTHER BIG ISSUES WE HAVEN'T TALKED ABOUT.  I GUESS

18  IF YOU WANT TO TALK BRIEFLY ABOUT "BROADENING" --

19           IS THAT THE ONLY OTHER THING WE HAVEN'T TALKED

20  ABOUT?

21           **MR. CHANDLER:**  YEAH, SO THE ACCEPTING ARGUMENT IS

22  REALLY A BROADENING ARGUMENT, WHICH IS THE -- THE ORIGINAL

23  CLAIM IS JUST AS I DESCRIBED THAT THE USER HAS TO MAKE THE

24  CHOICE AND THAT'S THE ACT OF ACCEPTING.

25           IN THE PROCESS OF AMENDING THE CLAIMS, THEY CHANGED

```
 1   THAT STEP TO BE A STEP PERFORMED BY THE SERVER.  THE PARTIES

 2   AGREE THAT AS A RESULT OF THE AMENDMENTS, THAT THAT STEP IS NOW

 3   PERFORMED BY THE SERVER.  SO YOU HAVE A SITUATION WHERE THE

 4   ORIGINAL STEP WAS PERFORMED BY A USER.  THE AMENDED STEP IS

 5   PERFORMED BY A SERVER.  THAT CHANGES WHAT THE CLAIM SCOPE

 6   COVERS, AND THEREFORE THE CLAIM IS INVALID.  I THINK THE

 7   MOST --

 8            THE COURT:  WELL, IT HAS TO BROADEN IT, NOT JUST

 9   CHANGE IT.

10            MR. CHANDLER:  WELL, SO "BROADENING" IS A TERM OF

11   ART.  SO I THINK THE MOST INSTRUCTIVE CASE IS THE IN RE:

12   FREEMAN CASE.  SIMILAR FACT PATTERN WHERE YOU HAD A CLAIM

13   DURING THE AMENDMENTS ONLY WORDS WERE ADDED TO THE CLAIMS, BUT

14   BY ADDING THOSE WORDS, THE CRAFTY PATENT PROSECUTOR CHANGED THE

15   MEANING OF THE CLAIMS AND, SPECIFICALLY, IN THAT CASE, THE

16   CLAIMS ORIGINALLY REQUIRED A LENS THAT WOULD FLOAT AND THROUGH

17   THE MAGIC OF PATENT PROSECUTION, THEY ADDED WORDS TO CHANGE THE

18   MEANING OF THE CLAIM SUCH HAS THE LENS NOW WAS REQUIRED TO

19   SINK.

20            BEFORE THE LENS FLOATED; AFTERWARDS, THE LENS WOULD

21   SINK.  THE FEDERAL CIRCUIT PICKED UP ON EXACTLY WHAT WAS GOING

22   ON AND HELD THAT BY CHANGING THE SCOPE OF THE CLAIMS, THAT IS

23   IMPERMISSIBLE AND, THEREFORE, IT'S INVALID.

24            THE ONLY THING YOU CAN DO -- THE ONLY PERMISSIBLE

25   AMENDMENT YOU CAN MAKE DURING REEXAMINATION IS TO SOLELY NARROW
```

1    THE CLAIMS.  YOU'RE NOT ALLOWED TO MOVE THE SCOPE OF THE CLAIMS

2    FROM ONE THING, LIKE FLOATING AND -- TO COVER SOMETHING ELSE

3    LIKE SINKING.  IN THIS CASE, THEY HAD TRIED TO MOVE THE CLAIMS

4    TO COVER FROM -- AN ACTION PERFORMED BY THE USER TO AN ACTION

5    PERFORMED BY THE SERVER.  THAT IS WHAT IS IMPERMISSIBLE.

6            THEY ALSO MADE AN IMPERMISSIBLE, QUOTE, BROADENING

7    WITH RESPECT TO THE "REVISING" LANGUAGE.  AND THIS ONLY APPLIES

8    TO CLAIM 9.  AGAIN, I -- IT -- I THINK TAB J -- IT'S EASIEST TO

9    SEE TO SEE WHAT'S GOING ON.  WE HAVE A RED LINE THAT SHOWS THE

10   AMENDMENTS THAT WERE MADE TO CLAIM 9 DURING THE REEXAMINATION.

11           SO WE HAVE UNDERLINED THE WORDS THAT WERE ADDED.

12   "SAID DATA" WAS ADDED.  AND THEN AT THE END, THEY HAVE ALL

13   THIS -- "AND OUTPUTTING SAID REVISED DATA FOR SAID FEATURE

14   SCREEN."  SO WHAT THESE AMENDMENTS DID TO CLAIM 9 IS THEY

15   CHANGED CLAIM 9 IN TWO WAYS AS COMPARED TO THE ORIGINAL CLAIM

16   LANGUAGE.  FIRST, THEY CHANGED THE ACT FROM REVISING THE

17   FEATURE SCREEN TO AN ACT OF REVISING THE DATA FOR THE FEATURE

18   SCREEN.

19           **THE COURT:**  YEAH, I JUST DON'T SEE HOW THAT CAN BE

20   ANY DIFFERENT.  WHAT DOES THAT MEAN?  IT SEEMS MEANINGLESS TO

21   ME.  THE ORIGINAL CLAIM, REVISING THE FEATURE SCREEN, AS WE

22   WERE DISCUSSING EARLIER, THAT IS WHERE THE CLIENT COMPUTER IS

23   REVISING WHAT IS SHOWN TO THE USER.

24           AMENDED MANY CLAIM 9, EVERYONE AGREES -- BOTH

25   PARTIES AGREE, IS NOW AN ACT PERFORMED BY THE SERVER, WHERE THE

1   SERVER IS REVISING THE DATA THAT'S GOING TO BE SENT OUT TO THE

2   CLIENT.  AND THAT'S ALL THAT AMENDED CLAIM 9 NOW COVERS.

3           SO THERE HAVE BEEN TWO CHANGES TO CLAIM 9.  FIRST,

4   THE ACTION IS DIFFERENT.  BEFORE, IT WAS REVISING THE FEATURE

5   SCREEN.  NOW IT'S REVISING DATA.  SECOND, THE ACTOR HAS

6   CHANGED.  THE ORIGINAL CLAIM WAS THE CLIENT COMPUTER PERFORMING

7   THE REVISION OF THE FEATURE SCREEN.

8           **THE COURT:**  THIS IS UNDER YOUR INTERPRETATION.

9           **MR. CHANDLER:**  CORRECT AND ALL OF THIS IS CLAIM

10  CONSTRUCTION.  IT'S PURELY -- THERE'S NO SORT OF FACTUAL ISSUE

11  ABOUT WHAT HAPPENS.  IT'S PURELY A QUESTION OF HOW YOU CONSTRUE

12  THE CLAIMS.  IF WE'RE CORRECT, IT'S INVALID UNDER SECTION 305.

13  IF THEY'RE CORRECT, THEN THIS SECTION 305 INVALIDITY ARGUMENT

14  WOULD NOT APPLY.

15          THE SECOND WAY THEY CHANGED THE SCOPE OF THE CLAIM

16  IS BY CHANGING THE ACTOR FROM THE CLIENT PERFORMING REVISING

17  THE FEATURE SCREEN TO NOW THE SERVER IS PERFORMING THE ACT OF

18  REVISING THE DATA.

19          **THE COURT:**  OKAY.

20          **MR. BECKER:**  I HAVE A FEW COMMENTS ON THAT BRIEFLY,

21  YOUR HONOR.  FIRST OF ALL, THERE WAS NO CLIENT ANYWHERE

22  SPECIFIED IN THE ORIGINAL CLAIMS.  SO HE KEEPS TALKING ABOUT

23  SWITCHING FROM A CLIENT TO A SERVER.  IN THE ORIGINAL CLAIMS,

24  THERE WAS NO LIMITATION ON WHERE ACCEPTING COULD BE, FOR

25  EXAMPLE.  THERE WAS NO LIMITATION ANYWHERE IN THE CLAIMS THAT

1    SAID SOMETHING HAD TO TAKE PLACE ON A CLIENT.   THOSE ARE -- IF

2    ANYTHING --

3          **THE COURT:**   I WOULD THINK "BY THE USER" WOULD BE THE

4    DISTINCTION THAT WOULD HAVE BEEN DRAWN BEFORE, WHETHER THE

5    SOFTWARE IS DOING IT ON THE COMPUTER OR WHETHER THE USER IS

6    DOING IT BY SOME ACTIONS THE USER IS TAKING.

7          **MR. BECKER:**   WITH RESPECT TO THE ELEMENTS THAT WE'RE

8    TALKING ABOUT, IT DIDN'T SPECIFY THAT.   DIDN'T SPECIFY USER HAD

9    TO DO IT.   IT DIDN'T SPECIFY THAT A CLIENT HAD TO DO IT.   THOSE

10   ARE LIMITATIONS THAT HE'S IMPORTING INTO THE ORIGINAL CLAIMS

11   AND SAYING THAT NOW BY ADDING SERVER LIMITATIONS IN THE AMENDED

12   CLAIMS, WE'VE BROADENED -- WE'VE NARROWED IN ONE SENSE BUT

13   BROADENED IN ANOTHER SENSE 'CAUSE WE GOT RID OF CLIENT

14   RESTRICTIONS OR USER RESTRICTIONS, BUT THOSE RESTRICTIONS WERE

15   NEVER THERE.

16          WITH RESPECT TO ACCEPTING THAT WE HAD BEEN TALKING

17   ABOUT BEFORE AND THERE WAS A DISCUSSION ABOUT WHETHER YOU WOULD

18   ACCEPT ON A CLIENT COMPUTER BY MAKING LITTLE SELECTIONS, I -- I

19   REFER THE COURT TO COLUMN 8 OF THE PATENT, LINES 59.   IT STATES

20   THE USER MAY SELECT ONE OR MORE AVAILABLE ALTERNATIVES, 7.   SO

21   WHAT THE USER DOES IS SELECTS ALTERNATIVES.

22          BUT WHAT THE -- THE PATENT SAYS IS IT DOESN'T TALK

23   ABOUT THOSE ALTERNATIVES.   WHAT IT TALKS ABOUT IS ACCEPTING A

24   SELECTION CRITERIA OR ACCEPTING A SECOND SELECTION CRITERIA,

25   WHICH INCLUDES A RESUBMISSION OF THE FIRST SELECTION CRITERIA.

1    THOSE SELECTION CRITERIAS (SIC), AS WE POINT OUT IN

2    OUR BRIEFS, ARE ELECTRICAL SIGNALS THAT ARE GENERATED AFTER THE

3    USER HAS MADE HIS OR HER SELECTION.  IT'S VERY CAREFUL TO USE

4    THE CORRECT TERMINOLOGY IN THE PATENT.  IT'S THE SELECTION

5    CRITERIA THAT MUST BE ACCEPTED.  AND NOWHERE DID AN ORIGINAL

6    CLAIM SAY THAT THAT MUST TAKE PLACE ON THE CLIENT.

7    AS I STATED BEFORE, THAT SIGNAL IS BATTED BACK AND

8    FORTH BETWEEN THE SERVER AND CLIENT, AND IT'S THAT SIGNAL

9    THAT -- THAT MUST BE ACCEPTED.

10    **MR. CHANDLER:**  IF I MAY RESPOND TO THE SIGNAL

11    ARGUMENT, THAT'S A NEW -- THAT'S A DIFFERENT CLAIM TERM OF WHAT

12    THE SELECTION CRITERIA IS.

13    THE PATENT EXPRESSLY DEFINES WHAT THE SELECTION

14    CRITERIA IS.  WE SHOW THIS QUOTE AT TAB K.  THE PATENT STATES,

15    "THE CURRENT SELECTION CRITERIA, 14, IS DEFINED AS THE SET OF

16    SELECTED ALTERNATIVES."

17    AND THEN IF -- TAB L IS WHAT WE WERE LOOKING AT

18    BEFORE, SO THE USER HAS ALTERNATIVES.  THE USER CAN TURN THOSE

19    ALTERNATIVES ON AND OFF.  WHEN THE USER IS SATISFIED WITH THOSE

20    SELECTIONS, THE USER CLICKS THE CHECK BOX.  ALL OF THOSE

21    ALTERNATIVES THAT HAVE BEEN SELECTED BECOME THE, QUOTE,

22    SELECTION CRITERIA THAT IS THEREBY ACCEPTED.

23    SO, AGAIN, THE QUOTE'S AT TAB K, AND THE FIGURE FROM

24    IF PATENT IS AT TAB L.

25    **MR. BECKER:**  HE CUT ME OFF IN THE MIDDLE.

1        SO THE -- IT'S TRUE THAT -- THERE ARE THESE

2   DIFFERENT TERMS, BUT WITH RESPECT TO WHAT MUST BE ACCEPTED BY

3   THE SERVER, IT IS SELECTION CRITERIA, AND IT'S MADE CLEAR IN

4   FIGURE 25.  THERE'S ARROWS GOING BACK AND FORTH.  AND IT'S THE

5   SELECTION CRITERIA, 14, THAT SIGNAL THAT'S TRAVELING TO THE

6   SERVER.  AND THE CLAIM, AS AMENDED, REQUIRES THAT THAT BE

7   ACCEPTED AT THE SERVER.

8        IT WAS SILENT IN THE ORIGINAL CLAIM, SO ALL THAT

9   TOOK PLACE WAS THE CLAIM WAS NARROWED BY SPECIFYING A LOCATION

10  WHERE IT HAD TO BE ACCEPTED.  OTHERWISE, IT WAS NOT SPECIFIED.

11       AND THE CLAIMS ARE NOT LIMITED OTHERWISE TO SIMPLY

12  THE EMBODIMENTS THAT ARE SHOWN IN THE PATENT.  YOU DON'T HAVE

13  TO INCLUDE ALL THE ELEMENTS FROM THE SPECIFICATION IN A CLAIM.

14  IT JUST SO HAPPENS THAT THERE WAS NO LIMITATION AND THEN WE

15  ADDED ONE.  WE ADDED A LIMITATION THAT THE SELECTION CRITERIA

16  BE ACCEPTED AT THE SERVER.  AND SO THERE'S NO BROADENING THERE.

17       AND WITH RESPECT TO THE -- THE OTHER BROADENING

18  ISSUE, THE "REVISING THE FEATURE SCREEN," THE -- THE WAY THAT

19  FEATURE SCREEN IS REVISED IS BY REVISING THE DATA.  THE PATENT

20  MAKES THAT CLEAR.

21       THERE IS NO DISTINCTION.  IF ANYTHING, IT'S JUST A

22  LIMITING WHEN WE SAID "REVISING THE DATA."  AND -- FOR THE --

23  TO REVISE THE FEATURE SCREEN.

24       **THE COURT:**  WHAT DOES THAT REALLY MEAN?  I MEAN,

25  WHAT --

1          **MR. BECKER:**  WELL, AGAIN --

2                    (SIMULTANEOUS COLLOQUY.)

3          **THE COURT:**  -- REVISING THE CODE TO MAKE THE SCREEN

4    LOOK DIFFERENTLY?  THEY'RE REVISING HOW MANY DIFFERENT COLORS

5    OF SHOES THEY HAVE?  THEY'RE REVISING THE DATABASE FOR THE CODE

6    OR --

7          **MR. BECKER:**  THE SCREEN IS COMPRISED OF DATA.

8          **THE COURT:**  WELL, IT'S COMPRISED OF CODE THAT

9    PRESENTS -- THAT MAKES THE COLORS AND THINGS LOOK DIFFERENT.

10         **MR. BECKER:**  RIGHT.

11         **THE COURT:**  WHICH TO ME, I WOULD CALL IT CODE AND

12   NOT DATA.  THE DATA IS THE STUFF THAT'S IN THE DATABASE.

13         **MR. BECKER:**  RIGHT.

14         **THE COURT:**  IS WHAT IT WOULD SEEM TO ME BUT MAYBE --

15         **MR. BECKER:**  WELL, THAT IS CORRECT.  I MEAN, YOU

16   NEED TO PULL IN DIFFERENT DATA TO -- TO COME -- COMPOSE A NEW

17   SCREEN.

18         AND --

19         **THE COURT:**  THAT'S THE DATA THEY'RE TALKING ABOUT?

20         **MR. BECKER:**  THAT'S THE DATA THEY'RE TALKING ABOUT.

21         **THE COURT:**  -- HTML THAT SAYS NOW MAKE A BLUE COLOR

22   HERE AND NOW MAKE THE TEXT SAY THIS?  OR IS IT THE DATA THAT IS

23   THE SUBJECT OF THE SEARCH, LIKE BLUE SHOES, RED SHOES, SIZE 7.

24         **MR. BECKER:**  IT'S NEITHER.  I CAN -- IT'S NOT

25   SPECIFIED AS BEING EITHER ONE OF THOSE.  I CAN TELL YOU WHAT IT

1    SAYS IN THE -- IN THE SPECIFICATION.  AND PART OF THE ISSUE

2    HERE IS THAT, AS WE KNOW THE WEB TODAY, IS A LITTLE BIT

3    DIFFERENT THAN AS IT EXISTED BACK IN 1992 OR 1994.

4         SO THE PATENT SAYS IN COLUMN 16, LINES 45 THROUGH

5    48, FRAME INFO.  AND WHEN -- THIS IS ONE I READ BEFORE, IS USED

6    TO REVISE THE FEATURE SCREEN 9 BASED UPON THE RESULTS OF THE

7    SELECTION CRITERIA 14.

8         THEN, AGAIN, AT COLUMN 17, LINES 38 TO 40, IT SAYS

9    THE FRAME INFO AND LIST STATUS ARRAYS ARE USED TO REVISE THE

10   FEATURE SCREEN ACCORDING TO THE RESULTS OF THE SEARCH, SO THAT

11   IS HOW THOSE ARRAYS -- THE DATA ARRAY, THAT'S HOW THE FEATURE

12   SCREEN IS REVISED.

13        IT'S JUST A FURTHER NARROWING OF THE CLAIM.  IT'S

14   CERTAINLY NOT AN EXPANSION OF IT, WHICH IS WHAT THEY'RE

15   CLAIMING.

16        **THE COURT:**  YEAH, WELL, I DON'T SEE IT AS AN

17   EXPANSION, BUT I DON'T -- I DON'T UNDERSTAND WHAT IT MEANS AT

18   ALL, I GUESS.  I DON'T KNOW WHAT IT'S DOING IN THERE.

19        BUT OKAY.  SO I WILL JUST TO GO THROUGH THE CLAIM

20   CONSTRUCTION, AND AS FAR AS THE CASE MANAGEMENT, I THINK IT

21   MAKES MORE SENSE FOR ME JUST TO TRY TO GET THIS ORDER OUT, SEE

22   WHAT'S IN AND WHAT'S OUT, AND THEN PERHAPS I'LL BE ABLE TO MAKE

23   A CLAIM -- A CASE MANAGEMENT ORDER BASED ON WHAT YOU'VE

24   SUBMITTED AFTERWARDS.

25        OR MAYBE I'LL CALL ANOTHER CASE MANAGEMENT

1  CONFERENCE OR ASK YOU ALL TO PUT YOUR HEADS TOGETHER AND SEE IF

2  YOU CAN COME UP WITH SOME PROPOSAL BASED ON WHAT'S STILL IN THE

3  CASE AND WHAT CASES ARE STILL AROUND AND WHETHER ADOBE IS IN OR

4  OUT AND SO FORTH AND TAKE IT FROM THERE.

5          I GUESS YOU HAVE NO NEW DATES AFTER THIS, OR DO YOU?

6          **MR. CHANDLER:**  YOUR HONOR, WE HAVE A CASE MANAGEMENT

7  CONFERENCE SCHEDULED FOR APRIL.

8          **THE COURT:**  OH.

9          **MR. CHANDLER:**  AND ALSO IN THE -- WHICH WOULD BE

10  AFTER EXPERT REPORTS.  IN -- IN MY CASE, THE 10-4947, THE

11  PARTIES HAVE AGREED IN THE CMC STATEMENT THEY SUBMITTED THAT

12  THE PARTIES WOULD PREFER A FIXED DATE FOR EXPERT REPORTS, SO

13  THAT WAS SUBMITTED TO THE COURT AS A JOINT STIPULATION.

14          WE WOULD INVITE THE COURT TO SIGN THAT SO THAT OUR

15  EXPERT REPORT DEADLINE IS THE SAME AS IN THE OTHER THREE CASES.

16  THE DEADLINE MAY CHANGE DEPENDING ON WHAT HAPPENS WITH THE

17  COURT'S RULING, BUT I EXPECT THAT IN THE FOUR CASES, IT SHOULD

18  STAY THE SAME.

19          THERE WAS A COMMENT MADE BY THE COURT WITH RESPECT

20  TO THE ADOBE ACTION THAT I'D LIKE TO ADDRESS.  I WAS A LITTLE

21  CONCERNED.  THE COURT INDICATED THAT THE COURT WOULD LIKE THE

22  ADOBE ACTION TO CATCH UP WITH THE EXISTING ACTION.  OUR ACTION

23  IS -- IS ONE YEAR AHEAD OF THEIRS, AND I AM CONCERNED THAT IF

24  THE COURT TRIES TO WAIT FOR ALL THE ACTIONS TO CATCH UP, THERE

25  WILL BE NO END TO THAT.

```
 1            A NEW ACTION WAS FILED IN MISSOURI A FEW DAYS AGO,

 2   ANOTHER DECLARATORY JUDGMENT ACTION.  FURTHERMORE, KELORA

 3   DURING THE PENDENCY OF THE YEAR THAT THIS ACTION HAS BEEN

 4   PENDING, KELORA HAS BEEN SENDING OUT DEMAND LETTERS TO

 5   LITERALLY HUNDREDS OF WEBSITES.  SO THERE ARE UNTOLD NUMBERS OF

 6   POTENTIAL DECLARATORY JUDGMENT ACTIONS WAITING TO BE FILED OR,

 7   CONVERSELY, FOR KELORA TO FILE AGAINST THOSE DEFENDANTS.

 8            THE ONLY WAY THAT THIS CASE WILL EVER BE BROUGHT TO

 9   RESOLUTION IS IF SUMMARY JUDGMENT IS GRANTED OR IF ONE OF THE

10   CASES IS ACTUALLY BROUGHT TO TRIAL.  SO I'M CONCERNED ABOUT

11   TRYING TO SLOW DOWN THE LEAD CASE SO THAT ANOTHER CASE CAN

12   CATCH UP.  THERE WILL BE NO END TO THE CATCHING UP BECAUSE

13   KELORA WILL CONTINUE TO FILE --

14            THE COURT:  WELL --

15            MR. CHANDLER:  -- LAWSUITS.

16            THE COURT:  CLAIM CONSTRUCTION WILL CARRY OVER.

17            MR. CHANDLER:  CORRECT.

18            THE COURT:  THAT WILL HELP SOME.  WE'LL HAVE THE

19   CLAIMS CONSTRUED.

20            MR. CHANDLER:  YES.

21            THE COURT:  WE COULD CONCEIVABLY TRY VALIDITY APART

22   FROM INFRINGEMENT BECAUSE THAT WOULD BE SORT OF A COMMON PROOF

23   THAT WOULDN'T -- THAT WOULDN'T BE DIFFERENT DEPENDING ON ALL OF

24   THE DIFFERENT PARTIES.

25            MR. CHANDLER:  SO WHAT THE PARTIES AGREED TODAY --
```

1   THE REASON FOR THE CMC IN APRIL AFTER EXPERT REPORTS IS THE

2   PARTIES AGREED THAT AT THAT CMC, THEY WOULD PROPOSE TO THE

3   COURT SOME WAY TO MANAGE ALL OF THESE CASES.   THERE IS A TRIAL

4   DATE OF JULY 2012.   THERE ARE STILL 16 DEFENDANTS, AND I GUESS

5   ADOBE WOULD BE 17.   OBVIOUSLY, NOT ALL 17 DEFENDANTS CAN BE

6   TRIED IN JULY OF 2012.

7           THE -- THE PARTIES ASKED FOR THE APRIL CMC STATEMENT

8   SO THEY CAN COME FORWARD WITH A PROPOSAL, WHETHER IT BE THAT

9   VALIDITY GO FIRST OR WHETHER THERE BE A BELLWETHER TRIAL WHERE

10  ONE PARTY TRIES EVERYTHING AND THAT GOES FIRST.   I MEAN, THE

11  REALITY IS THAT THE DAMAGES ARE ALSO AN IMPORTANT ISSUE THAT --

12          YOU KNOW, FOR SETTLEMENT PURPOSES, THERE ARE ALL OF

13  THESE UNTOLD DEFENDANTS OUT THERE.   I THINK THEY'RE TRYING TO

14  FIGURE OUT WHAT THEIR EXPOSURE IS AND WHETHER THEY WANT TO

15  LITIGATE OR WHETHER THEY WANT TO SETTLE.   AND THAT'S NOT GOING

16  TO BE RESOLVED, I WORRY, UNTIL THERE'S ACTUALLY, AGAIN, EITHER

17  A SUMMARY JUDGMENT OF INVALIDITY, WHICH IS THE PURPOSE OF THIS

18  MOTION, IS TO END THE CASE.   OR IF THAT'S UNSUCCESSFUL OR IF

19  THE SUMMARY JUDGMENT MOTIONS ARE DENIED AND ANY PORTION OF THE

20  CASE PROCEEDS, I THINK THE ONLY WAY THAT THERE'S GOING TO BE

21  RESOLUTION IS IF THERE IS A TRIAL ON THE MERITS.

22          **THE COURT:**   OKAY.   WELL, WE'LL JUST HAVE TO -- I'LL

23  JUST HAVE TO SEE WHERE I GO WITH THIS.   I MEAN, THE OTHER

24  OPTION IS IF I DECIDE I WANTED TO ALLOW YOU TO REFILE THE

25  SUMMARY JUDGMENT MOTION BUT WITH AN EXPERT --

1        **MR. CHANDLER:**  YES, YOUR HONOR.

2        **THE COURT:**  -- THAT WOULD TAKE ANOTHER MONTH OR

3   TWO --

4        **MR. CHANDLER:**  RIGHT.

5        **THE COURT:**  -- TO GET THAT DONE.

6        **MR. CHANDLER:**  CORRECT.

7        **THE COURT:**  SO LET ME JUST FIGURE OUT WHAT TO DO

8   WITH THE MOTIONS I'VE GOT BEFORE ME.  I DON'T KNOW HOW LONG

9   IT'S GOING TO TAKE ME TO RESOLVE THEM.  AND THEN WE'LL JUST

10  DEAL WITH THE CASE MANAGEMENT AFTER THAT ONE WAY OR THE OTHER.

11       **MR. CHANDLER:**  IF YOUR HONOR -- THE REASON WE DIDN'T

12  FILE THE EXPERT IS THERE ARE A NUMBER OF CASES SAYING IT'S NOT

13  NECESSARY.  IF IT'S SOMETHING THAT WOULD HELP, IF YOU LET US

14  KNOW SOONER RATHER THAN LATER, I THINK WE COULD GET YOU AN

15  EXPERT DECLARATION.

16       **THE COURT:**  OKAY.

17       ANYTHING ELSE THAT DESPERATELY NEEDS TO BE ADDRESSED

18  RIGHT NOW?

19       **MR. BECKER:**  NO.

20       **MR. CHANDLER:**  HAPPY HOLIDAYS.

21       **MR. KATZ:**  THANK YOU, YOUR HONOR.

22       (PROCEEDINGS WERE CONCLUDED AT 3:55 P.M.)

23                      --OOO--

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4          I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED

5    STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY

6    THAT THE FOREGOING PROCEEDINGS IN C10-04947CW; C11-01398CW;

7    C11-01548CW; C11-02284CW; AND C11-03938CW, EBAY, INC. V.

8    PARTSRIVER, INC., ET AL.; CABELA'S INC. V. KELORA SYSTEMS, LLC;

9    KELORA SYSTEMS LLC V. TARGET CORPORATION, ET AL. AND

10   THIRD-PARTY ACTION; NEBRASKA FURNITURE MART, INC. V KELORA

11   SYSTEMS, LLC; ADOBE SYSTEMS INCORPORATED V. KELORA SYSTEMS,

12   LLC, WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND

13   WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO

14   TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE

15   RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF

16   FILING.

17          THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID

18   TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE

19   COURT FILE.

20

21   _____

22   RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR

23          MONDAY, DECEMBER 5, 2011

24

25

# Exhibit 49

# Manual of
# PATENT
# EXAMINING
# PROCEDURE

### Original Eighth Edition, August 2001
### Latest Revision July 2008



## U.S. DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

Rev. 7, July 2008

# Chapter 2200  Citation of Prior Art and Ex Parte Reexamination of Patents

2201    Introduction
2202    Citation of Prior Art
2203    Persons Who May Cite Prior Art
2204    Time for Filing Prior Art Citation
2205    Content of Prior Art Citation
2206    Handling of Prior Art Citation
2207    Entry of Court Decision in Patent File
2208    Service of Citation on Patent Owner
2209    Ex Parte Reexamination
2210    Request for Ex Parte Reexamination
2211    Time for Requesting  Ex Parte Reexamination
2212    Persons Who May File a Request for Ex Parte Reexamination
2212.01     Inquiries from Persons Other Than the Patent Owner
2213    Representative of Requester
2214    Content of Request  for Ex Parte Reexamination
2215    Fee for Requesting Ex Parte Reexamination
2216    Substantial New Question of Patentability
2217    Statement in the Request Applying Prior Art
2218    Copies of Prior Art
2219    Copy of Printed Patent
2220    Certificate of Service
2221    Amendments Included in Request by Patent Owner
2222    Address of Patent Owner
2223    Withdrawal of Attorney or Agent
2224    Correspondence
2225    Untimely Paper Filed Prior to Order
2226    Initial Processing of Request for Ex Parte Reexamination
2227    Incomplete Request  for Ex Parte Reexamination
2229    Notice of Request for Ex Parte Reexamination in Official Gazette
2230    Constructive Notice to Patent Owner
2231    Processing of Request Corrections
2232    Public Access
2232.01     Determining if a Reexamination >Request< Was Filed for a Patent
2233    Processing in Central Reexamination Unit and Technology Center
2234    Entry of Amendments
2235    Record Systems
2236    Assignment of Reexamination
2237    Transfer Procedure
2238    Time Reporting
2239    Reexamination Ordered at the Director's Initiative
2240    Decision on Request
2241    Time for Deciding Request

2242    Criteria for Deciding Request
2243    Claims Considered in Deciding Request
2244    Prior Art on Which the Determination Is Based
2245    Processing of Decision
2246    Decision Ordering Reexamination
2247    Decision on Request for  Reexamination, Request Denied
2247.01     Examples of Decisions on Request for Reexamination
2248    Petition From Denial of Request
2249    Patent Owner's Statement
2250    Amendment by Patent Owner
2250.01     Correction of Patent Drawings
2250.02     Correction of Inventorship
2250.03     Fees for Adding Claims
2251    Reply by Third Party Requester
2252    Consideration of Statement and Reply
2253    Consideration by Examiner
2254    Conduct of Ex Parte Reexamination Proceedings
2255    Who Reexamines
2256    Prior Art Patents and Printed  Publications Reviewed by  Examiner in Reexamination
2257    Listing of Prior Art
2258    Scope of Ex Parte Reexamination
2258.01     Use of Previously Cited/Considered Art in Rejections
2259    Res Judicata and Collateral Estoppel In Reexamination Proceedings
2260    Office Actions
2260.01     Dependent Claims
2261    Special Status For Action
2262    Form and Content of Office Action
2263    Time for Response
2264    Mailing of Office Action
2265    Extension of Time
2266    Responses
2266.01     Submission Not Fully Responsive to Non-Final Office Action
2266.02     Examiner Issues Notice of Defective Paper in Ex Parte Reexamination
2266.03     Service of Papers
2267    Handling of Inappropriate or  Untimely Filed Papers
2268    Petition for Entry of Late Papers for Revival of Reexamination Proceeding
2269    Reconsideration
2270    Clerical Handling
2271    Final Action
2271.01     Panel Review
2272    After Final Practice

**2256    Prior Art Patents and Printed Publications Reviewed by Examiner in Reexamination [R-7]**

Typically, the primary source of prior art will be the patents and printed publications cited in the request for *ex parte* reexamination.

Subject to the discussion provided below in this section, the examiner must also consider patents and printed publications:

(A) cited by another reexamination requester under 37 CFR 1.510 or 37 CFR 1.915;

(B) cited in a patent owner's statement under 37 CFR 1.530 or a requester's reply under 37 CFR 1.535 if they comply with 37 CFR 1.98;

(C) cited by the patent owner under a duty of disclosure (37 CFR 1.555) in compliance with 37 CFR 1.98;

(D) discovered by the examiner in searching;

(E) of record in the patent file from earlier examination; and

(F) of record in the patent file from any 37 CFR 1.501 submission prior to date of an order if it complies with 37 CFR 1.98.

\*\*

==Where patents, publications, and other such items of information are submitted by a party (patent owner or requester) in compliance with the requirements of the rules, the requisite degree of consideration to be given to such information will be normally limited by the degree to which the party filing the information citation has explained the content and relevance of the information. The initials of the examiner placed adjacent to the citations on the form PTO/SB/08A and 08B or its equivalent, without an indication to the contrary in the record, do not signify that the information has been considered by the examiner any further than to the extent noted above.==

As to (E) above, it is pointed out that \*\* the degree of consideration of information from the patent file and its parent files is dependent on the availability of the information. Thus, for example, \*>as to< a reference other than a U.S. \*>patent< and U.S. patent publication \*\*>that is< not scanned into the Image File Wrapper (IFW) \* what was said about \*>that< reference in the patent's record is the full extent of consideration, unless otherwise indicated >, or unless parties appropriately supplied a copy<.

As to \*\*>(C) and (F) above, 37 CFR 1.98(a)(2) requires a legible copy of:

(1) each foreign patent;

(2) each publication or that portion which caused it to be listed, other than U.S. patents and U.S. patent application publications unless required by the Office;

(3) for each cited pending unpublished U.S. application, the application specification including the claims, and any drawing of the application, or that portion of the application which caused it to be listed including any claims directed to that portion;

(4) all other information or that portion which caused it to be listed.

It is not required nor is it permitted that parties submit copies of copending reexamination proceedings and applications (which copies can be mistaken for a new request/filing) ; rather, submitters may provide the application/proceeding number and its status. A submission that is not permitted entry will be returned, expunged, or discarded at the soled discretion of the Office. <

The exception to the requirement for reference copies note 37 CFR 1.98(d)(1) does not apply to reexamination proceedings since a reexamination proceeding does not receive 35 U.S.C. 120 benefit from the patent.