**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EBAY INC.; and MICROSOFT                     No. C 10-4947 CW
CORPORATION,
                                             ORDER ON CLAIM
        Plaintiffs,                          CONSTRUCTION AND
                                             GRANTING MOTION
    v.                                       FOR SUMMARY
                                             JUDGMENT
KELORA SYSTEMS, LLC,                         (Docket Nos. 94 in
                                             10-4947, 57 in
        Defendant.                           11-1398 and 361 in
                                             11-1548)
_____/

CABELA'S INC.,                               No. C 11-1398 CW

        Plaintiff,

    v.

KELORA SYSTEMS, LLC,

        Defendant.

_____/

KELORA SYSTEMS, LLC,                         No. C 11-1548 CW

        Plaintiff,

    v.

TARGET CORPORATION; AMAZON.COM,
INC.; DELL, INC.; OFFICE DEPOT,
INC.; NEWEGG INC.; COSTCO
WHOLESALE CORPORATION; HEWLETT-
PACKARD COMPANY; AUDIBLE, INC.;
and ZAPPOS.COM, INC.,

        Defendants.

_____/

AND ALL RELATED COUNTERCLAIMS
_____/

        Plaintiffs and Counterclaim-Defendants eBay, Inc., Microsoft

Corporation and Cabela's Inc., Defendants and

United States District Court
For the Northern District of California

Counterclaim-Plaintiffs Target Corporation, Amazon.com, Inc., Dell, Inc., Office Depot, Inc., Newegg, Inc., Costco Wholesale Corporation, Hewlett-Packard Company, Audible, Inc. and Zappos.com, Inc. (hereinafter, collectively referred to as Defendants) and Defendant/Counterclaim-Plaintiff and Plaintiff/Counter-claim Defendant Kelora Systems, LLC (hereinafter, Kelora) seek construction of terms and phrases used in Kelora's U.S. Patent No. 6,275,821 ('821 patent). In addition, Defendants move for summary judgment of non-infringement and invalidity of the '821 patent. Kelora opposes their motion. Having considered the papers submitted by the parties and their oral arguments, the Court construes the terms and phrases as set forth below. In addition, the Court GRANTS Defendants' motion for summary judgment.

BACKGROUND

Kelora Systems LLC is the current owner of the '821 patent, which is entitled, "Method and System for Executing a Guided Parametric Search," and claims a "process for identifying a single item from a family of items." '821 patent, Abstract. The invention is intended "to provide a guided parametric search to isolate a subfamily of items within a family of items based on alternatives associated with each item." Id. at 3:36-39. The patent specification describes two embodiments of the invention: (1) an embodiment that runs on a single, local computer, see id. at 5:50-18:9; and (2) an embodiment that runs over the Internet and requires a server and client computer, see id. at 18:10-19:34. Over the Internet, "the invention . . . may be used as an electronic catalog, providing an electronic alternative to

2

updating and distributing product and/or service information." Id. at 4:6-9.

The '821 patent is the continuation of U.S. Patent No. 5,983,219, which is itself a continuation of U.S. Patent No. 5,715,444 ('444 patent).  The application for the '444 patent was filed on October 14, 1994.  Defs.' Claim Construction Brief and Mot. for Summary J. (Mot.), Ex. 6.

A previous iteration of the '821 patent was at issue in a case previously before this Court, PartsRiver, Inc. v. Shopzilla, Inc., Case No. 09-0811 (N.D. Cal.).  There, PartsRiver, the previous owner of the '821 patent, charged eBay and Microsoft with infringement.  eBay and Microsoft counterclaimed for judgment of non-infringement and invalidity.  The Court held that claims two and two of the patent were invalid based on the on-sale bar, 35 U.S.C. § 102(b).  In so holding, the Court found that those claims had been the subject of a commercial offer for sale in March and April 1992 and that they were reduced to practice in a demonstration program, referred to as AMP Navigator, by April 1992.  On September 18, 2009, PartsRiver appealed the Court's judgment of invalidity to the Federal Circuit.

While litigation before this Court was ongoing in the Partsriver case, the U.S. Patent and Trademark Office (PTO) was conducting an ex parte reexamination of claims one and two. There, the patent examiner initially rejected claims one and two as being clearly anticipated by prior art.  PartsRiver sought reconsideration of this conclusion, arguing the prior art did not teach the subject matter contained in claim one.  The patent examiner dismissed PartsRiver's arguments, concluding that

3

PartsRiver relied on features that did not appear in the language of the claims subject to reexamination. On or about September 18, 2009, PartsRiver appealed the patent examiner's final rejection to the Board of Patent Appeals and Interferences (BPAI).

During the pendency of its appeals to the Federal Circuit and the BPAI, PartsRiver proposed amending claim one and adding a ninth claim to the '821 patent. PartsRiver's amendments to claim one necessarily changed dependent claim two. The patent examiner deemed claim one, as amended, and new claim nine to be patentable. Claims three and four were not re-examined. Thereafter, PartsRiver's BPAI appeal was dismissed. After a reexamination certificate for the '821 patent issued on November 2, 2010, PartsRiver filed a motion to dismiss its appeal of this Court's judgment, which the Federal Circuit granted.

In these related cases, Kelora, to whom Partsriver had transferred ownership of the '821 patent, and Defendants have filed various complaints and counter-complaints against each other, with Defendants seeking declarations of non-infringement, invalidity and/or intervening rights and Kelora alleging that Defendants have infringed the re-examined '821 patent. Kelora asserts against Defendants two independent claims, claims one and nine, and three dependent claims, claims two through four.

Claims one through four of the re-examined patent '821 are as follows, with additions to, and deletions from, the original claim one indicated in underlined text and brackets respectively:

> 1. A method for assisting a user in identifying a subfamily of items within a family of items said method performed with a server connected to a client computer through a computer network, comprising the steps of:

(a)   providing a computer readable data file of stored information representing at least one family of items, said data file identifying at least one alternative for each item,

(b)   reading said data file,

(c)   displaying a feature screen indicating said alternatives represented in the family,

(d)   accepting a first selection criteria of at least one alternative,

(e)   determining a first subfamily of items wherein each said item in the first subfamily satisfies said first selection criteria,

(f)   determining available alternatives represented in the first subfamily,

(g)   revising said feature screen to indicate the available alternatives of the first subfamily,

(h)   accepting a second selection criteria [comprising] from the client computer via said computer network at said server wherein the second selection criteria comprises a resubmission to the server of the alternative or alternatives of the first selection criteria plus at least one alternative selected from the revised feature screen,

(i)   determining a second subfamily of items of the family wherein each item in the second subfamily satisfies said second selection criteria,

(j)   determining available alternatives represented in the second subfamily, and

(k)   revising said feature screen to indicate the available alternatives of the second subfamily.

2.   The method of claim 1 wherein each family has at least one feature associated therewith and further comprising the step of displaying at least one grouping wherein each said grouping comprises one of said features visually related to respective alternatives.

3.   The method according to claim 2 and further comprising the step of: providing an interactive pointer and displaying information specific to one of said features upon a user initiated signal when said pointer is pointing to a feature caption on said feature screen.

4.   The method according to claim 2 wherein at least one said grouping is hidden from view if all said respective alternatives are not available.

Mot., Ex. 2, at 20:5-20, and Ex. 3, at 1:26-2:7.  The text of new claim nine reads as follows,

    9.   A method for assisting a user in identifying a subfamily of items within a family of items, the method comprising the following steps which are performed with a server connected to a computer network:

    (a)  providing a computer readable data file of stored information representing at least one family of items, said data file identifying at least one alternative for each item,

    (b)  reading said data file,

    (c)  displaying a feature screen indicating said alternatives represented in the family, wherein data is output to a client computer via said computer network,

    (d)  receiving and accepting a first selection criteria of at least one alternative from said client computer, said first selection criteria being received by said server from said client computer via said computer network,

    (e)  determining a first subfamily of items wherein each said item in the first subfamily satisfies said first selection criteria,

    (f)  determining available alternatives represented in the first subfamily,

    (g)  revising said data for said feature screen to indicate the available alternatives of the first subfamily and outputting said revised data for said feature screen to said client computer via said computer network,

    (h)  receiving and accepting a second selection criteria from the client computer via said computer network at said server wherein the second selection criteria comprises (1) a resubmission by the client computer of the alternative or alternatives of the first selection criteria along with (2) at least one alternative selected from the revised feature screen,

    (i)  determining a second subfamily of items of the family wherein each item in the second subfamily satisfies said second criteria,

    (j)  determining available alternatives represented in the second subfamily, and

        (k)  revising said data for said feature screen to
indicate the available alternatives of the second
subfamily and outputting said revised data for said
feature screen to said client computer via said computer
network.

Mot., Ex. 3, at 2:8-50.

    Defendants now move for summary judgment of non-infringement

and invalidity of the '821 patent based on obviousness and

broadening during re-examination.[1]

DISCUSSION

I.  Claim Construction

    A.  Legal Standard

    The construction of a patent is a matter of law for the

Court.  Markman v. Westview Instruments, Inc., 517 U.S. 370, 372

(1996).  "It is a 'bedrock principle' of patent law that 'the

claims of a patent define the invention to which the patentee is

entitled the right to exclude.'"  Phillips v. AWH Corp., 415 F.3d

1303, 1312 (Fed. Cir. 2005) (en banc) (quoting Innova/Pure Water,

Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115

(Fed. Cir. 2004)).  Accordingly, in construing disputed terms, the

Court first looks to the words of the claims.  Vitronics Corp. v.

Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

_____

    [1] After the hearing on claim construction and Defendants'
motion for summary judgment, the Court invited the parties to
submit supplemental briefs and additional expert reports on a
limited issue.  Defendants argue that, in its supplemental brief
and expert reports, Kelora has included arguments and evidence
that go far beyond the subject matter that the Court gave it leave
to address, and requests that the Court decline to consider this
information.  The Court has reviewed Kelora's supplemental
submissions and finds that they do exceed the scope of the Court's
prior order.  However, the Court OVERRULES Defendants' objection
as moot, because the Court has considered the arguments and
evidence that exceed the scope and has found that they do not
change the result of this Order.

United States District Court
For the Northern District of California

Generally, the Court ascribes the words of a claim their ordinary and customary meaning.  Id.  The Federal Circuit instructs that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  Phillips, 415 F.3d at 1313.  Other claims of the patent in question can also assist in determining the meaning of a claim term.  Id. at 1314. "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."  Id.

The Federal Circuit also instructs that claims "must be read in view of the specification, of which they are a part."  Id. at 1315 (quoting Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996)).  The specification must contain a description of the invention that is clear and complete enough to enable those of ordinary skill in the art to make and use it, and thus the specification is "always highly relevant" to the Court's claim construction analysis. Vitronics, 90 F.3d at 1582.  "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term."  Id.  In some cases, the specification may reveal that the patentee has given a special definition to a claim term that differs from its ordinary meaning; in such cases, "the inventor's lexicography controls."  Phillips, 415 F.3d at 1316. The specification also may reveal the patentee's intentional disclaimer or disavowal of claim scope.  "In that instance as well, the inventor has dictated the correct claim scope, and the

8

inventor's intention, as expressed in the specification, is regarded as dispositive." Id.  However, claims are not limited to the preferred embodiment described in the specification.  See SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc, plurality opinion).

In addition to reviewing the specification, the Court considers the patent's prosecution history.  Markman, 52 F.3d at 980.  The prosecution history is intrinsic evidence that "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  Phillips, 415 F.3d at 1317 (citing Vitronics, 90 F.3d at 1582-83); see also Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.") (internal quotations omitted).  However, the Court may find that the inventor "disclaimed protection during prosecution only if the allegedly disclaiming statements constitute 'a clear and unmistakable surrender of subject matter.'"  Ecolab, Inc. v. FMC Corp., 569 F.3d 1335, 1342 (Fed. Cir. 2009) (quoting Bayer AG v. Elan Pharm. Research Corp., 212 F.3d 1241, 1251 (Fed. Cir. 2000)).

While emphasizing the importance of intrinsic evidence in claim construction, the Federal Circuit has authorized courts to rely on extrinsic evidence, which consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."

Phillips, 415 F.3d at 1317 (quoting Markman, 52 F.3d at 980).

Although extrinsic evidence may be useful to the Court, it is less

significant than intrinsic evidence in determining the legally

operative meaning of claim language.  Phillips, 415 F.3d at 1317-

18; see also C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858,

862 (Fed. Cir. 2004).  Furthermore, extrinsic evidence is unlikely

to lead to a reliable interpretation of claim language unless

considered in the context of the intrinsic evidence.  Phillips,

415 F.3d at 1319.

B.   Discussion

The parties dispute the meaning of more than a dozen words or

phrases in claims one through four and nine of the amended patent

and one in the original claim one.  The disputed terms and phrases

appear in other places in the patent as well.

Because the Court grants Defendants' motion for summary

judgment, the Court need not construe disputed terms beyond the

extent necessary for resolution of this motion.

1.   "User"

In their motion, Defendants argue that the word "user" means

"a person using a computer."[2]  Mot. at 55.  Kelora does not

challenge this construction or propose an alternative.

_____

    [2]  Throughout their motion, Defendants cite a table that they
include as Exhibit 1 to their motion.  This table has
"[a]dditional evidence in support of Defendants' proposed
construction[s]," which they do not include or discuss in their
brief "[d]ue to space limitations."  Mot. at 37, n.23.  Kelora
challenges the consideration of this table, arguing that
Defendants "merely seek to circumvent the already extended page
limit for Defendants' brief" by including a table with "arguments
not deemed worthy of discussion in Defendants' Motion."  Opp. at
60.  The Court SUSTAINS Kelora's objection and declines to
consider Defendants' Exhibit 1.

United States District Court
For the Northern District of California

1   Accordingly, the Court adopts Defendants' proposed construction

2   and construes "user" to mean a "person using a computer."

3           2.   "Server"

4       Defendants contend that the word "server" need not be

5   construed.  Kelora states that the word "server" as used

6   throughout the claims refers to a "web server."  Kelora argues

7   that the word "server" was limited to a "web server" during the

8   prosecution history of the '821 patent to distinguish it from

9   prior art.  Defendants reply that Kelora's proposed construction

10  is incorrect, and that the cited pages from the prosecution

11  history do not constitute a "clear and unmistakable waiver of

12  subject matter."

13      The portions of the prosecution history cited by Kelora do

14  not constitute a clear and unmistakeable waiver of subject matter.

15  Kelora relies on a response sent by the patentee to the

16  Commissioner for Patents, requesting reconsideration of the

17  rejection of the original claims one and two.  As noted by

18  Defendants, the claims addressed at the time did not include the

19  words "server," and the letter did not propose any amendments to

20  the claims.  Reexam. Ex. 5, at 2-5.  In the discussion, the

21  patentee used the word "webserver" in paragraphs that were

22  intended to provide an example of how the patented method

23  addressed a problem that servers faced.  See id. at 10 ("A

24  concrete example may be helpful here.  Assume a webserver  . .

25  .").  In fact, the surrounding sentences use the word "server,"

26  with no qualification, as the more general term.  See id. ("In

27  typical client server applications, the server establishes a

28  separate session with each user . . .").  There is no language

United States District Court
For the Northern District of California

1   that provides a clear and unmistakable waiver of subject matter

2   related to any server that is not a web server.

3       Accordingly, the Court declines to construe the word server

4   to be limited to a web server.

            3.   "With a server"

6       Kelora argues in an indirect manner that the phrase "with a

7   server" should be construed to mean "by a server."  Kelora states

8   that the use of this phrase in the preamble means that all of the

9   steps in claims one and nine require no action by any entity other

10  than a server, specifically, no action by a client computer, and

11  that the "server performs each step."  See Opp. at 47, 48.

12  Defendants respond that this construction is incorrect, because

13  the plain terms of the preamble allow some of the steps to be

14  performed by a client computer as long as it is connected with the

15  server when the step is performed.

16      As Defendants point out, this Court has already found that

17  the steps in the claims do require some action by a client

18  computer.  In the Order of May 9, 2011, the Court recognized that,

19  in step (h) of amended claim one and claim nine, tasks are divided

20  between the client computer and the server, and that "the client

21  computer combines 'the alternative or alternatives of the first

22  selection criteria plus at least one alternative selected from the

23  revised feature screen,' which, together, constitute the 'second

24  selection criteria.'"  Order Granting in Part and Denying in Part

25  Plaintiffs' Motion for Summary Judgment and Consolidating Cases,

26  Docket No. 70 in Case No. 10-4947, at 7-8.

27      Further, the clear terms of the specification support

28  Defendants' interpretation.  The specification describes, for

United States District Court
For the Northern District of California

example, that the client computer, and not the server, performs the step of "displaying."  See below, section I.B.4, "Displaying."

Accordingly, the Court declines to construe the phrase "with a server" to mean "by a server."  The phrase need not be construed.

4.   "Displaying"

Defendants propose that the word "displaying" should be construed as "showing on the display device of the user's computer."  Kelora contends that the word should be construed as "the action of sending a page to a display surface or device for viewing."

Defendants' proposed construction is more consistent with the claim language.  Step (c) of the newly added claim nine differs from step (c) of claim one, which did not change during re-examination, only by the addition of "wherein data is output to a client computer via said computer network."  Kelora argues that this clause means that "displaying" must include the concept of outputting.  However, if "displaying" were construed to include this already, the additional phrase in claim nine would be superfluous, and step (c) in each claim would have the same meaning.  Both parties point out, "A claim construction that gives meaning to all terms of the claim is preferred over one that does not."  Merck & Co. v. Teva Pharms. USA, Inc., 395 F.3d 1364, 1372 (Fed. Cir. 2005).  Defendants' proposed construction renders this additional phrase meaningful and allows step (c) to be differentiated between the two claims.

Kelora also argues that Defendants' construction disregards language from the preamble of claims one and nine, which states

United States District Court
For the Northern District of California

13

United States District Court
For the Northern District of California

that the steps are "performed with a server connected [. . .] to a computer network."  However, the preamble does not specify that the steps are all performed by the server.  Instead, the specification makes clear that the display step is performed by "a client," in conjunction with a server sending data to the client, and not by the server alone.

In arguing that "displaying" is defined in part as "sending," Kelora states that "the specification describes the act of 'displaying' by the server in the Internet embodiments," and "that the client then merely reflects what the server sends it."  Opp. at 50 (citing Mot., Ex. 2, 18:48-54, 61-63).  However, this inaccurately describes the contents of the specification. Instead, the specification clearly distinguishes between "sending" and "displaying," and states that the server computer performs the former and the client computer performs the latter.  See Ex. 2, 18:49, 61-63 ("the server sends a feature screen status . . . The client receives the feature screen status and displays the feature screen accordingly.").  These two words are consistently used in a non-interchangeable manner, and the division of roles is reiterated, elsewhere in the specification.  See id. at 19:6-10 ("The server sends the feature screen status . . . to the client. The client receives the feature screen status and displays the updated feature screen.").  The specification also makes clear that the client refers to the user's computer.  See, e.g., id. at 18:12-13 (distinguishing between the server computer and the client computer); 18:45 ("a user on the client"); 18:64 ("The user on the client").  Thus, Kelora's proposed construction is not

14

consistent with the language of the specification, while Defendants' proposal is.

Defendants' proposed construction is also consistent with the prosecution history of the '821 patent.  Defendants point out that, during the re-examination process, the patentees proposed a new claim one in which the step of "displaying" was replaced with a step of "outputting data for a feature screen."  Mot. at 48 (citing '821 Reexam., Ex. 8 at 5).  They later reverted to the "displaying" language in the final amendment, which demonstrates that the patentees deliberately chose not to use the word "outputting."  Id.  In response, Kelora argues only that the addition of the phrase "wherein data is output to" supports its construction, which is unavailing for the reasons addressed above.

Finally, the inventor testimony offered is also consistent with Defendants' position that "displaying" refers to the browser "showing," as distinguished from the server "sending."  See Opp. at 51 (quoting deposition testimony of inventor Sherif Danish that "it is a function of the server to determine what is this feature screen and send it to the browser, and the browser will interpret it and visualize it for the user" and "the browser can only display what it receives"); Mot. at 48 (inventor Mr. Danish agreeing that "the browser process[es] HTML code that it receives from the server," formats it, and then "displays it on the screen," and that "the display is . . . a display that happens on the user of the--on the browser of the client").

Thus, the Court construes the word "displaying" to mean "showing on the display device of the user's computer."

5.   "Resubmission"

Kelora contends that the phrase "resubmission to the server," which appears in claim one and nine, does not need to be construed.  Defendants argue that this phrase does need to be construed in claim one, but not in claim nine, where it is followed by the phrase "by said client computer."  Defendants propose that the phrase in claim one should be construed as "resubmission by said client computer to the server."  Kelora responds with two arguments: that Defendants' construction improperly changes a noun to a verb requiring action, and that requiring this action to be done by the client computer violates the limitation of the preamble that the steps are to be "performed with a server."

First, Kelora's argument that Defendants' construction improperly changes a noun to a verb is unpersuasive.  Kelora is correct that the word "resubmission" is a noun; however, contrary to Kelora's contentions, nouns can describe actions and not all words that describe actions are verbs.  See, e.g., Webster's Third New International Dictionary 1545 (Philip Babcok Gove ed., 1993) (defining a noun as "a word that is the name of a subject of discourse (as a person, animal, plant, place, thing, substance, quality, idea, action, or state)"); Merriam-Webster Dictionary (May 18, 2012, 2:04 p.m.), http://www.merriam-webster.com/dictionary/noun (defining a noun as "any member of a class of words that typically can be combined with determiners to serve as the subject of a verb, can be interpreted as singular or plural, can be replaced with a pronoun, and refer to an entity, quality, state, action, or concept").  Resubmission is such a

16

noun.  See Webster's Third New International Dictionary, above, at 1937 ("resubmission" is a noun defined as "an act of resubmitting").

As Defendants point out, the plain text of the claim and the specification demonstrate that the resubmission is something that the client computer sends to the server.  The claim describes a step of "accepting a second selection criteria from said client computer . . . wherein the second selection criteria comprises a resubmission to the server . . ."  Mot., Ex. 3 at 1:46-50.  The specification explains that the user on the client computer "makes selections," and the client computer "initiates a search with the modified selection criteria" and "sends to the server, the ScreenNum value . . . and the modified selection criteria."  Mot., Ex. 3 at 18:64-19:2.  In turn, the "server receives" these items and "executes the search operation."  Id. at 19:3-5.  That the resubmission is sent from the client computer to the server is also supported by the re-examination history: when allowing the re-examined claims, the Examiner stated that "when the client computer of claims 1 or 9 submits a second query, it transmits both the previous and current selection criteria together."  '821 Reexam., Ex. 16 at 3.

Kelora responds that this construction would "render superfluous" the limitation in the preamble that the steps are performed "with a server."  Opp. at 12.  However, allocating actions between the server and client computer does not render "with a server" superfluous; the client computer must send the resubmission to the server, as is evident from the claims themselves.

**United States District Court**
For the Northern District of California

Accordingly, the Court construes the phrase "resubmission to the server" to mean "resubmission by said client computer to the server."

II.   Motion for Summary Judgment

    A.   Legal Standard

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Federal Rule Civil Procedure 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

**United States District Court**
For the Northern District of California

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial. Id. at 1107.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a prima facie showing in support of its position on that issue. UA Local 343 v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. Id.; see also Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir. 1991). Once it has done so, the non-moving party must set forth specific facts controverting the moving party's prima facie case. UA Local 343, 48 F.3d at 1471. The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible." Id. This standard does not change merely because resolution of the relevant issue is "highly fact specific." Id.

B.   Summary Judgment of Invalidity due to Obviousness

Under 35 U.S.C. § 103(a), a patent is invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." To avoid being obvious, a patent must be "more than the predictable use of prior art elements according to their

20

established functions." <u>KSR Int'l Co. v. Teleflex Inc.</u>, 550 U.S. 398, 417 (2007).  To determine obviousness, "the invention must be considered as a whole and the claims must be considered in their entirety." <u>Kahn v. General Motors Corp.</u>, 135 F.3d 1472, 1479 (Fed. Cir. 1998).

"Although the ultimate determination of obviousness under § 103 is a question of law, it is based on several underlying factual findings, including (1) the scope and content of the prior art; (2) the level of ordinary skill in the pertinent art; (3) the differences between the claimed invention and the prior art; and (4) evidence of secondary factors, such as commercial success, long-felt need, and the failure of others." <u>Retractable Techs., Inc. v. Becton</u>, 653 F.3d 1296, 1310 (Fed. Cir. 2011) (citing <u>Graham v. John Deere Co.</u>, 383 U.S. 1, 17-18 (1966)).  "Where . . . the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate." <u>KSR</u>, 550 U.S. at 427.

The Court is not required to accept blindly conclusory assertions made by the parties' experts.  In <u>KSR</u>, the Supreme Court rejected the approach that the patentee can necessarily create a material question of fact by proffering a conclusory expert affidavit.  <u>See</u> 127 S. Ct. at 1745 ("To the extent the court understood the <u>Graham</u> approach to exclude the possibility of summary judgment when an expert provides a conclusory affidavit addressing the question of obviousness, it misunderstood the role expert testimony plays in the analysis.").  Thus, when considering

United States District Court
For the Northern District of California

21

**United States District Court**
For the Northern District of California

summary judgment on the question of obviousness, "the district court can and should take into account expert testimony, which may resolve or keep open certain questions of fact," but expert testimony is not the end of discussion, because "[t]he ultimate judgment of obviousness is a legal determination." Id.

Defendants contend that the re-examined '821 patent is obvious, based on a combination of the AMP Navigator program, which this Court found was prior art for the original '821 patent, with other prior art.

        1.   The hypothetical person of ordinary skill in the art

The parties agree that "a low level of skill in the art" is the appropriate standard to use. While Defendants define this as "a person with a moderate level of computer science experience acquired through either formal or informal training," Mot. at 29, n.18, Kelora defines it as someone with "2-3 years of experience or education with computer programming and familiarity with standards that had been established at the time," Opp. at 20. The difference between these two definitions, if any, is not material to the resolution of this motion. Thus, the Court adopts Kelora's proposed definition for the purposes of this order.

In its supplemental opposition, Kelora refers to anecdotal evidence from one of its experts about her first-hand experience reviewing solutions generated by computer science and engineering students in response to an assignment to adapt a computer application with search capability to a networked application. Kelora argues that, because none of these students adapted the application to the Web or to use resubmission, such steps were not

obvious to a person of ordinary skill in the art.  Kelora's other
expert also refers to the fact that the inventors themselves were
unfamiliar with web servers until the second quarter of 1994 and
could not have adapted the invention to the Web before that time.
However, this evidence is not determinative.  "The issue of
obviousness is determined entirely with reference to a
hypothetical 'person having ordinary skill in the art.'"  Std. Oil
Co. v. Am. Cyanamid Co., 774 F.2d 448, 454 (Fed. Cir. 1985).
Thus, the actual skills displayed or solutions derived by any
particular person or people are irrelevant to the inquiry.  See,
e.g., id. (stating that, because the focus is on a hypothetical
person, the "actual inventor's skill is irrelevant to the
inquiry").  Further, even if the students were of ordinary skill
in the art, the fact that the students did not choose to go beyond
the basic requirements of a school assignment to adapt their
applications to the Web or use resubmission does not establish or
suggest that they lacked the skills to do so with the appropriate
motivation.  Similarly, there is no showing that these students
had access to all prior art references at the time, or that they
viewed the collective teachings of the prior art "as a whole," as
is presumed of the hypothetical person of ordinary skill.  See
Std. Oil, 774 F.2d at 454; In re Gorman, 933 F.2d 982, 986 (Fed.
Cir. 1991).

        2.   The scope and content of the prior art

     Prior art refers to "knowledge that is available, including
what would be obvious from it, at a given time, to a person of
ordinary skill in an art."  Kimberly-Clark Corp. v. Johnson &
Johnson, 745 F.2d 1437, 1453 (Fed. Cir. 1984).  Under section 103,

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

the relevant content for the obviousness analysis is what was in the prior art "at the time of the invention was made."  35 U.S.C. § 103.

<blockquote>a.    The time of invention</blockquote>

For consideration of obviousness, the relevant prior "art must have existed as of the date of invention, presumed to be the filing date of the application until an earlier date is proved." Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc., 796 F.2d 443, 449 (Fed. Cir. 1986). See also 35 U.S.C. § 103(a) (stating that the relevant consideration is what "would have been obvious at the time the invention was made").  The parties do not dispute that the relevant application filing date was August 14, 1994.  See, e.g., Mot. at 19 n.6; Opp. at 22.  See also Defs.' Exs. 2, 6.

Kelora, however, argues that there is a material dispute of fact as to whether the date of invention was during or before the second quarter of 1994.  See Opp. at 22, 24.  In support, Kelora cites its interrogatory responses, in which it states that the inventors, Kris Kimbrough and Mr. Danish, conceived of the Internet embodiment after taking a class on web servers that Mr. Danish learned of through a listserve that he joined in or before April 1994, and that the only witnesses to the conception were the two inventors.  Id. (citing Mot., Ex. 15, at 5-6); see also Danish Decl. ¶ 1 (Mr. Danish is a managing member of Kelora).  On that basis, Kelora argues that, because one of the claimed pieces of prior art, a message posted to the WWW-Talk listserve by Nick

24

Arnett,[3] bears the date of May 16, 1994, there is a genuine issue of material fact as to whether the Arnett prior art was known to others or publicly available as a printed publication before the date of invention.   Id.

However, inventor testimony alone is insufficient to establish a conception date.  "It is well established that when a party seeks to prove conception via the oral testimony of a putative inventor, the party must proffer evidence corroborating that testimony."  P&G v. Teva Pharms. USA, Inc., 566 F.3d 989, 999 (Fed. Cir. 2009) (quoting Shu-Hui Chen v. Bouchard, 347 F.3d 1299, 1309 (Fed. Cir. 2003)).  See also Monolithic Power Sys. v. O2 Micro Int'l Ltd., 2010 U.S. Dist. LEXIS 13106, at *27 (N.D. Cal.) ("in addition to providing the testimony of the inventor, whose credibility can be judged by a jury, a patentee must offer independent corroborating evidence to establish a priority date earlier than the application filing date").  "Such evidence 'may consist of testimony of a witness, other than an inventor, to the actual reduction to practice or it may consist of evidence of surrounding facts and circumstances independent of information received from the inventor.'"  Hahn v. Wong, 892 F.2d 1028, 1032-

_____

[3] Kelora objects to paragraphs four through ten of the declaration of Nick Arnett as hearsay and without foundation. Kelora does not object to the admissibility of Exhibit A to the declaration, which contains the message posted by Mr. Arnett.  Mr. Arnett attests that the statements in the declaration are based on his personal knowledge; many of the statements within the challenged paragraphs describe his own activities, including comments that he made and messages that he received.  Thus, to extent that the Court relies upon the Arnett declaration, Kelora's objection is OVERRULED.

United States District Court
For the Northern District of California

1033 (Fed. Cir. 1989) (quoting Reese v. Hurst, 661 F.2d 1222, 1225 (C.C.P.A. 1981)) (emphasis added).

Kelora has pointed only to the inventors' own statements to establish a conception date earlier than the application filing date, which is insufficient to support that finding as a matter of law.  Therefore, there is no material dispute of facts that conception date is October 14, 1994, the application filing date of the '444 patent, or that Arnett is prior art.

b.   AMP Navigator as prior art

Kelora also contests Defendants' use of the AMP Navigator demonstration program as prior art.  Kelora argues that Defendants make no showing that the AMP Navigator program represents an on-sale bar to the re-examined claims or that it anticipates the re-examined claims by itself.  This Court has already found that claims one and two of the original '821 patent were invalid "due to the on-sale bar because they were the subject of a commercial offer for sale of an invention that was reduced to practice before October 14, 1993." PartsRiver, Inc. v. Shopzilla, Inc., 2009 U.S. Dist. LEXIS 74433 (N.D. Cal.).  Kelora does not argue that claims one and two of the original '821 patent were in fact valid or dispute Defendants' argument that it would be barred from doing so as the successor-in-interest to PartsRiver, Inc.

The Federal Circuit has clearly stated, "Prior art under the § 102(b) on-sale bar is also prior art for the purposes of obviousness under § 103." Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1344 (Fed. Cir. 2007).  See also TorPharm Inc. v. Ranbaxy Pharms., Inc., 336 F.3d 1322, 1327 (Fed. Cir. 2003).  While Kelora argues that this is improper "bootstrapping" on the prior finding

United States District Court<br>For the Northern District of California

26

of invalidity, the courts have repeatedly recognized that "Section 102(b) may create a bar to patentability . . . in conjunction with [§ 103], if the claimed invention would have been obvious from the on-sale device in conjunction with the prior art." LaBounty Mfg. v. United States ITC, 958 F.2d 1066, 1071 (Fed. Cir. 1992). See also TorPharm, 336 F.3d at 1327-1328 (describing "the § 102(b)/103 bar"); Pfaff v. Wells Elecs., 124 F.3d 1429, 1436 (Fed. Cir. 1997), aff'd 525 U.S. 55 (1998) (same).

Kelora contends that "the law does not permit the AMP Navigator to be combined with other art that is created after the offer for sale . . . to show obviousness." Sur-reply at 4 (emphasis omitted). However, Kelora cites no legal authority in support of the proposition that the Court should ignore the clear statutory language of § 103(a) that the prior art relevant to obviousness is that which existed "at the time the invention was made." For the purposes of obviousness, the relevant prior art consists of those sources that are otherwise "prior art for purposes of Section 103 . . . plus those sources enumerated in Section 102(b) with effective dates more than one year before the applicant's filing date." 2 Donald S. Chisum, Chisum on Patents § 5.03[2][b], at 5-133-134 (2012) (emphasis in original). See also Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd., 2010 U.S. Dist. LEXIS 56752, at *10-11 (E.D. Mich.).

In opposing Defendants' obviousness arguments, Kelora focuses on the source code of the AMP Navigator demonstration program and argues that a person of ordinary skill in the art would not have been able to transform that source code into a client server arrangement. However, these arguments are irrelevant. The prior

27

United States District Court
For the Northern District of California

invalidity finding placed the claimed features that were the
subject of the offer for sale--claims one and two of the original
'821 patent--into the prior art for the obviousness inquiry, along
with the specific reduction-to-practice and unclaimed limitations
that were contained in the AMP Navigator demonstration program.
See Pfaff v. Wells Elecs., 525 U.S. 55, 60 (1998) (stating that,
in summarizing the lower court's obviousness inquiry, "[g]iven the
[lower] court's § 102(b) holding, the prior art included [the
patent's] first four claims").  See also Lockwood v. American
Airlines, 107 F.3d 1565, 1570 (Fed. Cir. 1997) ("it is the claims
that define a patented invention. . . . [the] public use of the
high-level aspects of the SABRE system was enough to place the
claimed features of the '359 patent in the public's possession").

This Court has already determined that the AMP Navigator
demonstration program constituted a reduction to practice of the
original claims and thus that all elements of the local embodiment
of the original claims were obvious.  Defendants are not required
to re-litigate each of these, as Kelora urges, and AMP Navigator
is prior art citable against the patent claims for obviousness
purposes.  Accordingly, Defendants may prove the obviousness of
the current claims by showing that they would have been obvious
from the combination of AMP Navigator, including the concept of
parametric search, with other prior art, including the Arnett and
Suzuki prior art.

Defendants contend that the only differences between the
original and re-examined claims are the requirement of the client-
server arrangement and the resubmission requirement for iterative
searching, and that each of these elements was taught in the prior

art.  See Mot. at 17; Reply at 9-10.  In his declaration, Kelora's expert witness, Mr. Gafford, also identifies these as the two specific items that the AMP Navigator prior art does not teach, and which are contained in the re-examined '821 patent.  See Gafford Decl. ¶¶ 34-39.  See also Sur-reply at 3 (recognizing the same).

### c.  Client-server arrangements

Defendants argue that client-server arrangements were well-known and obvious, and rely on a number of prior art examples to demonstrate this.  Kelora responds primarily that a client-"web server" system is not taught in the prior art, but does not dispute that a "client-server" system was taught.

Kelora argues that the AMP Navigator prior art "teaches away" from a web server arrangement, because the code for the AMP Navigator demonstration program does not have this functionality itself and cannot be altered to include it.  Nonetheless, Kelora and Mr. Gafford do not dispute that the Suzuki[4] reference and AMP Navigator together teach the combination of the local search process contained in the original claim one with the use of a database on a remote server, even though Suzuki does not use the

_____

[4] The Suzuki reference is to a patent published by the Japan Patent Office on January 5, 1989, entitled "File Searching Method."  Leventhal Decl., Ex. 2 at 321.  Kelora objects to the English translation of the reference.  The translation is accompanied by the declaration of Takeo Ohashi, who declares under penalty of perjury that he has "competent knowledge of the Japanese and English languages" and that the "translation is an accurate representation of" the original Japanese patent.  Id. at 340.  Defendants have laid a proper foundation for the admission of the translated reference.  See 28 U.S.C. § 1746; Federal Rules of Evidence 604, 702, 901.  Accordingly, Kelora's objection is OVERRULED.

United States District Court
For the Northern District of California

words "client" and "server."  See Opp. at 32; see also Gafford

Decl. ¶ 43 (recognizing that "combining Suzuki with the AMP

Navigator demonstration program would have been expected by a

person of ordinary skill in the art as of October 14, 1994, to

have resulted, and would have resulted, in a system with the

logical model of the AMP Navigator demonstration program, . . .

coupled with a remote database").

Further, Defendants offer substantial evidence, uncontested

by Kelora, that such an arrangement was common knowledge in the

art prior to the time of invention and would have been obvious to

try.  Defendants cite statements from the Examiner during the

examination of the grandparent patent to the patent-in-suit, when

the Examiner considered a claim dependent on the claim from which

the original claim one is derived and which is nearly identical to

the original claim one.  Mot. at 21 (citing '444 Prosecution, No.

7 ¶ 28).  The Examiner rejected as obvious the dependent claim,

which added a client server arrangement, stating that "client

server systems are well known in the art and it would have been

obvious to one of ordinary skill in the DP art at the time of the

applicant's invention to provide the invention also on a client

server system as that would provide a wider range of utilization."

'444 Prosecution, No. 7 ¶ 28.  See also In re Bozek, 416 F.2d

1385, 1390 (C.C.P.A. 1969) (noting that a patent examiner may

properly rely on "common knowledge and common sense of the person

of ordinary skill in the art" in making conclusions regarding

obviousness).  Kelora responds only that this statement is

irrelevant as to whether one would be motivated to combine the

present claim with a client server arrangement, but does not

United States District Court
For the Northern District of California

dispute this as evidence that client server systems were well-known in the art prior to the invention of the disputed claims. Opp. at 37.

Defendants also offer PC Magazine's 1993 book, <u>Guide to Client/Server Databases</u>, which explains the concept of client-server database arrangements and various benefits associated with such systems. They also provide references to Tim Berners-Lee's development of the World Wide Web as an example of a client-server arrangement, which consisted of a server and client-side browser and which was available in 1992 and earlier. Defendants also cite Jason Ng's GSQL program, which taught the use of remote databases on a web server. Rather than disputing that these prior art references teach client-server arrangements, including client-web server arrangements, Kelora contends only that these references do not teach resubmission.

Accordingly, the Court finds that client-server systems were known at the time of invention to people of ordinary skill in the art, were obvious to try and were taught by prior art.

d.   Resubmission

Similarly, the Court concludes that resubmission of all search terms was a method taught by the prior art to resolve the problem of statelessness.

"A 'stateless' server does not remember previous requests from a user." Larson II Decl. ¶ 26. Thus, from the perspective of the server, each request is treated independently and is unrelated to any other. <u>Id.</u> "For example, if a user submits search criteria to a stateless server, the server conducts a search, returns the search results to the user, and then 'forgets'

31

both the search and the results." <u>Id.</u>  The HTTP protocol used on the Web is a stateless protocol.  <u>See, e.g.,</u> Leventhal Decl. Ex. 8 at 1.  Defendants offer evidence to support that persons of ordinary skill in the art knew of the Web's use of stateless servers.  Larson II Decl. ¶ 35.

Such a design had critical advantages over a stateful server, such as to reduce the amount of disk storage and memory space required and to simplify crash recovery.  <u>Id.</u> at ¶ 29.  During the reexamination of the '821 patent, the inventors themselves acknowledged disadvantages of stateful servers on the World Wide Web.  <u>See</u> '821 Reexam. Ex. 5 at 10 ("If the webserver has to identify and track individual sessions with each such user in order to know what criteria the user previously searched in earlier search iterations, there is clearly a tremendous overhead load on the webserver to service such individual search sessions.").

As previously stated, the Arnett reference consists of a message written by Mr. Arnett in May 1994 on the WWW-Talk listserve.  "At the time of the invention, listserves were a venue for discussion by active implementers of particular systems or protocols."  Larson II Decl.  "WWW-Talk was one of the primary venues for discussion of WWW implementation issues."  <u>Id.</u>  In the message, Arnett remarks in part,

> I'm working on an application that would take advantage of this sort of capability, but I don't think it requires abandonment of statelessness.  My experience so far tells me that when the user wants to perform multiple queries and transfers, it's because they are somehow related to one another.  I'm attacking the problem by passing parameters, which are kept by the *browser* and re-sent.  I see the need for improvement of the browsers' ability to keep track of queries and

1
2
3
4
5
6
7

> such, based on interaction, rather than a need to change
> the servers' capabilities in that area. . . .
>
> At first glance, you'd think that that would require the
> server to record the state of the outline, but the
> people who've done it actually just create a document
> that contains a list of parameters describing the
> outline's state, then pass those parameters back to the
> server on each subsequent query. . . .
>
> There's no reason that the subsequent query can't pass
> back to the server a set of parameters that describes
> the previous search results, to which new narrowing or
> widening parameters can be added.

8 Arnett Declaration, Ex. A at 1-2.  Defendants contend, and their

9 expert, Dr. Larson, supports that this constitutes resubmission.

10    Kelora responds that Arnett does not teach resubmission for

11 several reasons.  Kelora argues that Arnett teaches several

12 different approaches to keeping previous search results, only one

13 of which is resubmission of the original search terms along with

14 the new search terms and that this would not have been the single

15 solution necessarily chosen by a person of ordinary skill in the

16 art.  However, "mere disclosure of alternative designs does not

17 teach away."  In re Fulton, 391 F.3d 1195, 1201 (Fed. Cir. 2004).

18 Kelora concedes that Arnett discloses that "a client can resend

19 certain parameters," admitting that Arnett describes a

20 resubmission by a client.  Kelora asserts instead that Arnett

21 "teaches away" from resubmission by a server.  Sur-reply at 6.

22 This argument is premised on Kelora's argument for a construction

23 that limits "resubmission" to something that a server does.

24 Because the Court has already declined to adopt this construction,

25 Kelora's argument is unavailing.

26    Kelora also contends that there may have been solutions to

27 the problem of statelessness that would not have involved

28 resubmission.  See, e.g., Gafford II Decl. ¶ 15.  However, the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  fact that there are multiple solutions, only one of which was
2  resubmission, does not mean resubmission was not obvious to try.
3  As the Supreme Court recognized in <u>KSR</u>, "When there is a design
4  need or market pressure to solve a problem and if there are a
5  finite number of identified, predictable solutions to a problem, a
6  person of ordinary skill has good reason to pursue the known
7  options within his or her technical grasp."  550 U.S. at 421.

8      Kelora finally argues that, even though Arnett suggests that
9  the client resubmit all earlier parameters in a successive search,
10  the discussion in Arnett is not clear and at a high level of
11  abstraction, without specific guidance as to how a person of
12  ordinary skill at that time would be able to perform a
13  resubmission.  However, Arnett provides the same level of detail
14  as the specification of the '821 patent itself does regarding how
15  resubmission is performed.  As background, the specification
16  explains that, when a user makes a first selection,

17     the server 125 sends a feature screen status 127 to the
18     client 126.  The feature screen status 127 comprises a
    feature screen code, ScreenNum 102 in a preferred
19     embodiment, all features 5 appropriate to the feature
    screen 9 specified in ScreenNum 102, all available
20     alternatives 7, all unavailable alternatives 8, and the
    selection criteria 14. . . . It is apparent, therefore,
21     that the server 125 sends all of the information
    necessary to define the current subfamily 2 to the
22     client 126.  The information, therefore need not be
    retained in memory on the server 125.  This particular
    feature renders it particularly appropriate for an
23     Internet environment.

24  Mot., Ex. 2, at 18:49-61.  <u>See also</u> '821 Reexam. Ex. 5 at 10.  The
25  specification goes onto state that the user may then select a
26  further criteria, "generating a selection criteria 14 different
27  from that which was set [sic] to it.  The client 126 initiates a
28  search with the modified selection criteria 14.  The client 126

sends to the server 125, the ScreenNum 102 value sent to it by the server, and the modified selection criteria," the resubmission, which the server then uses to execute the search.  Mot., Ex. 2, at 18:64-19:5.  This is a level of detail analogous to that in the Arnett reference.  <u>Lockwood</u>, 107 F.3d at 1570 (rejecting patentee's arguments where the "patent itself does not disclose the level of detail that [the patentee] would have us require of the prior art").  Further, the fact that the patent did not explain how to perform resubmission implies that persons of ordinary skill in the art would know how to do so.  <u>See</u> <u>Spectra-Physics, Inc. v. Coherent, Inc.</u>, 827 F.2d 1524, 1534 (Fed. Cir. 1987) ("A patent need not teach, and preferably omits, what is well known in the art.").

Defendants' expert provides evidence that a person of ordinary skill in the art at the time of the invention would have been able to implement resubmission in a web server arrangement, through one of several known design methods.  <u>See</u> Larson II Decl. ¶¶ 44-50.  Kelora and its expert do not dispute this fact, and argue only that a person of ordinary skill would not have been able to implement resubmission with the source code of the AMP Navigator demonstration program.  This argument does not raise a dispute of material fact, as already addressed.

Thus, Defendants have demonstrated that the Arnett reference taught a person of ordinary skill at the time of the invention of the re-examined '821 claims that resubmission was one available approach to address the issue of statelessness and that it was within the technical grasp of such a hypothetical person.

United States District Court
For the Northern District of California

e.   Motivation to combine prior art references

"Generally, a party seeking to invalidate a patent as obvious must demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so." In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig., 2012 U.S. App. LEXIS 7571, at *10 (Fed. Cir.) (internal citations omitted).   In KSR, the Supreme Court emphasized that this is to be a "flexible inquiry" in which a court should "take account of 'the inferences and creative steps,' or even routine steps, that an inventor would employ." Ball Aerosol & Spec. Container v. Ltd. Brands, 555 F.3d 984, 993 (Fed. Cir. 2009).   See also Perfect Web Techs., Inc. v. InfoUSA, Inc., 587 F.3d 1324, 1329 (Fed. Cir. 2009) (noting the obviousness inquiry may "include recourse to logic, judgment, and common sense available to the person of ordinary skill that do not necessarily require explication in any reference or expert opinion").

Defendants offer evidence that one of ordinary skill in the art would have been motivated to combine the teachings of AMP Navigator with a client-server arrangement.   See Larson II Decl. ¶¶ 32-33.   As previously noted, this is further supported by the opinion of the patent examiner.   See '444 Prosecution, No. 7 ¶ 28. Kelora does not offer any evidence creating a material dispute of fact as to this point.   While Kelora's expert, Mr. Gafford, opines that a person of ordinary skill would not have reason to combine the Suzuki client-server arrangement with AMP Navigator, he states that this is because Suzuki teaches nothing not already contained

in AMP Navigator, "other than, possibly, a remote database."
Gafford Decl. ¶ 43.  He offers no evidence to dispute that a
person of ordinary skill in the art would be motivated to combine
these.  He further concedes that, combining the two, one of
ordinary skill in the art would be expected to achieve "a system
with the logical model of the AMP Navigator demonstration program,
. . . coupled with a remote database."  Id.

Defendants also offer evidence that persons of ordinary skill
in the art would have been motivated to adapt a client-server
arrangement to the Internet.  Larson II Decl. ¶ 36.  Kelora's
expert does not challenge this basic motivation.  See Gafford
Decl. ¶ 47 ("Motivation to adapt applications, in general, to the
web, is not contested.").

Finally, as discussed above, the Arnett reference describes
the concept of resubmission as being a potential solution for the
then-known problem of statelessness with web server protocols, and
thus provides motivation to combine resubmission with a client-web
server arrangement.  Further, as previously found, a person of
ordinary skill in the art would have expected to achieve success
in doing so.  The Court has already addressed and rejected
Kelora's arguments against these findings.

Accordingly, the Court finds that there are no genuine issues
of materially disputed facts as to whether there was a motivation
to combine the various teachings.

       f.   Cumulative to references before the
           Examiner

Kelora argues that Defendants' proffered prior art references
are cumulative to those before the Patent Examiner and that this

United States District Court
For the Northern District of California

Court should defer to the Examiner's decision to grant the reexamination certificate over those teachings.

The Court declines to do so because, as Defendants pointed out at the hearing and in their renewed motion, the primary prior art references relied on by this Court were either not submitted, or not explained, to the Examiner. The Arnett reference was not given to the Examiner. Further, the AMP Navigator prior art was not before the Examiner, because re-examinations are limited to prior art patents or printed publications, and not public use or sale. See Manual of Patent Examining Procedure § 2258. While the Suzuki reference was before the Examiner, it was not discussed or addressed by the patentees, and "the requisite degree of consideration to be given to such information will be normally limited by the degree to which the party filing the information citation has explained the content and relevance of the information." Id. § 2256.

3. Secondary considerations of obviousness

Kelora argues that evidence of the commercial success of the claimed invention precludes summary judgment. While such evidence may be relevant "to the overall obviousness determination, . . . a nexus must exist between the commercial success and the claimed invention." Tokai Corp. v. Easton Enters., 632 F.3d 1358, 1369 (Fed. Cir. 2011) (internal citations omitted). "If commercial success is due to an element in the prior art, no nexus exists." Id. (citations omitted). Kelora points specifically to the declaration of Mr. Danish, discussing the commercial success of the "guided parametric search technology" in the '821 patent. Danish Decl. ¶¶ 2-10. However, that feature was part of the

United States District Court
For the Northern District of California

original patent which was previously put into the public domain through Mr. Danish's offer for sale.  Kelora points to no evidence that suggests commercial success due to elements not in the prior art.

Further, even if Kelora had offered evidence of a nexus, such evidence would be insufficient to overcome the strong showing of obviousness made here.  See Media Techs. Licensing, LLC v. Upper Deck Co., 596 F.3d 1334, 1339 (Fed. Cir. 2010) ("a highly successful product alone would not overcome the strong showing of obviousness").

> 4.   The dependent claims

For the foregoing reasons, the Court finds that there is no material dispute of fact that claims one and nine are invalid due to obviousness.  Defendants make additional arguments as to why the modifications of dependent claims two, three and four are also obvious.  However, Kelora disputes the obviousness of the dependent claims only to the extent that it disputes the obviousness of the re-examined claims one and nine.  Thus, because the Court has found that claims one and nine are obvious, there is also no material dispute of fact that the dependent claims are obvious as well.

> C.   Summary Judgment of Non-Infringement and of Invalidity on other grounds

Because the Court has concluded that claims one through four and nine are invalid due to obviousness, the remainder of Defendants' motion, to the extent it seeks summary judgment of invalidity on other grounds and of non-infringement, is moot. See, e.g., Princeton Biochems., Inc. v. Beckman Coulter, Inc., 411

United States District Court
For the Northern District of California

F.3d 1332, 1339-40 (Fed. Cir. 2005)("Because claim 32 is invalid
for obviousness, this court need not reach the issues of prior
invention and infringement."); <u>Richdel, Inc., v. Sunspool Corp.</u>,
714 F.2d 1573, 1580 (Fed. Cir. 1983)("The claim being invalid,
there is nothing to be infringed.").  Thus, the Court does not
reach Defendants' other arguments.

CONCLUSION

For the reasons set forth above, the Court construes the
disputed claim language in the manner explained and GRANTS
Defendants' motion for summary judgment of invalidity (Docket Nos.
94 in 10-4947, 57 in 11-1398 and 361 in 11-1548).  The Clerk shall
enter judgment and close the file.  Defendants shall recover their
costs from Kelora.

IT IS SO ORDERED.

Dated: 5/21/2012

CLAUDIA WILKEN
United States District Judge